# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

───────────────────────────────

JOHN RAPP,

                Plaintiff,

     v.

MARLO BARBOZA and THOMAS HASKELL,

                Defendants.

Civil Action No.
9:13-CV-0599 (NAM/DEP)

───────────────────────────────

APPEARANCES:                      OF COUNSEL:

FOR PLAINTIFF:

JOHN RAPP, *Pro se*
13-A-2819
Washington Correctional Facility
Box 180
Comstock, NY 12821

FOR DEFENDANTS:

FITZGERALD MORRIS BAKER       JOSHUA D. LINDY, ESQ.
FIRTH, P.C.
P.O. Box 2017
16 Pearl Street
Glens Falls, NY 12801

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

*Pro se* plaintiff John Rapp, a prison inmate formerly held as a pretrial detainee at the Washington County Correctional Facility ("WCCF"), has commenced this action against two corrections workers employed at the facility, pursuant to 42 U.S.C. § 1983, alleging that they deprived him of his civil rights. In his complaint, as twice amended, *inter alia*, plaintiff alleges that Corrections Inspector Marlo Barboza and Mail Room Officer Thomas Haskell violated his rights under the First Amendment to the United States Constitution by denying him access to certain types of books and magazines.

Currently pending before the court is a motion by defendants Barboza and Haskell for summary judgment dismissing plaintiff's remaining claims in the action. In their motion, defendants argue that (1) plaintiff failed to exhaust his administrative remedies with respect to a portion of his claim, (2) no reasonable factfinder could conclude plaintiff's First Amendment rights were violated based upon the record now before the court, and (3) in any event they are entitled to qualified immunity from suit. For the reasons set forth below, I recommend that defendants' motion be granted.

## I. BACKGROUND[1]

At the times relevant to his claims in this action, plaintiff was a pretrial detainee at the WCCF as a result of his arrest for third degree sale of a controlled substance. Dkt. No. 49-9 at 2-3. In his complaint, as amended, plaintiff alleges that on or about February 12, 2013, defendant Haskell, a mail room officer, denied him access to certain magazines, including American Curves, Maxim, XXL, Playboy, and the Sports Illustrated Swimsuit Edition, as well as the book *One Flew Over The Cuckoo's Nest.* Plaintiff was also advised that he could not possess the requested magazines while at the facility because of their sexually explicit nature and that defendant Barboza maintained a list of prohibited materials.[2] *Id.* at 7. According to the plaintiff, defendant Haskell also responded that the book *One Flew Over The Cuckoo's Nest* could not be obtained because it "involved a break out from a mental hospital." Dkt. No. 30 at 7-8. Plaintiff also alleges that he asked defendant Haskell whether he could have books provided to him by others, and was advised that such

---

[1]    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

[2]    There is evidence in the record showing that defendant Barboza did not maintain any such list. Dkt. No. 49-7 at 2, 4-5; Dkt. No. 49-9 at 14. Moreover, defendant Haskell denies ever having any conversations with plaintiff regarding his access to printed materials and publications. Dkt. No. 49-8 at 2-3, 5; Dkt. No. 49-9 at 15.

materials must be obtained from a vendor. *Id.* at 8.

It is undisputed that all inmates housed at the WCCF are provided with a jail handbook that explains facility policies, including those concerning books, magazines and periodicals, and that the handbook expressly prohibits inmates from receiving printed material and/or publications that present a "clear and present danger" to the safety of the facility, staff, inmates or the general public. Dkt. No. 49-9 at 3-4. Included in the handbook's list of prohibited material that might present such a "clear and present danger" are "sexually explicit material, nude photographs or any other offensive content" and "publications that advocate or condone illegal or socially unacceptable conduct." *Id.* The handbook also requires that "[a]ll books, magazines and periodicals . . . be of a paperback version received directly from a recognized vendor through the mail." *Id.* Supplementing the handbook setting forth these policies is an Operations Manual, which also provides similar guidelines regarding printed materials and publications. *Id.* at 4-5.

Plaintiff filed a grievance regarding the denial of his right to possess the specific magazines at issue on February 10, 2013. Dkt. No. 49-6 at 10; *see also* Dkt. No. 30 at 7; Dkt. No. 49-6 at 46-47. That grievance was investigated and adjudicated by Sergeant Michael S. Harp on February 14, 2013. Dkt. No. 49-6 at 10; *see also* Dkt. No. 49-6 at 49. During the

course of his investigation, Sergeant Harp met with plaintiff to discuss how publications with sexually explicit and provocative pictures and advertisements can be used as barter and may cause less fortunate individuals to resort to violence to obtain such publications even though they are not allowed to possess other inmate's items. Dkt. No. 49-6 at 10-11. Sergeant Harp advised plaintiff that inmates are not allowed to possess magazines that are "found to be offensive due to their explicit nature or deemed to be a risk to the safety, security and good order of the facility." *Id.* at 10. Based on his finding that the content of the magazines were "deemed as a risk to the safety, security and good order of the facility because of sexually explicit photos and articles about promoting contraband, making weapons, escaping and . . . illegal activities," Sergeant Harp concluded that plaintiff's grievance was "unfounded." *Id.* at 11. That determination was upheld on appeal to Michael Gates, the Chief Administrator of the WCCF, on February 26, 2013, and to the Citizen's Policy and Complaint Review Council, on April 16, 2013. *Id.* at 12; *see also* Dkt. No. 49-6 at 51, 55.

On February 28, 2013, plaintiff filed a grievance requesting that he be allowed access to books and publications from all sources. Dkt. No. 49-6 at 13; *see also* Dkt. No. 49-6 at 57. He also grieved the fact that Bibles are not provided in every cell, and complained about the lack of a facility

library.[3] *Id.* Plaintiff's February 28, 2013 grievance was investigated and adjudicated on March 4, 2013 by Sergeant DiDio, who found nothing improper about the policy at WCCF requiring that all publications must be secured from an authorized vendor such as Barnes and Noble or Amazon.com, and concluded that plaintiff's grievance was "unfounded." Dkt. No. 49-6 at 13-14; *see also* Dkt. No. 49-6 at 60. That determination similarly was upheld on appeal to the Chief Administrator Gates on March 11, 2013, and the Citizen's Policy and Complaint Review Council, on April 16, 2013. Dkt. No. 49-6 at 14-15; *see also* Dkt. No. 49-6 at 61, 64.

While plaintiff fully exhausted his administrative remedies with respect to the grievances filed on or about February 12, 2013 and February 28, 2013, no grievance was ever filed by him with respect to the alleged decision by defendant Haskell to deny him permission to receive a copy of the book *One Flew Over the Cuckoo's Nest*. Dkt. No. 49-6 at 15.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on May 24, 2013, asserting only claims for injunctive relief based on his having been denied the ability to receive books and magazines from various outside sources during his confinement at the WCCF, and requesting leave to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1, 2. Upon review of plaintiff's complaint, and in

---

[3]    Plaintiff has not raised those issues in his second amended complaint.

light of his transfer out of the WCCF and into the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), Senior United States District Judge Norman A. Mordue concluded that plaintiff's claims for injunctive relief were moot and conditionally dismissed his complaint, though affording plaintiff the opportunity to file an amended complaint. Dkt. No. 8.

Plaintiff subsequently filed an amended complaint, which set forth numerous claims arising out of his confinement at the WCCF and sought an award of money damages. Dkt. No. 10. In a decision and order filed March 24, 2014, the court concluded that the amended complaint could not survive *sua sponte* review under 28 U.S.C. §§ 1915(e) and 1915A. *See* Dkt. No. 23. In light of plaintiff's *pro se* status and his good faith effort to comply with the court's prior decision, Rapp was afforded a final opportunity to submit an amended complaint. *Id.*

Plaintiff submitted a second amended complaint ("SAC") on July 18, 2014. Dkt. No. 30. In that SAC, which is the operative pleading, plaintiff named as defendants Warren County Sheriff Nathan York, Warren County Sheriff's Office Captain Mike Gates, Warren County Correctional Facility Sergeant Diddio, Warren County Correctional Facility Sergeant Spring, Warren County Correctional Facility Sergeant Farmer, Warren County Correctional Facility Sergeant Tanner, Warren County Correctional Facility

Sergeant Keays, Warren County Correctional Facility Officer Feldsen, Warren County Correctional Facility Officer Perelli, Warren County Correctional Facility Officer Harp, Warren County Correctional Facility Sergeant Rainville, Warren County Correctional Facility Mail Room Officer Thomas Haskell, Warren County Correctional Facility Inspector Marlo Barboza, and Lisa "Doe." *Id.* In his SAC, plaintiff chronicles various incidents at the WCCF, spanning almost one year in time, that give rise to his claims. The causes of action set forth in that pleading include the claim against defendants Barboza and Haskell for violation of his First Amendment rights, which is the subject of the motion now before the court.

On March 25, 2015, the court issued an order accepting plaintiff's SAC for filing and *sua sponte* dismissing certain causes of action in his complaint pursuant to 28 U.S.C. §§ 1915(e) and 1915A. Dkt. No. 36. As a result of that decision, plaintiff's only remaining claim is for violation of his rights under the First Amendment, asserted against defendants Haskell and Barboza. *Id.*

On December 7, 2015, following the close of discovery, defendants moved for the entry of summary judgment. Dkt. No. 49. Thereafter, plaintiff filed three requests to extend his deadline to respond to defendants'

motion, all of which were granted for good cause.[4] Plaintiff's third request was granted on January 28, 2016 in a text order, which advised that his new response deadline of March 3, 2016 was "FINAL." Dkt. No. 58. Despite having been granted the third extension, plaintiff failed to respond to defendants' motion. Rather, on March 2, 2016, the day before the expiration of his response deadline, plaintiff filed a letter motion requesting permission to withdraw his action without prejudice based on his inability to timely respond to defendants' motion. Dkt. No. 59.

On March 3, 2016, a text order was issued directing defendants' counsel to prepare a stipulation of dismissal and serve it on plaintiff on or before March 10, 2016, and further directing plaintiff to either sign the stipulation and file it with the court, on or before March 17, 2016, or file a letter indicating why he is unwilling to sign this document by that same date. Dkt. No. 61. On March 17, 2016, defendants served plaintiff with a stipulation of discontinuance with prejudice. Dkt. No. 62. Instead of signing the stipulation, plaintiff filed a letter on April 28, 2016, requesting an extension until July 28, 2016 to respond to defendants' motion for summary judgment. Dkt. No. 64. That request was denied by text order issued on May 2, 2016. Dkt. No. 66.

---

4       Plaintiff filed his first request on or about December 28, 2015; the second request was made on January 11, 2016; and the third request was received on January 27, 2016. *See* Dkt. Nos. 51, 54, and 57.

Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

A.   Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be

decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B.    <u>Plaintiff's Failure to Oppose Defendants' Motion</u>

Before turning to the merits of defendants' arguments, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose defendants' summary judgment motion, and specifically whether that failure automatically entitles defendants to summary judgment

dismissing plaintiff's complaint.

This court's rules provide that

> [w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3). Undeniably, *pro se* plaintiffs are entitled to some measure of forbearance when defending against summary judgment motions. *See Jemzura v. Public Serv. Comm'n,* 961 F. Supp. 406, 415 (N.D.N.Y. 1997) (McAvoy, C.J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with Local Rule 7.1(b)(3). *Robinson v. Delgado*, No. 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.); *Cotto v. Senkowski*, No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian*, 980 F. Supp.106, 106-07 (N.D.N.Y. 1997) (Pooler, J. & Hurd, M.J.). When a non-moving party fails to respond to a motion for summary judgment, the movants' burden on their motion "is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a 'modest' burden." *Henry v. Dinelle, et al.*, 10-CV-0456, 2011 WL 5975027, *10 (N.D.N.Y. Nov. 29, 2011) (quoting *Xu-Shen Zhou*

*v. S.U.N.Y. Inst. of Tech.*, 08-CV-0444, 2011 WL 4344025, at *11 (N.D.N.Y. Sep. 14, 2011), *vacated in part on other grounds by* 499 F. App'x 105 (2d Cir. Oct. 10, 2012)). Accordingly, absent a showing of good cause defendants' unopposed summary judgment motion should be granted, if determined to be facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 231-32 (N.D.N.Y. 2000) (Scullin, C.J.); *Leach v. Dufrain*, 103 F. Supp. 2d 542, 545-46 (N.D.N.Y. 2000) (Kahn, J.); *Henry v. Dinelle, et al.*, 10-CV-0456, 2011 WL 5975027, *10 (N.D.N.Y. Nov. 29, 2011) (quoting *Xu-Shen Zhou v. S.U.N.Y. Inst. of Tech.*, 08-CV-0444, 2011 WL 4344025, at *11 (N.D.N.Y. Sep. 14, 2011), *vacated in part on other grounds by* 499 F. App'x 105 (2d Cir. Oct. 10, 2012)).

It should also be noted that the plaintiff's failure to properly oppose defendants' summary judgment motion is not without further consequences. By failing to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statement unchallenged, thus permitting the court to deem these facts to have been admitted.[5] *See Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing

---

[5] Local Rule 7.1(a)(3) provides that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." *See* N.D.N.Y.L.R. 7.1(a)(3)(emphasis in original).

cases); *see also Monahan v. New York City Dep't of Corrs.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).

Based upon plaintiff's failure to oppose defendants' motion, I recommend that the court review the motion for facial sufficiency, accepting defendants' assertions of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted to the extent they are supported by accurate record citations, and that the motion be granted if determined to be facially meritorious.

C.      Failure to Exhaust Available Administrative Remedies

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) ("Exhaustion is . . . mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley*, No. 04-CV-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition

precedent to any suit challenging prison conditions, including suits brought under Section 1983.").

"[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). In the event the defendant establishes that the inmate plaintiff failed "to fully complete[] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).

At the time defendants filed their motion, the law within this circuit required an analysis pursuant to a three-part test for determining whether dismissal of an inmate plaintiff's complaint was warranted based upon his failure to satisfy the PLRA's exhaustion requirement. *See Macias*, 495 F.3d at 41-42; *Hemphill v. New York*, 380 F.3d 680, 688-89 (2d Cir. 2004). That test had been articulated by the Second Circuit as follows:

> Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact available to the prisoner. The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense. If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements.

*Hemphill*, 380 F.3d at 686. Since *Hemphill* and its companion cases were decided, the "special circumstances" exception to the exhaustion requirement has been rejected by the Supreme Court.[6] *See Ross v. Blake,* 136 S. Ct. 1850, 1858 (2016). Whether non-exhaustion is excusable now exclusively "hinges on the 'availab[ility]' of administrative remedies." *Id.*

The Supreme Court has identified three circumstances in which administrative remedies may be "unavailable." *Id.* at 1859-1860. First, administrative procedures are unavailable when they "operate[] as a simple dead end – with officers unable or consistently unwilling to provide

---

[6]     *Hemphill* was decided in 2004 as one of the several cases addressing exhaustion. The other companion cases were *Giano v. Goord*, 380 F.3d 670 (2d Cir. 2004); *Abney v. McGinnis*, 380 F.3d 663 (2d Cir. 2004); *Johnson v. Testman*, 380 F.3d 691 (2d Cir. 2004); and *Ortiz v. McBride*, 380 F.3d 649 (2d Cir. 2004).

any relief[.]" *Id.* at 1859. Second, they are unavailable when "an administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use." *Id.* Third, they are unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation or intimidation." *Id.* at 1860.

With one exception, plaintiff's claims are based upon circumstances that were the subject of grievances filed by the plaintiff, and pursued to completion. Plaintiff's SAC asserts a cause of action for violation of his rights under the First Amendment based on defendant Haskell's refusal to obtain a copy of the book *One Flew Over The Cuckoo's Nest.* In support of their motion seeking dismissal of that claim, defendants have adduced record evidence, in the form of an affidavit from WCCF Jail Administrator Michael Gates, showing that plaintiff failed to file a grievance related to defendant Haskell denying him access to that book. Dkt. No. 49-6 at 15. The record evidence further establishes that a grievance procedure was available to plaintiff, and that, in fact, plaintiff utilized the grievance procedure on the same day that he was allegedly denied that book to grieve about defendant Haskell denying him access to magazines. Dkt. No. 49-6 at 46-47. The record additionally shows that plaintiff utilized the grievance procedure on fifteen other occasions in 2013. *See* Dkt. No. 49-6

at 84-163.

Plaintiff has failed to offer any excuse for his failure to grieve defendant Haskell's alleged denial of his request to obtain a copy of the book *One Flew Over The Cuckoo's Nest.* Nor is there anything in the record to support a finding that the grievance procedure in place at the WCCF was not available to the plaintiff. Accordingly, I recommend that plaintiff's claim based on defendant Haskell's alleged denial of plaintiff's request to obtain a copy of the book *One Flew Over The Cuckoo's Nest* be dismissed for failure to exhaust administrative remedies.

    D.    <u>Analysis of Plaintiff's First Amendment Claims</u>

In his SAC, plaintiff alleges that defendant Barboza maintained a predetermined list of prohibited materials on which defendant Haskell relied in depriving Rapp of certain requested magazines. Dkt. No. 30 at 7. Plaintiff also complains about a policy at the WCCF that limits the manner in which inmates may access books and other publications.[7] *Id.* at 8. Plaintiff's SAC is nonetheless ambiguous, in that it does not clearly state whether he is challenging the existence of a WCCF policy restricting inmate access to "sexually explicit material, nude photographs or any

---

[7]    Defendant Haskell has denied having had any conversation with plaintiff regarding his access to printed materials and publications at the WCCF. Dkt. No. 49-8 at 3. Since plaintiff's SAC is sworn to under penalty of perjury, Dkt. No. 30 at 13, however, and flatly contradicts the denial, an issue of fact exists, and I must assume for purposes of deciding this motion that such a conversation occurred.

other offensive content" or instead the application of that policy. In addressing defendants' motion, I will analyze both issues as they arise under the First Amendment.

## 1. Facial Validity

It is well-settled that the First Amendment serves to protect the flow of information to prisoners; thus, any limitations on prisoner access to information must be reasonably related to a legitimate penological interest. *See Turner v. Safley*, 482 U.S. 78, 89-90 (1987); *see also Thornburgh v. Abbott*, 490 U.S. 401, 407-08 (1989); *Bell v. Wolfish*, 441 U.S. 520, 545, 550-51 (1979). The Supreme Court has identified certain factors that inform the issue of whether a prison regulation reasonably relates to a legitimate penological interest, including whether (1) there exists a rational relationship between the regulation and the proffered legitimate governmental interest; (2) inmates have available alternative means of exercising their asserted rights; (3) accommodating the asserted constitutional right will have a significant "ripple effect" on fellow inmates or prison staff, and the allocation of prison resources; and (4) alternative means exist for the prison to easily serve its interests that would not infringe upon the rights of prisoners. *See id.* at 89-90; *Giano v. Senkowski*, 54 F.3d 1050, 1053-1054 (2d Cir. 1995). Courts have applied this four-factor test, developed principally to apply in cases involving convicted

inmates, to regulations impacting pretrial detainees as well. *See, e.g.*, *Mauro v. Arpaio*, 188 F.3d 1054, 1058-1060 (9th Cir. 1999) (applying *Turner* factors to First Amendment free exercise claim brought by pretrial detainee); *see also Bell*, 441 U.S. at 536-38 (noting that proper inquiry in determining constitutionality of conditions of pretrial detention is whether such conditions amounted to punishment of detainee, which depends on whether conditions were imposed for the purpose of punishment or were merely incidents of some other legitimate governmental purpose).

In the instant case, defendants have articulated a legitimate penological interest in prohibiting inmates housed at the WCCF from having access to sexually explicit material. The interest identified seeks to reduce the incidence of inmate violence.[8] Dkt. No. 49-6 at 49, Dkt. No. 49-10 at 14. A rational relationship between prohibiting inmates from accessing sexually explicit material and the legitimate interest in reducing inmate violence exists because, as was explained to plaintiff by Sergeant Michael Harp, the introduction of sexually explicit material into a prison setting would likely be regarded as permitting possession of a commodity

---

[8]     Plaintiff does not dispute that prison safety and security are legitimate penological interests. *See also Campos v. Coughlin*, 854 F.Supp. 194, 207 (S.D.N.Y. 1994) ("[P]rison security and penological institutional safety goals are indeed a most compelling governmental interest."); *Muhammad v. Coughlin*, 904 F.Supp. 161 (S.D.N.Y. 1995) (finding compelling interest in internal order in prisons); *Breland v. Goord*, No. 94 Civ. 3696, 1997 WL 139533, at *4 (S.D.N.Y. March 27, 1997) ("There is no question that prison safety and security are legitimate penological interests.").

in high demand, which "may be used as barter and may cause less fortunate [inmates] to resort to violence to obtain such publications." Dkt. No. 49-6 at 49. The fact that a determination of whether material is "sexually explicit" is made on a "case by case basis," Dkt. No. 49-8 at 3, bolsters defendants' claim, evidencing an intent by the WCCF policymakers to ensure that restrictions are rationally related to the legitimate objective.[9]

The second *Turner* factor is not dispositive in this case. While there are no alternative means for inmates at WCCF to access sexually explicit materials, a blanket restriction on materials that create a safety risk at a prison facility does not alone render the limitation unconstitutional, particularly where, as here, inmates are allowed access to a broad range of other publications. *See, e.g., Thornburgh*, 490 U.S. at 403-05, 417 (upholding the facial validity of regulations barring "sexually explicit material which by its nature or content poses a threat to the security, good order, or discipline of the institution, or facilitates criminal activity" and concluding that the second *Turner* factor was satisfied because "the

---

[9] Commission of Correction Minimum Standards Section 7026.2 subsection (e) provides that "[w]hen the introduction into a facility of any printed material or publication is thought to constitute a threat to the safety, security or good order of the facility, such printed material or publication shall be forwarded to the chief administrative officer. The chief administrative officer shall read and review such printed material and shall make a determination as to whether it shall be censored." 9 NYCRR § 7026.2.

regulations at issue in the present case permit a broad range of publications to be sent, received, and read").

With respect to the third *Turner* factor, it is foreseeable that allowing inmates to access sexually explicit material could have a significant ripple effect on fellow inmates and prison staff through an increased incidence of violence and unwanted inmate bartering. *See, e.g., Thornburgh*, 490 U.S. at 418.

As it relates to the fourth *Turner* factor, plaintiff has not offered an argument for an alternative that fully accommodates prisoners' rights with respect to accessing sexually explicit materials at *de minimis* cost to valid penological interests. As such, there is no proof in the record that the WCCF's policy regarding sexually explicit material represents "an 'exaggerated response' to the problem at hand." *Thornburgh*, 490 U.S. at 418.

Having examined the relevant factors, and because plaintiff has failed to adduce record evidence showing that denying him access to the desired magazines was for the purpose of punishment, as opposed to in furtherance of a legitimate governmental purpose, I conclude that the WCCF's policy regarding sexually explicit materials is not constitutionally improper. Accordingly, I recommend dismissal of plaintiff's First Amendment claim to the extent it is based on alleged facial

unconstitutionality of the WCCF's policy.[10]

## 2. Validity as Applied

To the extent that the plaintiff is complaining regarding the application of the policy, his claim against defendant Barboza is based solely on a hearsay statement allegedly made to him by defendant Haskell, suggesting that defendant Barboza maintains a list of prohibited materials. Dkt. No. 30 at 7. The record evidence adduced by defendants shows that defendant Barboza did not maintain any such list and, further, that determinations regarding what constitutes sexually explicit material are made on a case by case basis. Dkt. No. 49-7 at 2-3. Since there exists no admissible evidence in the record showing that defendant Barboza played any role in the alleged determination that the magazines requested by the plaintiff constitute sexually explicit material, I recommend that plaintiff's claim against her arising from her alleged unconstitutional application of the WCCF's policy be dismissed for lack of personal involvement. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("Personal involvement of defendants in alleged constitutional deprivations

---

[10] Since defendants Haskell and Barboza are not policymakers, plaintiff's claim against them should alternatively be dismissed for lack of personal involvement to the extent it is based on the existence of the policy, as distinct from its application. *See, e.g., Gabriel v. County of Herkimer*, 889 F.Supp.2d 374, 396 (N.D.N.Y. 2012) (concluding that a nurse who was "not a policymaker" could not "be liable for any unconstitutional policies of the County, should they be found"); *Zikianda v. County of Albany*, 12-cv-1194, 2015 WL 5510956, at *26 (N.D.N.Y. Sept. 15, 2015).

is a prerequisite to an award of damages under [section] 1983."); *Selah v. Fischer*, 09-cv-1363, 2015 WL 1893340, at *9 (N.D.N.Y. Apr. 15, 2015) (Report-Recommendation of Peebles, M.J., adopted by Sharpe, C.J.) ("Because the record is lacking in any evidence of defendant Fischer's personal involvement in the decisions rendered that allegedly denied plaintiff the right to exercise his chosen religion, I recommend that all claims against him be dismissed.").

Plaintiff's claim against defendant Haskell fares no better. In his SAC, plaintiff claims that he asked defendant Haskell whether he could receive magazines such as the Sports Illustrated Swimsuit Edition, Playboy, Maxim, American Curves, and XXL and was told that they were prohibited based upon a list prepared by defendant Barboza. Dkt. No. 30 at 7. In his affidavit, defendant Haskell expressly contradicts that allegation, stating "[p]laintiff Rapp and I never had any conversations whatsoever regarding his access to printing materials and publications." Dkt. No. 49-8 at 3. Based upon these conflicting accounts, an issue of fact exists as to whether the two had a conversation regarding those materials.

Nonetheless, in his SAC plaintiff does not allege that defendant Haskell was the decision-maker who denied him access to the requested magazines. Indeed, plaintiff's SAC is non-specific on this point. In light of the vague allegations in the SAC and the unopposed record evidence

subsequently adduced by defendants, I find that no reasonable factfinder could conclude that defendant Haskell denied plaintiff's request for access to those materials.[11]

Plaintiff's remaining claim relates to enforcement of the WCCF policy that requires "all books, magazines and periodicals to . . . be of a paperback version [and] received directly from a recognized vendor through the mail." Dkt. No. 49-6 at 2-3, 26. Plaintiff alleges that he "asked [defendant] Haskell if [he] could get books dropped off to [him]" and was told that books "had to come from a vendor," which prompted plaintiff to

---

[11]     Even if a factfinder could conclude, based upon the current record, that defendant Haskell denied plaintiff access to the materials determined to be sexually explicit, I would recommend that plaintiff's claim against him be dismissed on the basis of qualified immunity, and specifically based upon the fact that what may constitute "sexually explicit materials" is not so clearly established that a reasonable official would understand that finding the content of a magazine sought by plaintiff to be sexually explicit violates his rights under the First Amendment. *See Prison Legal News v. Stolle*, 13-cv-0424, 2014 WL 6982470, at *15-*16 (E.D. Va. Dec. 8, 2014) (concluding that jail employees were shielded, under the doctrine of qualified immunity, from a claim for money damages based on their determination that "photographs of women and men in lingerie, skimpy swimsuits, or other revealing clothing" constituted "sexually explicit materials" because "the state of the relevant law . . . does not indicate that a jail is prohibited from excluding all incoming publications containing revealing images of individuals in sexual poses overtly intended to sexually arouse the viewer"); *Elfand v. County of Sonoma*, 11-cv-0863, 2013 WL 1007292, at *4 (N.D. Cal. Mar. 13, 2013) (upholding the constitutionality of a jail's censorship of issues of Maxim Magazine and GQ Magazine that displayed pictures of woman and men in "underwear, bikinis, and tight and scant clothing revealing breasts and buttocks" to include an image of a woman in a "see-through bra and 'thong' underwear with her buttocks raised"); *Woods v. Director's Review Committee*, 11-cv-1131, 2012 WL 1098365, at *1, *4 (S.D. Tex. Mar. 30, 2012) (concluding that the defendants were entitled to qualified immunity in a case challenging a Texas prison's censorship of nude photos that had been "blurred in such a way as to disguise or cover up any exposed nudity," noting that there was "no clear statement" in the law that would put an official on notice that it was unlawful to ban such images). Indeed, plaintiff has not argued to the contrary. Nor has plaintiff cited any cases in which prison officials were held to have violated a prisoner's First Amendment rights by withholding similar images.

file a grievance. Dkt. No. 30 at 8. Plaintiff further alleges that he "asked [defendant] Barboza about the policy on May 15, 2012 and she stated that that is how it is and the only person she has to answer to is Sheriff York." *Id*. Plaintiff has not identified what books he wanted dropped off to him, or how defendants otherwise applied the policy in an unconstitutional manner. Rather, plaintiff has alleged only that the defendants told him what he could not do as a general matter due to the existence of the policy. The court therefore construes this aspect of plaintiff's First Amendment claim only as a challenge to the existence of the policy itself, and not as a challenge to the application of that policy.

It is undisputed that neither defendant Barboza nor defendant Haskell are policymakers. Dkt. Nos. 49-7 at 3 and 49-8 at 3. Moreover, there exists no evidence in the record from which a rational factfinder could conclude that either defendant was personally involved in the creation of the paperback vendor policy. Dkt. No. 49-6 at 2; Dkt. No. 49-7 at 3; Dkt. No. 49-8 at 3. Accordingly, plaintiff's claim against them arising from the alleged unconstitutional nature of the paperback vendor policy must be dismissed for lack of personal involvement.[12] *See Gabriel*, 889

---

[12]     Defendants have also articulated a legitimate penological interest in maintaining the policy – that is, to promote internal security by reducing the risk of hidden contraband within the facility. Dkt. No. 49-6 at 5; Dkt. No. 49-9 at 5. In addition, this policy does not ban certain materials altogether, but rather creates an alternative means for an inmate to access these materials, and plaintiff has failed to point to an

F.Supp.2d at 396; *Zikianda*, 2015 WL 5510956, at *26.

IV.   SUMMARY AND RECOMMENDATION

Plaintiff claims that defendants Barboza and Haskell deprived him of access to certain written materials in violation of his First Amendment rights. Plaintiff failed to exhaust his administrative remedies with respect to his claim that he was denied access to a book, and has failed to establish any personal involvement of defendants Barboza and Haskell with respect to his other claims. Plaintiff has also not established that any WCCF policy is unconstitutional and, even assuming defendant Haskell denied Rapp access to magazines deemed to be "sexually explicit materials," this claim should be dismissed on the basis of qualified immunity. Accordingly, it is hereby respectfully

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 49), be GRANTED, and that plaintiff's second amended complaint be DISMISSED.

---

alternative that would more fully accommodate his rights at *de minimis* cost to the facility's valid penological interests. Under such circumstances, plaintiff's First Amendment claim related to the alleged unconstitutionality of the policy should alternatively be dismissed on the merits. *See Jones v. Salt Lake County*, 503 F.3d 1147, 1158-1159 (10th Cir. 2007) (concluding that "the County Jail's paperback book policy, which allows inmates to obtain paperback books from the jail library and, with permission, the publisher, is rationally related to the legitimate governmental objective of prison security [because] [a]llowing inmates to purchase paperback books only from the publisher prevents contraband from being smuggled into the jail and lessens the administrative burden on jail personnel who must inspect each book[,]" noting also the existence of "alternative means of obtaining reading material" where inmates could obtain books from the jail library and possess newspapers and certain magazines).

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:     July 19, 2016
           Syracuse, NY

_____
David E. Peebles
U.S. Magistrate Judge

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Anthony ROBINSON, Plaintiff,

v.

Jane DELGADO, Hearing Officer and Lieutenant; and
Donald Selsky, Director of Inmate Special Housing
Program, Defendants.

No. 96-CV-169 (RSP/DNH).

May 22, 1998.

Anthony Robinson, Veterans Shelter, Brooklyn, for
Plaintiff, Pro Se.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Attorney for Defendants, Albany, Ellen Lacy
Messina, Esq., Assistant Attorney General, of Counsel.

ORDER

POOLER, D.J.

**\*1** Anthony Robinson, a former inmate incarcerated
by the New York State Department of Corrections
("DOCS"), sued two DOCS employees, alleging that they
violated his right to due process in the course of a
disciplinary proceeding and subsequent appeal. On
September 9, 1997, defendants moved for summary
judgment. Defendants argued that plaintiff failed to
demonstrate that the fifty days of keeplock confinement
that he received as a result of the hearing deprived him of
a liberty interest within the meaning of the Due Process
Clause. Plaintiff did not oppose the summary judgment
motion, and Magistrate Judge David N. Hurd
recommended that I grant it in a report-recommendation
filed April 16, 1998. Plaintiff did not file objections.

Because plaintiff did not file objections, I "need only
satisfy [myself] that there is no clear error on the face of
the record in order to accept the recommendation."
Fed.R.Civ.P. 72(b) advisory committee's note. After
reviewing the record, I conclude that there is no clear error
on the face of the record. After being warned by
defendants' motion that he must offer proof in admissible
form that his disciplinary confinement imposed an
"atypical and significant hardship on the inmate in relation
to the ordinary incidents of prison life," Robinson failed
to offer any such proof. Sandin v. Conner, 515 U.S. 472,
115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995).
Consequently, he cannot maintain a due process challenge.
Id. Therefore, it is

ORDERED that the report-recommendation is
approved; and it is further

ORDERED that defendants' motion for summary
judgment is granted and the complaint dismissed; and it is
further

ORDERED that the Clerk of the Court serve a copy

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

of this order on the parties by ordinary mail.

HURD, Magistrate J.

REPORT-RECOMMENDATION

The above civil rights action has been referred to the undersigned for Report and Recommendation by the Honorable Rosemary S. Pooler, pursuant to the local rules of the Northern District of New York. The plaintiff commenced the above action pursuant to 42 U.S.C. § 1983 claiming that the defendants violated his Fifth, Eighth, and Fourteenth Amendment rights under the United States Constitution. The plaintiff seeks compensatory and punitive damages.

Presently before the court is defendants' motion for summary judgment pursuant to Fed R. Civ. P. 56. However:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P 56(e).

In addition, "[f]ailure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." L.R. 7.1(b)(3).

***2** The defendants filed their motion on September 9, 1997. The response to the motion was due on October 23, 1997. It is now five months beyond the date when the plaintiff's response was due, and he has failed to file any papers in opposition to defendants' motion.

Therefore, after careful consideration of the notice of motion, affirmation of Ellen Lacy Messina, Esq., with exhibits attached, and the memorandum of law; and there being no opposition to the motion; it is

RECOMMENDED that the motion for summary judgment be GRANTED and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(l), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696(1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(l); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Order and Report-Recommendation, by regular mail, upon the parties to this action.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))


N.D.N.Y.,1998.

Robinson v. Delgado

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)


END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)
(Cite as: 1997 WL 665551 (N.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Marcus COTTO, Plaintiff,
v.
Daniel SENKOWSKI, Superintendent of Clinton
Annex; T.J. Howard, Hearing Officer; J. Maggy,
Sergeant; Byron Wind, Officer; Barry Rock, Officer;
and Philip Coombe, Jr., Acting Commissioner,
Defendants.
**No. 95-CV-1733 (RSP/DNH).**

Oct. 23, 1997.

Marcus Cotto, Plaintiff, pro se, Auburn Correctional
Facility, Auburn, New York.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Attorney for Defendants, Albany, New York,
Darren O'Connor, Esq., Asst. Attorney General, of
Counsel.

MEMORANDUM DECISION AND ORDER

POOLER, D.J.

**\*1** This matter comes to me following a
report-recommendation by Magistrate Judge David N.
Hurd, duly filed on the 29th of August, 1997. Following
ten days from the service thereof, the Clerk has sent me
the entire file, including any and all objections filed by the
parties herein.

In his *pro se* complaint, Cotto alleges that in August 1995,
he and some other inmates were attacked while
incarcerated at Clinton Correctional Facility. Compl., Dkt.
No. 1, ¶ 2. Cotto alleges that as a result of this incident he

was charged with engaging in violent conduct and conduct
which disturbed the order of the facility. *Id.* Although
Cotto was found guilty of these charges and sentenced to
a term of one year in the Special Housing Unit and loss of
six months good time, his sentence was reversed on
administrative appeal. *Id.* Cotto brought this action
pursuant to 42 U.S.C. § 1983, alleging various violations
of his rights under the Eighth and Fourteenth
Amendments. *Id.*

By motion filed March 3, 1997, defendants sought
summary judgment. Dkt. No. 17. Plaintiff filed no papers
in opposition to the motion. In his report-recommendation,
the magistrate judge recommended that I grant defendants'
motion pursuant to Local Rule 7.1(b)(3), which provides
that, absent a showing of good cause, failure to respond to
a motion shall be deemed consent to the relief requested.
Dkt. No. 19, at 2. Cotto has filed no objections to the
report-recommendation.

After careful review of all of the papers herein, including
the magistrate judge's report-recommendation, it is

ORDERED that the report-recommendation is hereby
approved, and it is further

ORDERED that defendants' motion for summary
judgement is GRANTED and the complaint against them
dismissed in its entirety, and it is further

ORDERED that the Clerk of the Clerk serve a copy of this
order on the parties by regular mail.

IT IS SO ORDERED.
DAVID N. HURD, United States Magistrate Judge.

*REPORT-RECOMMENDATION*

This matter was referred to the undersigned by the
Honorable Rosemary S. Pooler, for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)
(Cite as: 1997 WL 665551 (N.D.N.Y.))

Report-Recommendation pursuant to the Local Rules of the Northern District of New York.

Plaintiff commenced the above § 1983 action making various allegations regarding violations of his civil rights under the United States Constitution. Pursuant to Fed.R.Civ.P. 56, the defendants have moved for summary judgment alleging that there is no genuine issue as to any material fact and that as a matter of law they are entitled to judgment.

The defendants have filed a motion pursuant to Fed.R.Civ.P. 56 granting summary judgment in favor of the defendants on grounds including that there is no genuine issue as to any material fact, and that the defendant is entitled to judgment as a matter of law.

It is now more than ninety days beyond the date when the response papers were due, and the plaintiff has not filed any papers in opposition to the motion. "Failure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." Rules of U.S. Dist. Ct. for Northern Dist. of N.Y., L.R. 7.1(b)(3).

**\*2** NOW, upon careful consideration of the notice of motion, statement pursuant to Local Rule 7.1(F), with exhibits attached, and the memorandum of law submitted in support of the defendants' motion; and there being no opposition to the motion, it is

RECOMMENDED that the motion be granted and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(I), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(I);

Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation, by regular mail, upon the parties to this action.

N.D.N.Y.,1997.
Cotto v. Senkowski
Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Jonathan HENRY, Plaintiff,
v.
James F. DINELLE, Corrections Officer; Russell E.
Duckett, Corrections Officer; Alfred J. Deluca,
Corrections Officer; Donald L. Broekema, Sergeant;
and Jean Norton, Nurse, Defendants.
No. 9:10–CV–0456 (GTS/DEP).

Nov. 29, 2011.
Sivin & Miller, LLP, Edward Sivin, Esq., of Counsel,
New York, NY, for Plaintiff.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Timothy P. Mulvey, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

### MEMORANDUM–DECISION and ORDER

Hon. GLENN T. SUDDABY, District Judge.

*1 Currently before the Court, in this prisoner civil
rights action filed by Jonathan Henry ("Plaintiff") against
the five above-captioned employees of the New York
State Department of Corrections and Community
Supervision ("Defendants"), is Defendants' motion for
partial summary judgment. (Dkt. No. 24.) For the reasons
set forth below, Defendants' motion is granted in part and
denied in part.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Claims

Generally, liberally construed, Plaintiff's Complaint
alleges that, between approximately January 29, 2009, and
January 31, 2009, at Ulster Correctional Facility in
Napanoch, New York, Defendants violated Plaintiff's
following rights in the following manner: (1) Defendants

Nurse Jean Norton, Corrections Officer James F. Dinelle,
Corrections Officer Russell E. Duckett and Corrections
Officer Alfred J. DeLuca violated Plaintiff's rights under
the First Amendment by filing retaliatory false
misbehavior reports against him, and subsequently
providing false testimony against him at administrative
disciplinary hearings, which resulted in his spending time
in the Special Housing Unit ("SHU"); (2) Defendant
Dinelle violated Plaintiff's rights under the Eighth
Amendment by assaulting him on two occasions, and
Defendants DeLuca and Duckett violated Plaintiff's rights
under the Eighth Amendment by assaulting him once; (3)
Defendant Sergeant Donald L. Broekema violated
Plaintiff's rights under the Eighth Amendment by failing to
intervene to prevent one of these assaults from occurring;
(4) Defendant Norton violated Plaintiff's rights under the
Eighth Amendment by harassing him almost immediately
before he was subjected to the above-described assaults;
and (5) Defendants Norton, Dinelle, Duckett and DeLuca
violated Plaintiff's rights under the Fourteenth Amendment
by performing the aforementioned acts, which constituted
atypical and significant hardships in relation to the
ordinary incidents of prison life. (See generally Dkt. No.
1 [Plf.'s Compl.].) Familiarity with the factual allegations
supporting these claims in Plaintiff's Complaint is assumed
in this Decision and Order, which is intended primarily for
review by the parties. (Id.)

### B. Undisputed Material Facts

At all times relevant to Plaintiff's Complaint, Plaintiff
was an inmate and Defendants were employees of the New
York Department of Corrections and Community
Supervision at Ulster Correctional Facility. On January 30,
2009, Defendant Dinelle took Plaintiff to the medical
ward, because Plaintiff was experiencing a foul odor and
oozing from a wound on his leg. After Defendant Norton
treated Plaintiff, she filed an inmate misbehavior report
against Plaintiff based on (1) Plaintiff's harassing behavior
toward Defendant Norton and Defendant Dinelle, and (2)
Plaintiff's disobedience of a direct order to be quiet. The
misbehavior report was signed by Defendant Dinelle as an
employee witness.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

At his deposition, Plaintiff testified, while leaving the infirmary, he was punched and kicked by Defendant Dinelle and two unknown prison officials. Plaintiff was then taken to the SHU, where he waited with Defendants Dinelle and Duckett, and up to three more individuals, for a sergeant to arrive. When Defendant Broekema (a sergeant) arrived at the SHU, Plaintiff was taken to a frisk room, where a frisk was conducted. During the frisk, Defendants Dinelle, Duckett and (Plaintiff suspected) DeLuca used force to bring Plaintiff to the ground. Plaintiff testified that, during the use of force, he was simultaneously punched in the nose by two officers while their supervisor watched.

**\*2** After the use of force, Plaintiff stated to Defendants Dinelle, Broekema and Duckette, "I will be contacting my attorney," or "I will be calling a lawyer." [FN1] Plaintiff never used the term "grievance" when addressing Defendants Dinelle, Broekema and Duckette (or Defendant Norton).[FN2] Subsequently, Defendant Duckett filed an inmate misbehavior report against Plaintiff based on his disobedience of frisk procedures and a direct order. Defendant DeLuca signed this report as a witness to the events.

> FN1. (*Compare* Dkt. No. 24, Attach. 9, at ¶ 17 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 27, Attach. 3, at ¶ 17 [Plf.'s Rule 7 .1 Response]; *see also* Dkt. No. 24, Attach. 4, at 100, 102–03 [attaching pages 216, 218 and 219 of Trans. of Plf.'s Depo.]; Dkt. No. 33, at 2–3 [attaching pages 228 and 229 of Trans. of Plf.'s Depo .].)

> FN2. (*Compare* Dkt. No. 24, Attach. 9, at ¶ 17 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 27, Attach. 3, at ¶ 17 [Plf.'s Rule 7 .1 Response]; *see also* Dkt. No. 24, Attach. 4, at 59–60, 100, 102–03 [attaching pages 175, 176, 216, 218 and 219 of Trans. of Plf.'s Depo.]; Dkt. No. 33, at 2–3 [attaching pages 228 and 229 of Trans. of Plf.'s Depo.].)

Familiarity with the remaining undisputed material facts of this action, as well as the disputed material facts, as set forth in the parties' Rule 7.1 Statement and Rule 7.1 Response, is assumed in this Decision and Order, which (again) is intended primarily for review by the parties. (*Id.*)

**C. Defendants' Motion**

Generally, in support of their motion for partial summary judgment, Defendants argue as follows: (1) Plaintiff's claim that Defendants issued false misbehavior reports should be dismissed because Plaintiff has no constitutional right to be free of false misbehavior reports; (2) Plaintiff's First Amendment retaliation claim should be dismissed because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that he (a) engaged in protected activity, or (b) suffered adverse action as a result of engaging in protected activity; (3) Plaintiff's Fourteenth Amendment substantive due process claim should be dismissed because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendants deprived Plaintiff of his liberty rights; (4) Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton should be dismissed because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that she (a) used force against Plaintiff, or (b) was in a position to prevent the use of force from occurring, yet failed to do so; (5) Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca should be dismissed because Plaintiff's identification of Defendant DeLuca is "very tentative"; (6) Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema should be dismissed because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Broekema had a realistic opportunity to intervene to prevent or stop the assault, yet failed to do so; and (7) Defendants are protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances. (*See generally* Dkt. No. 24, Attach. 10 [Defs.' Memo. of Law].).[FN3]

> FN3. In their motion, Defendants do not challenge the evidentiary sufficiency of Plaintiff's Eighth Amendment excessive-force claim against Defendants Dinelle or Duckett. (*See generally* Dkt. No. 24, Attach. 10 [Defs.' Memo. of Law].)

In Plaintiff's response to Defendants' motion for partial summary judgment, he argues as follows: (1) his

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

retaliation claims should not be dismissed because there are triable issues of fact as to whether Defendants retaliated against him for stating that he would be contacting an attorney; (2) his failure-to-intervene claim against Defendant Broekema should not be dismissed because there are triable issues of fact as to whether Defendant Broekema failed to prevent excessive force from being used against him; (3) his excessive-force claim against Defendant DeLuca should not be dismissed because there are triable issues of fact as to whether Defendant DeLuca used excessive force against him; and (4) Defendants are not protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances. (*See generally* Dkt. No. 27, Attach. 5 [Plf.'s Response Memo. of Law].) [FN4]

> FN4. Plaintiff does not oppose Defendants' arguments that (1) Plaintiff's excessive-force claim against Defendant Norton should be dismissed, and (2) Plaintiff's substantive due process claim should be dismissed. (*See generally* Dkt. No. 27, Attach. 5 [Plf.'s Response Memo. of Law].)

**\*3** In their reply, Defendants essentially reiterate their previously advanced arguments. (*See generally* Dkt. No. 29, Attach. 1 [Defs .' Reply Memo. of Law].)

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the Court will not recite that well-known legal standard in this Decision and Order, but will direct the reader to the Court's decision in *Pitts v. Onondaga Cnty. Sheriff's Dep't,* 04–CV–0828, 2009 WL 3165551, at *2–3 (N.D.N.Y. Sept.29, 2009) (Suddaby, J.), which accurately recites that legal standard.

### B. Legal Standards Governing Plaintiff's Claims

### 1. First Amendment Retaliation Claim

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that, in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of his First Amendment rights. *See Gill,* 389 F.3d at 381–383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a plaintiff must prove by the preponderance of the evidence that (1) the speech or conduct at issue was "protected", (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights, and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

**\*4** In determining whether an inmate has established a prima facie case of a causal connection between his protected activity and a prison official's adverse action, a number of factors may be considered, including the following: (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation. *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996); *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002). Even where the inmate has established such a prima facie case, the prison official may be entitled to judgment as a matter of law on the inmate's retaliation claim where the prison official has satisfied his burden of establishing that the adverse action would have been taken on proper grounds alone. *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994); *Jordan v. Garvin,* 01–CV–4393, 2004 WL 302361, at *6 (S.D.N.Y. Feb.17, 2004).

## 2. Eighth Amendment Claims of Excessive–Force and Failure–to–Intervene

To establish a claim of excessive-force under the Eighth Amendment, a plaintiff must satisfy two components: "one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009). In consideration of the subjective element, a plaintiff must allege facts which, if true, would establish that the defendant's actions were wanton " 'in light of the particular circumstances surrounding the challenged conduct.' " *Id.* (quoting *Blyden v. Mancusi,* 186 F.3d 252, 262 [2d Cir.1999] ). The objective component asks whether the punishment was sufficiently harmful to establish a violation "in light of 'contemporary standards of decency.' " *Wright,* 554 F.3d at 268 (quoting *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Generally, officers have a duty to intervene and prevent such cruel and unusual punishment from occurring or continuing. *Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). "It is well-established that a law enforcement official has an affirmative duty to intervene

on behalf of an individual whose constitutional rights are being violated in his presence by other officers." *Cicio v. Lamora,* 08–CV–0431, 2010 WL 1063875, at *8 (N.D.N.Y. Feb.24, 2010) (Peebles, M.J.). A corrections officer who does not participate in, but is present when an assault on an inmate occurs may still be liable for any resulting constitutional deprivation. *Id.* at *8. To establish a claim of failure-to-intervene, the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene. *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008). Generally, officers cannot be held liable for failure to intervene in incidents that happen in a "matter of seconds." *Parker v. Fogg,* 85–CV–177, 1994 WL 49696 at *8 (N.D.N.Y. Feb.17, 1994) (McCurn, J.).

## 3. Fourteenth Amendment Substantive Due Process Claims

**\*5** The Due Process Clause of the Fourteenth Amendment contains both a substantive component and a procedural component. *Zinernon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinernon,* 494 U.S. at 125 [internal quotations marks omitted]. The procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property ... *without due process of law.*" *Id.* at 125–126 [internal quotations marks and citations omitted; emphasis in original]. One of the differences between the two claims is that a substantive due process violation "is complete when the wrongful action is taken," while a procedural due process violation "is not complete unless and until the State fails to provide due process" (which may occur *after* the wrongful action in question). *Id.*

"Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) [internal quotations marks and citations omitted], *aff'g,* 91–CV–1196, Memorandum–Decision and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

Order (N.D.N.Y. filed Jan. 26, 1993) (DiBianco, M.J.) (granting summary judgment to defendants in inmate's civil rights action).

"An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes 'an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Whitaker v. Super,* 08–CV–0449, 2009 WL 5033939, at *5 (N.D.N.Y. Dec. 14, 2009) (Kahn, J. adopting Report–Recommendation by Lowe, M.J.) (quoting *Sandin v. Conner,* 515 U.S. 472, 484 [1995] ). Regarding the first prong of this test, "[i]t is undisputed ... that New York state law creates a liberty interest in not being confined to the SHU." *Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004). When evaluating whether an inmate's confinement in SHU violates his substantive due process rights, the issue, then, is whether his keeplock confinement imposed "an atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Id.* at 64.

"In the Second Circuit, determining whether a disciplinary confinement constituted an 'atypical and significant hardship' requires examining 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation compared to discretionary confinement.' " *Whitaker,* 2009 WL 5033939, at *5 (quoting *Palmer,* 364 F.3d at 64). "Where a prisoner has served less than 101 days in disciplinary segregation, the confinement constitutes an 'atypical and significant hardship' only if 'the conditions were more severe than the normal SHU conditions.' " *Id.* (quoting *Palmer,* 364 F.3d at 65).[FN5]

FN5. Generally, " '[n]ormal' SHU conditions include being kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week." *Whitaker,* 2009 WL 5033939, at *5 n. 27 (citing *Ortiz v. McBride,* 380 F.3d 649, 655 [2d Cir.2004] ).

## 4. Qualified Immunity Defenses

**\*6** The qualified immunity defense is available to only those government officials performing discretionary functions, as opposed to ministerial functions. *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). As a result, a qualified immunity inquiry in a civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68–69 (2d Cir.2004), *accord, Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007).

In determining the second issue (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted), courts in this circuit consider three factors:

(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 [1992].[FN6] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169–70 (2d Cir.2007).[FN7] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

*v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).[FN8] As the Supreme Court has explained,

> FN6. *See also Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *Prue v. City of Syracuse,* 26 F.3d 14, 17–18 (2d Cir.1994); *Calhoun v. New York State Div. of Parole,* 999 F.2d 647, 654 (2d Cir.1993).

> FN7. *See also Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' "); *Davis v. Scherer,* 468 U.S. 183, 190, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

> FN8. *See also Malsh v. Corr. Oficer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) [citing cases]; *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity

should be recognized.

*Malley,* 475 U.S. at 341.[FN9]

> FN9. *See also Hunter v. Bryant,* 502 U.S. 224, 299, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") [internal quotation marks omitted].

## III. ANALYSIS

### A. Plaintiff's Retaliation Claim Under the First Amendment

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of this claim because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that he (1) engaged in protected activity, or (2) suffered adverse action as a result of engaging in protected activity. More specifically, Defendants argue that the claim should be dismissed because (1) the statement of an inmate's intent to contact an attorney is not protected conduct, (2) Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Norton knew of Plaintiff's intention to contact an attorney, and (3) Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendants' actions were retaliatory. (Dkt. No. 24, Attach.10.) [FN10]

> FN10. Defendants also argue that Plaintiff's First Amendment claim should be dismissed to the extent that it is based solely on the fact that misbehavior reports against him were *false* (as opposed to being false *and retaliatory* ). The Court agrees that Plaintiff has no general constitutional right to be free from false misbehavior reports. *See Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997). As a result, to the extent that the Plaintiff's Complaint may be construed as asserting a claim based solely on the issuance of false behavior reports, that claim is dismissed.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

**\*7** After carefully considering the admissible record evidence adduced in this case, and carefully reviewing the relevant case law, the Court has trouble finding that an inmate's one-time making of an oral statement (immediately after the use of force against him) that he would be "contacting [his] attorney," or "calling a lawyer" at some unidentified point in the future constitutes engagement in activity that is protected by the First Amendment—especially where, as here, the inmate did not reference the prison grievance process in his statement.

Representation by a lawyer is certainly not necessary to file an inmate grievance in the New York State Department of Corrections and Community Supervision, nor does such representation necessarily result in the filing of a grievance. Rather, such representation is most typically associated with the filing of a civil rights action in federal court (as is clear from the motions for appointment of counsel typically filed in federal court actions). As a result, the statement in question does not reasonably imply that Plaintiff would be filing a grievance as much as it implies that he was going to consult an attorney as to whether or not to file a civil rights action in federal court.

Here, such a statement is problematic. This is because, generally, the filing of the prisoner civil rights action in federal court in New York State must be preceded by the prisoner's exhaustion of his available administrative remedies (or his acquisition of a valid excuse for failing to exhaust those remedies). Any filing without such prior exhaustion (or acquisition of a valid excuse), under the circumstances, would be so wholly without merit as to be frivolous. Of course, filing a court action that is frivolous is not constitutionally protected activity.[FN11]

> FN11. *See Wade–Bey v. Fluery,* 07–CV–117, 2008 WL 2714450 at \*6 (W.D.Mich. July 8, 2010) ("Although it is well established that prisoners have a constitutional right of access to the courts ..., the filing of a frivolous lawsuit would not be protected activity.") [citation omitted].

Moreover, to the extent that Plaintiff's statement could be construed as reasonably implying that he was going to consult an attorney as to whether or not to file a grievance, the Court has trouble finding that such a vague statement is constitutionally protected.[FN12] As one district court has stated, "[h]oping to engage in constitutionally protected activity is not itself constitutionally protected activity."[FN13] The Court notes that a contrary rule would enable a prisoner who has committed conduct giving rise to a misbehavior report to create a genuine issue of material fact (and thus reach a jury) on a retaliation claim (alleging adverse action based on the issuance of that misbehavior report) simply by uttering the words, "I'm calling a lawyer," after he commits the conduct in question but before the misbehavior report is issued.

> FN12. The Court notes that numerous cases exist for the point of law that even *expressly threatening* to file a *grievance* does not constitutes protected activity. *See, e.g., Bridges v. Gilbert,* 557 F.3d 541, 554–55 (7th Cir.2009) ("[I]t seems implausible that a *threat* to file a grievance would itself constitute a First Amendment-protected grievance.") [emphasis in original]; *Brown v. Darnold,* 09–CV–0240, 2011 WL 4336724, at \*4 (S.D.Ill. Sept.14, 2011) ("Plaintiff cannot establish that his threat to file a grievance against Defendant Darnold is a constitutionally protected activity."); *Koster v. Jelinek,* 10–CV–3003, 2011 WL 3349831, at \*3, n. 2 (C.D.Ill. Aug.3, 2011) ("The plaintiff does not seem to be asserting that he had a First Amendment right to threaten the facilitators with lawsuits and grievances, nor does the Court believe that he has such a right."); *Ingram v. SCI Camp Hill,* 08–CV–0023, 2010 WL 4973302, at \*15 (M.D.Pa. Dec.1, 2010) ("Stating an intention to file a grievance is not a constitutionally protected activity."), *aff'd,* No. 11–1025, 2011 WL 4907821 (3d Cir. Oct.17, 2011); *Lamon v. Junious,* 09–CV–0484, 2009 WL 3248173, at \*3 (E.D.Cal. Oct.8, 2009) ("A mere threat to file suit does not rise to the level of a protected activity...."); *Miller v. Blanchard,* 04–CV–0235, 2004 WL 1354368, at \*6 (W.D.Wis. June 14, 2004) ("Plaintiff alleges that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

defendants retaliated against him after he threatened to file a lawsuit against them. Inmates do not have a First Amendment right to make threats.").

FN13. *McKinnie v. Heisz,* 09–CV–0188, 2009 WL 1455489, at *11 (W.D.Wis. May 7, 2009) ("Hoping to engage in constitutionally protected activity is not itself constitutionally protected activity. At most, petitioner's actions could be construed as a 'threat' to assert his rights but that is not enough.").

In any event, even assuming, for the sake of argument, that Plaintiff's statement was constitutionally protected, the Court finds, based on the current record, that Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that his statement to Defendants Dinelle, Duckett, and Broekema that he would be contacting an attorney was a substantial or motivating factor for the issuance of the misbehavior report by Defendant Norton (which was signed by Defendant Dinelle as a witness), and the misbehavior report by Defendant Duckett (which was signed by Defendant DeLuca as a witness). The Court makes this finding for two alternate reasons.

**\*8** First, with regard to the misbehavior report issued by Defendant Norton, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that she was aware Plaintiff would be contacting an attorney. In addition, with regard to the report made by Defendant Duckett (which was signed by Defendant DeLuca as a witness), although there is record evidence that Defendant Duckett had knowledge of Plaintiff's statement that he would contact an attorney, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Duckett had reason to believe, at the time the misbehavior report was issued, Plaintiff would actually follow through with his one-time oral statement, made on the heals of a heated incident.

Second, even assuming that Defendant Duckett or Defendant Norton had reason to believe Plaintiff would contact an attorney, Plaintiff has failed to adduce

admissible record evidence from which a rational factfinder could conclude that Defendant Duckett or Defendant Norton would not have issued the misbehavior report anyway, based on Plaintiff's actions. Indeed, at Plaintiff's disciplinary hearings, evidence was adduced that he in fact committed most of the misconduct alleged in the misbehavior reports, which resulted in the hearing officer finding multiple violations and sentencing Plaintiff to SHU. FN14 Furthermore, those convictions were never subsequently reversed on administrative appeal. FN15 As a result, no admissible record evidence exists from which a rational factfinder could conclude that Plaintiff has established the third element of a retaliation claim—the existence of a causal connection between the protected speech and the adverse action.

FN14. *See Hynes v. Squillance,* 143 F.3d 653, 657 (2d Cir.1998) (holding that defendants met their burden of showing that they would have taken disciplinary action on valid basis alone where the evidence demonstrated that plaintiff had committed "the most serious, if not all, of the prohibited conduct"); *Jermosen v. Coughlin,* 86–CV–0208, 2002 WL 73804, at *2 (N.D.N.Y. Jan.11, 2002) (Munson, J.) (concluding, as a matter of law, that defendants showed by a preponderance of the evidence that they would have issued a misbehavior report against plaintiff even in the absence of his complaints against correctional department personnel, because they established that the misbehavior report resulted in a disciplinary conviction, "demonstrat[ing] that plaintiff in fact committed the prohibited conduct charged in the misbehavior report.").

FN15. For these reasons, the Court finds to be inapposite the case that Plaintiff cites for the proposition that the Court must accept as true his sworn denial that he committed any of the violations alleged in the misbehavior reports issued against him. *See Samuels v. Mockry,* 142 F.3d 134, 135–36 (2d Cir.1998) (addressing a situation in which a prisoner was placed in a prison's "Limited Privileges Program," upon a finding rendered by the prison's Program Committee, that he had refused to accept a

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

mandatory work assignment, *"without a hearing or a misbehavior report"* ) [emphasis added]. The Court would add only that, even if it were to accept Plaintiff's sworn denial as true, the Court would still find that he has failed to establish that Defendants Duckett and Norton would not have issued the misbehavior reports against him anyway, based on their subjective belief that he was acting in a disturbing, interfering, harassing and disobedient manner at the time in question (as evident from, *inter alia,* their misbehavior reports, the disciplinary hearing testimony of three of the Defendants, and admissions made by Plaintiff during his deposition regarding the "confusion" and "misunderstanding" that occurred during his examination by Defendant Norton, his persistent assertions about his prescribed frequency of visits, and his unsolicited comments about his proper course of treatment).

For each of these alternative reasons, Plaintiff's retaliation claim under the First Amendment is dismissed.

**B. Plaintiff's Claims Under the Eighth Amendment**

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of Plaintiff's Eighth Amendment claims because (1) Plaintiff has failed to adduce any admissible evidence from which a rational factfinder could conclude that Defendant Norton used any force against Plaintiff, or was in a position to intervene to prevent the use of force against Plaintiff, yet failed to do so, (2) Plaintiff has failed to adduce any admissible evidence from which a rational factfinder could conclude that Defendant Broekema had a reasonable opportunity to intervene and prevent the alleged assault by Defendants Dinelle, DeLuca and Duckett, yet failed to do so, and (3) Plaintiff's identification of Defendant DeLuca is "very tentative."

As an initial matter, because Plaintiff did not oppose Defendants' argument that his excessive-force claim against Defendant Norton should be dismissed, Defendants' burden with regard to this claim "is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a 'modest' burden." *Xu–Shen Zhou v.*

*S.U.N.Y. Inst. of Tech.,* 08–CV–0444, 2011 WL 4344025, at *11 (N.D.N.Y. Sept.14, 2011)* (Suddaby, J.). After carefully considering the matter, the Court finds that Defendants have met this modest burden, for the reasons stated by them in their memoranda of law. The Court would add only that, based on its own independent review of the record, the Court can find no record evidence to support the claim that Defendant Norton used force against Plaintiff, or was in a position to intervene to prevent the use of force against Plaintiff, yet failed to do so. As a result, Plaintiff's Eighth Amendment claim against Defendant Norton is dismissed.

**\*9** Turning to Plaintiff's failure-to-intervene claim against Defendant Broekema, it is undisputed that it was Defendants Duckett, Dinelle and DeLuca who used force against Plaintiff. Plaintiff testified that, while Defendant Broekema was in the room at the time, Defendant Broekema was standing behind Defendant Dinelle on his "immediate right." In addition, Plaintiff testified that Defendant Duckett's threat of physical force against Plaintiff was conditioned on Plaintiff's continued failure to comply with (what Plaintiff perceived to be) conflicting instructions by Defendants Duckett and Dinelle during the frisk. (Dkt. No. 24, Attach. 4, at 97–99.) Furthermore, Plaintiff testified that it was only after he failed to put his hands in his pockets (rather soon after being warned by Defendant Duckett) that either Defendant Duckett or Defendant Dinelle punched him *one time* with a "closed fist" in the side of his nose, causing him to immediately fall to the ground. (*Id.* at 98–99.) Finally, Plaintiff testified that the kicks that he suffered soon after falling to the ground were limited in nature, having occurred only "a couple of times," and indeed having only *possibly* occurred. (*Id.* at 99.)

While the Court in no way condones the conduct alleged in this action, the Court is simply unable to find, based on the current record, that Plaintiff has adduced sufficient admissible record evidence to reach a jury on his Eighth Amendment claim against Defendant Broekema. Rather, based on the evidence presented, a rational factfinder could only conclude that the use of force was simply too uncertain for a reasonable person in Defendant Broekema's position to expect; and it was too brief in nature to give Defendant Broekema a realistic opportunity

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

to intervene in it, so as prevent the one punch and possibly few kicks that Plaintiff presumably experienced.[FN16]

> FN16. *See* *O'Neill v. Krzeminski,* 839 F.2d 9, 11–12 (2d Cir.1988) (noting that "three blows [that occurred] in such rapid succession ... [is] not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator"); *Blake v. Base,* 90–CV–0008, 1998 WL 642621, at *13 (N.D.N.Y. Sept.14, 1998) (McCurn, J.) (dismissing failure-to-intervene claim against police officer based on finding that the punch to the face and few body blows that plaintiff allegedly suffered "transpired so quickly ... that even if defendant ... should have intervened, he simply did not have enough time to prevent plaintiff from being struck"); *Parker v. Fogg,* 85–CV–0177, 1994 WL 49696, at *8 (N.D.N.Y. Feb.17, 1994) (McCurn, J.) (holding that an officer is not liable for failure-to-intervene if there "was no 'realistic opportunity' to prevent [an] attack [that ends] in a matter of seconds"); *see also* *Murray–Ruhl v. Passinault,* 246 F. App'x 338, 347 (6th Cir.2007) (holding that there was no reasonable opportunity for an officer to intervene when one officer stood by while another fired twelve shots in rapid succession); *Ontha v. Rutherford Cnty., Tennessee,* 222 F. App'x 498, 506 (6th Cir.2007) ("[C]ourts have been unwilling to impose a duty to intervene where ... an entire incident unfolds 'in a matter of seconds.' "); *Miller v. Smith,* 220 F.3d 491, 295 (7th Cir.2000) (noting that a prisoner may only recover for a correction's officer's failure to intervene when that officer "ignored a realistic opportunity to intervene").

Finally, based on the current record, the Court rejects Defendants' third argument (i.e., that Plaintiff's excessive-force claim against Defendant DeLuca should be dismissed because Plaintiff's identification of Defendant DeLuca is "very tentative"). Defendants argue that Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant DeLuca was present during the use of force

against Plaintiff (let alone that Defendant DeLuca used force against Plaintiff). This is because Plaintiff's basis for bringing his excessive-force claim against Defendant DeLuca is that he remembered being assaulted by three individuals, including Defendants Dinelle and Duckett, whose last names began with the letter "D." While this fact is undisputed, it is also undisputed that Defendant DeLuca was interviewed by the Inspector General's Office regarding his involvement in the incidents giving rise to Plaintiff's claims,[FN17] and that both Defendant Broekema's use-of-force report, and Defendant Broekema's Facility Memorandum, state that Defendant DeLuca participated in the use of force against Plaintiff.[FN18] Based on this evidence, a rational factfinder could conclude that Defendant DeLuca violated Plaintiff's Eighth Amendment rights. As a result, Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca survives Defendants' motion for summary judgment. The Court would add only that, although it does not construe Plaintiff's Complaint as alleging that Defendant DeLuca failed to intervene in the use of force against Plaintiff, assuming, (based on Plaintiff's motion papers) that Plaintiff has sufficiently alleged this claim, the claim is dismissed because the entirety of the record evidence as it pertains to Defendant DeLuca establishes that he used force against Plaintiff.

> FN17. (Dkt. No. 27, Attach. 2, at 19–20.)

> FN18. (Dkt. No. 27, Attach. 2, at 10, 14.)

**C. Plaintiff's Claim Under the Fourteenth Amendment**

**\*10** As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of this claim because Defendants did not deprive Plaintiff of his liberty rights. As stated above in note 2 of this Decision and Order, Plaintiff failed to address Defendants' argument that his substantive due process claim should be dismissed. As a result, as stated above in Part III.B. of this Decision and Order, Defendants' burden with regard to this claim "is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a 'modest' burden." *Xu–Shen Zhou,* 2011 WL 4344025, at *11.

After carefully considering the matter, the Court finds

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

that Defendants have met this modest burden, for the reasons stated by them in their memoranda of law. The Court would add only that, based on its own independent review of the record, although the record evidence establishes that Plaintiff was confined in SHU for 150 days as a result of the misbehavior reports issued by Defendants Norton and Duckett, Plaintiff has failed to adduced admissible record evidence from which a rational factfinder could conclude that the conditions of his confinement during this 150–day period were more severe than normal SHU conditions.[FN19] As a result, Plaintiff's substantive due process claim is dismissed.

> FN19. *See* *Spence v. Senkowski,* 91–CV–0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr.17, 1998) (McCurn, J.) (finding that 180 days that plaintiff spent in SHU, where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217–19 (W.D.N.Y.1998) (180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353–56 (W.D.N.Y.1997) (161 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96–CV–2003, 1997 WL 137448, at *4–6 (S.D.N.Y.1997) (192 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116–17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94–CV–4094, 1996 WL 487951, at *4–5 (S.D.N.Y. Aug.27, 1996) (210 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103–04 (W.D.N.Y.1995) (270 days in SHU under numerous conditions of confinement that

were more restrictive than those in general population).

**D. Defendants' Defense of Qualified Immunity**

As stated above in Part I.C. of this Decision and Order, Defendants seek dismissal of Plaintiff's claims on the alternative ground that they are protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances.

**1. Retaliation**

The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 [1982] ). Here, even assuming that Plaintiff's statement that he would contact an attorney regarding the use of force he experienced constitutes engagement in protected activity, and even also assuming that the only reason Defendant Norton and/or Duckett issued Plaintiff a misbehavior report was because he made this statement, these Defendants are, under the circumstances, entitled to qualified immunity. This is because the Court finds that the right to make this statement (without experiencing any resulting adverse action) was not a clearly established during the time in question (January 2009), based on a review of the relevant case law. *See, supra,* notes 12 and 13 of this Decision and Order.

As a result, Plaintiff's retaliation claim is dismissed on the alternate ground of qualified immunity.

**2. Excessive Force**

There is no doubt that the right to be free from the use of excessive force was "clearly established" at the time of the incidents giving rise to Plaintiff's claims. *See, e.g., Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). Moreover, with regard to whether it was objectively reasonable for Defendants to use the alleged amount of force that they used, the Second Circuit has made clear that, "[w]here the circumstances are in dispute, and contrasting accounts present factual issues as to the degree of force actually employed and its

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

reasonableness, a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity." *Mickle v. Morin,* 297 F.3d 114, 122 (2d Cir.2002) [internal quotation marks omitted].

**\*11** Here, after carefully reviewing the record, and construing it in the light most favorable to Plaintiff, the Court finds that, even if Defendants Dinelle, DeLuca and Duckett genuinely feared being assaulted by Plaintiff, and even if those three Defendants genuinely perceived Plaintiff's words and movements to constitute an attempt to resist a frisk, admissible record evidence exists from which a rational jury could conclude that those perceptions were not objectively reasonable under the circumstances. As the Second Circuit has observed, it is impossible to "determine whether [Defendants] reasonably believed that [their] force was not excessive when several material facts [are] still in dispute, [and therefore,] summary judgment on the basis of qualified immunity [is] precluded." *Thomas v. Roach,* 165 F.3d 137, 144 (2d Cir.1999).[FN20] For these reasons, the Court rejects Defendants' argument that Plaintiff's excessive-force claim should be dismissed on the ground of qualified immunity as it relates to Defendants Dinelle, DeLuca and Duckett.

> FN20. *See also Robison v. Via,* 821 F.2d 913, 924 (2d Cir.1987) ( "[T]he parties have provided conflicting accounts as to [who] initiated the use of force, how much force was used by each, and whether [the arrestee] was reaching toward [a weapon]. Resolution of credibility conflicts and the choice between these conflicting versions are matters for the jury and [should not be] decided by the district court on summary judgment.").

However, the Court reaches a different conclusion with regard to Plaintiff's failure-to-intervene claim against Defendant Broekema: the Court finds that, at the very least, officers of reasonable competence could disagree on the legality of Defendant Broekema's actions, based on the current record. As a result, Plaintiff's failure-to-intervene claim against Defendant Broekema is dismissed on this alternative ground.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for partial summary judgment (Dkt. No. 24) is ***GRANTED*** in part and ***DENIED*** in part in the following respects:

(1) Defendants' motion for summary judgment on Plaintiff's First Amendment claim is ***GRANTED;***

(2) Defendants' motion for summary judgment on Plaintiff's Fourteenth Amendment substantive due process claim is ***GRANTED;***

(3) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton is ***GRANTED;***

(4) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema is ***GRANTED;*** and

(5) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca is ***DENIED;*** and it is further

**ORDERED** that the following claims are ***DISMISSED*** with prejudice from this action:

(1) Plaintiff's First Amendment claim;

(2) Plaintiff's Fourteenth Amendment substantive due process claim;

(3) Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton; and

(4) Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema; and it is further

**ORDERED** that Defendants Norton and Broekema are ***DISMISSED*** from this action; and it is further

**ORDERED** that, following this Decision and Order, the following claims remain pending in this action: Plaintiff's Eighth Amendment excessive-force claim against Defendants DeLuca, Dinnelle and Duckett; and it is further

**\*12 ORDERED** that counsel are directed to appear

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

on **JANUARY 4, 2012 at 2:00 p.m.** in chambers in Syracuse, N.Y. for a pretrial conference, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to defendants no later than **DECEMBER 16, 2011,** and the parties are directed to engage in meaningful settlement negotiations prior to the 1/4/12 conference.

N.D.N.Y.,2011.

Henry v. Dinelle
Slip Copy, 2011 WL 5975027 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

KeyCite Red Flag - Severe Negative Treatment

**Affirmed in Part, Vacated in Part, Remanded by** Xu-Shen Zhou
v. State University of New York Institute of Technology, 2nd Cir.
(N.Y.), October 10, 2012

2011 WL 4344025
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

XU–SHEN ZHOU, a/k/a Jason Zhou, Plaintiff,
v.
S.U.N.Y. INST. OF TECH.; Dr. Lisa
Beradino; Dr. Stephen Havlovic; Dr. William
Langdon; and Dr. Peter Spina, personally
and in their official capacities, Defendants.

No. 6:08–CV–0444 (GTS/ATB).
|
Sept. 14, 2011.

**Attorneys and Law Firms**

Satter & Andrews LLP, Ross P. Andrews, Esq., of
Counsel, Syracuse, NY, for Plaintiff.

Hon. Eric. T. Schneiderman, Attorney General for the
State of New York, Christina L. Roberts–Ryba, Esq.,
Douglas J. Goglia, Esq., Susan C. Von Reusner, Esq., of
Counsel, Albany, NY, for Defendants.

*MEMORANDUM–DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this employment
discrimination action filed by Xu–Shen Zhou ("Plaintiff")
against the State University of New York Institute
of Technology, Dr. Lisa Berardino, Dr. Stephen
Havlovic, Dr. William Langdon, and Dr. Peter Spina
("Defendants"), is Defendants' motion for summary
judgment. (Dkt. No. 69.) For the reasons set forth below,
Defendants' motion is granted, and Plaintiff's Amended
Complaint is dismissed.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Claims**

Generally, liberally construed, Plaintiff's Amended
Complaint alleges that Plaintiff, a person of Chinese
nationality and origin, was subject to discrimination
during his employment at the State University of
New York Institute of Technology ("SUNY IT"). (*See
generally* Dkt. No. 28 [Plf.'s Am. Compl.].) More
specifically, Plaintiff alleges as follows.

Beginning in August 2005, Defendant Langdon, who
was Plaintiff's supervisor, harassed and intimidated
Plaintiff by (1) making "repeated negative comments
about China and persons of Asian origin," (2) seeking
"to have plaintiff do the work for a scholarly
publication but include Langdon's name [on that
publication]," (3) "encourag[ing] students to make
complaints against plaintiff," (4) telling Plaintiff that
he could assist Plaintiff with student complaints "if
plaintiff helped [him] get a paper published," (5)
"unfairly criticizing plaintiff's teaching," (6) "behaving
in a menacing manner," and (7) "recommending against
plaintiff's reappointment." (*Id.*) Plaintiff complained
about Defendant Langdon's behavior to human resources
on June 29, 2006, and to Defendant Havlovic on July 6,
2006. (*Id.*) Defendant Berardino also "knew of Plaintiff's
complaints of unlawful discrimination."

During Plaintiff's meeting with Defendant Havlovic,
Defendant Havlovic "assured Plaintiff that the complaints
that had been made by a few students about
Plaintiff was a closed issue." (*Id.*) After this meeting,
Defendant Havlovic "began to exaggerate the import
of those student complaints ... and opposed plaintiff's
reappointment." (*Id.*)

Despite Plaintiff's complaints, SUNY IT "failed or
refused to take appropriate action to remedy the
hostile working environment." (*Id.*) Instead, Defendants
"retaliated against plaintiff [by] ... refusing to renew his
employment contract." (*Id.*) Defendant Spina also "stated
in front of faculty members 'We do not want foreigners'
or words to that affect"; and it was her decision not to
recommend Plaintiff for reappointment that lead to his
termination. (*Id.*)

Based on these (and other) factual allegations, the Court
liberally construes Plaintiff's Amended Complaint as
asserting the following three claims: (1) a claim of national
origin and/or race discrimination under Title VII of the
Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e

*et seq.* ("Title VII"), 42 U.S.C. § 1981, and Section 292 of the New York State Human Right's Law ("NYHRL"); (2) a claim of hostile work environment based on national origin and/or race under Title VII, 42 U.S.C. § 1981, and Section 292 of the NYHRL; and (3) a claim of retaliation based on national origin and/or race under Title VII, 42 U.S.C. § 1981, and Section 292 of the NYHRL. (*Id.*) Familiarity with the remaining factual allegations supporting these claims in Plaintiff's Amended Complaint is assumed in this Decision and Order, which is intended primarily for review by the parties. (*Id.*)

**B. Undisputed Material Facts**
 **\*2** The following material facts are not in dispute. (*Compare* Dkt. No. 69, Attach. 1 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 78, Attach. 7 [Plf.'s Rule 7.1 Response].)

**1. Plaintiff's Initial Employment with SUNY IT**
SUNY IT is a college within the educational system of New York State. In or around July 2005, Plaintiff applied for a position at SUNY IT to teach finance as a faculty member in the School of Business. Plaintiff was initially interviewed over the telephone, and was subsequently interviewed in person during a campus visit. When Plaintiff was interviewing at SUNY IT, he did not disclose that he had received complaints from students about his teaching at Bloomsburg University.

On July 19, 2005, Dr. Peter Spina, the Interim President at SUNY IT, sent to Plaintiff an initial offer of employment, which was contingent upon official notification from the U.S. Citizenship and Immigration Services that Plaintiff had authorization to work at SUNY IT. Plaintiff's employment was scheduled to begin on September 1, 2005, and the offer was for a two-year appointment. Dr. Steven Havlovic, Dean of the School of Business and tenured Professor of Human Resource Management, endorsed the hiring of Plaintiff.

Sometime after Plaintiff began teaching at SUNY IT, students in his class made complaints about him. During the summer of 2006, Plaintiff went on a car ride with Dr. Langdon, a full professor at SUNY IT who served (with all the tenured professors in the School of Business) on the School of Business Review Peer Committee. During the car ride, Dr. Langdon explained to Plaintiff that he and Dean Havlovic had received complaints regarding

Plaintiff's teaching style. Dr. Langdon also told Plaintiff that he and another professor were working on a research project, and indicated that he could use Plaintiff's help.

Shortly after the car ride, Dr. Langdon called Plaintiff, who informed Dr. Langdon that he was not interested in working on the research project. Plaintiff also contacted Dean Havlovic and Anthony Panebianco, Associate Vice President of Human Resources, to complain about the car ride. Dean Havlovic advised Plaintiff that he was not required to work on papers that he did not wish to work on. Dean Havlovic subsequently contacted Dr. Langdon, and instructed Dr. Langdon not to take employees on car rides.

During the fall of 2006, Dr. Langdon was contacted by Dean Havlovic, who informed Dr. Langdon that he had received additional complaints regarding Plaintiff's teaching. By the same point in time, Dr. Langdon also had received written complaints from students regarding Plaintiff's teaching. One student requested to withdraw from Plaintiff's class on account of Plaintiff's limited English language skills. The student stated, "I cannot comprehend [Plaintiff because he] speaks very broken English and most of my class has no idea what he is saying."

**2. Plaintiff's Application for Renewal**
Also during the fall of 2006, Plaintiff's teaching contract was up for renewal. Plaintiff, along with two other candidates, put in applications for two-year renewals. As Dean of the School of Business, Dr. Havlovic sent Plaintiff a memorandum outlining the steps for renewal. The memorandum included a recommended timetable for the Personnel Actions. The memorandum stated that faculty members who were being reviewed would be notified by the appropriate Dean and instructed to complete and/or update their personnel files. Those who wished to have an advocate needed to send the notification by a certain date. The memorandum also outlined the committees that were set up for the review process.

 **\*3** Prior to the President of SUNY IT making a final decision on renewal or non-renewal of a faculty member, it is SUNY IT's practice to receive recommendations from the School's Personnel Committee, the College–Wide Personnel Committee, the Dean, and the Vice President for Academic Affairs. Dr. Lisa Berardino, Associate Professor for the Department of Business,

along with two other professors, Robert Yeh and Ed Petronio, served on the School of Business Personnel Committee (hereinafter "Personnel Committee"). The Personnel Committee served to coordinate the faculty review of professors who are up for employment renewal on behalf of the School of Business Peer Review Committee (hereinafter "Peer Review Committee"). The guidelines that govern the review of professors that are up for renewal are entitled "The State University of New York Policies of the Board of Trustees."

### 3. Personnel Review Committee's Evaluation, Recommendation and Subsequent Action

Pursuant to SUNY IT guidelines regarding the renewal of faculty members, the Personnel Committee was required to organize the three candidates' materials, review them, and ultimately make a recommendation to the Peer Review Committee. Before making their recommendation, Dr. Yeh and Dr. Berardino met to discuss the review of the three candidates. Although Mr. Petronio was invited to the meetings, was a part of the Personnel Committee's recommendation, signed the Personnel Committee's letters, and as was kept informed by Dr. Berardino as to the status of the review process, he was not present for the meetings because he was traveling during most of the review period.

With regard to the standard of review pertaining to the contractual renewal determination, the following five criteria were considered: (i) the candidate's terminal degree; (ii) the candidate's teaching ability and effectiveness; (iii) the candidate's research; (iv) the candidate's university service; and (v) professional development. Under normal circumstances, professors are renewed for two years if the review results in a determination that the candidate is meeting the relevant criteria.

To ascertain effectiveness in teaching, among other things, the Personnel Committee reviewed each candidate's Individual Development and Educational Assessment scores (hereinafter "IDEA"). The IDEA rating system allows students to rate professors by soliciting feedback and evaluating teaching. The scale for IDEA scores goes from one-to-five. A score of one is very bad while a score of five is great. The Personnel Committee also considered a portfolio, put together by the candidate, with information from his or her perspective on each of these

categories, along with written complaint from students (if any).

Plaintiff's IDEA scores were not great. In addition, Plaintiff had received written complaints from students. Nonetheless, Dr. Berardino visited with Ken Wallace, Plaintiff's advocate, and told him that the Personnel Committee was planning to propose a one year renewal. Mr. Wallace indicated that was fine. The Personnel Committee then recommended to the Peer Review Committee that Plaintiff be renewed for one year.

### 4. Peer Review Committee's Evaluation, Recommendation and Subsequent Action

**\*4** The Peer Review Committee, which consisted of eight tenured professors from the business department, met to review the recommendation made by the Personnel Committee. Dr. Berardino was also part of the Peer Review Committee. At the meeting, Robert Orilio, the Undergraduate Coordinator, and William Langdon, the Coordinator of Finance, each expressed his concerns about Plaintiff's inability to teach undergraduate students. A discussion ensued about how the students were being harmed and how they were not learning. Ultimately, the Peer Review Committee rejected the recommendation for a one-year renewal in a vote of 6–2. The rejection of the appointment was based on Plaintiff's weak IDEA evaluations, student complaints, and the comments by coordinators Will Langdon and Dr. Robert Orilio. Dr. Berardino was one of the six faculty members to vote not to renew Plaintiff for a one-year term.

After the Peer Review Committee voted against renewing Plaintiff's contract, the Personnel Committee was required to send this recommendation to the College–Wide Academic Personnel Committee (hereinafter "College–Wide Committee"), which consisted of tenured faculty members across the different schools and areas of SUNY IT. Dr. Berardino prepared a draft memorandum that she circulated by email message to the other two members of the Personnel Committee for their review. The memorandum was then printed, circulated to the three members of the Personnel Committee for their signatures, and sent to the chair of the College–Wide Committee. Dr. Havlovic also received a copy of a memorandum, dated October 31, 2006, which stated that, although the Personnel Committee had recommended a one-year renewal of Plaintiff's application, the Peer

Review Committee had rejected the appointment by a vote of 6–2.

**5. College–Wide Committee's Evaluation and Recommendation**
After the Peer Review Committee sent the recommendation of non-renewal to the College–Wide Committee, the College–Wide Committee held a meeting, which resulted in a request that Plaintiff's letter, along with the letters for other candidates, be revised. With respect to Plaintiff, the College–Wide Committee asked for more information about the student complaints and Plaintiff's teaching performance.

Dr. Berardino followed up on the instructions of the College–Wide Committee by emailing requests for more information to Dean Havlovic, Ken Wallace, Robert Orilio, and Will Langdon. Specifically, Dr. Berardino requested more information about Plaintiff's teaching performance. The Dean indicated the he would be sending his own letter to the Interim Vice President of Academic Affairs, Rosemary Mullick.

Dr. Berardino also sent an e-mail message to each of the three candidates, and asked them to help with the memorandum that the Personnel Committee would be sending to the College–Wide Committee. Plaintiff responded to the e-mail message by providing a small amount of background information.

On November 14, 2006, Dr. Berardino submitted a revised letter on behalf of the Personnel Committee to the College–Wide Committee. On November 15, 2006, Dr. Langdon prepared a letter to the College–Wide Committee detailing his concerns about Plaintiff's teaching. In the letter, Dr. Langdon stated, in part, that "[Plaintiff's] difficulties speaking the English language preclude his effectively communicating with students in a class room setting." In addition, he wrote, "to recommend [Plaintiff] for reappointment would, in my opinion, render a great disservice to students in the School of Business as well as to Dr. Zhou. His research interest and productivity would potentially be more fully utilized, and more fulfilling to all parties involved, at an institution less oriented to teaching."

**\*5** After receiving these letters, the College–Wide Committee met again. At this second meeting, Robert Yeh informed the College–Wide Committee members that

William Langdon had a personal conflict with Plaintiff, which effected the information Langdon provided. During their meeting, the College–Wide Committee asked Dr. Berardino (who was a member of the College–Wide Committee) about her observation of Plaintiff's teaching. Dr. Berardino reported Plaintiff's teaching as "average." The College–Wide Committee ultimately voted 4–1 not to support the Peer Review Committee's vote for non-renewal of Plaintiff's application. Dr. Berardino was the member of the College–Wide Committee who voted against the renewal.

**6. Vice President Mullick's Evaluation and Recommendation**
On November 15, 2006, in response to Dr. Berardino's request for more information about Plaintiff's teaching, Dean Havlovic sent a letter to Dr. Mullick, which stated, in part, that Plaintiff continued to struggle as a finance instructor, that his teaching ratings for his undergraduate courses declined from a 3.1 average in the fall of 2005 to an average of 2.4 in the spring of 2006, and that, as a result, he concurred with the recommendation of the School of Business tenured faculty that Plaintiff's contract not be renewed.

After receiving the memorandum from Dean Havlovic regarding Plaintiff's renewal, Dr. Mullick had conversations with Dean Havlovic, who discussed his level of concern regarding the student complaints about Plaintiff's teaching. During their conversations, Dean Havlovic referred to email messages from students, as well as petitions, where students asked to be removed from the class and reimbursed.

Based on Dr. Mullick's personal review of Plaintiff's file, the student complaints, and the recommendations of non-renewal by the Dean and the tenured faculty in the School of Business, Dr. Mullick recommended that Plaintiff not be reappointed as Assistant Professor of Finance. She sent her recommendation to the Interim President, Dr. Peter Spina, in a memorandum dated November 27, 2006. Dr. Mullick's recommendation not to renew Plaintiff was based entirely on the information that she received regarding Plaintiff's inability to effectively teach the students at SUNY IT.

**7. President Spina's Decision**

In a letter dated December 11, 2006, Dr. Spina informed Plaintiff that his "term appointment" as Assistant Professor of Finance at SUNYIT would be terminated on August 31, 2007. Dr. Spina's decision not to renew Plaintiff's contract was based in large part on the recommendation of Dr. Mullick. Dr. Spina also heavily relied upon the recommendation from Dean Havlovic, who eventually removed Plaintiff from teaching in his final semester, replacing him with another professor.

### 8. SUNY IT's Discrimination Complaint Procedure

SUNY IT has a Discrimination Complaint Procedure that was in place prior to, and during, Plaintiff's entire term of employment with SUNY IT. The procedure is available to all SUNY IT students, employees and to the public on the school's web page. The procedure "provides a mechanism through which the University may identify, respond to, and prevent incidents of illegal discrimination." The procedure requires employees to "file a written complaint with the affirmative action officer within 90 calendar days following the alleged discriminatory act or the date on which the complainant first knew or reasonably should have known of such act."

**\*6** SUNY IT also has a faculty handbook, which is available through the college's website. The handbook also states how to file a complaint based on discrimination.

While at SUNYIT, Plaintiff had access to the Discrimination Complaint Procedure. In addition, Plaintiff had access to the faculty handbook. However, throughout his employment at SUNY IT, Plaintiff never filed any formal complaints regarding discrimination or any other matter. The only time Plaintiff discussed any concern with Mr. Panebianco was after the car ride with Dr. Langdon, and Plaintiff never went back to Mr. Panebianco's office to follow up on the one conversation they had.

Familiarity with the remaining undisputed material facts of this action, as well as the disputed material facts, as set forth in the parties' Rule 7.1 Statement and Rule 7.1 Response, is assumed in this Decision and Order, which (again) is intended primarily for review by the parties. (*Id.*)

### C. Defendants' Motion

Generally, in support of their motion for summary judgment, Defendants argue, *inter alia,* as follows: (1) Plaintiff's claim of discrimination based on race and/or national origin should be dismissed because the record shows that Plaintiff's national origin or race was not a factor that motivated Defendants' employment actions; (2) Plaintiff's claim of hostile work environment based on race and/or national origin should be dismissed because the record shows that Plaintiff never formally complained of a hostile work environment, and one isolated incident does not establish a hostile work environment; (3) Plaintiff's claim of retaliation based on race and/or national origin should be dismissed because the record shows that Plaintiff's national origin and/or race was not a factor that motivated Defendants' employment actions; (4) Plaintiff's discrimination and retaliation claims should be dismissed, in the alternative, because SUNY IT had a discrimination policy in effect that was available to all faculty at the time Plaintiff was allegedly discriminated against, and Plaintiff unreasonably failed to follow that policy; and (5) Plaintiff's request for compensatory damages, back pay, or front pay should be dismissed, in the alternative, pursuant to the "after-acquired evidence doctrine" because the record shows that, had Defendants been aware of Plaintiff's poor teaching ratings at Bloomsburg University during the hiring process, Plaintiff never would have been offered employment. (*See generally* Dkt. No. 70, Attach. 1 [Defs.' Memo. of Law].)

In response to Defendants' motion for summary judgment, Plaintiff argues, *inter alia,* as follows: (1) his claim of discrimination based on race and/or national origin should not be dismissed because he has (a) established a prima facie case of discrimination, and (b) adduced record evidence from which a rational factfinder could conclude that Defendants' purported nondiscriminatory reason for not renewing his employment contract is pretextual; (2) his claim of retaliation based on race and/or national origin should not be dismissed because he has (a) established a prima facie case of retaliation, and (b) adduced record evidence from which a rational factfinder could conclude that Defendants' purported non-discriminatory reason for not renewing his employment contract is pretextual; and (3) Defendants arguments that they are entitled to a "same actor" presumption, and that the "after acquired evidence" and *Farragher Ellert* defenses apply, are without

merit. (*See generally* Dkt. No. 78, Attach. 5 [Plf.'s Reply Memo. of Law].)

**\*7** In reply to Plaintiff's response, Defendants (in addition to reiterating previously advanced arguments) argue, *inter alia,* that the Court should disregard the several qualifying statements provided by Plaintiff in his Rule 7.1 Response. (*See generally* Dkt. No. 82 [Defs.' Reply Memo. of Law].)

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the Court will not recite that well-known legal standard in this Decision and Order, but will direct the reader to the Court's decision in *Pitts v. Onondaga Cnty. Sheriff's Dep't,* 04–CV–0828, 2009 WL 3165551, at \*2–3 (N.D.N.Y. Sept.29, 2009) (Suddaby, J.), which accurately recites that legal standard.

### B. Legal Standards Governing Plaintiff's Claims

Again, because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the relevant points of law contained in the legal standards governing Plaintiff's claims in this action, the Court will not recite, in their entirety, those legal standards in this Decision and Order, which (again) is intended primarily for review by the parties. (Dkt. No. 70, Attach. 1 [Defs.' Memo. of Law]; Dkt. No. 78, Attach. 5 [Plf.'s Reply Memo. of Law]; Dkt. No. 82 [Defs.' Reply Memo. of Law].)

## III. ANALYSIS

### A. Plaintiff's Claim of National Origin and/or Racial Discrimination Under Title VII, Section 1981, and the NYHRL [1]

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of Plaintiff's discrimination claim because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that the non-renewal of his employment contract was

discriminatory. Based on the current record, the Court agrees with Defendants.

Claims of national origin and/or racial discrimination are governed by the burden-shifting analysis announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). "Under the burden-shifting rules set forth in *McDonnell Douglas* ..., a plaintiff has the initial burden of making out a prima facie case of discrimination." *Farias v. Instructional Sys., Inc.,* 259 F.3d 91, 98 (2d Cir.2001). For purposes of a Title VII disparate treatment claim, a plaintiff may do so by demonstrating "1) that he belonged to a protected class; 2) that he was qualified for the position he held; 3) that he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Feingold v. New York,* 366 F.3d 138, 152 (2d Cir.2004) (citing *Collins v. New York City Transit Auth.,* 305 F.3d 113, 118 [2d Cir.2002] ). The plaintiff's burden of establishing a prima facie case for discrimination "is not onerous .... [but] serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253–54, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

**\*8** "If a plaintiff establishes a prima facie case, a presumption of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action or termination." *Farias,* 259 F.3d at 98. "The defendant is not required to prove that the articulated reason actually motivated its actions." *Id.* "If the defendant fails to discharge the burden by presenting a nondiscriminatory reason, the plaintiff will prevail (assuming the other aspects of the prima facie case are not contested)." *James v. New York Racing Ass'n,* 233 F.3d 149, 154 (2d Cir.2000).

"If the defendant bears its burden of production, the presumption drops out of the analysis ... and the defendant 'will be entitled to summary judgment ... unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination.' " *Farias,* 259 F.3d at 98 (quoting *James,* 233 F.3d at 154). "Evidence that the defendant's articulated nondiscriminatory reason is false, when added to the prima facie case, may or may not be 'sufficient to support a reasonable inference

that prohibited discrimination occurred' and warrant submitting the case to the jury." *Id.* (quoting *James,* 233 F.3d at 156).

Here, with regard to the first and third above-described prongs, it is undisputed that (1) Plaintiff is a member of a protected class, and (2) his employment contract was not renewed. [2]

As for the second prong, Plaintiff has adduced record evidence from which a rational factfinder could conclude that he was qualified for the position he held. In fact, Defendants hired Plaintiff, who previously taught at a different University, instead of other applicants; and Dean Havlovic endorsed Plaintiff's hiring.

As for the fourth prong, even when viewing the facts in the light most favorable to Plaintiff, based on the admissible evidence in the record, a rational factfinder could not conclude that the non-renewal of Plaintiff's employment contract occurred under circumstances giving rise to an inference of unlawful discrimination. At best, the record establishes that Defendant Langdon had a conflict with Plaintiff, and that, as a result of this conflict, he voted against recommending Plaintiff for renewal and attempted to influence other faculty members to do the same. However, even viewing the evidence in the record in a light most favorable to Plaintiff, there is no evidence from which a rational factfinder could conclude that this conflict was based on Plaintiff's national origin and/or race. This is because the only evidence in the record regarding Defendant Langdon and Plaintiff's national origin and/or race is as follows: (1) a declaration from Plaintiff that Defendant Langdon made general comments about fearing people of Chinese descent and China being a "Third World Country" in Plaintiff's presence (Dkt. No. 78, Attach. 3, at ¶ 4); (2) testimony from Plaintiff that Defendant Langdon told him that he could not speak to students in the same manner as Tom Alee, an American-born professor, because Plaintiff is Chinese (Dkt. No. 69, Attach. 14, at 151); and (3) testimony from Plaintiff that Defendant Langdon previously "intimidated" two Asian faculty members (Dkt. No. 69, Attach. 14, at 179).

**\*9** With regard to Plaintiff's declaration about Defendant Langdon's general comments regarding China and Chinese people, those comments are vague, without context, and insufficient to establish animus toward

Plaintiff. With regard to Plaintiff's testimony that Defendant Langdon "intimidated" two other Asian faculty members, that testimony was both vague and based on hearsay. Finally, with regard to Plaintiff's testimony that Defendant Langdon made a statement about an American-born professor being able to "say" things to his students that Plaintiff cannot "say," it was at best ambiguous, and at worst evidence that Plaintiff pronounces words other than those he intends to pronounce. (*See also* Dkt. No. 69, Attach. 15, at 152 [pronouncing the word "eagle" but intending to say the word "ego"]; Dkt. No. 69, Attach. 15, at 152–54 [pronouncing the word "brown" but intending to say the word "bound"].)

In any event, even assuming, for the sake of argument, that Plaintiff has adduced record evidence from which a rational factfinder could conclude that Defendant Langdon's conflict with Plaintiff was based on Plaintiff's national origin, and therefore that the non-renewal of Plaintiff's employment contract occurred under circumstances giving rise to an inference of unlawful discrimination, Defendants have articulated legitimate, nondiscriminatory reasons for not renewing Plaintiff's employment with SUNY IT. More specifically, Defendants have adduced admissible record evidence establishing that Plaintiff was not renewed because of his IDEA scores, student complaints, student evaluations, and the recommendations of the Peer Review Committee, Dean Havlovic, and Vice President Mullick. As a result, Plaintiff must point to evidence that reasonably supports a finding of prohibited discrimination.

In an effort to satisfy his burden of demonstrating that Defendants' reasons for non-renewal are pretextual, Plaintiff argues that the admissible record evidence establishes the following: (1) from the fall of 2005 through the spring of 2006, only three student complaints were filed against Plaintiff; (2) two of these complaints were solicited by Defendant Langdon; (3) none of these student complaints were presented to Plaintiff, as required by SUNY IT's applicable grievance procedure or departmental policy (which suggests that the complaints were not taken seriously); (4) in late June and early July 2006, Defendants Langdon and Havlovic each told him that he did not need to worry about the prior student complaints, which were "closed issues"; (5) only one complaint was filed by a student against Plaintiff after he was told not to worry, which was based on

Plaintiff's accent, and was filed after the drop deadline as a justification for seeking late withdrawal; and (6) the student evaluations of Plaintiff were "better" than the student evaluations of a comparator whose contract was renewed.

As an initial matter, as stated above, even assuming that the record establishes that a conflict existed between Plaintiff and Defendant Langdon, a rational factfinder could not conclude, based on the admissible evidence in the record, that Defendant Langdon's conflict with Plaintiff was based on Plaintiff's national origin and/or race.

 **\*10** Moreover, even assuming that Defendant Langdon's conflict with Plaintiff was based on Plaintiff's nationality and/or race, contrary to Plaintiff's argument, the admissible evidence in the record does not establish that any student complaints were solicited by Defendant Langdon. Rather, the admissible evidence in the record establishes that students complained to Defendant Langdon on more than one occasion about Plaintiff's teaching, and, in response to those complaints, Defendant Langdon told the students to draft a petition and submit it to the Dean of the School of Business. (Dkt. No. 69, Attach. 7, at 11–14.)

In addition, the fact that Plaintiff was not informed of student complaints in accordance with school policy, and was told not to worry about the complaints filed in the spring of 2006 when he was made aware of them, is not evidence that a subsequent decision not to renew Plaintiff's contract was motivated by Plaintiff's national origin and/or race. This is especially true because Plaintiff does not dispute that additional student complaints were filed after he was allegedly told not to worry about the complaints filed in the spring of 2006.

Furthermore, the evidence in the record establishes as follows: (1) Plaintiff's IDEA scores were not great; (2) professors on the Peer Review Committee other than Defendant Langdon expressed concerns about Plaintiff's teaching; (3) the individual who endorsed Plaintiff's hiring recommended that Plaintiff's contract not be renewed; (4) the individual who hired Plaintiff decided not to renew Plaintiff's employment contract; (5) SUNY IT employs full-time faculty members of Asian and Chinese descent;[3] and (6) while he was a teacher at Bloomberg University, he received negative evaluations about his teaching from

several students, as well as complaints about his English, and the Dean of the College of Business stated in his final performance evaluation that one of his "concerns" was "the significant number of ratings in the C and D categories on [Plaintiff's] student evaluations."[4]

In other words, there is admissible evidence in the record that supports the decision not to renew Plaintiff's contract independent of (and uninfluenced by) Defendant Langdon. In addition, there is no admissible evidence in the record that the student complaints and/or concerns expressed by faculty members other than Defendant Langdon were in any way related to Plaintiff's national origin. Furthermore, finding a lack of discriminatory motive is supported by the above-described "same actor evidence," the fact that SUNY IT employs people of the same ethnic descent as Plaintiff, and the fact that the concerns expressed by Defendant Langdon, other faculty members, and students were shared by faculty members and students at Bloomberg University.[5] Simply put, Plaintiff has failed to point to any admissible record evidence from which a rational factfinder could find prohibited discrimination.

 **\*11** As a result, Plaintiff's discrimination claim is dismissed.

### B. Plaintiff's Claim of Hostile Work Environment Based on His Race and/or National Origin Under Title VII, 42 U.S.C. § 1981 and the NHHRL[6]

Defendants argue that, to the extent Plaintiff's Amended Complaint may be construed as asserting a claim of a hostile work environment, that claim should be dismissed because a single incident is insufficient as a matter of law to constitute a hostile work environment. Essentially, Defendants argue that, because Plaintiff has adduced record evidence of only one incident of harassment, Plaintiff's hostile work environment claim must be dismissed. Defendants further argue that, even if his work environment was hostile, Plaintiff's failure to formally complain about the incident of harassment, as required by the employee handbook, is fatal to his hostile-work-environment claim.

In his memorandum of law in opposition to Defendants' motion for summary judgment, Plaintiff does not address Defendants' challenge to his claim of a hostile work environment. For this reason, Defendants' burden, with

regard to their request for dismissal of that claim, is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a "modest" burden. [7] After carefully considering the matter, the Court finds that Defendants have met this modest burden, for the reasons stated by them in their memoranda of law. The Court would add only two points.

First, the Court does liberally construe Plaintiff's Amended Complaint as asserting a claim of a hostile work environment. (*See, e.g.,* Dkt. No. 28, ¶¶ 13–14, 15, 16 ["During the course of his employment by SUNY IT, defendants subjected plaintiff to a hostile work environment, which caused plaintiff great emotional distress and adversely affected plaintiff's ability to do his job.... Plaintiff was subjected to the hostile work because of his nationality and race.... The hostile environment included harassing and intimidating conduct by defendant Langdon."].)

Second, under the circumstances, the single incident involving Plaintiff riding in a car with Dr. Langdon, which did not involve a physical assault or any other "extraordinarily severe" conduct, such as intimidating verbal harassment, and which did not deter Plaintiff from teaching the following semester and seeking employment renewal, does not establish a hostile work environment as a matter of law. [8]

As a result, Plaintiff's hostile-work-environment claim is dismissed.

### C. Plaintiff's Claim of Retaliation Based on His Race and/or National Origin Under Title VII, Section 1981 and the NYHRL

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of Plaintiff's retaliation claim because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that his non-renewal was retaliatory. Based on the current record, the Court accepts Defendants' argument.

**\*12** "To make out a prima facie case of retaliation, under Title VII, Section 1981 and NYSHRL, a plaintiff must show [the following]: (1) participation in a protected activity known to Defendants; (2) an adverse employment action; and (3) a causal connection between the two."

*Schanfield v. Sojitz Corp. of Am.,* 663 F.Supp.2d 305, 341 (S.D.N.Y.2009) (collecting cases).

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz,* 202 F.3d at 566 (noting that a protected activity need not "rise to the level of a formal complaint in order to receive statutory protection"). Protected activities encompass "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Sumner v. United States Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990). A plaintiff "need not establish that the conduct [he] opposed was in fact a violation of [the law]," *Bush v. Fordham Univ.,* 452 F.Supp.2d 394, 416 (S.D.N.Y.2006), but he must demonstrate a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Sumner,* 899 F.2d at 209.

Adverse employment action is any employer action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006). "[T]ermination is an adverse employment action." *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 169 (2d Cir.2006). Similarly, being laid off constitutes adverse employment action. *See Galabya,* 202 F.3d at 640 (2d Cir.2000); *Walker v. City of New York,* 98–CV–2695, 2002 WL 31051534, at \*4 (E.D.N.Y. July 22, 2002) ("Plaintiff's temporary lay-off during the summer of 1997[was] sufficient to meet Plaintiff's burden of putting forth evidence to show that the terms of her employment were altered."). [9]

A plaintiff may establish a casual connection between the protected activity and the adverse employment action "either (1) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant[,] or (2) indirectly, by showing that the protected activity was followed closely by discriminatory treatment." *Schanfield,* 663 F.Supp.2d at 343 (citing *Knight v. City of New York,* 303 F.Supp.2d 485, 496 [S.D.N.Y.2004] ).

"Direct evidence giving rise to an inference of discrimination may include 'a showing that the employer criticized the plaintiff's performance in ethnically degrading terms, made invidious comments about others in the employee's protected group, or treated employees

not in the protected group more favorably.' " *Id.* (quoting *Hunter v. St. Francis Hosp.,* 281 F.Supp.2d 534, 542 [E.D.N.Y.2003] ).

In order for a court to "accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case," the temporal proximity must be "very close." *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (citing cases finding temporal proximity of three months and more to be insufficient).

**\*13** "Under *McDonnell Douglas,* once the plaintiff has established a prima facie case of retaliation, the burden of production shifts to the defendant to proffer a legitimate, non-discriminatory business rationale to justify its adverse employment action." *Schanfield,* 663 F.Supp.2d at 343. "If the ... defendant ... points to evidence of a legitimate, nonretaliatory reason for the challenged employment decision, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Cifra v. Gen. El. Co.,* 252 F.3d 205, 216 (2d Cir.2001).

Here, Plaintiff argues that complaining to Dean Havlovic and Anthony Panebianco, Associate Vice President of Human Resources, about Defendant Langdon taking him for a car ride constitutes engagement in protected activity. Plaintiff further argues that he has established a casual connection between this protected activity and the adverse action that he suffered.

As an initial matter, the Court rejects Plaintiff's argument that his complaint constitutes protected activity. Although Plaintiff testified (vaguely) that he "report[ed] to Dr. Havlovic [Defendant Langdon's] behavior of coercion, harassment and discrimination," and "mentioned the pattern of what [Defendant Langdon] did to ... other Asian people," Plaintiff also testified that he did not expressly use the word "discrimination," mention his national origin, or indicate that he felt Defendant Langdon was treating him with discriminatory animus. (Dkt. No. 69, Attach. 14, at 175–80.) Rather, Plaintiff essentially told Dean Havlovic and Anthony

Panebianco that, during a car ride, Defendant Langdon "demanded" or attempted to "coerce" Plaintiff into assisting him with a publication. (*Id.*) In other words, a rational factfinder could not conclude, based on Plaintiff's vague testimony about "other Asian people," that Plaintiff accused Defendant Langdon of subjecting him to discrimination on the basis of his national origin and/or race during the car ride. (*Id.*)

In addition, even assuming, for the sake of argument, that Plaintiff's complaint can be deemed to have been a protest against discrimination (such that Plaintiff has established a prima facie case of retaliation), [10] as stated above in Part III.A. of this Decision and Order, Defendants have articulated legitimate, nondiscriminatory reasons for non-renewal. More specifically, Defendants have adduced admissible record evidence establishing that Plaintiff was not renewed because of his IDEA scores, student complaints, student evaluations, and the recommendations of the Peer Review Committee, Dean Havlovic, and Vice President Mullick. As a result, Plaintiff must point to evidence that reasonably supports a finding of prohibited discrimination.

In an effort to satisfy his burden of demonstrating that Defendants' reasons for not renewing him were pretextual, Plaintiff restates the arguments that he advanced regarding his discrimination claim. This Court has already rejected these arguments. *See, supra,* Part III.A. of this Decision and Order.

**\*14** As a result, Plaintiff's retaliation claim is dismissed.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 69) is ***GRANTED;*** and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 28) is ***DISMISSED.*** The clerk of the Court is directed to enter judgment in favor of the defendants and close this case.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4344025

Footnotes

1    "Courts require the same standards and burdens of proof for claims brought under Title VII, § 1981, and the NYHRL." *Ayton v. Lenox Hill Hosp.,* 93–CV–6601, 1997 WL 10000, at \*1 n. 1 (S.D.N.Y. Jan.9, 1997) (collecting cases).

2    The Court agrees with Plaintiff that "non-renewal of an employment contract constitutes an adverse employment action for purposes of Title VII." *Liebowitz v. Cornell Univ.,* 584 F.3d 487, 500–501 (2d Cir.2009).

3    (Dkt. No. 69, Attach. 15, at 2.)

4    (Dkt. No. 69, Attach. 14, at 35, 41–42, 47–50, 53–54.)

5    *See Rolle v. Worth Cnty. Sch. Dist.,* 128 F. App'x 731, 733 (11th Cir. Apr.19, 2005) ("Reviewing the evidence, the only possible evidence of motive relates to a single Board member, but an improper motive of one member does not impart discrimination on the entire Board.... Additionally, the fact that the Board hired other minorities negates any showing of pretext."); *Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 560 (2d Cir.1997) ("[W]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to [that person] an invidious motivation that would be inconsistent with the decision to hire."); *Alexander v. Gerhardt Enter., Inc.,* 40 F.3d 187, 196 (7th Cir.1994) (finding that "evidence that [plaintiff] had encountered employment difficulties with previous employers" supported conclusion that defendant had offered legitimate, nondiscriminatory reason for plaintiff's discharge, but affirming "district court's implicit finding that [defendant]'s proffered reasons were pretextual and that its actual reasons were retaliatory"); *cf. Cutshall v. Potter,* 347 F.Supp.2d 228, 237 (W.D.N.C.2004) ("[T]he fact that an employer offered a promotion to a member of one race creates a powerful inference that the failure to offer the same promotion to another employee of the same race was not motivated by race discrimination.").

6    "Hostile work environment claims under Title VII, § 1981[and] NYSHRL ... are ... analyzed using the same standard." *Jean–Louis v. Am. Airlines,* 08–CV–3898, 2010 WL 3023943, at \*9 n .12 (E.D.N.Y. July 30, 2010).

7    *See Rescuecom Corp. v. Chumley,* 07–CV–0690, 2011 WL 2791272, at \*3 & n. 4 (N.D.N.Y. July 14, 2011) (Suddaby, J.) (collecting authorities); *cf. Frink Am., Inc. v. Champion Road Mach. Ltd.,* 48 F.Supp.2d 198, 209 (N.D.N.Y.1999) ("Plaintiff does not address these claims in its opposition papers, leading the Court to conclude that it has abandoned them.") (McAvoy, J.); *Singleton v. City of Newburgh,* 1 F.Supp.2d 306, 312 (S.D.N.Y.1998) (deeming plaintiff's claim "abandoned" and granting defendants' motion for summary judgment where claim was alleged in the complaint but "not raised elsewhere in the record"); *Nat'l Commc'n Ass'n, Inc. v. Am. Tel. & Tel. Co.,* 92–CV–1735, 1998 WL 118174, at \*28 (S.D.N.Y. Mar.16, 1998) (plaintiff's claim deemed "abandoned" and defendant granted summary judgment where plaintiff did not address claim in response to defendant's summary judgment motion); *Anti–Monopoly, Inc. v. Hasbro, Inc.,* 958 F.Supp. 895, 907 n. 11 (S.D.N.Y.1997) ( "[T]he failure to provide argument on a point at issue constitutes abandonment of the issue."), *aff'd,* 130 F.3d 1101 (2d Cir.1997).

8    *See, e.g., Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175, 183–85 (W.D.N.Y.2010) (holding that female deputy sheriff jailor was not subjected to gender based hostile work environment under Title VII or New York State Human Rights Law based on single incident of being subjected to graphic live sex in the workplace); *Kennedy v. J.P. Morgan Chase & Co.,* 325 F.Supp.2d 401, 409 (S.D.N.Y.2004) (finding that single incident of vice-president of company, entering African–American employee's work area, dressed in a "robber baron" costume with a top hat and cane, approaching employee's desk, and slamming his cane repeatedly on the floor, loudly questioning the presence of "black people" within the company, was not sufficiently severe to support employee's hostile work environment claim); *Samuels v. New York State Dep't of Corr. Servs.,* 94–CV–8645, 1997 WL 253209, at \*7 (S.D.N.Y. May 14, 1997) (granting summary judgment, dismissing claim that a single incident of defendant poking plaintiff in the breast created a hostile work environment); *cf. Patterson v. Cnty. of Oneida,* 375 F.3d 206, 230 (2d Cir.2004) (finding that "[a]lthough a single incident ordinarily will not give rise to a cognizable claim for hostile work environment, [an] alleged event [that] included not only racial remarks but also a physical assault" created a question of fact for the factfinder).

9    *Cf. Leibowitz v. Cornell Univ.,* 584 F.3d 487, 501 (2d Cir.2009) ("An employee seeking a renewal of an employment contract, just like a new applicant or a rehire after a layoff, suffers an adverse employment action when an employment opportunity is denied and is protected from discrimination in connection with such decisions under Title VII and the ADEA.").

10    It is undisputed that Defendant Langdon decided not to recommend Plaintiff for renewal within a close time period to him learning about Plaintiff's complaint.

---



Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

C Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

*1 Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681*etseq.* ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local

Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See,e.g.,Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317;*Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL 903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton,* 1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at *1 n. 2 (N.D.N.Y.1998). As in the cases just cited, this court deems as admitted all of the facts asserted in defendant's Statement of Material Facts. The court next recites these undisputed facts.

FN1. Amended January 1, 1999.

## BACKGROUND

*2 Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member

selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer. FN2 The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

> [FN3.] Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

**\*4** Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

> FN4. Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer, 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action.

See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing Cannon v. University of Chicago, 441 U.S. 677 (1979) and Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See Davis, 119 S.Ct. at 1675 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), a Title VII case). Accord Kracunas v. Iona College, 119 F.3d 80, 87 (2d Cir.1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by Gebser, 118 S.Ct. at 1999.

> FN5. In Gebser, 118 S.Ct. at 1999, and Davis v. Monroe County Bd. of Educ., 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

> It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See, e.g., Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional teasing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *SeeOncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration

and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.AccordKotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. *See Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant

properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *See Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us," ' are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *seesupra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *See Davis,* 119 S.Ct. at 1671;*Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *Accord*Davis, 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *SeeReese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murrel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7]*SeeReese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and

refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *seesupra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See*Murray, 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See*Murray, 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See* *Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in

[plaintiff's] case was inconsistent with these standards.").

CONCLUSION

*10 For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

C  Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

**\*1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical staff,
(collectively, "defendants"), seeking damages for injuries
allegedly caused by defendants while he was incarcerated
at NCCF. Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that
Hargrove's claims should be dismissed because he failed
to exhaust administrative remedies, as required by the
Prison Litigation Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997e. For the following reasons, defendants'
motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint,
alleging that defendants violated his civil rights when they
forcibly administered purified protein derivative skin tests
("PPD test") to test for latent tuberculosis ("TB") in April
2002, 2003 and 2004 while he was incarcerated at NCCF.
Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove
named Nassau County Sheriff Edward Reilly ("Reilly"),
NCCF and Nassau County University Medical Staff [FN2] as
defendants.[FN3] On November 22, 2004, after discovery,
County Defendants and NHCC Defendants filed separate
motions for summary judgment pursuant to Fed.R.Civ.P.
56. Both defendants properly filed a Local Rule 56.1
Statement and served Hargrove a Notice to *Pro Se* Litigant
Opposing Motion for Summary Judgment, pursuant to
Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27,
2004. The *pro se* clerk's office received and filed
the complaint on September 20, 2004. Under the
prison mail-box rule, a *pro se* prisoner's
complaint is deemed filed when it is delivered to
prison authorities. *See, e.g., Walker v.
Jastremski,* 430 F.3d 560, 562 (2d
Cir.2005)(deeming *pro* se prisoner's § 1983
action filed on date complaint was handed to
prison officials). There is no evidence in the
record as to when Hargrove handed the
complaint to prison officials. However, it is clear
the operative date is between August 27, 2004
and September 20, 2004. As discussed, *infra,*
both of these dates occur before Hargrove
properly exhausted the administrative remedies
available to him at NCCF.

FN2. The Nassau County University Medical
Staff are employed by the Nassau Health Care
Corporation ("NHCC"). Pursuant to the
Correctional Center Health Services Agreement
between the County of Nassau and NHCC, dated
September 24, 1999, NHCC provides medical
services for inmates at NCCF. County Defs.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.[FN4] Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a(1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* WEBMD, http://www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF.

NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.[FN5] Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD

test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

(3)

**NCCF's Inmate Grievance Procedure**

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. [FN6] The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form [FN7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [FN8] *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9] *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

FN8. Hargrove has not argued that he was unaware of this five-day deadline.

FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

(4)

**Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove**

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom this may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

> FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

*4 A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated

documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

*5 Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest argument, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,*

--- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525). *See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524). Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383; *Ruggiero,* 467 F.3d at 174; *Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth,* 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford,* 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2385 (emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock,* 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero,* 467 F.3d at 176 (quoting *Woodford,* 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2382).

**(3)**

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams,* 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca,* No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

**\*7** Hargrove has submitted both forged FN11 and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero,* 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford,* 126 S.Ct. at 2382).

> FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

> FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams, 418 F.Supp.2d at 101, 102* (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams, 418 F.Supp.2d at 101* (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by 42 U.S.C. § 1997e(a) unless Hargrove can establish excuse for his failure to exhaust.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(4)**

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

**\*8** Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at * 8-11;*Sloane,* 2006 WL 3096031, at *4;*Williams,* 418 F.Supp.2d at 101. Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175;*Collins v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by Section 1997e(a) of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

> FN13. Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law"). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No. 99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, see *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14]*Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs'. Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

### c. Special circumstances

**\*10** Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Hemphill,* 380 F.3d at 688 (quoting *Giano,* 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." *Giano,* 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. *See Sloane,* 2006 WL 3096031, at *8; *Freeman v. Goord,* No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

**(5)**

### Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct

its own mistakes with respect to the programs it administers." *Woodford,* 126 S.Ct. at 2385. *See also Ruggiero,* 467 F.3d at 178 (citing *Porter,* 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." *Berry,* 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests were given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. *Berry,* 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

**\*11** Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. *Shangold v. The Walt Disney Co.,* No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." *Gleason v. Jandrucko,* 860 F.2d 556, 559 (2d Cir.1988); *McMunn v. Mem'l Sloan-Kettering Cancer Center,* 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

the presentation of the opposing party's claim or defense." *McMunn*, 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold*, 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn*, 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer*, 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn*, 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn

affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold*, 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic*, 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn*, 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

**Conclusion**

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent, Deputy Ryan,
Defendants.
No. 9:04-CV-0471.

Sept. 13, 2006.

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney
General, The Capitol Albany, NY, for Defendants.

### DECISION and ORDER

THOMAS J. McAVOY, Senior District Judge.

**\*1** Plaintiff commenced the instant action asserting
various violations of his constitutional rights arising out of
his placement at the Southport Correctional Facility. In his
Complaint, Plaintiff alleges that he was improperly sent to
the Special Housing Unit ("SHU") at a maximum security
facility and that being in SHU has put his life in jeopardy.
Currently before the Court is Defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56 seeking
dismissal of the Complaint in its entirety for failure to
exhaust administrative remedies.

### I. FACTS[FN1]

> FN1. The following facts are taken from
> Defendants' statement of material facts submitted

pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts
are deemed admitted because they are supported
by the record evidence and Plaintiff failed to
submit an opposing statement of material facts as
required by Rule 7.1(a)(3). Plaintiff was
specifically advised by Defendants of his
obligation to file an opposing statement of
material facts and to otherwise properly respond
to the motion for summary judgment.

Plaintiff is an inmate in the custody of the New York State
Department of Correctional Services. Plaintiff signed the
instant Complaint on April 7, 2004. On his Complaint
form, Plaintiff indicated that there is a grievance
procedure available to him and that he availed himself of
the grievance procedure by filing a complaint with the
IGRC [FN2], followed by an appeal to the superintendent of
the facility, and then to the Central Office Review
Committee in Albany. The Complaint indicates that
Plaintiff is "waiting for response from Albany." The
Complaint was filed on April 27, 2004.

> FN2. Inmate Grievance Review Committee.

On April 12, 2004, prior to the filing of the instant
Complaint, Plaintiff filed a grievance relating to the issues
presented in this case. On April 19, 2004, the IGRC
recommended that Plaintiff's grievance be denied. Plaintiff
then appealed that decision to the facility Superintendent.
In the meantime, on April 27, Plaintiff commenced the
instant litigation. On May 3, 2004, after Plaintiff filed the
Complaint in this case, the Superintendent denied
Plaintiff's grievance. On May 5, 2004, Plaintiff appealed
the decision to the Central Office Review Committee in
Albany. On June 23, 2004, the Central Office Review
Committee denied Plaintiff's appeal. Plaintiff did not file
any other grievances in connection with the matters raised
in this lawsuit.

Defendants now move to dismiss on the ground that
Plaintiff commenced the instant action before fully
exhausting his available administrative remedies.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

## II. DISCUSSION

The sole issue presented is whether Plaintiff was required to complete the administrative process before commencing this litigation. This issue has already been addressed by the Second Circuit in *Neal v. Goord,* 267 F.3d 116 (2d Cir.2001). The issue in that case was "whether plaintiff's complaint should have been dismissed despite his having exhausted at least some claims during the pendency of his lawsuit." *Id.* at 121. The Second Circuit held that "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." *Id.*

In this case, Defendants have established from a legally sufficient source that an administrative remedy is available and applicable. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also* 7. N.Y.C.R.R. § 701.1, *et seq.* Plaintiff's Complaint concerns his placement in SHU at a maximum security facility. These are matters that fall within the grievance procedure available to NYSDOCS inmates and are required to be exhausted under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Plaintiff has failed to demonstrate any applicable exception to the exhaustion requirement. Because Plaintiff commenced the instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed without prejudice. *Neal,* 267 F.3d 116.

## III. CONCLUSION

**\*2** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Pettus v. McCoy
Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2015 WL 1893340
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Selam SELAH, Plaintiff,
v.
Brian FISCHER, et al., Defendant.

Civil Action No. 9:09–cv–1363 (GLS/DEP).
|
Signed April 15, 2015.

**Attorneys and Law Firms**

Selam Selah, Cape Vincent, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney
General, Christopher W. Hall, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for the Defendants.

### *ORDER*

GARY L. SHARPE, Chief Judge.

**\*1** The above-captioned matter comes to this court
following a ReportRecommendation by Magistrate Judge
David E. Peebles, duly filed March 24, 2015. Following
fourteen days from the service thereof, the Clerk has sent
the file, including any and all objections filed by the parties
herein.

No objections having been filed, and the court
having reviewed the Magistrate Judge's Report–
Recommendation for clear error, it is hereby ORDERED
that the Report–Recommendation of Magistrate Judge
David E. Peebles filed March 24, 2015 (Dkt. No. 223) is
ACCEPTED in its entirety for the reasons stated therein;
and it is further

ORDERED that defendants' motion for summary
judgment (Dkt. No. 198) is granted, and that all remaining
claims set forth in plaintiff's complaint are DISMISSED;
and it is further

ORDERED that the Clerk close this case and provide a
copy of this Order to the parties in accordance to the local
rules.

IT IS SO ORDERED.

### *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

*Pro se* plaintiff Selam Selah, a New York State prison
inmate, has brought this action against the Commissioner
of the New York State Department of Corrections and
Community Supervision ("DOCCS") and several present
or past DOCCS employees, pursuant to 42 U.S.C. §
1983, alleging that they have deprived him of his civil
rights. In his complaint, as amended, plaintiff alleges,
*inter alia,* that defendants have failed to accommodate
his religious beliefs and permit him to practice his chosen
religion, while members of other religions are treated more
favorably, and have thereby violated his constitutional
rights to freely exercise his chosen religion and to equal
protection in violation of the First and Fourteenth
Amendment, as well as the Religious Land Use and
Institutionalized Person Acts ("RLUIPA"), 42 U.S.C. §
2000cc *et seq.*

Now that discovery in the action is closed, the defendants
remaining in the action have moved for summary
judgment dismissing plaintiff's claims on the basis of lack
of personal involvement and on the merits, additionally
asserting their entitlement to qualified immunity from
suit. For the reasons set forth below, I recommend that
defendants' motion be granted.

I. *BACKGROUND* [1]
Plaintiff is a prison inmate currently in the custody of the
DOCCS. *Dkt. No. 84.* While it is clear from plaintiff's
prolific filings in this case that he believes the failure to
accommodate his religious beliefs is systemic throughout
the DOCCS and the many facilities which it operates,
the claims set forth in plaintiff's amended complaint
stem from events occurring at Gouverneur Correctional
Facility ("Gouverneur"), where he was confined from
May 1,2009, until May 17, 2010. [2] *Dkt. No. 84 at 15; see
also Dkt. No. 198–4 at 3.*

Plaintiff subscribes to the religious tenets of the Ethiopian
Orthodox Christian faith, also known as Ethiopian/
Egyptian Coptic Orthodox Christianity ("EOC"). *Dkt.*

*No. 84 at 9.* According to plaintiff, EOC is "similar to Orthodox Judaism" and "virtually identical" to Rastafarianism, with the exception that Jesus Christ is recognized by EOC followers as the Messiah, but is not by Rastafarians and Jews. *Id.* at 5, 9. Members of EOC observe several major and minor holy days, including (1) Ethiopian Christmas, (January 7) to celebrate the birth of Jesus; (2) Ethiopian Epiphany/Revelation of Holy Trinity (January 19); (3) Ethiopian Empress Menen's birthday/ Annunciation to Virgin Mary (March 25); (4) Palm Sunday; (5) Holy Friday; (6) Ascension Thursday (40 days following the Ethiopian Easter); (7) Ethiopian Emperor Haile Selassie's birthday (July 23); (8) the Ethiopian New Year (September 11); (9) the Coronation of Haile Selassie I (November 2); and (10) Ethiopian Liberation Day (May 5). *Dkt. No. 84 at 2,* 5. In addition, EOC followers observe Wednesdays and Fridays as holidays when they must fast, and Saturdays and Sundays as days of rest during which they are forbidden from "perform[ing] secular tasks of menial or servile labor[.]" *Id.* at 5. The followers of EOC subscribe to Old Testament dietary laws, similar to those followed by Orthodox Jews, with heavy emphasis placed on observing "Kosher" dietary requirements. *Id.*

**\*2** In his amended complaint, plaintiff alleges that he and other EOC followers have been discriminated against by prison officials in various ways, including through defendants' (1) refusal to recognize EOC as a religion in the DOCCS statewide correctional system database; (2) refusal to permit him and other EOC followers to possess and display headgear, a prayer shawl, prayer girdle, prayer rug, and other religious attire and artifacts consistent with their beliefs; (3) refusal to allow members of his sect to observe and commemorate the major and minor holy days; (4) failure to permit plaintiff to participate in EOC congregate religious services and education; (5) failure to provide meals consistent with Old Testament dietary laws; (6) failure to permit the plaintiff and other EOC believers to wear beards and dreadlocks or braids; and (7) refusal to exempt the plaintiff and other EOC members from work on Saturdays and Sundays. *See generally Dkt. No. 84.*

The policies and practices regarding ministerial services and religious programs in the New York prison system are governed by DOCCS Directives Nos. 4200 and 4202, as well as the DOCCS's religious holy day calendar. *Dkt. No. 198–4 at 2; Dkt. No. 198–5 at 2–3.* Responsibility for implementation of those policies is entrusted to the DOCCS Office of Family, Ministerial, and Volunteer Services ("OFMVS") which, in turn, relies upon chaplains at the various individual correctional facilities to meet the pastoral needs of inmates of varying religious faiths.[3] *Dkt. No. 198–4 at 2.* At the local facility level it is the prison superintendent's duty, in the first instance, to ensure compliance with DOCCS religious policies. *Dkt. No. 198– 8 at 2.* In the case of Gouverneur, that responsibility was delegated to the deputy superintendent for programs, who in turn relied upon the coordinating chaplain to attend to the pastoral needs of the facility's inmates. *Id.*

Plaintiff complained to various DOCCS officials claiming that his religious beliefs were not being accommodated, while Rastafarians were provided many of the same accommodations sought by him. *Dkt. No. 84 at 5,* 6–7, 11–13. The alleged failure of prison officials to accommodate plaintiff's religious beliefs was the subject of multiple grievances filed by Selah while at Gouverneur. *Dkt. No. 198–8 at 3; Dkt. No. 198–9; Dkt. No. 198– 10; Dkt. No. 198–11; Dkt. No. 198–12; Dkt. No. 198– 13.* The first two, which were addressed separately by the Inmate Grievance Review Committee ("IGRC") at Gouverneur and the facility superintendent before being consolidated on review by the Central Office Review Committee ("CORC"), are identified as GOV–14596–09 and GOV–14611–09, and were filed on May 4, 2009, and May 11, 2009, respectively. *Dkt. No. 198–9 at 4,* 11. Those grievances alleged religious discrimination generally and requested that EOC be recognized by the DOCCS.[4] *Id.* Following the IGRC's denial of both grievances, defendant Justin Taylor, the superintendent at Gouverneur at the time, advised plaintiff that, to the extent the grievances sought to establish policy concerning a departmental issue, neither the IGRC nor he had the authority to make those changes. *Dkt. No. 198–9 at 8,* 18. The superintendent's determinations were upheld on review to the CORC on July 8, 2009. *Dkt. No. 198–9 at 2.* In its decision, the CORC noted the following:

**\*3** [T]he grievant is free to practice his chosen religion and although the department takes no position on it, ministerial services staff will attempt to accommodate the grievant if feasible. This will, however, require that the grievant provide ministerial staff with the name and address of his church and a clergy member whom they may contact to verify religious tenets. Having done so, the grievant may then request approval for head wear, a beard permit and clergy visitation. CORC notes

that the grievant has been advised that proselytizing is prohibited by Directive # 4202. CORC advises the grievant to address any further concerns regarding the Cold Alternative Diet (CAD) to the Food Service Administrator and any specific religious concerns to the Coordinating Chaplain for the most expeditious means of resolution.

Id.

Plaintiff's second grievance, GOV–14641–09, was filed on May 28, 2009, and alleged that he was wrongfully denied his request to the Food Service Administrator at Gouverneur that he be provided fish, poultry, nuts or fruits, instead of beef or lamb, on Wednesdays and Fridays, which, according to plaintiff, are fasting days for EOC followers. *Dkt. No. 198–10 at 6.* Plaintiff also complained in the grievance that he was precluded from "enjoy [ing] congregate religious services," claimed that he should be exempt from the DOCCS initial haircut and beard-length policies and the "ppd T.B. skin test," and also contended that he should be permitted to wear a crown in accordance with his faith. [5] *Id.* at 8. The IGRC and defendant Taylor both again denied plaintiff's grievance because, based on their interpretation of plaintiff's grievance, he was seeking a change to a departmental policy, a matter beyond the authority of both the IGRC and superintendent. *Id.* at 4, 10. The CORC upheld that determination by memorandum dated July 8, 2009, with the same notation included in response to grievance numbers GOV–14596–09 and GOV–14611–09. *Id.* at 2; *Dkt. No. 198–9 at 2.*

On October 19, 2009, plaintiff filed yet another grievance at Gouverneur, identified as GOV–15011–09, involving religion, on this occasion requesting clarification of the religious holidays recognized by the DOCCS. [6] *Dkt. No. 198–11 at 4.* In response, defendant Taylor noted that "[a]ll required holidays and religious celebrations are determined by [the DOCCS] Central Office," whose dictates in that regard are followed at each particular facility. *Dkt. No. 198–11 at 6.* Defendant Taylor also referred plaintiff to the DOCCS religious holy day calendar. [7] *Dkt. No. 198–11 at 6.* The CORC affirmed defendant Taylor's determination on January 13, 2010, and Selah was advised "to address any further concerns regarding religious and cultural holidays to the Director of Ministerial, Family and Volunteer Services in [the DOCCS] Central Office." *Dkt. No. 198–11 at 2.*

In his fifth grievance, GOV–15083–09, filed on November 18, 2009, plaintiff requested that EOC be recognized by the DOCCS throughout the statewide correctional system as a legitimate religion, and that he and other EOC followers be afforded the right to celebrate and observe EOC religious and national holidays, be exempted from assigned work on recognized holy days, and be allowed to participate in religious fasts, feasts and festivals. [8] *Dkt. No. 198–12 at 4.* On December 2, 2009, the IGRC responded by advising plaintiff to discuss his problems or concerns with the facility chaplain. *Dkt. No. 198–12 at 5.* That determination was upheld by defendant Taylor, who reiterated the reminder to plaintiff that he should direct concerns regarding religious dietary constraints to "the Food Service Administrator and any specific religious concerns to the coordinating Chaplain[.]" *Dkt. No. 198–12 at 6.* The CORC rejected plaintiff's appeal of defendant Taylor's determination on February 24, 2010. *Dkt. No. 198–12 at 2.* In its determination, the CORC "note[d] that the grievant is free to practice his chosen religion and although the department takes no position on it, ministerial services staff will attempt to accommodate the grievant if feasible." *Id.* The CORC further stated that any accommodation would require that Selah provide "ministerial staff with the name and address of his church and a clergy member whom they may contact to verify his religion's tenets." *Id.* Addressing plaintiff's concern regarding the DOCCS's recognition of his religion, the "CORC further note[d] that it is not possible to include every religion on the NYS DOCs computer system[,]" and for that reason, plaintiff's "religious designation is indicated as 'other.' "

**\*4** Plaintiff's sixth and seventh grievances at Gouverneur concerning his religious rights, identified as GOV–15184–10 and GOV–15219–10, were filed on January 19, 2010, and February 8, 2010, respectively. *Dkt. No. 198–13 at 7–11,* 18–24, 47–50. Grievance number GOV–15184–10 generally alleges that Selah was the subject of an improper misbehavior report charging him with, *inter alia,* smuggling food from the mess hall. *Id.* at 47–50. Plaintiff alleged that he intended to bring food out of the mess hall because he was observing a fast and intended to eat the food later in the day in accordance with EOC doctrine. *See generally id.* In grievance number GOV–15219–10, plaintiff complains that the DOCCS does not recognize his religion and has unfairly placed the responsibility on him to notify the DOCCS of his religious needs. [9] *See generally id.* at 7–11, 18–24. The

facility's IGRC responded to grievance number GOV–15219–10, on February 18, 2010, recommending that plaintiff correspond in writing directly to defendant Thomas Kilian, the Senior Chaplin at Gouverneur, concerning any issues regarding policies or procedures related to religious practices. [10] *Id.* at 12. Similarly, the IGRC responded to grievance number GOV–15184–10 on January 28, 2010, by advising plaintiff to correspond with defendant Kilian. *Id.* at 39. The determinations by the IGRC regarding those two grievances were affirmed by defendant Taylor in his responses dated February 16 and 24, 2010, which in relevant part, instructed plaintiff to coordinate his religious needs with defendant Kilian. *Id.* at 25, 40. Defendant Taylor's determinations were upheld by the CORC on August 4, 2010, in a decision that consolidated both grievance numbers GOV–15184–10 and GOV–15219–10. *Id.* at 2. In its decision, the CORC noted that, pursuant to DOCCS Directive No. 4202, in cases where a religion is not represented by certified chaplains, the DOCCS "will seek advice on matters of religious doctrine, practice and tradition from recognized religious authorities in the outside community." *Id.* The CORC further noted that a DOCCS Chaplain had met with the plaintiff on July 6, 2010, to discuss his religious demands, and the Chaplain contacted "a recognized religious authority in the outside community." *Id.* The CORC concluded that it "has not been presented with sufficient evidence to support the grievant's claim that the Department has not accommodated the legitimate spiritual needs of the grievant as reasonably as possible in a manner which is commensurate with its legitimate correctional interests and the safety and security of its respective facilities." [11] *Id.*

In his position as coordinating chaplain at Gouverneur, defendant Kilian serves as the principal advisor to the superintendent on matters regarding religious programs and practices and is responsible for planning the overall religious program at the facility, in collaboration with other chaplains assigned there. *Dkt. No. 198–4 at 1.* Defendant Kilian interacted with the plaintiff while he was at Gouverneur and repeatedly advised that, in order for him to obtain his assistance in accommodating Selah's beliefs, plaintiff needed to inform defendant Kilian, in writing, of his dietary requirements, the holy days he wished to observe, and the religious books and articles that he desired to possess. *Id.* at 2–3. Defendant Kilian also repeatedly asked Selah to provide the name of a clergy person he wished to have visit, and indicated that, if possible, he would facilitate the visit. *Id.* at 3.

**\*5** Defendant Kilian met with Selah on February 11, 2010. *Dkt. No. 198–4.* During that meeting, Kilian informed Selah that he was to correspond directly with Kilian concerning religious matters and was instructed to provide a specific list or request concerning the facilitation of any religious observants. *Dkt. No. 198–4 at 6.* On the day of the meeting, plaintiff signed a memorandum from defendant Kilian specifically instructing him to provide any religious-based requests to Kilian, as the coordinating chaplain, in writing. *Dkt. No. 201 at 27.* Plaintiff acknowledged that he would provide defendant Kilian with a list of EOC holy days. *Id.* Plaintiff's failure to comply with that directive resulted in the issuance of a misbehavior report for not following facility procedures. *Id.* at 25.

Between February 12 and February 15, 2010, Kilian received "voluminous responses" from the plaintiff concerning his needs. *Dkt. No. 198–4 at 6.* The materials submitted by Selah were forwarded by Kilian to Omega Austin, the Assistant Director of OFMVS with a notation that Selah's religion was listed in departmental records as "other" and that he was placed on an Cold Alternative Diet ("CAD") to accommodate his religious dietary requirements, and additionally had been relieved of work and programs for the holy day of Ethiopian Christmas. *Id.; Dkt. No. 201 at 35.* Kilian requested that Austin provide additional instructions regarding plaintiff's requests. *Dkt. No. 201 at 35.* Further correspondence from Selah was forwarded by defendant Kilian on March 25, 2010, to Deacon Donald T. Sharrow, at the DOCCS Central Office. *Dkt. No. 198–4 at 6–7.* In his cover letter accompanying those materials, defendant Kilian indicated he would advise plaintiff of the need to provide a name and address of an EOC clergy as directed by the CORC. *Dkt. No. 201 at 106.* Defendant Kilian did not receive any further correspondence regarding plaintiff through the date of Selah's transfer out of Gouverneur on May 17, 2010. *Dkt. No. 198–4 at 7.*

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on December 7, 2009. *Dkt. No. 1.* Since its inception, the action has had an extensive and tortured procedural history that includes over 200 docket entries, and features repetitive serial filings by plaintiff, including, but not limited to, twenty-

nine requests for injunctive relief or supplemental materials in support of previously filed requests for injunctive relief, Dkt. Nos. 5, 69, 74, 76, 86–89, 91, 95–96, 99, 102–103, 105–07, 109–10, 131, 155, 157, 164, 176, 182, 189, 211, 214, 220; eight requests for the appointment of *pro bono* counsel or supplemental materials in support of previously filed requests for counsel, Dkt. Nos. 6, 115, 118, 122, 135, 208–09, 211; and twenty-one miscellaneous submissions that seek no relief, seek relief that cannot be obtained from the court, include discovery-related materials but request no specific court intervention, relate to settlement, and/or request copies from the court of voluminous materials submitted earlier by plaintiff, Dkt. Nos. 58, 72, 80–81,83, 108, 117, 119, 142, 144, 147, 150–51, 154, 158, 160, 166, 184, 187, 197, 206.

**\*6** On September 14, 2011, with leave of court, plaintiff filed an amended complaint, which serves as the currently operative pleading in the case.[12] *Dkt. No. 84.* As defendants, plaintiff's amended complaint names (1) the DOCCS; (2) the former DOCCS Commissioner, Brian Fischer; (3) the retired DOCCS Chaplain to Rastafarian inmates, Abuna Ammanuel Foxe; (4) the DOCCS Director of the OFMVS, Cheryl Morris; (5) the DOCCS Greek Orthodox Christian Chaplain, Fr. Mantzouris; (6) the Director of the DOCCS Inmate Grievance Program, Karen Bellamy; (7) the Superintendent at Gouverneur, Justin Taylor; (8) the Coordinating Chaplain at Gouverneur, Thomas Kilian; and (9) the former DOCCS Director of OFMVS, Mark Leonard, all of whom are sued in both their individual and official capacities. *See generally id.* Plaintiff's amended complaint asserts three claims, including (1) a violation of his right to freely exercise his chosen religion as guaranteed under the First Amendment; (2) the denial of equal protection in violation of the Fourteenth Amendment; and (3) infringement of his statutory rights under the RLUIPA. *Id.* Plaintiff seeks various forms of monetary, declaratory, and injunctive relief. *Id.*

Since the filing of plaintiff's amended complaint, the defendants have brought three dispositive motions seeking dismissal of the action. In the first, filed on November 21, 2011, they sought dismissal of plaintiff's original complaint for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Dkt. No. 111.* That motion was granted only to the limited extent of ordering dismissal of all claims against the DOCCS. Dkt. Nos.

125, 126. Defendants then filed a motion for judgment on the pleadings on September 17, 2012, pursuant to Rule 12(b)(c) of the Federal Rules of Civil Procedure. *Dkt. No. 136.* That second motion resulted in dismissal of plaintiff's claims against defendants Mantzouris, Bellamy, and Leonard, without leave to replead, but was otherwise denied. Dkt. Nos. 165, 177.

On March 31, 2014, following the close of discovery, defendants moved for the entry of summary judgment dismissing plaintiff's remaining claims, arguing that the record does not adequately reflect the personal involvement of two of the defendants, the plaintiff's claims lack merit, and, alternatively, defendants are all entitled to qualified immunity from suit. *Dkt. No. 198.* Plaintiff has since responded in opposition to defendants' motion. Dkt. Nos. 207, 212, 219. Defendants' motion, which is now fully briefed, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

**\*7** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F .3d at 83. In

the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); Celotex, 477 U.S. at 324; Anderson, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. Anderson, 477 U.S. at 255; Jeffreys, 426 F.3d at 553; Wright v. Coughlin, 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. Bldg. Trades Employers' Educ. Ass'n v. McGowan, 311 F.3d 501, 507–08 (2d Cir.2002); see also Anderson, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. Personal Involvement

In their motion, defendants first contend that the record evidence does not support a finding that defendants Fischer and Foxe were personally involved in the alleged violations of plaintiff's rights under the Constitution or RLUIPA. Dkt. No. 198–14 at 3–6.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994) (citing Mofitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir.1991); McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir.1977)). As the Supreme Court has noted, a defendant may only be held accountable for his actions under section 1983. See Iqbal, 556 U.S. at 683 ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered ." Bass v. Jackson, 790 F.2d 260, 263 (2d Cir.1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." Hen drickson v. U.S. Attorney Gen., No. 91–CV–8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994). [13]

1. Defendant Fischer [14]

Defendant Fischer, the Commissioner of the DOCCS, is mentioned only four times in plaintiff's amended complaint. Dkt. No. 84 at 13, 14, 15–16. Plaintiff alleges that (1) he intends to "keep Defendant[ ] ... Fischer ... as [a] named defendant[ ] in this case," id. at 15; (2) members of the prison staff at the Orleans Correctional Facility report to defendant Fischer, id.; (3) defendant Fischer, as the Commissioner of the DOCCS, owed plaintiff "a duty of care" related to "[d]efendant Fischer's responsibility for directing policies," at 13; and (4) defendant Fischer has "consulted with and [has] relied on Defendant Abuna Foxe to assist [him] in authoring and promulgating [DOCCS] rules, directives, regulations and policies concerning Rastafarianism and decisions about Ethiopian/Egyptian Coptic Orthodox Christian doctrine, practices, tradition, beliefs, and observances ... that the Defendants, the [DOCCS] and its agents, have used to subject the Plaintiff ... to religious discrimination and deprivations," id. at 14.

*8 It appears that plaintiff's claims against defendant Fisher are predicated largely upon his supervisory role as the DOCCS Commissioner. It is wellestablished that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor, "and [liability] cannot rest on respondeat superior." Richardson v. Goord, 347 F.3d 431, 435 (2d Cir.2003); Wright, 21 F.3d at 501. To establish responsibility on the part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. Iqbal v. Hasty, 490 F.3d 143, 152–53 (2d Cir.2007), rev'd on other grounds sub nom. Ashcroft v. Iqbal, 556 U .S. 554 (2009); see also Richardson, 347 F.3d at 435; Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995); Wright, 21 F.3d at 501.

In my prior report, addressing plaintiff's motion for judgment on the pleadings, I found that only the fourth allegation listed above against defendant Fischer could give rise to a plausible claim. In doing so, in light of the procedural posture of the case, I generously construed plaintiff's complaint as alleging that defendant Fischer is responsible for promulgating policies that have prevented

the plaintiff from (1) possessing and displaying head gear, a prayer shawl, a prayer girdle, a prayer rug, and other appropriate religious attire and artifacts; (2) observing and commemorating holy days; (3) participating in congregate religious services and education; (4) eating meals consistent with Old Testament dietary laws; (5) wearing beards and dreadlocks or braids; and (6) being exempt from work on Saturdays and Sundays. *See generally Dkt. No. 84; Dkt. No. 165 at 14.*

Despite the opportunity for plaintiff to engage in discovery, the record before the court fails to reveal any evidence from which a reasonable factfinder could conclude that defendant Fischer was aware of and failed to remedy any of the constitutional or statutory violations alleged by plaintiff. At this stage of the litigation, the burden is on plaintiff to come forward with evidence giving rise to a genuine dispute of material fact regarding whether defendant Fischer created or enforced DOCCS policies that specifically precluded plaintiff from possessing religious accoutrements, observing and celebrating holy days, participating in congregate services and the appropriate dietary restrictions for EOC, wearing his hair in dreadlocks and/or braids and wearing his beard a certain length, and working on Saturdays and Sundays.

In his response in opposition to defendants' motion, plaintiff includes the following argument:

> **\*9** [W]hile the Defendants claim that they have not ... created, implemented, nor carried out any discriminatory prison policies ... [,] in actuality [the DOCCS] *Directive # 4040, § 701.5, (d)(2) (ii ) (7/12/06) states in pertinent part: The CORC functions on behalf of the Commissioner and under his authority. CORC decisions have the [same] effect of [Departmental] directives ....* The Departmental Directives are in other words **prison policies ....**

*Dkt. No. 207 at 8* (emphasis and bracketed text in original). This argument appears to suggest that, because the CORC acts on behalf of the DOCCS Commissioner and under his authority, any decision by the CORC has the same force and effect as a departmental directive from the Commissioner, which then becomes controlling prison

policy. Even liberally construed, however, this argument misses the mark and merely serves to underscore the fact that defendant Fischer's personal involvement in this case is based on his role as the DOCCS Commissioner. This is not enough at the summary judgment stage to give rise to a dispute of fact regarding personal involvement. Because the record is lacking in any evidence of defendant Fischer's personal involvement in the decisions rendered that allegedly denied plaintiff the right to exercise his chosen religion, I recommend that all claims against him be dismissed. [15]

### 2. *Defendant Foxe*

Defendant Foxe is mentioned five times in plaintiff's amended complaint. *Dkt. No. 84 at 10,* 14–16. Plaintiff alleges that defendant Foxe (1) founded the Ba Beta church of Haile Selassie I sect of Rastafarians, *id.* at 10; (2) is not an expert on plaintiff's religion, *id.* at 14; (3) was excommunicated from the Ethiopian Orthodox Church, *id.;* (4) assisted defendants Fischer and Morris in creating the policies and regulations allegedly responsible for violating plaintiff's rights when they consulted with him, *id.;* and (5) possessed the authority to approve the requests made by Orleans Correctional Facility staff as they relate to plaintiff's religious accommodations, *id.* at 15–16.

Plaintiff's allegations against defendant Foxe were also addressed in my prior report addressing defendants' motion for judgment on the pleadings. I concluded that the first, third, and fifth allegations were legally insufficient to support a finding of liability for damages on the part of defendant Foxe. *Dkt. No. 165 at 16–17.* I further found, however, that given the early procedural stage at which the issue was being raised, the allegations that defendant Foxe contributed to creating and maintaining the DOCCS policies and practices, which, plaintiff alleges, violated his rights were sufficient at that point to state a plausible claim against that defendant. *Id.* at 17.

Now that defendants have moved for summary judgment, the procedural setting has been altered, and the pending motion now requires a careful review of the record to determine whether any evidence has been presented to inculpate defendant Foxe in the violations alleged. Based upon that review, I find that the record now before the court is lacking in evidence to support a

finding that defendant Foxe was personally involved in the alleged violations. In his declaration, defendant Foxe denies consulting with defendants Fischer or Morris "concerning the policies of the Division of Family, Ministerial, and Volunteer Services" or "communicat[ing] with [defendants Fischer or Morris] regarding [plaintiff]'s complaints." [16] *Dkt. No. 198–3 at 3.* Moreover, aside from a single discussion between Foxe and the plaintiff "[i]n the latter part of 2010," after plaintiff had been transferred out of Gouverneur, defendant Foxe had "no further contact, in person or in writing, with [plaintiff]." *Id.* In light of the fact that plaintiff has failed to come forward with evidence to contradict these statements, I recommend that his claims against defendant Foxe be dismissed based upon a lack of personal involvement.

### 3. *Defendant Morris* [17]

**\*10** Based on my review of the record, it is not clear how defendant Morris was involved in the alleged violations of plaintiff's rights under the Constitution and RLUIPA. Although in part I. of this report and in my previous report and recommendation, *Dkt. No. 165 at 14–16,* I generously construed plaintiff's amended complaint as suggesting that defendant Morris is responsible for various specific conduct, I find there is no record evidence to support plaintiff's allegations against that defendant. In defendant Morris' declaration submitted in support of defendants' motion, she provides the court with information regarding her role as the Director of the OFMVS, the individuals to whom she reports, and the role the OFMVS serves within the DOCCS, and refers the court to the declarations of defendants Kilian and Taylor for specific examples of how plaintiff's religious needs were attempted to be served while he was confined at Gouverneur. *See generally Dkt. No. 198–5.* As was mentioned above, defendant Morris denies ever consulting with defendant Foxe concerning plaintiff's requests. *Id.* at 8. As for plaintiff's proof, he has offered no evidence to support his allegations regarding defendant Morris' involvement. While general and conclusory allegations occasionally will permit a plaintiff's claim to pass muster in connection with a motion dismiss pursuant to Rule 12 of the Federal Rules of Civil Procedure, at the summary judgment stage he is required to set forth evidence that gives rise to a genuine dispute of material fact. Plaintiff's failure to do so in this case is fatal to his claim against defendant Morris. Because I find there is no record evidence from which a reasonable factfinder could conclude that defendant

Morris was personally involved in the constitutional and statutory violations alleged, I recommend the dismissal of all claims asserted against her.

### C. *Qualified Immunity*

Defendants contend that they are entitled to qualified immunity from suit in this action based on their conduct as alleged by plaintiff. *Dkt. No. 198–14 at 21–22.* "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards,* 132 S.Ct. 2088, 2093 (2012); *see also Pearson v. Callahan,* 555 U.S. 223, 231 (2009); *Sudler v. City of N.Y.,* 689 F.3d 159, 174 (2d Cir.2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson,* 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler,* 689 F.3d at 174 (citing *Saucier v. Katz,* 533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson,* 555 U.S. 223)).

**\*11** Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation," *Pearson,* 555 U.S. at 231 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227 (1991) (per curiam)).

The determination of whether a government official is immune from suit is informed by two factors. *Doninger v. Niehoff,* 642 F.3d 334, 345 (2d Cir.2011). Specifically, the inquiry turns on whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a statutory or constitutional right, and if so, whether that right "was clearly established at the time of the challenged conduct." *Terebesi v. Torreso,* 764 F.3d 217, 230 (2d Cir.2014) (citing *Reichle,* 132 S.Ct. at 2093). The Supreme Court has said that an officer's "conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."

*Ashcroft v. al-Kidd,* 131 S.Ct. 2074, 2083 (2011) (quotation marks and alterations omitted). "To this end, a plaintiff need not show a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.' " *Terebesi,* 764 F.3d at 230 (quoting *al-Kidd,* 131 S.Ct. at 2083). However, '[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169–70 (2d Cir.2007) (citations omitted). This "objective reasonableness" part of the test is satisfied if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v.. Briggs,* 475 U.S. 335, 341 (1986).

After carefully considering the record evidence and the parties' memoranda submitted in connection with defendants' motion, I recommend a finding that defendants are entitled to qualified immunity in this action. Under the circumstances, and even assuming, without deciding, that defendants Kilian and Taylor violated plaintiff's clearly established rights, I conclude that it was objectively reasonable for them to believe that their conduct did not violate plaintiff's rights under the First Amendment or RLUIPA.

1. *Defendant Kilian*

According to the record, as early as December 1, 2009, plaintiff was instructed by Deputy Commissioner Kenneth S. Perlman to refer his requests regarding his religious needs to defendant Kilian, the coordinating chaplain at Gouverneur. *Dkt. No. 201 at 2.* On December 23, 2009, plaintiff was again advised by R. Pirie, the DOCCS Deputy Superintendent for Program Services, to refer his religious needs to defendant Kilian. *Id.* at 6. Pirie's memorandum explained that, in order to obtain assistance in having his religious beliefs met, plaintiff must provide defendant Kilian "specific requests," which would enable him to consult with "those who are authorities on such religious matters, as well as Central Office staff in Ministerial Services[.]" *Id.*

**\*12** According to a letter from plaintiff, dated January 2, 2010, and addressed to several individuals, including defendant Kilian and Pirie, defendant Kilian met with plaintiff in or around that date. *Dkt. No. 102 at 8.* During that meeting, defendant Kilian asked plaintiff "to draft

a list of some of the various things and ways that [he] desire[s] and/or request[s] to exercise [his] freedom of religion[.]" *Id.* Plaintiff's letter then asks for EOC to be listed as a religion in the DOCCS database, that EOC "duly be recognized as a bonifide [sic] and legitimate religious designation and religion by the [DOCCS]," that he "and similarly situated inmates" that adhere to EOC be permitted to celebrate "major and minor holy days of significance ... and to be allocated daily kosher meals (at least one hot meal per day) and special holy days meals." *Id.* It appears from the record that defendant Kilian did not receive this letter from plaintiff. Instead, it appears that the letter was sent to and received by Pirie, who responded to the letter in a memorandum dated January 6, 2010, in which Pirie wrote as follows:

> As Deacon Kilian advised you at [your] meeting [with him], you should direct any and all requests for religious assistance to him because he is the Coordinating Chaplain and in the best position to assist you. Therefore, I am forwarding your letter to him so that he may investigate and respond to your requests ....

*Id.* at 21.

Less than a month later, plaintiff again met with defendant Kilian again. *Dkt. No. 198–4 at 6; Dkt. No. 201 at 27.* Defendant Kilian provided plaintiff with a memorandum that stated the following:

> Please be advised that I am in receipt of copies of your recent religious requests and grievance filing. In order to best help you with any religious/faith group matters you may have you must follow these procedures:
>
> 1. You are to correspond, in writing, with me DIRECTLY regarding any religious/faith group concerns you may have so that I may best serve you in a timely manner.
>
> 2. You are to provided me DIRECTLY with a specific list or request regarding any matter of religious/faith group practice that you claim is part of your religious observance that you want facilitated on your behalf. Any list or request will be submitted to Ministerial and Family Services, Central Office, for their recommendation and approval.

*Id.* Plaintiff signed and acknowledged receipt of this memorandum on the same day. *Id.*

Following this meeting, plaintiff provided defendant Kilian with "voluminous" submissions dated February 12, 2010, and February 15, 2010. *Dkt. No. 198–4 at 6; Dkt. No. 201 at 36–104.* Defendant Kilian forwarded plaintiff's submissions to Omega Alston, the Assistant Director Ministerial Services, seeking guidance as to "what further action is to be taken regarding [plaintiff's] religious requests[.]" *Dkt. No. 201 at 35.* Similarly, defendant Kilian submitted additional correspondence received by plaintiff to Deacon Donald T. Sharrow at the Central Office on March 25, 2010. Dkt. No. 106–19. According to defendant Kilian, "[a]s of May 17, 2010, the date of [plaintiff]'s transfer out of Gouverneur, [he] had not received further correspondence concerning [plaintiff]." *Dkt. No. 198–4 at 7.*

**\*13** Aside from the evidence described above, there is nothing in the record before the court regarding defendant Kilian's conduct in this matter. Although plaintiff's amended complaint, liberally construed, alleges defendant Kilian is responsible for denying him various specific religious requests, there is no record to support those allegations. Even assuming, however, that plaintiff's allegations are true, and assuming for the sake of argument that the allegations were sufficient to support a reasonable factfinder's conclusion that defendant Kilian violated plaintiff's rights under the First Amendment and RLUIPA, I find that it was reasonable for defendant Kilian to believe that his responses to plaintiff's letters did not violate his rights. Based on the record before me, it appears defendant Kilian met with plaintiff on two occasions, instructed him to put in writing his specific requests regarding his religious exercise, and forwarded plaintiff's demands to the appropriate personnel within the DOCCS for further guidance. Because I find that no reasonable factfinder could conclude that it was objectively unreasonable for defendant Kilian to believe that his conduct in this case did not violate plaintiff's clearly established constitutional and statutory rights, I recommend defendant Kilian be afforded qualified immunity from suit and the claims asserted against him be dismissed.

### 2. *Defendant Taylor*

The record evidence reflects that defendant Taylor affirmed the IGRC's denials of each of plaintiff's grievances described in part I. of this report. *Dkt. No. 198–8 at 3–5; Dkt. No. 198–9 at 8,* 18; *Dkt. No. 198–10 at 6; Dkt. No. 198–11 at 6; Dkt. No. 198–12 at 6; Dkt. No. 198–13 at 25,* 40. In addition, defendant Taylor instructed defendant Kilian and Deputy Superintendent Pirie to take specific steps to address plaintiff's religious requests and cooperate with the OFMVS to this end. *Dkt. No. 198–8 at 3,* 5. Having had an opportunity to review plaintiff's grievances and defendant Taylor's responses, I find that no reasonable factfinder could conclude that his conduct was objectively unreasonable or that he knew or should have known that his conduct violated plaintiff's rights under the Constitution or RLUIPA. As defendant Taylor emphasizes, he denied plaintiff's appeals in connection with the grievances based on his belief that plaintiff was seeking relief that he was not authorized to provide, and he provided plaintiff with instructions regarding how to seek the relief requested. *Id.* at 3–5. Moreover, defendant Taylor responded in accordance with DOCCS policies that were in place at the time. *Id.* at 5; *see Green v. Bauvi,* 46 F.3d 189, 195 (2d Cir.1995) ( "[A]dherence to [state regulations] may be pertinent in considering whether a reasonable official would have known his actions violated the Constitution."). Accordingly, even assuming that defendant Taylor violated plaintiff's clearly established rights by denying his appeals from each of his grievances, I recommend defendant Taylor be afforded qualified immunity from suit and the claims asserted against him be dismissed. [18]

### IV. *SUMMARY AND RECOMMENDATION*

**\*14** In this action, plaintiff complains of a host of actions taken by DOCCS employees that allegedly imposed substantial burdens upon his right to freely exercise his chosen religion. After a careful review of the record in the case, I find the record fails to give rise to a genuine dispute of fact regarding whether defendants Fischer, Foxe, and Morris were personally involved in the alleged conduct. In addition, even assuming plaintiff's allegations are true, and without rendering any finding regarding whether defendants did, in fact, violate plaintiff's rights under the First Amendment and RLUIPA, I find that no reasonable factfinder could conclude that it was unreasonable for defendants Kilian and Taylor to believe that their conduct did not violate plaintiff's rights.

Based upon the foregoing, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 198) be granted, and that all remaining claims set forth in plaintiff's complaint be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is further hereby ORDERED that the clerk serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Filed March 24, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1893340

---

Footnotes

1    Although plaintiff has opposed defendants' motion for summary judgment, he did not file an opposition to defendants' Local Rule 7.1(a)(3) Statement of Material Facts. By its terms, Local Rule 7.1 provides, in part, that *"[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced this portion of Local Rule 7.1 in cases involving a non-movant's failure to properly respond. See, *e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Svc. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado,* No. 96–CV–0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins,* No. 09–CV–0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.). Here, because plaintiff was warned of the consequences of failing to properly respond to defendants' Local Rule 7.1 Statement, *Dkt. No. 198 at 3,* and he has failed to do so, I will deem defendants' facts contained in their Local Rule 7.1(a)(3) Statement as having been admitted to the extent they are supported by accurate record citations. *See, e.g., Latouche,* 2011 WL 1103045, at *1; *see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). As to any facts not contained in defendants' Local Rule 7.1(a)(3) Statement, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

2    Plaintiff's amended complaint also raises issues concerning the alleged failure to accommodate his religious beliefs following his transfer into the Orleans Correctional Facility. *Dkt. No. 84 at 15–16.*

3    The OFMVS operates under the auspices of the DOCCS Deputy Commissioner for Programs. *Dkt. No. 198–2 at 2; Dkt. No. 198–5 at 1.*

4    Defendants did not submit a copy of either grievance number GOV–14596–09 or GOV–14611–09 in support of their motion for summary judgment. *See generally Dkt. No. 198–9.* My description of those grievances, as set forth above, is based upon an official Gouverneur document entitled "Case History and Record." *Id.* at 4, 15. The identity of the individual that prepared the documents is not disclosed. *Id.*

5    Because defendants included a copy of grievance number GOV–14641–09 in support of their motion, my description above is based on my review of the grievance. *Dkt. No. 198–10 at 5–9.*

6    Because defendants did not provide a copy of the original grievance number GOV15011–09, my description above is based on the "Case History and Record" document submitted in connection with the grievance. *See generally Dkt. No. 198–11.*

7    A copy of that document, entitled Religious Holy Day Calendar for the year 2014, was submitted as an exhibit to defendant Morris' declaration in support of defendants' motion. *Dkt. No. 198–7.*

**8**    Although defendants submitted a copy of the original grievance number GOV–15083–09, the second page is not legible. *Dkt. No. 198–12 at 11.* The first page of the grievance explicitly threatens to sue the DOCCS if it "fail[s] to remedy the wrongs" described in the grievance. *Id.* at 10.

**9**    Defendants have submitted a copy of grievance numbers GOV–15184–10 and GOV–15219–10 in support of their motion for summary judgment. *Dkt. No. 198–13 at 7–11,* 18–24, 47–50.

**10**    According to the documents submitted in support of defendants' motion, plaintiff has misspelled this individual's name as "T. Killian." *Compare Dkt. No. 84 with Dkt. No. 198–4.* The clerk of the court is respectfully directed to modify the court's records to reflect the correct spelling of defendant Kilian's name.

**11**    It appears that, by the time the CORC's decision was rendered with respect to grievance numbers GOV–15184–10 and GOV–15219–10, plaintiff had been transferred out of Gouverneur into another facility. *Dkt. No. 198–13 at 2.* In its decision, the CORC "advise[d] [plaintiff] to address any further religious concerns to the Facility Coordinating Chaplain at his current facility." *Id.*

**12**    Both the signed version of plaintiff's amended complaint and the proposed pleading proffered by Selah in support of his motion for leave to file that amended complaint appear to be lacking page two and the corresponding allegations included within paragraphs three through a portion of paragraph seven. Dkt. Nos. 68–1 and 84.

**13**    All unreported decisions cited to in this report have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

**14**    Anthony Annucci has replaced defendant Fischer as the Acting Commissioner of the DOCCS. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Annucci is automatically substituted for defendant Fischer to the extent defendant Fischer has been sued in his official capacity for purposes of any declaratory or injunctive relief. Fed.R.Civ.P. 25(d).

**15**    To the extent the assigned district judge does not dismiss this action in its entirety, I recommend dismissal of only the damage claims against defendant Fischer at this time. Because plaintiff also seeks declaratory relief, which could impact DOCCS policies, Anthony Annuci, as defendant Fischer's successor, should remain in the action, in his official capacity, in the event it is necessary to affect declaratory and injunctive relief with respect to the agency.

**16**    It is worth noting that both defendants Fischer and Morris also deny "consult[ing] with or rely[ing] on defendant Abuna Foxe ... to assist [them] in authoring and promulgating rules, directives, regulations and policies concerning Rastafarianism and decisions about [EOC] doctrine, practices tradition, beliefs and observances."*Dkt. No. 198–2 at 3; Dkt. No. 198–5 at 8.*

**17**    Defendants' motion does not challenge the sufficiency of plaintiff's evidence regarding the personal involvement of defendant Morris in connection with the violations alleged. This notwithstanding, I have addressed the personal involvement of defendant Morris *sua sponte* pursuant to the court's inherent authority. *See Williams v. Fischer,* No. 13–CV–0118, 2013 WL 2945396, at *3 (W.D.N.Y. June 12, 2013) ("A claim which fails to demonstrate a defendant's personal involvement in the alleged constitutional deprivation is subject to *sua sponte* dismissal.); *Winfield v. Bishop,* No. 09–CV–1055, 2010 WL 2773343, at *2 (N.D.N.Y. June 21, 2010) (Lowe, M.J.), *report and recommendation adopted by* 2010 WL 2773346 (N.D.N.Y. July 12, 2010) (Kahn, J.), (recommending dismissal of a defendant *sua sponte* based on lack of personal involvement).

**18**    Although defendants seek dismissal of plaintiff's claims on a variety of grounds, because I find their arguments concerning personal involvement and qualified immunity dispositve, I have not addressed the other grounds upon which they rely.

2015 WL 5510956
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Yodi ZIKIANDA, as Administrator of
the Estate of Irene Bamenga, Plaintiff,
v.
COUNTY OF ALBANY, et al., Defendants.

No. 1:12–CV–1194.
|
Signed Sept. 15, 2015.

**Attorneys and Law Firms**

Alex H. MacDonald, Michael D. Lurie, Rebecca A.G.
Robertson, Macdonald Law Group, Boston, MA, Amy
A. Barsky, Brookline, MA, John K. Powers, Powers,
Santola Law Firm, Albany, NY, John C. Reinstein, Office
of John C. Reinstein, Brookline, MA, Nancy Gertner,
Office of Nancy Gertner, Brookline, MA, for Plaintiff.

James M. Skelly, Danielle H. Garten, Marks, O'Neill,
O'Brien, Doherty & Kelly, P.C., New York, NY, Karen A.
Butler, Kelly M. Monroe, Molly C. Casey, Thuillez, Ford
Law Firm, Albany, NY, Thomas A. Cullen, Thomas J.
Mortati, Burke, Scolamiero Law Firm, Albany, NY, for
Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**\*1** Plaintiff Yodi Zikianda, as Administrator of
the Estate of Irene Bamenga ("Plaintiff") commenced this
action pursuant to 42 U.S.C. § 1983 and state law, alleging
that Defendants violated the rights of Irene Bamenga
while she was in their custody on an immigration detainer,
causing her death. Defendants have filed motions for
summary judgment, which are presently before the Court.
The Court has determined that oral argument on the
motions is not necessary and will render its decision based
on the filings.

**I. BACKGROUND** [1]

This case arises out of the detention of Decedent Irene
Bamenga ("Decedent" or "Bamenga"). On July 15, 2011,
Decedent was taken into custody at the Lewiston Bridge
Port of Entry in Lewiston, New York, by the United States
Customs and Border Patrol. Decedent had attempted
to reenter the United States after being denied entry
into Canada. Officials determined that Decedent had
overstayed a visa and was ineligible to remain in the
county. While she was in the custody of immigration
officials, Decedent advised officers that she had been
diagnosed with congestive heart failure ("CHF") and
needed to take medication daily.

Decedent had traveled with her husband, the Plaintiff, and
another man to Lewiston. The two men were released,
but Decedent was transferred to the custody of the
Allegany, New York, County Jail. Customs and Border
Patrol officers informed the Jail that Decedent had been
diagnosed with CHF, had six different medications with
her, and appeared to be in good health.

Decedent arrived that the Allegany County Jail ("ACJ")
at around 10:30 p.m. on July 15, 2011. The ACJ officer
who took Decedent into custody signed a federal form
that indicated that Decedent had CHF controlled by
the medications she carried with her. An intake receipt
executed by that officer indicated that Decedent was on
"lots of" medication. The intake officer delivered the
medication that had been in Decedent's possession to the
desk of Nurse Practioner Cheryl Ralyea. Ralyea was not
present because of the late hour, and no other medical
officer was there to receive Decedent.

The next day, Debra Harrington, a registered nurse,
conducted an initial screening of decedent. Harrington
noticed that Plaintiff had two large medication organizers
that contained various medications. Decedent informed
her that she had taken her medication the previous day,
but she was not sure of the dosages she was to take or the
names of the medication. Decedent told Harrington
that she was concerned about being able to take her
medication. Ralyea saw Decedent on July 18, 2011 and
prescribed a number of medications to be started on that
day. Decedent did not actually receive the medication until
July 19, 2011.

On July 21, 2011, Customs and Border Patrol officials
transferred custody of Decedent to officers from the
Albany County Correctional Facility ("ACCF") in

Albany, New York. Federal Agents informed ACCF agents of Decedent's medications and heart condition. The Federal Officials transferred Plaintiff and her medications to the Albany County officers. ACCF medical staff reviewed Decedent's health and medications. They continued the medications prescribed at the ACJ, though two of the medications were not started until July 25 and July 26, 2011.

 **\*2** On July 25, 2011, Decedent completed two request forms, complaining that she had not been provided her full dosage of medications and that she had been suffering from shortness of breath, palpitations when lying down, and dizziness when standing. During a medical interview the next day, July 26, 2011, Decedent complained that she had not been receiving her medication.

On July 27, 2011, inmates in Decedent's housing area notified officers that she was sick. When officers entered her cell at around 12:20 a.m., they noted that she was unresponsive. Officers attempted CPR, to no avail. Eventually, emergency medical technicians arrived and transported Decedent to Albany Memorial Hospital. There, she was pronounced dead. The Certificate of Death indicates that Decedent's cause of death was cardiomyopathy. The time of death was 1:17 a.m.

Plaintiff filed the instant Complaint in this Court on July 26, 2012. *See* dkt. # 1. After the Defendants answered the Complaint, the parties engaged in discovery and extensive motion practice surrounding that discovery. Eventually, the parties agreed that Plaintiff should be permitted to file an amended complaint. Plaintiff filed an Amended Complaint on March 15, 2013. *See* dkt. # 109. The Defendants answered that Complaint. Defendants Christopher Depner, M.D., Debra Harrington, County of Allegany, Cheryl Ralyea, and Rick L. Whitney also filed cross claims against various Defendants. *See* dkt.s 112, 114. After additional discovery and additional extensive motion practice, Defendants filed the instant motions for summary judgment. *See* dkt.s 304, 307, 308, 311. [2]

## II. Legal Standard

Defendants have moved for summary judgment. It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, *see Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999), and may grant summary

judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994), or on conclusory allegations or unsubstantiated speculation. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998).

## III. ANALYSIS

 **\*3** Various of the Defendants have filed motions for summary judgment. The Court will address each in turn, addressing first the facts relevant to each motion, as appropriate, and then turning to the legal arguments each party makes.

### A. Motion of Dr. Christopher Depner, M.D.

#### I. Facts Relevant to the Motion

Since 2007, Allegany County has used the services of private physicians in the role of County Medical Director. (Defendant Christopher Depner's Statement of Material Facts ("Depner's Statement"), dkt. # 304–4, at ¶ 2). The Medical Director has a variety of roles, overseeing the County's family planning clinic, public health clinic, sexually transmitted diseases clinic, and a number of environmental programs. (*Id.* at ¶ 3). Plaintiff emphasizes that the Defendant "specifically contracted to serve as 'Medical Director for the Allegany County

Jail as provided for by law.' " (Plaintiff's Response to Defendant's Statement of Material Facts, dkt. # 337, ("Plaintiff's Response") at ¶ 3). The Medical Director also attends meetings of the County Health Board. (Depner's Statement at ¶ 4). The Director additionally serves as "advisor" to the preschool program, the Medical Director for the Children with Special Needs Program, and the Allegany County Jail. (*Id.* at ¶ 5). Plaintiff again disputes this language, pointing out that Defendant's title was "Medical Director[,]" not "Advisor." (Plaintiff's Response at ¶ 5). Defendant Christopher Depner, MD, became County Medical Director in October 2007. (Depner's Statement at ¶ 6).

The Allegany County Jail has the capacity to house 164 inmates, but on average holds between 135 and 145 inmates. (*Id.* at ¶ 7). In addition to inmates from Albany County and surrounding counties, the Jail also houses federal prisoners on a temporary basis,[3] both for the United States Marshals Service and for Immigration and Customs Enforcement (ICE). (*Id.* at ¶¶ 8–9). Plaintiff expands on this statement, pointing out that the Jail houses prisoners from a variety of agencies, including other counties, prisoners detained by the United States Marshal's Service and persons in the custody of the Department of Homeland Security ("DHS") and ICE. (Plaintiff's Response at ¶ 8). Allegany County-connected prisoners comprise only about one-third of the jail's population. (*Id.*). The County is paid a per-diem fee for all other prisoners. (*Id.*). Further, while the County's population has decreased over the past twenty years, the jail population has increased. (*Id.*).

Nurse Practitioner Cheryl Ralyea has provided medical services at the Jail since May 2001. (*Id.* at ¶ 10). She provides inmates with clinical services, oversees the nursing staff and formulates and implements policies and structures. (*Id.* at ¶ 11). County policies designated Ralyea as "responsible health authority" at the Jail beginning in March 2010. (*Id.* at ¶ 12). Defendant contends that this designation appeared because Ralyea "was the person providing the direct care and formulating the policies." (*Id.*). Plaintiff disputes this characterization; he argues that Ralyea coined the term "responsible health authority" to describe herself, and that no one at the ACJ ever reviewed or approved that term. (Plaintiff's Response at ¶ 12). Plaintiff also points out that "responsible health authority" is a term derived from the National Commission on Correctional Health

Care's STANDARD FOR HEALTH SERVICES IN JAILS (2008), Standard J–A–02. (*Id.*). That standard provides that when the responsible authority is not a physician, " 'clinical judgments rest with a single, designated, licensed 'responsible physician.' " (*Id.*). Plaintiff contends that Ralyea wrote the ACJ's healthcare policies and procedures, deriving them from the National Commission's Standards. (*Id.*).

**\*4** Upon becoming County Medical Director, Dr. Depner entered into an agreement with Ralyea regarding her role as Nurse Practitioner at the jail. (Depner's Statement at ¶ 13). Pursuant to this agreement, when Ralyea was on vacation Dr. Depner would be available to medical staff at the Jail when necessary. (*Id.* at ¶ 14). Plaintiff points out that this evidence could be read to indicate that Dr. Depner was at times unaware that Ralyea was unavailable, and that Depner may not have been available the entire time Ralyea was gone. (Plaintiff's Response at ¶ 14). Moreover, Ralyea's schedule and contact list for the time in question indicate that she would be out of town, but provides no contact information for Dr. Depner. (*Id.*). Though Depner is available when needed, Ralyea and the Jail staff rarely contact him. (Depner's Statement at ¶ 15). Plaintiff disputes whether Depner is actually available at all times. (Plaintiff's Response at ¶ 15). Indeed, Depner never actually provided medical services directly to inmates, and his contract did not require him to do so. (Depner's Statement at ¶ 16). Plaintiff disputes whether Dr. Depner's conduct met the essential requirements for prison health care. (Plaintiff's Response at ¶ 16).

At the time when Decedent first entered the Jail, Ralyea was on vacation. (Depner's Statement at ¶ 28). Defendant Dr. Depner was available for consultations. (*Id.*). Plaintiff disputes that Dr. Depner was actually available to jail inmates at that time. (Plaintiff's Response at ¶ 28). Debra Harrington, a nurse, performed an initial screening on July 16, 2011. (Depner's Statement at ¶ 23). Plaintiff agrees that Harrington examined Decedent to some degree on July 16, 2011, but contends that an "initial screening was performed by a corrections officer at intake." (Plaintiff's Response at ¶ 23). Decedent indicated that she was taking " 'a lot' " of medications. (Depner's Statement at ¶ 24). Decedent, Defendant asserts, was unable to provide information about the dosages she was prescribed, the name of the physician who prescribed the drugs, or the pharmacy where Bamenga filled the prescription. (*Id.* at ¶

25). Plaintiff denies this claim by pointing to evidence he contends indicates that Decedent contacted her husband to obtain information on dosages and intended to pass that information on to medical staff. (Plaintiff's Response at ¶ 25). The medications were not in prescription bottles, but in a single container. (Depner's Statement at ¶ 26). Plaintiff describes the container holding these pills as a "pill organizer" with the days of the week printed on the outside. (Plaintiff's Response at ¶ 26). Decedent did not at that point appear to be in any distress, and did not make any complaints. (Depner's Statement at ¶ 27). Plaintiff responds that Decedent was under a great deal of stress "as the result of having been arrested and jailed," and points out that "stress is a significant contributor to decompensation in patients with congestive heart failure." (Plaintiff's Response at ¶ 27). Harrington did not call Defendant Depner to advise him of Decedent's admission. (Depner's Statement at ¶ 29).

**\*5** Nurse Practioner Ralyea performed a full evaluation of Bamenga and ordered medication on July 18, 2011. (*Id.* at ¶ 30). Plaintiff disputes that Ralyea's examination was a "full" one. (Plaintiff's Response at ¶ 30). Decedent remained in the Jail from approximately 11:30 p.m. on July 15, 2011 until around 9:30 a.m. on July 21, 2011. (Depner's Statement at ¶ 31; Plaintiff's Response at ¶ 31). Defendant Dr. Depner never met Decedent during this period, nor was he informed of her presence in the Jail. (Depner's Statement at ¶ 32). He was not called for a consultation concerning her care and treatment. (*Id.* at ¶ 33). He was not aware she had even existed until her lawsuit was filed. (*Id.* at ¶ 34). ICE transferred Decedent to the Albany County Correctional Facility on July 21, 2011. (*Id.* at ¶ 35). Defendant contends that Bamenga passed away on July 27, 2011 (*Id.* at ¶ 36). Plaintiff contends that the medical evidence indicates that Decedent actually died several hours earlier on July 26, 2011. (Plaintiff's Response at ¶ 36). The official cause of death was cardiomyopathy. (Depner's Statement at ¶ 37). Plaintiff points to his expert reports to argue that "medical mismanagement" caused Decedent's passing, not her heart condition. (Plaintiff's Response at ¶ 37).

### ii. Defendant's Argument

#### a. Medical Malpractice Claims

Defendant Depner first seeks dismissal of Plaintiff's medical malpractice claims against him. These claims consist of two counts, one on behalf of the estate for pain and suffering and one on behalf of the survivors for pecuniary loss. Defendant notes that the same wrongful acts provide the basis for both claims, and that if one is dismissed, the other must as well. He contends that Plaintiff cannot prevail on a malpractice cause of action because no patient-physician relationship existed. Depner had no contact with the Decedent, no knowledge of her presence at the jail and did not provide her with any treatment, and thus he could not have been negligent as a provider. Defendant also argues that he could not be vicariously liable in his role as medical director because he did not have any supervisory role over those who provided Decedent care, but instead served only as a consultant who was not consulted. Likewise, he could not be responsible for any County policies that harmed the Decedent, since his role was not to craft those policies. Even if he were charged with creating the policies, Defendant argues, the policies were adequate and were not the cause of Decedent's harm. Plaintiff admits that Defendant did not treat Decedent directly, and that no claim for vicariously liability exists here, but points to his expert reports and insists that Dr. Depner violated his duty to the Decedent both as a physician and as medical director of the jail.

The parties appear to agree that Plaintiff raises two potential theories of liability against Defendant Depner: negligence in his role as Medical Director of the Albany County Jail and negligence in his role as the physician named on Decedent's charts. The Court will address each claim in turn.

**\*6** Plaintiff's claims sound in medical malpractice. "[T]o establish a claim of 'medical malpractice under New York law, a plaintiff must prove (1) that the defendant breached a standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries.' " *Milano by Milano v. Freed,* 64 F.3d 91, 95 (2d Cir.1995) (quoting *Arkin v. Gittleson,* 32 F.3d 658, 664 (2d Cir.1994)). In addition, "except as to matters within the ordinary experience and knowledge of laymen, ... expert medical opinion evidence is required" to establish these elements. *Id.* A physician defending a medical malpractice action can meet his burden " 'by the submission of affidavits and/or deposition testimony and medical records which rebut plaintiff's claim of [medical] malpractice with factual proof.' " *Suib v. Keller,* 6 A.D.3d 805, 806, 774 N.Y.S.2d 608, 609 (3d Dept.2004) (quoting *Horth v. Mansur,* 243 A.D.2d 1041, 1042, 663 N.Y.S.2d 703 (1997)). A plaintiff is then required to "rebut

defendant's showing by demonstrating, typically through expert medical opinion, a deviation from accepted practice and that the deviation was the proximate cause of the injury." *Id.*

Defendant's position is that no direct physician-patient relationship existed between Depner and the Decedent, and that no liability can therefore attach. The Court agrees that Plaintiff can establish liability for Dr. Depner only by demonstrating that he was negligent in establishing policies for medical care in the Allegany county jail, and that such negligence was a cause of Decedent's injuries. No physician-patient relationship was ever established between Dr. Depner and decedent, since under New York law such a "relationship is created when the professional services of a physician 11 are rendered to and accepted by another person for the purposes of medical or surgical treatment." *Lee v. City of New York,* 162 A.D.2d 34, 36, 560 N.Y.S.2d 700, 701 (2d Dept.1990).

Plaintiff does not really dispute that Depner did not provide any direct treatment to Decedent. Indeed, Depner testified that he was not aware of "what transpired with respect ot the care and treatment of Irene Bamenga while she was detained at the Allegany County Jail." Exh. 16 to Affidavit of Michael Lurie, dkt. # 341 ("Depner Dep."), at 45. If Plaintiff is to establish liability against Defendant Depner for negligence, that liability must come on some other basis. In this respect, Plaintiff points to Dr. Depner's role as the Medical Director of the Jail. Courts in New York are clear that a physician in Depner's position cannot be vicariously liable for the failings of other medical professionals at the Jail, and that no liability exists "against the director of a medical department of a hospital without proof of a negligent act or omission on his part, whether acting in a treating or supervising capacity." *Ellis v. Brookdale Hosp. Medical Center,* 122 A.D.2d 19, 19–20, 504 N.Y.S.2d 189, 190 (2d Dept.1986). A physician who has the "authority to establish procedures ... may be held liable for treatment not personally given by him to the patient." *Wilson v. McCarthy,* 57 A.D.2d 617, 393 N.Y.S.2d 770, 771 (2d Dept.1977); *see Maxwell v. Cole,* 126 Misc.2d 597, 598 482 N.Y.S.2d 1000, 1002 (York Cty.1984) (finding that "[a] failure on the part of a Chief of Service to supervise residents and interns and to develop and implement rules, regulations and guidelines for treatment and supervision is a claim for breach of duty which rested initially with the hospital but was alleged delegated by the hospital" to the

supervising physician); *Barker v. Saltzman,* 124 A.D.2d 617, 617–18, 507 N.Y.S.2d 878, 878–79 (2d Dept.1986) (physician who "never saw, treated or consulted with any physicians regarding the plaintiff" could be liable because he was "responsible for providing anesthesia for all surgical patients at the hospital and that he employed assistants whom he supervised in the administration of anesthesia."). In other words, the Plaintiff must show that Depner had a duty to establish policies and procedures for treating inmates like the Decedent, and that he breached that duty.

**\*7** Plaintiff has submitted the expert report of Randy Wertheimer, M.D., in opposition to Defendants' motions for summary judgment. *See* dkt. # 347. Wertheimer is a physician and the Jaharis Chair of Familty Medicine at the Tufts University School of Medicine in Boston, Massachusetts. Report, Exh. A to dkt. # 347 at 1. In addition to training and credentials as a Family Practice Physician, Wertheimer is, through her position as Chair of the Department of Family Practice at Tufts and in other positions in her medical career, "involved in direct patient care, supervision of direct patient care and education of multiple groups of providers including medical students, residents in training, nurses and nurse practitioners and non-clinical staff." *Id.* Wertheimer has experience "in collaborating with non-medical professionals such as legal counsel and administrative chiefs" to address his supervisory issues. *Id.* She has also been charged with "creating guidelines, establishing protocols and assessing outcomes within [his] department as well as on the local, state, and national level." *Id.* Having served as a member of the Board of Registration in Medicine in Massachusetts, she has substantial "experience regarding acceptable standards of care, physician behavior, acceptable collaboration and responsibilities in primary care teams." *Id.* at 1–2, 507 N.Y.S.2d 878.

Dr. Wertheimer's report concludes that the conduct of Dr. Depner and Dr. Haider–Shah, medical directors of the jails involved, "conducted themselves in a manner which not only departed from applicable standards of care in connection with the care and treatment of Irene Bamenga, but which also demonstrated a callous disregard for the likely consequences of their acts and failures to act[.]" *Id.* at 3, 507 N.Y.S.2d 878. These failings, Dr. Wertheimer concludes, "were a substantial contributing cause to the decompensation of [Decedent's] chronic congestive heart

failure that led to her resulting death on July 27, 2011." *Id.* Both Dr. Depner and Dr. Haider–Shah, Dr. Wertheimer finds, should have been familiar with CHF and versed in treatment of the condition. *Id.*

In terms of Dr. Depner's conduct, Wertheimer notes that, as the Medical Director of the Allegany County Jail, Depner was "the sole responsible supervising physician in charge of inmates, including newly admitted individuals" at the time of Decedent's admission. *Id.* at 4, 507 N.Y.S.2d 878. Even though there was documentation of Decedent's medications and heart condition when she arrived at the jail, "no medical personnel were present or called to evaluate" her. *Id.* Decedent was processed by intake officers when she arrived at the facility. *Id.* These officers were required to "complete a computerized questionnaire concerning medical issues" that the County provided. *Id.* Such officers, however, lacked training "to assess the medical needs of arriving prisoners and are expected to exercise their own judgment as to whether any medical attention is required by the arriving prisoner." *Id.* In Decedent's case, the intake officer knew that Decedent was talking "a lot" of prescription medications, but failed to seek more detailed information on which pills Decedent was taking, "the dose of each, how frequently they were to be administered, or when she had last taken her medications." *Id.*

**\*8** Dr. Wertheimer finds that "the failure of Dr. Depner to establish appropriate triage and admitting protocols to guide the corrections officers in determining when an arriving prisoner required assessment by medical staff demonstrated a complete disregard for the likely consequences of the absence of such protocols." *Id.* Even though a wide variety of prisoners with various medical conditions enter the jail daily, and many arrive when no medical staff is on site, Dr. Depner did nothing "to provide intake officers with guidelines that would prompt them to involve medical personnel when necessary," instead leaving the decision to act on such conditions to "corrections officers lacking in any basic training that would permit them to make such assessments." *Id.* at 5, 507 N.Y.S.2d 878. Wertheimer opines that Dr. Depner should have established "protocols including but not limited to clear definitions of intake procedure for both medical and non-medical personnel, explicit protocols about prisoners with medical conditions that needed to be referred out either at time of initial assessment or at time of new complaints or symptoms, explicit protocols

on continuity of medications, explicit steps to contact health care providers, including back-up contacts and on-call schedules for physicians and nursing staff." *Id.* These failings made it "all but inevitable that critical failures in the provision of medical care to inmates would ensue." *Id.* Leaving the initial assessment of medical needs "to untrained corrections staff reflects the Medical Director's failure to establish appropriate patient safety mechanisms." *Id.*

Dr. Wertheimer finds that the "relevant standards of medical care" demand that "a supervising physician is never permitted to abdicate responsibility for ensuring proper intake and assessment of patients." *Id.* Dr. Depner's failure to provide such procedures as part of his "supervisory and managerial responsibilities" caused Decedent to miss critical elements of care for a person with her condition, such as receiving proper medications, proper diagnostic testing, and proper continuity of care. *Id.* Wertheimer notes that no procedures were in place to ensure that an ill prisoner like Decedent was seen by medical professionals in a timely fashion. *Id.* at 6, 507 N.Y.S.2d 878. Decedent saw Nurse Harrington only because Harrington came to the jail for an "unrelated" reason. *Id.* Dr. Wertheimer finds that this meeting with the nurse, which occurred largely by chance, "illustrates the absence of reasonable precautions to ensure patient safety at the Albany jail under Dr. Depner's management." *Id.* According to Wertheimer, Depner's "failure to develop protocols or policies that would have mandated contact with medical personnel be made when a new prisoner arrives at the facility with a diagnosis of a serious illness and medications for treatment of that illness" points to "a complete abdication of [Depner's] responsibilities as Medical Director[.]" *Id.*

**\*9** Wertheimer points to a number of procedures that Depner could have put in place during the intake process to ensure that new prisoners with serious health issues have their conditions evaluated and monitored. *Id.* at 6–7, 507 N.Y.S.2d 878. Depner's failure to institute any such "protocols, or their functional equivalents" in Wertheimer's opinion "evidences a disregard for the likely serious consequences to patient safety of providing untrained corrections staff with unfettered discretion to determine when medical staff involvement with a new prisoner is necessary." *Id.* at 7, 507 N.Y.S.2d 878. Another example of this failure to institute proper procedures was that, even after Nurse Harrington saw the decedent

and recognized her serious health condition, no protocol required that a medical professional examine Decedent. *Id.* at 7–8, 507 N.Y.S.2d 878. This lack of standards led to a serious delay in Decedent receiving her medications and contributed to the illness that caused her death. *Id.* at 8, 507 N.Y.S.2d 878. Indeed, Dr. Wertheimer finds that Depner "fail[ed] to put appropriate policies, protocols and guidelines in place to assist his nursing staff in caring for patients," despite the fact that he served as Medical Director at the Jail and "there was no other physician providing care, or collaborating with the nursing staff resident at the facility." *Id.*

Wertheimer contends that Dr. Depner "was obligated to involve himself in establishing policies, protocols, socpe of practice for nurse practitioners and rules that would ensure that patients at the Allegany county jail would receive appropriate, timely treatment for serious medical conditions, and to oversee the manner in which care was provided to ensure that such policies, protocols and rules were actually followed." *Id.* Failing to do so, Wertheimer opines, represented "a callous indifference to the serious medical needs of the patients confined at the ACJ." These failings led to Decedent's demise, as she did not receive proper assessment and treatment. *Id* . at 10–12, 507 N.Y.S.2d 878.

In the end, Dr. Wertheimer finds that Dr. Depner and his staff effectively "abandoned" the Decedent. *Id.* at 12–13, 507 N.Y.S.2d 878. She concludes:

> Here, Irene Bamenga had no option but to rely on the physicians in charge of the two facilities where she was involuntarily held to ensure that the systems for medical care would be responsive to her needs. Dr. Depner, by taking no steps, over many years, to ensure that the medical system at the ACJ could meet the needs of the ever-shifting population detained there completely abdicated his responsibilities. In Ms. Bamenga's case, Dr. Depner and his nursing team demonstrated a shocking degree of indifference to the complex medical issues of Ms. Bamenga's serious cardiac diagnosis of congestive heart failure and

their conduct throughout the period that Ms. Bamenga was under their care directly contributed to her worsening congestive heart failure and death.

*Id.* at 13, 507 N.Y.S.2d 878.

In responding to Plaintiff's opposition to his motion, Defendant emphasizes that all agree that Dr. Depner never had a treating relationship with the Decedent. Defendant also argues that Dr. Wertheimer's report overstates the role that Dr. Depner played in providing health care at the jail. Defendant points out that, at the time of the incident in question, Dr. Depner had ceded authority over medical care at the jail to Nurse Practioner Cheryl Ralyea, and argues that she was responsible for establishing policies and procedures at the facility. Because Ralyea, not Depner, supervised at the jail, Dr. Depner cannot be responsible.

 **\*10** The Court finds that the evidence is ambiguous about Dr. Depner's authority at the jail, and that a jury could find him responsible for establishing policies regarding the treatment and care of inmates that contributed to Decedent's injuries. Ralyea testified that she "believed" the Jail's policies for processing medication brought by inmates at the jail were "written down in the policies and procedures manual[.]" dkt. # 311–4 at 23. She also testified that she was responsible for drafting that manual. *Id.* The jail administrator, Mr. Ivers, reviewed the manual with her before it became effective. *Id.* She "sent copies" to Dr. Depner, who did not have any comments. *Id.* While the manual provided that the Jail would confiscate inmates' medications when they arrived, an exception was made for immigration detainees, who were generally unaware of the policy. *Id.* at 21, 507 N.Y.S.2d 878. Ralyea could not be certain, however, that the policy was in place in July 2011. *Id.* at 23, 507 N.Y.S.2d 878.

When asked what Defendant Depner did as medical director of the jail, Ralyea explained that "[h]e does peer review. He's available by phone should I need to consult with him. He provides coverage when I'm not available." *Id.* at 92, 507 N.Y.S.2d 878. Depner did not come to the facility when he covered for her and received "a call to request that he come to the" Jail. *Id.* While Ralyea did not meet with Depner, she "regularly" sent him "peer review." *Id.* She testified that she sent approximately five percent

of her patient files for review to Depner. *Id.* at 95, 507 N.Y.S.2d 878. She sent him files about which she had questions, the files of prisoners sent to the hospital, and random files to ensure Depner saw five per cent of the patient files. *Id.* Depner would view notes on the patients and send them back. *Id.* at 93, 507 N.Y.S.2d 878. He might write on the form before sending it back; Ralyea also occasionally discussed the notes with Depner on the phone. *Id.*

At her deposition, Ralyea discussed the "practice agreement" that existed between which had begun when he became the county medical director. *Id.* at 114117, 507 N.Y.S.2d 878. The agreement in place in 2011 provided that:

> In accordance with medical protocols agreed upon in advance between the nurse-practitioner performing the services and physician of record, the nurse-practitioner evaluates test findings, makes initial medical diagnoses and initiates appropriate action to facilitate the implementation of the therapeutic plan consistent with the continuing health needs of the client.

*Id.* at 115–16, 507 N.Y.S.2d 878. Ralyea testified that the Jail had "policies and procedures," though not "medical protocols for a specific diagnosis." *Id.* at 116, 507 N.Y.S.2d 878. Such policies and procedures were "agreed upon in advance" by Ralyea and Depner. *Id.* That agreement occurred when Depner "first took over and read the policies and signed off on them." *Id.* Depner had not reviewed and approved any amendments to the policies and procedures, and had not been involved in updating them. *Id.* at 117, 507 N.Y.S.2d 878. Though the agreement provided that the collaborating physician was to be available at all times by telephone or on site for consultation, Ralyea testified that he had stopped coming to the Jail for peer review after the first "couple of months" he was on the job in 2006. *Id.* 118, 507 N.Y.S.2d 878. He had never come to the jail to examine a patient, and only once had a patient transported to his office for an examination in his six years as a jail physician. *Id.* at 119, 507 N.Y.S.2d 878. Depner also failed to meet his contractual obligation to provide peer review on 20 per cent of the cases. *Id.* at 119–20, 507 N.Y.S.2d 878. Ralyea

found most cases routine and Dr. Depner's comments unnecessary. *Id.* at 120, 507 N.Y.S.2d 878.

**\*11** Ralyea testified that she had written the Jail's policies and procedures manual. *Id.* at 126, 507 N.Y.S.2d 878. She wrote them when she first began working for the jail in 2001. *Id.* at 127, 507 N.Y.S.2d 878. She based the manual on the National Commission for Correctional Health Care standards, which provided "standards for jails nationally" and provided "a place to start." *Id.* When Ralyea sought to "promulgate a new policy," she would "send it to Sergeant Brantley," who was "in charge of the policies and procedures." *Id.* at 128, 507 N.Y.S.2d 878. Brantley would "send it to Christopher Ivers." *Id.* If Ralyea heard no response to her proposed policy, she assumed it was approved. *Id.* at 129, 507 N.Y.S.2d 878. In 2007, Dr. Depner "received all the policies." *Id.* at 131, 507 N.Y.S.2d 878. He did not offer any comments. *Id.*

Depner testified that he signed an agreement naming him as Medical Director for Allegany County in July 2011. Depner Dep. at 14–15. Before that, he had a "verbal contract" with the County. *Id.* at 20, 507 N.Y.S.2d 878. Depner testified that, as county medical director, he did not have an obligation to review the policies and procedures at the Allegany County Jail. *Id.* He had never reviewed those policies and procedures, and Ralyea never requested that he do so. *Id.* He could not recall Ralyea ever sending him a copy of the policies and procedures to review. *Id.* at 21–22, 507 N.Y.S.2d 878. He made no effort to determine whether the jail's policies and procedures comported with national standards. *Id.* at 38, 507 N.Y.S.2d 878. He could not recall being asked to review such policies. *Id.* at 40–41, 507 N.Y.S.2d 878. He was unaware of the procedures to be used when new prisoners arrive at the jail who have prescription medication, nor did he know about the procedures used by the County to inform the receiving institution about the health needs of transferred inmates. *Id.* at 3940, 42, 507 N.Y.S.2d 878. Depner had not reviewed any nursing assessment protocols, nor had he performed annual reviews at the jail. *Id.* at 43, 507 N.Y.S.2d 878. He had never attended any administrative meetings in relation to the jail. *Id.*

Depner testified that his role was to "review periodically charts of inmates that Ms. Ralyea" saw and to be "available for phone consultation." *Id.* at 22, 507 N.Y.S.2d 878. Ralyea called him "a couple times a year"

for such consultation. *Id.* Shown copies of prison policies at his deposition, Depner could not recall having seen them before. *Id.* at 23–25, 507 N.Y.S.2d 878. Depner testified that he had come to the jail once in has capacity as medical director. *Id.* at 29, 507 N.Y.S.2d 878. He did so to review an incident where an inmate had died; he had never gone to the jail to treat a live patient. *Id.* Depner's role in reference to the jail came largely in his review of inmate patient files. *Id.* at 30–32, 507 N.Y.S.2d 878. He was not aware that he was designated as the physician for the jail's patients. *Id.* at 36, 507 N.Y.S.2d 878. Instead, his role as medical director consisted mainly of "answer[ing] questions at the jail and back[ing] up the nurse-practitioner." *Id.* at 42, 507 N.Y.S.2d 878.

**\*12** The Court finds that a question of fact exists over whether Dr. Depner breached any duty he had to establish policies and procedures that protected patients who, like the Decedent, had serious medical conditions that required medication and careful monitoring of that medication. The Court recognizes that there is likewise a factual dispute about what responsibility Dr. Depner had to establish those roles. While there is evidence, particularly in the testimony of Ralyea, that Dr. Depner's role as medical director at the jail did not involve anything but reviewing an occasional chart, there is also evidence a jury could use to determine that he had a larger responsibility than the one he took, and that he should be responsible for the jail's allegedly inadequate policies. Evidence in the record indicates that, as medical director, Depner was charged with overseeing and reviewing the policies in place at the jail. Using Plaintiff's expert report, [4] combined with the testimony of Nurse Ralyea about Dr. Depner's supervisory relationship over her and Depner's own understanding of his role, a jury could find that Defendant had a duty to establish policies and procedures for the examination of inmates and the administration of medication to them, and that he breached that duty by failing to provide any proper standards for treating inmates who arrived with Decedent's illnesses and medications. The jury will have to sort out the precise lines of medical authority at the jail; Ralyea's testimony indicates that any formal labels regarding authority may not have reflected actual practice. Read in the light most favorable to Plaintiff, the non-moving party, however, the record indicates that a jury could find that Dr. Depner failed to establish proper policies, procedures and supervision of medical care in the jail. The motion will be denied in this respect.

### b. Constitutional Violation

Depner argues as well that he cannot be liable for violating Decedent's constitutional rights. He contends that he is not a state actor and therefore cannot be responsible under 42 U.S.C. § 1983. Even if he were a state actor, Depner insists, he could not be personally liable because he did not provide any care to the Decedent. No evidence exists to prove Defendant Depner was deliberately indifferent to a serious medical need of the Decedent, nor is there evidence to show a failure to supervise medical care in the Jail. Depner also asserts a qualified immunity defense.

### i. State Action

Defendant Dr. Depner argues that he cannot be liable for any constitutional violations because he was not a state actor but merely a private party. Plaintiff brings his constitutional claims pursuant to 42 U.S.C. § 1983. "To state a § 1983 claim, a plaintiff must establish that the defendant deprived him of a federal or constitutional right while acting under the color of state law." *Cox v. Warwick Valley Cent. Sch. Dist.,* 654 F.3d 267, 272 (2d Cir.2011). No action exists for " 'merely private conduct, no matter how discriminatory or wrongful' " *Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999) (quoting *Blum v. Yaretsky,* 334 U.S. 1, 13, 68 S.Ct. 836, 92 L.Ed. 1161 (1948)). To establish state action, Plaintiffs must show that the person who caused their constitutional deprivation " 'may fairly be said to be a state actor.' " *Grogan v. Blooming Grove Volunteer Ambulance Corps,* 768 F.3d 259, 264 (2d Cir.2014) (quoting *Cranley v. Nat'l Life Ins. Co. of Vt.,* 318 F.3d 105, 111 (2d Cir.2003)). State action occurs when "the 'allegedly unconstitutional conduct is fairly attributable to the State.' " *Id.* (quoting *Sullivan,* 526 U.S. at 50). When a plaintiff contends that a private actor violated her rights, the plaintiff proves state action "by demonstrating that 'there is such a close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.' " *Id.* (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,* 531 U.S., 288 295, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001)).

**\*13** To determine whether the behavior can be attributed to the state, the Court must "[identify] 'the specific conduct of which the plaintiff complains, rather than the general characteristics of the entity.' " *Id.* (quoting

*Fabrikant v. French,* 691 F.3d 193, 207 (2d Cir.2012)). In making this determination, Courts employ a number of factors, including "[t]hree main tests [.]" *Fabrikant,* 691 F.3d at 207. Those tests are:

> (1) [when] the entity acts pursuant to the coercive power of the state or is controlled by the state ('the compulsion test'); (2) when the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the sate, or the entity's functions are entwined with state policies ('the joint action test' or 'close nexus test'); or (3) when the entity has been delegated a public function by the state ('the public function test')

*Id.* (quoting *Syblaski v. Indep. Grp. Home Living Program,* 546 F.3d 255, 257 (2d Cir.2008)). The Supreme Court has concluded that "a physician employed ... to provide medical services to state prison inmates, acted under color of state law for purposes of § 1983 when undertaking his duties in treating petitioner's injury." *West v. Atkins,* 487 U.S. 52, 54 (1988). The Court found that "[s]uch conduct is fairly attributable to the state." *Id.* A prison physician is a state actor even if not officially a state employee: "[i]t is the physician's function within the system, not the precise terms of his employment, that determines whether his actions can be fairly attributed to the State." *Id.* at 55–56.

While the conduct for which the Court finds Defendant Depner potentially liable did not include providing direct treatment to the Decedent, the Court nevertheless finds such conduct "fairly attributable to the state." Depner had a contract with the prison to serve as medical director, and there is evidence a jury could use to find him responsible for establishing the policies and procedures used to treat inmates like the Decedent. While Defendant is correct that "[p]ersonal involvement of the defendant in the alleged deprivation is a prerequisite to recovery of damages under § 1983," courts have also concluded that an actor can have "personal involvement" if "the defendant (1) created or permitted the continuance of a policy that caused the alleged deprivation, (2) failed to remedy the alleged deprivation after learning of it, or (3) was grossly negligent in managing subordinates who caused the alleged deprivation." *K & A Radiologic Tech. Servs.*

*v. Commissioner of the Dep't of Health,* 189 F.3d 273, 278 (2d Cir.1999). As explained above, Plaintiff has submitted evidence by which a reasonable juror could find that Defendant Depner created or permitted the continuance of the policies concerning inmates who arrived with a serious medical condition and who required numerous prescription medications. A juror could also conclude that those policies were inadequate. A reasonable juror could also find that the inadequacies in those policies harmed Decedent. Evidence therefore exists to find that Defendant Depner engaged in the requisite personal involvement in Plaintiff's injuries to be considered a state actor. *See, e.g.,, Brock v. Wright,* 315 F.3d 148, 166–67 (2d Cir.2003) ("While liability may not be established against a defendant simply because that defendant was a 'policy maker' at the time unconstitutional acts were committed, where unconstitutional acts are *the result* of a policy promulgated by the defendant, a valid § 1983 action may lie.") (internal citations omitted) (emphasis in original).

**\*14** Plaintiff also points to evidence that Dr. Depner, despite responsibilities assigned to him to monitor patient care and ensure that the jail provided adequate medical services, made no efforts to evaluate policies in the jail or insure that medical staff at the prison followed those policies. Plaintiff argues that such conduct is evidence that Depner was "grossly negligent in managing the subordinates who caused the unlawful event." (Plaintiff's Response, dkt. # 335, at 45). Plaintiff's argument, however, does not point to any particular supervision of any other medical care provider, but instead appears to reference only Depner's alleged failure to craft and monitor policies for managing inmate's medical conditions. As explained above, the evidence is clear that Depner did not provide any direct care to Decedent and no evidence indicates that he had any information about the particular care Decedent received before her death. Plaintiff therefore could not prevail on a claim that Depner was "grossly negligent in managing subordinates who caused the alleged deprivation."

Still, because there is evidence a jury could use to find that Depner created or permitted a policy to continue that caused the alleged deprivation, the motion for summary judgment will be denied on this basis.

### ii. Deliberate Indifference

Liability here also requires a showing that Depner "deprived [Decedent] of a federal or constitutional right while acting under the color of state law." *Cox,* 654 F.3d at 272. Plaintiff's claim is that Defendant violated the due process rights of Decedent, an immigration detainee. Courts have found that pre-trial detainees, like the Decedent here not convicted of any crime, making a claim for inadequate medical care have rights "at least as great as those of a convicted prisoner" under the Eighth Amendment's prohibition of cruel and unusual punishment. *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) [5] ; *see also, Cuoco v. Mortisugu,* 222 F.3d 99, 106 (2d Cir.2000) ("We have often applied the Eighth Amendment deliberate indifference test to pre-trial detainees bringing actions under the Due Process Clause of the Fourteenth Amendment."). Under that standard, prisoners are not entitled to " 'unqualified access to health care[.]" *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). Still, a prisoner "can nevertheless prevail on an Eighth Amendment claim arising out of medical care by showing that a prison official acted with 'deliberate indifference' to the inmate's serious medical needs." *Id.* (quoting *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994)). "An official acts with deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

**\*15** In this case, any deliberate indifference for which Defendant Dr. Depner could be responsible must be connected to the policies which he allegedly promulgated or failed to promulgate. In *Brock v. Wright,* cited above, the Second Circuit Court of Appeals found summary judgment inappropriate for the Chief Medical Director of the New York Department of Corrections. *Brock,* 315 F.3d at 158. The plaintiff in *Brock* was injured when another inmate slashed his face with a knife. *Id.* at 160. Plaintiff alleged that he had been subjected to "painful and disfiguring keloid" because "various DOCS employees ... wrongfully, and in violation of the Eighth Amendment, prevented him from obtaining the care of a dermatologist." *Id.* Among the defendants was the Medical Director, who had promulgated a policy that

declared keloids "among the 'conditions and services which, absent the existence of *collateral symptoms,* are considered prima facie medically unnecessary." *Id.* at 165. The Court found that the policy could be read as "intended to bar the treatment of a keloid for purposes of alleviating moderate, but persistently chronic, pain in a body part," and did so in plaintiff's case *Id.* at 166. Since the defendant doctors in the case had " 'properly implemented' the policy," the policy was therefore "the reason for their actions[.]" *Id.* That failure to treat could reasonably be found deliberate indifference, and a reasonable juror could conclude that "unconstitutional acts would then have occurred as a result of the policy promulgated by" the Defendant. *Id.*

This case is similar. While there is a dispute about whether Depner promulgated the policies that injured the Decedent, there is evidence-as explained above-by which the jury could find that he was responsible for those policies. There is also evidence by which a jury could find that Depner was responsible for policies which were followed by the prison medical staff and caused Decedent to be deprived of essential medication and denied vital examinations which could have detected a need for additional treatment and diagnosis. A jury could likewise find that these failings injured Decedent and played a role in her demise. Because evidence exists that Depner was responsible for policies that led medical staff to ignore Decedent's serious need for proper medication and treatment, and that medical staff followed the policies as designed, the Court must conclude that a reasonable juror could find Defendant Dr. Depner deliberately indifferent to a serious medical need. The motion for summary judgment will be denied on this basis.

### iii. Qualified Immunity

Defendant Dr. Depner also asserts that, even if he could somehow be found liable for violating Decedent's constitutional rights, he should be entitled to qualified immunity. "Qualified immunity is an affirmative defense that shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Stephenson v. Doe,* 332 F.3d 68, 76 (2d Cir.2003) (quoting *McCardle v. Haddad,* 131 F.3d 43, 50 (2d Cir.1997)). Qualified immunity also applies when " 'it was 'objectively reasonable' for [the officer] to believe that [his or her] actions were lawful at the time of the challenged act.'

" *Betts v. Shearman,* 751 F.3d 78, 83 (2d Cir.2014) (quoting *Jenkins v. City of New York,* 478 F.3d 76, 87 (2d Cir.2007)). A right is clearly established when " 'the contours of the right [were] sufficiently clear in the context of the alleged violation such that a reasonable official would understand that what he [was] doing violate[d] that right.' " *Iqbal v. Hasty,* 490 F.3d 143, 152 (2d Cir.2007) (quoting *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250–51 (2d Cir.2001)). At the same time, "for a right to be clearly established for the purposes of a qualified immunity defense, the precise conduct at issue need not previously have been ruled unlawful." *Zahrey v. Coffey,* 221 F.3d 342, 357 (2d Cir.2000).

**\*16** In this respect, Dr. Depner repeats his assertion that he was not a state actor and that no constitutional violation occurred. Moreover, without asserting any particular right or theory of violation, Depner contends that "there is no clearly established right of which a physician such as Dr. Depner could reasonably have known was being violated." (Defendant's Brief, dkt. # 304–3, at 19). Plaintiff responds by arguing that Depner, who was a private citizen working under a state contract, is not entitled to assert qualified immunity. [6] Defendant does not address these arguments in reply and does not attempt to expand on his argument that qualified immunity applies. Dr. Depner's argument instead focuses on his role within the prison health-care system and his failure to provide direct treatment to the Decedent.

Assuming that qualified immunity applies to these circumstances, the Court concludes that Defendant Dr. Depner is not entitled to summary judgment on the issue. As the Court has explained, evidence indicates that Dr. Depner failed properly to establish and monitor treatment programs in his role as prison doctor, and that a jury could find that those failings caused Decedent's harm. Plaintiff has produced evidence by which a jury could conclude that Dr. Depner was responsible for Defendants' failure to provide decedent with necessary medical treatment. There can be no doubt that a prisoner's right to adequate medical care is clearly established in federal law, and a qualified immunity defense is unavailing under these circumstances. The motion will be denied in this respect as well.

### c. Punitive Damages

Defendant Depner next asserts that he cannot be liable for punitive damages under either New York or federal law. None of his conduct in the case, he insists, rises to the level of outrageousness that would justify such damages. Plaintiff argues that the jury should be permitted to examine the evidence and determine the character of Defendant's conduct.

In terms of Plaintiff's Section 1983 claim, punitive damages may be recovered " 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.' " *Lee v. Edwards,* 101 F.3d 805, 808 (2d Cir.1996) (quoting *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). "To be entitled to an award of punitive damages, a claimant must show a 'positive element of conscious wrongdoing.' " *New Windsor Volunteer Ambulance Corps., Inc. v. Meyers,* 442 F.3d 101, 121 (2d Cir.2006) (quoting *Kolstad v. American Dental Ass'n,* 527 U.S. 526, 538, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999)). Still, for a jury to consider punitive damages, "[t]he plaintiff['s] evidence need only be enough 'to permit the factfinder to infer that the responsible official was motived by malice or evil intent or that he acted with reckless or callous indifference.' " *Cameron v. City of New York,* 598 F.3d 50, 69 (2d Cir.2010) (quoting *New Windsor Volunteer Ambulance Corps.,* 442 F.3d at 122)) (emphasis in original). The Court finds summary judgment on Plaintiff's claim for punitive damages under Section 1983 inappropriate at this time. The jury should be permitted to determine whether the evidence indicates that Defendant Depner's alleged failure to act represented reckless or callous indifference.

**\*17** As to the state-law claim, New York courts have concluded that "punitive damages are available for the purpose of vindicating a public right only where the actions of the alleged tort-feasor constitute gross recklessness or intentional, wanton or malicious conduct aimed at the public generally or are activated by evil or reprehensible motives." *Spinosa v. Weinstein,* 168 A.D.2d 32, 42–43, 571 N.Y.S.2d 747, 754 (2d Dept.1991). "Punitive damages are recoverable in a medical malpractice action only where the defendant's conduct evinces 'a high degree of moral culpability,' or constitutes 'willful or wanton negligence or recklessness[.]" *Hill v.2016 Realty Assoc.,* 42 A.D.3d 432, 433, 839 N.Y.2d 801, 802 (2d Dept.2007) (quoting *Lee v. Health Force,* 268 A.D.2d 564, 702 N.Y.S.2d 108 (2000)); *see also, Brooking v. Polito,* 16 A.D.3d 898, 899, 791 N.Y.S.2d 686, 687 (3d Dept.2005) ("In a medical malpractice action,

punitive damages are only recoverable where the conduct in question shows 'a wrongful motive on the defendant's part, willful or intentional misdoing, or a reckless indifference equivalent to willful or intentional misdoing.' ") (quoting *Frenya v. Champlain Val. Physicians' Hosp. Med. Crt.,* 133 A.D.2d 1000, 1000, 521 N.Y.S.2d 150 (1987)). As with the Section 1983 claim, the Court finds that the evidence is sufficient to permit a jury to characterize Defendant Depner's conduct and determine whether his alleged failures to act and provide training represented willful or wanton negligence or recklessness. The motion will be denied on this basis as well.

**d. Conclusion as to Defendant Depner**
For the reasons explained above, Defendant Depner's motion for summary judgment will be denied. A jury could find that Defendant Depner's conduct constituted both malpractice and a violation of the Decedent's ocnsitutional rights.

**B. Motion of Defendants County of Allegany, Sheriff Rick L. Whitney, Cheryl Ralyea and Debra Harrington**
Defendants County of Allegany, Sheriff Rick L. Whitney, Cheryl Ralyea and Debra Harrington (named individually or as "Allegany County Defendants") also filed a motion for summary judgment. *See* dkt. # 311. Defendants offer various arguments and address them to the defense of various Defendants. The Court will address each in turn.

**i. Facts Relevant to the Motion** [7]
The Court will discuss the facts relevant to Defendant's motion in this section, but will endeavor to avoid repeating the general facts relayed above.

Decedent Ireme Bamenga arrived at the Allegany County jail at around 11 p.m. on July 15, 2011. (Allegany County Defendants' Statement of Material Facts ("Allegany County Defendants' Statement"), dkt. # 311–1, at ¶ 1). The parties disagree about whether Decedent took her medications as prescribed on July 15, 2011. (Allegany County Defendants' Statement at ¶2; Plaintiff's Response to Allegany County Defendants' Statement ("Plaintiff's Response to Allegany Defendants"), dkt. # 336, at ¶ 2). Defendants, pointing to the testimony of Plaintiff, Decedent's husband, insist that Bamenga took her medication as directed on July 15. (Allegany Defendants' Statement at ¶ 2). Plaintiff points to a Department of Homeland Security Detainee Death Report that indicates that Plaintiff took her medication on July 14, 2011 and does not mention that she took such medication the next day. (Plaintiff's Response to Allegany Defendants at ¶ 2; *see* Exh. G to dkt. # 304–2).

**\*18** The Defendants contend that when Defendant Debra Harrington examined Decedent on July 16 and 18, she was medically stable, did not show any signs of disease and made no complaints. (Allegany Defendants' Statement at ¶ 3). Plaintiff disputes this claim, pointing to evidence indicating that by July 18, 2011, Plaintiff had not received the appropriate medication and arguing that, under those circumstances, Bamenga was "highly unlikely to be medically stable." (Plaintiff's Response to Allegany Defendants at ¶ 3). Defendants insist that Decedent remained "medically stable" during her entire stay at the Allegany County jail. (Allegany Defendants' Statement at ¶ 4). Plaintiff disputes this, arguing that the jail's medical staff failed to follow proper procedures for monitoring Bamenga's condition, failed to perform basic exams, and failed perform any follow-up exams. (Plaintiff's Response to Allegany Defendants at ¶4). Because of these failings, Plaintiff contends, "it is not possible to conclude in a medically and scientifically reliable fashion that Ms. Bamenga was medically stable" during the time she was detained at the Allegany County Jail. (*Id.*). Plaintiff likewise cites to his expert reports to dispute Defendants' claim that Decedent "experienced no decompensation relative to her pre-existing heart condition" while detained in Allegany County. (Plaintiffs' Response to Allegany Defendants at ¶ 5; Allegany Defendants' Statement at ¶ 5). Likewise, Plaintiff contends that a failure to perform appropriate tests explains why Decedent "did not exhibit gross signs and symptoms of decompensation prior to July 25, 2011." (Plaintiff's Response to Allegany Defendants at ¶ 6; Allegany Defendants' Statement at ¶ 6).

When Decedent arrived at the Allegany County Jail, an intake officer asked her a number of booking observation questions. (*Id.* at ¶ 7, 521 N.Y.S.2d 150). He entered the information Bamenga provided into his computer. (*Id.*). Questions the officer asked included whether Bamenga had any medical problems and whether she was taking medication. (*Id.*). The intake officer forwarded Bamenga's container of medication to the Jail's medical unit. (*Id.*). While Plaintiff disputes the adequacy of the examination, the parties agree that Defendant nurse Debra Harrington examined Plaintiff on July 16,

2011. (*Id.* at ¶ 8, 521 N.Y.S.2d 150; Plaintiff's Response to Allegany Defendants' at ¶ 8). Harrington recorded that Decedent had a prior history of congestive heart failure, hypertension and a positive Tuberculosis test. (Allegany Defendants' Statement at ¶ 9). Harrington's examination included observation, vital signs including pulse and blood pressure, listening to Bamenga's chest and lungs, and "checking" Decedent's ankles for peripheral edema. (*Id.* at ¶ 10, 521 N.Y.S.2d 150). Harrington recorded that her findings as normal, showing no peripheral edema, no acute or apparent distress, and no complaints of shortness of breath or chest pains. (*Id.*). Plaintiff disputes the adequacy of this examination or the documentation accompanying it. (Plaintiff's Response to Allegany Defendants' Statement at ¶ 10). Plaintiff points to Harrington's deposition to argue that she did not record any results of an edema examination or the results of a test for lung sounds. (*Id.*). Plaintiff also contends that Jail procedures failed to provide for any initial assessment or procedures to be used in such assessment. (*Id.*).

**\*19** While the parties agree that Harrington looked over the container that contained Bamenga's medications, they dispute about whether this "examination" represented an exercise of medical or nursing judgment. (Allegany Defendants' Statement at ¶ 11; Plaintiff's Response to Allegany Defendants at ¶ 11). The parties agree that Bamenga provided Harrington with the names of her medications, but did not know the doses or the frequency with which she was to take them. (Allegany Defendants' Statement at ¶ 12). While Defendants contend that Harrington recorded information about the doses in Decedent's "medical chart," Plaintiff points to various affidavits and investigations in disputing this claim. (Allegany Defendants' Statement at ¶ 13; Plaintiff's Response to Allegany Defendants at ¶ 13). According to the Plaintiff, Harrington "made the limited notes she" recorded "on a copy of a booking form used by corrections officers when recording booking information about a new prisoner." (Plaintiff's Response to Allegany Defendants at ¶ 13).

The parties also dispute whether Harrington asked Decedent for the names of her treating physician and the pharmacy. (Allegany Defendants' Statement at ¶ 14; Plaintiff's Response to Allegany Defendants at ¶ 14). Defendants contend that Decedent could not provide Harrington with any of this information. (Allegany Defendants' Statement at ¶ 14). Plaintiff contends, again

citing to the Homeland Security Department's Report, that Harrington told investigators in August 2011 that Decedent "was not asked for information on her private provider or when she was last seen." (Plaintiff's Response to Allegany Defendants at ¶ 14). Plaintiff does not address whether Bamenga was asked for information about her pharmacy. (*Id.*). Harrington asked Decedent to contact someone to find out her prescription information. (Allegany Defendants' Statement at ¶ 15).

Defendants contend that Harrington determined that Decedent was stable and feeling well. (*Id.* at ¶ 16, 521 N.Y.S.2d 150). Plaintiff disputes this statement, pointing to alleged inadequacies in Harrington's examination, including failures to take certain measurements or perform certain tests. (Plaintiff's Response to Allegany Defendants at ¶ 16). Defendants contend that Harrington made a "nursing judgment" to wait until the following Monday, July 18, 2011, to further evaluate Decedent. (Allegany Defendants' Statement at ¶ 17). On that date, Defendants insist, Defendant Cheryl Ralyea, the jail's nurse practitioner, would return, evaluate Bamenga, and order her medication. (*Id.*). Plaintiff responds, citing to various expert reports, that Harrington "had to know" that an "abrupt discontinuation of cardiac medications" would be dangerous for a patient like the Decedent, and even "potentially fatal." (Plaintiff's Response to Allegany Defendants at ¶ 17).

On July 18, 2011, Ralyea performed a physical examination of Decedent. (Allegany Defendants' Statement at ¶ 18). Ralyea recorded listening to Bamenga's heart and lungs, examining her abdomen and extremities, as well as her head, eyes, ears, mouth, throat, neck, respiratory, cardiac, musculoskeletal and neurologic systems. (*Id.*). Ralyea concluded that Decedent was medically stable, not in acute distress, and had vital signs that were normal. (*Id.*). Decedent's "physical assessment was entirely normal"; she had warm and dry skin, with good color and turgor. (*Id.*). Bamenga was alert, oriented and cooperative. (*Id.*). Plaintiff disputes the accuracy of these findings, and in particular Defendants' claim that the examination was a "complete" one. (Plaintiff's Response to Allegany Defendants at ¶ 18). Plaintiff insists that Ralyea failed to perform proper diagnostic investigations and testified that she did not even consider such tests. (*Id.*).

**\*20** During the examination, Decedent reported to Plaintiff that she had a history of prior diagnoses

of congenital heart failure, high blood pressure (hypertension) and anemia. (Allegany Defendants' Statement at ¶ 19). Defendants contend that Decedent gave Ralyea the names of her medications, but was uncertain about the doses except that she took one pill twice a day and the rest once a day in the morning. (*Id.* at ¶ 20, 521 N.Y.S.2d 150). Plaintiff disputes this, pointing out that Ralyea told Department of Homeland Security investigators in August 2011 that the medications she ordered were those reported by the Decedent. (Plaintiff's Response to Allegany Defendants at ¶ 20). Defendants also assert that Bamenga did not provide Ralyea with the name of her treating physician or the pharmacy where she filled her prescriptions. (Allegany Defendants' Statement at ¶ 21). Plaintiff disputes this claim, pointing out that Ralyea told investigators in August 2011 that she had not attempted to verify Plaintiff's medications before ordering them and alleging that Ralyea had not even considered seeking out Bamenga's medical records before writing prescriptions. (Plaintiff's Response to Allegany Defendants at ¶ 21). The parties agree that Ralyea asked Bamenga to call someone for information about her prescriptions. (Allegany Defendants' Statement at ¶ 22).

Defendants allege that on July 18, 2011, Ralyea prescribed dosages for Decedent which she considered medically appropriate based on the six medications that Bamenga had identified. (*Id.* at ¶ 23, 521 N.Y.S.2d 150). Plaintiff disputes this statement, pointing out that Ralyea told investigators in August 2011 that she had ordered the medications and dosages as reported by the Decedent. (Plaintiff's Response to Allegany Defendants at ¶ 23). Plaintiff also points to Ralyea's deposition, in which she testified that she had determined dosages by referring to the Nurse Practitioner's Prescribing Reference, particularly for the drugs Spironolactone and Carvedibol. (*Id.*). Despite Ralyea's testimony that she wrote prescriptions based on this source, Plaintiff alleges that the product label for the generic Carvedibol does not reference a 20 mg dose and clearly directs that the drug be administered twice daily for CHF. (*Id.*). Plaintiff contends that the dosages prescribed by Ralyea belie her claim that she used "independent medical judgement concerning dose or dosage schedule based on appropriately careful review of prescribing information for the medications she prescribed." (*Id.*). Ralyea prescribed the following medications for Decedent: (1) Spirolactone, 25 mg twice per day; (2) Lasix, 20 mg once per day; (3) Digoxin, .25 mg once per day; (4) Carvedilol, 20 mg once per day; (5)

Lisinopril, 20 mg once per day; and (6) Aspirin, 81 mg once per day. (Allegany Defendants' Statement at ¶ 24). Defendants claim Ralyea chose these doses based on the information she received from Decedent, her examination of the Decedent, her knowledge and experience, and the Nurse Practitioner's Prescribing Reference. (*Id.* at ¶ 25, 521 N.Y.S.2d 150). Plaintiff disputes this statement, pointing to the errors identified with reference to ¶ 23. (Plaintiff's Response to Allegany Defendants at ¶ 25).

**\*21** After establishing these prescriptions and dosages, Ralyea determined that no further workup or consultation was necessary for the decedent at the time. (Allegany Defendants' Statement at ¶ 26). Plaintiff, citing to statements from Ralyea that she did not consider ordering any laboratory tests, contends that the decision not to order any additional tests was not based on any "reasoned conclusion[s]" about the need for such examinations. (Plaintiff's Response to Allegany Defendants at ¶ 26). The parties dispute whether Ralyea scheduled a follow-up visit with Bamenga for a week later. (Allegany Defendants' Statement at ¶ 27; Plaintiff's Response to Allegany Defendants at ¶ 27). Plaintiffs contend that there is no note of such an appointment in the medical file and no calendar entry noting such an appointment. (Plaintiff's Response to Allegany Defendants at ¶ 27). Plaintiff therefore disputes Defendants' claim that Ralyea scheduled Bamenga for an appointment as a chronic needs patient on July 25, 2011. (Allegany Defendants' Statement at ¶ 28; Plaintiff's Response to Allegany Defendants at ¶ 28).

Ralyea filed an electronic request with Immigration and Customs Enforcement ("ICE") for a chest x-ray for Decedent on July 18, 2011. (Allegany Defendants' Statement at ¶ 29). The parties disagree whether Ralyea was required to seek approval from ICE before scheduling the x-ray. (Allegany Defendants' Statement at ¶ 30; Plaintiff's Response to Allegany Defendants at ¶ 30). While Defendants insist that Ralyea had to contact ICE for approval, Plaintiff cites to the contract between the County and ICE to argue that such approval was necessary only if the County requested reimbursement for the procedure. (*Id.*). ICE would arrange for the transport of detainees like Decedent. (Allegany Defendants' Statement at ¶ 31).

Decedent began receiving the medications prescribed by Ralyea on the evening of July 18, 2011. (*Id.* at ¶ 32, 521 N.Y.S.2d 150). She received an evening does of

Spironolactone at that time, and then all six of the prescribed medications on the next day, July 19, 2011. (*Id.*). Plaintiff disputes that Decedent received the proper doses of her medications, and whether simply re-starting the medications after three days of abstention was proper. (Plaintiff's Response to Allegany Defendants at ¶ 32). At the Allegany County Jail, a nurse and/or officer would bring around a medication cart with cards that indicated the medications and times for each inmate. (Allegany Defendants' Statement at ¶ 33). The Defendants contend that officers requested inmates who refused medications to sign a form. (*Id.* at ¶ 34, 521 N.Y.S.2d 150). Plaintiff disputes that this information is material, that the procedures were followed by guards, or that Decedent refused any medication. (Plaintiff's Response to Allegany Defendants at ¶ 34). Likewise, Plaintiff disputes the materiality of Defendants' description of the procedure inmates used to request medical care, which required inmates to fill out a request form and place it in a box in a common area. (Plaintiff's Response to Allegany Defendants at ¶ 35; Allegany Defendants' Statement at ¶ 35). Plaintiff also disputes the contents of a telephone call he and Decedent had on July 20, 2011; Defendants contend that the call describes the procedure for delivering medication to inmates. (Plaintiff's Response to Allegany Defendants at ¶ 36; Allegany Defendants' Statement at ¶ 36).

**\*22** ICE informed the Allegany County Jail on July 20, 2011 that Decedent would be transferred the following day. (Allegany Defendants' Statement at ¶ 37). Ralyea prepared a transfer form, which Plaintiff contends lacked necessary information. (Allegany Defendants' Statement at ¶ 38; Plaintiff's Response to Allegany Defendants at ¶ 38). On the transfer form, Ralyea noted that Decedent suffered from congestive heart failure and other conditions, that medication had been prescribed to her, and that no chest x-ray had yet been performed. (Allegany Defendants' Statement at ¶ 39). Plaintiff points out that the medications on the list were the medications prescribed by Ralyea, and that they listed the prescriptions, not the doses actually administered. (Plaintiff's Response to Allegany Defendants at ¶ 39).

Decedent was transferred out of the Allegany County Jail in the morning of July 21, 2011. (Allegany Defendants' Statement at ¶ 40). The parties dispute whether the transfer came before or after the time when daily medications were administered. (*Id.;* Plaintiff's Response

to Allegany Defendants at ¶ 40). Plaintiff contends that the time listed for transfer came after the 9:00 a.m. medical rounds, and that testimony that the time of transfer explains a failure to administer medication is "speculative on its face." (Plaintiff's Response to Allegany Defendants at ¶ 40). While the medications prescribed to Decedent were transferred with her, the parties dispute whether the medications Bamgena brought with her to the Jail were also transported with her. (Allegany Defendants' Statement at ¶ 41; Plaintiff's Response to Allegany Defendants at ¶ 41).

The parties agree that Decedent never made any written complaints about her health while in the Allegany County Jail, though Plaintiff insists that she did complain about her condition. (Allegany Defendants' Statement at ¶ 42; Plaintiff's Response to Allegany Defendants at ¶ 42). Bamgena never requested to be transferred to the hospital while at the Jail. (Allegany Defendants' Statement at ¶ 43). Neither did she fill out any sick slips or sick call requests. (*Id.* at ¶ 44, 521 N.Y.S.2d 150).

Defendants contend that since 2007 ICE has inspected the Allegany County Jail, finding the facility compliant with ICE standards. (Allegany Defendants' Statement at ¶ 45). Plaintiff responds that the standards to which the facility complied are not stated, but notes that the contract between ICE and Allegany County requires that the County house detainees and provide services "in accord with the most current edition of ICE National Detention Standards." (Plaintiff's Response to Allegany Defendants at ¶ 45). Defendants also claim that the Jail has been inspected and certified under ICE's 2000 National Detention Standards since entering into an agreement with the agency. (Allegany Defendants' Statement at ¶ 46). Plaintiff disputes this claim. (Plaintiff's Response to Allegany Defendants' Statement at ¶ 46). Though Plaintiff disclaims the relevance of such reviews, the parties agree that ICE and the New York State Commission on Correction have reviewed the Jail's policies and procedures on healthcare and found them appropriate. (Plaintiff's Response to Allegany Defendants' Statement at ¶ 47; Allegany Defendants' Statement at ¶ 47).

**\*23** The parties also disagree over whether the New York State Commission on Correction approved a staffing plan for the jail that placed a nurse practitioner or registered nurse in charge of "health care administration in correctional facilities[.]" (Allegany

Defendants' Statement at ¶ 48; Plaintiff's Response to Allegany Defendants at ¶ 48). The Commission's staffing plan permits a nurse practitioner or registered nurse to " 'implement a managed care system in the jail and monitors chronically ill inmates,' perform health assessments, and supervise pharmaceutical and medication delivery." (Albany Defendants' Statement at ¶ 49). The plan also describes the nurse practitioner as a " 'mid-level clinician' who 'performs services within the boundaries of her licensure, normally provided by a physician as well as completing tasks performed by registered nurses." (Id. at ¶ 50, 521 N.Y.S.2d 150). Cheryl Ralyea was at the relevant times a licensed and registered Nurse Practitioner who had a collaborative agreement with the licensed physician at the prison, Dr. Depner. (Id. at ¶ 51, 521 N.Y.S.2d 150).

The New York State Commission of Correction's Medical Review Board investigated Irene Bamenga's death. (Id. at ¶ 52, 521 N.Y.S.2d 150). The Review Board determined that the " 'case could be closed as a natural death.' " (Id.). Plaintiff responds that the determination of a natural death does not necessarily give rise to a finding that no malpractice or constitutional violation was involved in the death. (Plaintiff's Response to Allegany Defendants at ¶ 52). A review by Dr. Jeffrey Hubbard concluded that Decedent did not have uncontrolled congestive heart failure. (Allegany Defendants' Statement at ¶ 53). Plaintiff points out that Dr. Hubbard also concluded that " 'the liver and lung showed congestion, indicating terminal congestive heart failure, but there were no effusions or pulmonary edema which would suggest uncontrolled chronic heart failure.' " (Plaintiff's Response to Allegany Defendants at ¶ 53). The parties dispute, citing both Dr. Hubbard's examination and Plaintiff's expert reports, whether Dr. Hubbard's examination indicates that Defendants' conduct played a role in Decedent's demise, or if the cause was her chronic condition. (Allegany Defendants' Statement at ¶ 54; Plaintiff's Response to Allegany Defendants at ¶ 54).

The parties agree that there is no documentation demonstrating that Decedent complained of pain while she was at the Allegany County Jail. (Allegany Defendants' Statement at ¶ 55; Plaintiff's Response to Allegany Defendants at ¶ 55). Irene Bamenga spoke to Plaintiff, her husband, on the telephone on July 18, 2011. (Allegany Defendants' Statement at ¶ 56). According to the Defendants, Bamenga told her husband that "It is

well" with her. (Id.). Plaintiff disputes that she made this statement, and disputes any characterization of the statement as expressing a lack of concern with her health. (Plaintiff's Response to Allegany Defendants at ¶ 56). According to Plaintiff, the statements attributed to Bamenga could be interpreted in many ways, given the setting and audience. (Id.). Likewise, the parties disagree about the meaning and import of a statement allegedly made by Bamenga to Plaintiff on July 18, 2011, where Defendants allege she told her husband she was " 'doing fine[.]' " (Allegany Defendants' Statement at ¶ 57; Plaintiff's Response to Allegany Defendants at ¶ 57).

**\*24** Defendant Sheriff Rick L. Whitney does not manage the day-to-day operations of the Allegany County Jail. (Allegany Defendants' Statement at ¶ 58). Sheriff Whitney did not establish the medical policies at the jail. (Id. at ¶ 59, 521 N.Y.S.2d 150). During Decedent's detention in the Jail, Defendant Whitney was not aware of the events of her stay, did not become personally involved in her medical care, and did not examine her medical chart. (Id. at ¶ 60, 521 N.Y.S.2d 150). [8]

### ii. Defendants' Motion

The Defendants raise several grounds in support of their motion. The Court will address each in turn, as appropriate. The Court will apply the relevant legal standards as articulated above, explaining any additional standards where necessary.

### a. *Monell* Liability for the County

Defendants first argue that no evidence supports a finding by the jury that Decedent's injuries were the result of an official policy or custom, and any claim brought against the County pursuant to 42 U .S.C. § 1983 must therefore be dismissed. Municipal liability is limited under Section 1983 by *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In that case, the Supreme Court found that municipal liability existed "where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir.2006). To prevail, a plaintiff must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). "A government's official policy may be 'made by its lawmakers or by those whose edicts or acts may fairly

be said to represent official policy.' " *Dangler v. New York City Off Track Betting Corp.,* 193 F.3d 130, 142 (2d Cir.1999)* (quoting *Monell,* 436 U.S. at 694). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson,* 141 S.Ct. 1350, 1359 (2011). Claims against the County would thus be proved by showing that Decedent's rights were violated "pursuant to a governmental custom, policy, ordinance, regulation, or decision ." *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983). Plaintiff must demonstrate "(1) an official policy or custom that (2) causes the [decedent] to be subjected to (3) a denial of a constitutional right." *Id.*

Defendants contend that Plaintiff's theory of liability is of two parts: (1) that Defendant Debra Harrington, as a nurse, should have acted immediately upon examining the Decedent to have Decedent seen by a nurse practitioner or doctor and provided her with medication before July 18, 2011, and (2) that Defendant Nurse Practitioner Ralyea should have prescribed medication in the exact doses prescribed by Decedent's treating physician in Massachusetts. Defendants insist that these decisions were not made pursuant to any official policy or custom and the County cannot be liable. Moreover, Plaintiff has not identified any other individuals whose rights were similarly violated by the County, and Plaintiff therefore cannot establish injury pursuant to a policy or custom. Plaintiff responds that the County's policies in staffing the jail and supervising medical care meant that there was little practical supervision of Nurse Practitioner Ralyea, and that Dr. Depner's position was so poorly overseen that the Jail Administrator was not even aware that Dr. Depner was paid by the jail or that he had any duties. Moreover, Plaintiff argues, the County did not staff the jail adequately and did not train the staff to recognize and treat conditions like the Decedent's. Indeed, guards with no adequate training often did initial screening of inmates.

**\*25** The Court agrees with the Plaintiff that evidence exists by which a jury could conclude that Decedent's demise was the result of a policy or custom of Defendant Allegany County. As explained in the factual sections above, the County's policies and procedures did little to ensure that complex cases for inmates like Decedent received any particular attention. Rather than having a policy in place that would ensure that a physician or other highly trained professional were contacted to address the

unique medication and health issues presented by a inmate who arrived with a deadly heart condition and a container filled with a number of medications, the County's system simply relied on an intake officer and a nurse to gather information and perform basic tests. These procedures resulted in interruptions and delays in Decedent's receipt of her medication that Defendants' expert reports contend contributed to her death. As explained above, Plaintiff's expert reports provide additional evidence to support such claims. The motion for summary judgment must be denied in this respect.

Defendants also argue that Plaintiff cannot prove liability for failing to provide proper training in a way that violated the Decedent's constitutional rights. Under this theory of municipal liability, "[t]he existence of an official municipal policy or custom can also be demonstrated by establishing a deliberate government policy of failing to train or supervise its officers." *Anthony v. City of New York,* 339 F.3d 129, 140 (2d Cir.2003). Under this theory, "[m]unicipal liability attaches only where the failure to train amounts to 'deliberate indifference to the rights of persons with whom the policy come in contact.' " *Id.* (quoting *City of Canton, Ohio v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). Liability attaches under this theory only when three "requirements" are met: "[f]irst, the plaintiff must show that a policymaker knows 'to a moral certainty' that her employees will confront a given situation." *Walker v. New York,* 974 F.2d 293, 297 (2d Cir.1992). No liability attaches for failing to train "for rare or unforseen events." *Id.* "Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult, or that there is a history of employees mishandling the situation." *Id.* Third, "the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Id.* at 298.

The Court first notes that courts have cast failure to provide training as simply an alternative means of proving municipal liability for a deprivation of constitutional rights. The Court finds that the facts in the record would also permit a jury to conclude that a failure to train guards and nurses to take aggressive action to determine the medical care and treatment of incoming inmates with a serious medical condition like Decedent's constitutes a deliberate indifference to the rights of persons presented for intake at the Allegany County Jail.

Jail officials developed some medical procedures, and had to know that inmates would arrive with extremely serious medical conditions that required complex treatment regimens, including extensive medication. Second, these complicated medical conditions present intake officers and nurses like Harrington with difficult decisions about what to report, whom to contact, and what to do with the medication that arrived at the prison. A jury could conclude that the County did not provide training in making these decisions. Finally, as with any serious medical condition, a failure to take appropriate action to address medication issues with incoming inmates could quickly turn deadly and thus deprive the inmate of a constitutional right. The motion must be denied in this respect too.

**b. Individual Defendants**

 **\*26** Defendants next assert that the claims against the individual Defendants, Sheriff Whitney, Cheryl Ralyea and Debra Harrington, should be dismissed. They first argue that any claims brought against these individuals in their official capacities should be dismissed, as they are redundant with claims against the County. The Court agrees here. Courts are clear that "[o]fficial-capacity suits ... 'generally represent only another way of pleading an action against an entity of which an officer is an agent.' " *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (quoting *Monell,* 436 U.S. at 690 n. 55). "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* Thus, "[a] claim against an offender in his official capacity is, and should be treated as, a claim against the entity that employs the officer [.]" *Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997). As Plaintiff has brought such official-capacity claims, any claims against the Allegany Defendants in their official capacities are a nullity. *Wallikas v. Harder,* 67 F.Supp.2d 82, 83 (N.D.N.Y.1999). The motion will be granted in this respect.

Defendants do not deny, of course, that Plaintiff could raise claims against them in their individual capacities. They instead argue that no evidence exists to support such claims. The Court will address the evidence concerning each Defendant.

**1. Sheriff Whitney**

Defendant Sheriff Rick L. Whitney contends that he cannot be liable in this case because Plaintiff seeks to impose on him *respondeat superior* liability, which is unavailable under Section 1983. Defendant is correct that "liability for supervisory government officials cannot be premised on a theory of *respondeat superior* because § 1983 requires individual, personalized liability on the part of each government defendant." *Raspardo v. Carlone,* 770 F.3d 97, 116 (2d Cir.2014). A plaintiff must introduce "[e]vidence of a supervisory official's 'personal involvement' in the challenged conduct." *Hayut v. State Univ. of N.Y.,* 352 F.3d 733, 753 (2d Cir.2003) (quoting *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 254 (2d Cir.2001)). Personal involvement can include "direct participation by the supervisor in the challenged conduct." *Id.* Personal involvement by a supervisor can "also be established by evidence of an official's (1) failure to take correct action after learning of a subordinate's unlawful conduct, (2) creation of a policy or custom fostering the unlawful conduct, (3) gross negligence in supervising subordinates who commit unlawful acts, or (4) deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates." *Id.*

The facts, as established above and not disputed by the Plaintiff, indicate that Sheriff Whitney did not manage the Jail's day-to-day operations, did not formulate any of the medical policies in place, and had nothing to do with Decedent's care while in the jail. Plaintiff's brief offers no argument as to why summary judgment should not be granted to Sheriff Whitney on these claims, and the additional facts cited in Plaintiff's statement of material facts make no mention of any decisions made or actions taken by Defendant Whitney. The facts agreed to by the parties indicate that Sheriff Whitney was not personally involved in any of the actions, policies or decisions that allegedly harmed the decedent and violated her rights. He did nothing to establish the policies that allegedly harmed Bamenga, and he was not aware of any mistreatment of her while she was in the Jail. He thus could not fail to act after being informed of unlawful conduct, did not formulate any policies that injured Decedent, was not grossly negligent in his supervision of subordinates, and did engage in deliberate indifference to reports of misconduct. Because Plaintiff could not make out any claim of liability against Defendant Whitney under Section 1983, either for his individual or supervisory conduct, the Court will grant the Defendants' motion

with respect to any Section 1983 claims raised against Defendant Whitney. As these are the only claims asserted against Whitney, he will be dismissed from the action.

## 2. Defendants Ralyea and Harrington

**\*27** Defendants Nurse Cheryl Ralyea and Nurse Practitioner Debra Harrington both argue that they cannot be liable on Plaintiff's Section 1983 claim that Decedent's due process rights were violated by Defendants' deliberate indifference to Bamenga's serious medical need. Defendants argue both that Decedent's heart condition did not represent a serious medical need and that, even if the condition were serious, Plaintiff has no evidence to establish that either defendant was deliberately indifferent to that need. The legal standard recited above with respect to the claims against Dr. Depner likewise apply to the claims against these two Defendants.

### i. Serious Medical Need

Defendants first argue that Plaintiff has presented no evidence to establish that Decedent suffered from a serious medical need when they treated her at the hospital. They argue that their failure to provide Decedent with her medication during the first few days of her stay at the jail "did not create a serious risk to Bamenga's health and she did not exhibit any signs of heart failure until several days after she was transferred from Allegany County Jail." (Defendants' Brief, dkt. # 311–2, at 7). Moreover, when Harrington and Ralyea examined Decedent, she appeared medically stable and did not show any signs of distress nor make any complaints. Medical expert reports also indicate that the doses provided the Decedent were "rational and appropriate under the circumstances," and that Decedent's medical condition while at the jail indicated that drugs kept her medically stable while at the Allegany County Jail. *Id.* From the Defendants' perspective, then, "plaintiff cannot raise an issue of fact that the 'allegedly incorrect medical dosage posed an objectively serious risk to [Bamenga's] health.' " *Id.* at 8 (quoting Price v. Reilly, 697 F.Supp.2d 344, 359 (E.D.N.Y.2010)).

As a general matter a claim of this sort may proceed if a defendant, "with deliberate indifference, expose[s] [a detainee]" to conditions which "pose an unreasonable risk of serious damage to [her] future health." Helling v. McKinney, 509 U.S. 25, 35, 113 S.Ct. 2475, 125 L.Ed.2d 22

(1993). Thus, "[a] serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.' " Harrison v. Barkley, 219 F.3d 132, 136 (2d Cir.2000) (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir.1998)). Since medical conditions "vary in severity ... a decision to leave a condition untreated will be constitutional or not depending on the facts of the particular case." *Id.* at 136–137. Therefore, "a prisoner with a hang-nail has no constitutional right to treatment, but if prison officials deliberately ignore an infected gash, 'the failure to provide appropriate treatment might well violate the Eighth Amendment.' " *Id.* (quoting Chance, 143 F.3d at 702). In Harrison, for example, the Second Circuit noted that "[o]rdinarily, a tooth cavity is not a serious medical condition, but this is at least in part because a cavity is so easily treatable." *Id.* at 137. Immediate treatment is often unnecessary, but "is a degenerative condition, and if it is left untreated indefinitely, it is likely to produce agony and to require more invasive and painful treatment, such as root canal therapy or extraction." *Id.* "Consequently, because a tooth cavity will degenerate with increasingly serious implications if neglected over sufficient time, it presents a 'serious medical need' within the meaning of our case law." *Id.*

**\*28** Under this standard, failing to treat congestive heart failure, which can cause a patient's heart to stop beating, surely qualifies as a serious medical need. See Hill v. Curcione, 657 F.3d 116, 122 (2d Cir.2011) ("objective" element requires a showing that " 'a condition of urgency, one that may produce death, degeneration, or extreme pain exists.' ") (quoting Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir.1996)). Defendants, argue however, that the failure to treat Bamenga's congestive heart failure was not ongoing, but represented only a brief interruption in treatment that was quickly remedied and did not cause Decedent harm.

Defendants cite to the standards articulated in Smith v. Carpenter, 316 F.3d 178 (2d Cir.2003). In that case, the plaintiff, who suffered from HIV, did not "[challenge] the defendants' failure to provide medical care to treat [his] medical condition" or "about the general level of HIV treatment that he received" during his incarceration. *Id.* at 184–185. "Instead," plaintiff's "Eighth Amendment claim is based solely on interruptions in the provision of HIV medication prescribed by [the defendant] doctors

as part of his overall HIV treatment." *Id.* at 185. The Court of Appeals found that "[w]hen the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious to support an Eighth Amendment claim." *Id.* (quoting *Chance,* 143 F.3d at 702) (emphasis in original).

The Appeals Court concluded that in cases where a prisoner receives "appropriate on-going treatment for his medical condition" and alleges "a narrower denial of medical care claim based on a temporary delay or interruption of treatment, the serious medical need inquiry can properly take into account the severity of the temporary deprivation alleged by the prisoner." *Id.* at 186. A court must consider "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract[.]" Under those terms, the plaintiff's rights are violated when the interruption in treatment "[creates] a substantial risk of injury in the absence of appropriate treatment," but not when "the alleged lapses in treatment are minor and inconsequential." *Id.* A jury may "consider the absence of adverse medical effects in evaluating the objective sufficiency" of an Eighth Amendment claim. *Id.* at 187. The jury is to evaluate "the specific factual context of each case," and "in most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Id.* In *Smith,* the Court found that the jury properly considered the "absence of concrete medical injury" as a result of brief delays in HIV treatment in deciding that plaintiff's medical need was not serious. *Id.* at 189.

**\*29** Plaintiff does not respond directly to Defendants' argument regarding an interruption in care, instead emphasizing that Decedent's condition was obviously serious, as congestive heart failure is frequently a fatal condition, and one that allegedly lead to Irene Bamenga's death while in the custody of Albany County. The Court finds that this case is different from *Smith* in significant ways. First, unlike in *Smith,* the Plaintiff here does not

allege that Bamenga received adequate medical care, except for an occasional interruption in the medication she was prescribed for her condition. Instead, Plaintiff alleges, and the expert reports he provides insist, that the medical care provided to Decedent was inadequate from the moment Bamenga arrived at Allegany County jail. Plaintiff does not contend that Defendants generally provided Bamenga with proper treatment, but injured her by failing to provide her with medication immediately when she arrived in the jail. Instead, Plaintiff contends that Defendants failed to perform appropriate testing when Bamenga arrived at the prison, failed to act in a timely fashion to establish her medical needs, failed to have in place and to follow proper procedures for chronically ill inmates, and failed to engage in basic steps to verify the medications prescribed for Bamenga were the appropriate ones for her condition. Such conduct is much different from that alleged in *Smith,* where the plaintiff did not have complaints about the general medical regimen established to treat his HIV, but about "interruptions" in the delivery of medication he had been prescribed. *See Smith,* 316 F.3d at 184–85. Here, Plaintiff's complaint is about the general level of care provided by the Defendants in treating Bamenga's congestive heart failure, which he contends was grossly inadequate from the start. The Court finds that the *Smith* test is inappropriate for this matter and that the evidence indicates that Plaintiff's congestive heart failure was a serious medical need.

Even applying the test in *Smith* would lead the Court to conclude that the evidence supports a finding that Plaintiff's condition represented a serious medical need. Defendants contend that, because Harrington's initial assessment of Bamenga on July 16, 2011 and Ralyea's examination on July 18, 2011 indicated that Decedent was in no acute distress and that she made no complaints about her medical condition either to the health professionals or by registering a sick call, Plaintiff cannot demonstrate any adverse medical effects from failing to provide medical treatment. Defendants therefore contend that Bamenga did not suffer from a serious medical condition. This argument ignores, of course, the fact that Bamenga died less than two weeks after she left the Allegany County Jail, and while she was taking the medication prescribed her by Nurse Practitioner Ralyea. Plaintiff's experts contend that these doses were inappropriate, and that Ralyea failed to follow proper medical procedures in assigning them. These experts find that Bamenga died as a result of these failings. Plaintiff has submitted the expert report of

David DeNofrio, a physician and Director of the Heart Failure and Cardiac Transplantation Center at Tufts Medical Center in Boston, Massachusetts. *See* dkt. # 346. Dr. Denofrio is also a professor of medicine at Tufts University. *Id.* He is Board Certified in Internal Medicine, Cardiovascular Disease and Advanced Heart Failure and Transplant Cardiology. *Id.* His expert report explains:

> **\*30** Any licensed health care provider-whether L.P.N., R.N. N.P. or M .D.-by virtue of basic education and training knows that continuity of care isessential to maintenance of a compensated status. The lack of continuity of care, and most especially continuity of Ms. Bamenga's pharmacological regimen in light of her underlying disease state, exemplifies an attitude of conscious disregard for the patient's health and safety that lead directly to her death. For example, Ms. Bamenga received no medication whatsoever from Friday evening July 15, 2011 until Monday evening July 18, 2011, a period of approximately 72 hours. To a high degree of medical certainty approaching 100%, this directly contributed to a decompensation of her underlying congestive heart failure ... Irene Bamenga, at the time of her detention, was a patient with cardiomyopathy and stable, compensated congestive heart failure. The woeful mismanagement of her care at all levels at both facilities was, to a high degree of medical certainty, the cause of the decompensation of her heart failure and resulting death.

(DeNofrio Report, dkt. # 346 at 5–6, 9). A jury could certainly find that the medical need faced by Bamenga was serious considering all of the facts surrounding her condition.

Morever, the Defendant's argument appears to ignore the alleged consequences of the inadequate treatment that Bamenga supposedly received. Defendant's argument seems to imply that, as long as the party allegedly injured by deliberate indifference to a serious medical need appeared fine at the time of the deliberate indifference, the providers of that treatment cannot be liable. If that were the case, then the doctors who failed to treat a cavity and then saw no adverse affects from that failure when they next examined the prisoner could not be liable for failing to provide treatment. That flies in the face of the standard articulated in *Harrison,* where simple tooth decay "left untreated indefinitely, it is likely to produce agony and to require more invasive and painful treatment, such as root canal therapy or extraction." *Harrison,* 219 F.3d at 137. "Consequently, because a tooth cavity will degenerate with increasingly serious implications if neglected over sufficient time, it presents a 'serious medical need' within the meaning of our case law." *Id.*

A jury could certainly find that Bamenga's congestive heart failure represented a serious medical need, and the motion will be denied on this basis.

**ii. Deliberate Indifference**

Defendants next argue that, even if Bamenga suffered from a serious medical need, no evidence exists to demonstrate deliberate indifference to that need. Defendants contend that both Ralyea and Harrington offered appropriate care to the Decedent, and that they had no knowledge that their treatment of Decedent could place her in any danger. They provided standard treatments under the circumstances and based on the information that Bamenga supplied them about her medical condition and the medications she took. Any failings in that treatment were at worst inadvertent failures, and not activities for which they could be liable.

**\*31** Proof of deliberate indifference must show that the defendant "act[ed] with a sufficiently culpable state of mind." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006). "In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Id.* This "deliberate indifference" is an inquiry into the defendant's "mental state," and is "equivalent to subjective recklessness, as the term is used in criminal law." *Id.* To be liable, the defendant "act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* The defendant can be liable

without acting "intentionally and knowingly," and a plaintiff does not need to demonstrate that the defendant "desire[d] to cause such harm or [was] aware that such harm will surely or almost certainly result." Under those circumstances, "proof of awareness of a substantial risk of harm suffices." *Id.* The awareness of risk by the defendant must be subjective. *Id.* at 281. A "defendant's belief that his conduct poses no risk of serious harm (or an insubstantial risk of serious harm) need not be sound so long as it is sincere." *Id.* A plaintiff must therefore show more than negligence by the defendant to prevail. *Id.* A "mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to a [constitutional] violation." *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998). "Whether a treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case." *Id.*

Defendants argue that the mere fact that the doses prescribed by Ralyea for Bamenga differed from those her doctor prescribed does not demonstrate deliberate indifference. They contend that Ralyea used her medical judgment and prescribed doses she found appropriate, and she cannot be found deliberately indifferent for such conduct. Defendants cast this argument in the context of cases where courts have found that mere "disagreements" over medications and treatments and the use of specialists do not constitute deliberate indifference. *See, e.g., Wright v. Genovese,* 694 F.Supp.2d 137, 155 (N.D.N.Y.2010). In *Wright,* plaintiff complained of deliberate indifference by prison doctors who treated him after a heart procedure. 694 F.Supp.2d at 156–57. Plaintiff complained that the doctors failed him because they "did not ensure that he was appropriately excused from strenuous prison labor" failed to "ensure that he scheduled for a follow-up examination with his surgeon" and "did not recommend ro prescribe adequate prescription medication." *Id.* at 156. The Court found that "[p]laintiff's disagreement with particular medical decisions by the defendants and conclusory allegations of deliberate indifference do not negate the extensive evidence that [defendants] reasonably and diligently addressed plaintiff's needs over an extended period of time." *Id.* at 156–7. This case is different, as a jury could find that the Plaintiff and Defendants have more than a simple disagreement over what medical procedures Defendants should have used in evaluating and treating Decedent's *congestive heart failure.* Instead,

a jury considering all of the facts of Defendants' treatment of Decedent could conclude that Defendants failed to make a legitimate effort to determine the proper treatment to provide Decedent for an extremely serious health condition. A jury could find that Defendants' efforts to treat Decedent fell below even a minimal standard and amounted to deliberate indifference to an obviously serious condition.

**\*32** A case cited by the Defendants is instructive. In *McCloud v. Delaney,* 677 F.Supp. 230 (S.D.N.Y.1988), the plaintiff alleged that his Eighth Amendment rights were violated when the Defendant, a prison physician's assistant, prescribed him penicillin and forced him to take the drug, despite the plaintiff's claim that he was allergic to that medication. *Id.* at 231. The defendant had examined plaintiff, who sought treatment for nausea, chills and vomiting. *Id.* Defendant also determined that plaintiff's claimed allergy to penicillin was more likely a sensitivity. *Id.* He prescribed the drug and kept close watch over the plaintiff for any signs of allergic reaction. *Id.* None occurred, and plaintiff improved. *Id.* The court found that plaintiff could not demonstrate deliberate indifference because defendant, "in prescribing penicillin to [plaintiff], used great care." *Id.* The defendant "took the time to learn" about plaintiff's claimed allergy to penicillin and then "investigated the basis for that belief." *Id.* at 23233. The defendant "us[ed] his professional judgment to determine that penicillin was still the best treatment." *Id.* at 233. He also advised the plaintiff to be aware of signs of an allergic reaction, and informed guards that they should "keep a close watch[.]" *Id.* Defendant checked on plaintiff "the very next morning, and made an appointment to check him again." *Id.* Such evidence, the court found, "shows a great concern for [plaintiff's] welfare." *Id.*

A jury could read the evidence against moving Defendants differently. A jury could conclude that neither Ralyea or Harrington, when informed of Plaintiff's medical condition and shown her numerous medications, made any sort of careful effort to determine the proper (and prescribed) doses of medications beyond asking Decedent to try to discover that information on her own. They placed this burden on Decedent even though she was incarcerated, with limited access to telephones and other information. Neither thought to call a physician to inquire about medication, and neither seemed to conclude that Decedent, especially when she lacked access to her medications and was receiving doses prescribed according

to a desk manual, was deserving of any special monitoring to ensure that she did not suffer from any adverse reactions from disruptions in her medication. A jury could conclude that the Defendant's conduct failed to "[show] a great concern for [Decedent's] welfare." *McCloud,* 677 F.Supp. at 233. Thus, the motion must be denied in this respect as well.

### c. Qualified Immunity

Defendants also assert that they are entitled to qualified immunity. Without providing any detailed analysis, the Allegany Defendants contend that the they have established that "it was objectively reasonable for them to believe that they did not violate Bamenga's rights."

The Court will deny the motion on these grounds as well. As explained in reference to Dr. Depner above, there can be no doubt that a jail official is aware that an inmate is entitled to adequate medical care. There are facts here by which a jury could conclude that Defendants were deliberately indifferent to Bamenga's congestive heart failure, failing to provide her with an adequate initial assessment and then failing to make any adequate effort to determine the proper dosages of her medication. Qualified immunity is unavailable under those circumstances.

### d. Proximate Causation

**\*33** Defendants also contend that a jury could not find any of the Allegany Defendants liable because no proof exists that their conduct caused of Bamenga's death. They point out that Decedent did not expire until days after she left Allegany County's custody, and there is no way to show that the alleged failings in the Defendants' treatment were what led to her demise.

In New York, the plaintiff in a negligence action must prove "the existence of a duty, the breach of which may be considered the proximate cause of the damages suffered by the injured party." *Becker v. Schwartz,* 46 N.Y.2d 401, 410, 413 N.Y.S.2d 895, 386 N.E.2d 807, 810 (1978). "An act is a proximate cause of an injury if it is in clear sequence with the result and if it could have been reasonably anticipated that the consequences complained fo would result from the act." *Ouimet v. Humble Oil & Refining Co.,* 55 A.D.2d 855, 856, 390 N.Y.S.2d 497, 499 (4th Dept.1976).

To the extent that Plaintiff makes medical malpractice claims, the Court notes that "a plaintiff asserting a medical malpractice claim must demonstrate that the doctor deviated from acceptable medical practice, and that such deviation was a proximate cause of the plaintiff's injury." *James v. Wormuth,* 21 N.Y.3d 540, 545, 974 N.Y.S.2d 308, 997 N.E.2d 133, 136 (2013). Unless the matter is " 'within the ordinary experience and knowledge of laymen" a plaintiff alleging medical malpractice must provide " 'expert medical opinion evidence' " with respect to each of these two elements. *Milano v. Freed,* 64 F.3d 91, 95 (2d Cir.1995) (quoting *Fiore v. Galang,* 64 N.Y.2d 999, 1001, 489 N.Y.S.2d 739, 741 (1985)). If a doctor defending a malpractice case produces evidence that he did not divert from the standard of care or plaintiff was not injured by the doctor's conduct, " 'the plaintiff must submit a physician's affidavit attesting to the defendant's departure from accepted practice, which departure was a competent producing cause of the injury.' " *Martin v. Siegenfeld,* 70 A.D.3d 786, 788, 894 N.Y.S.2d 115, 118 (2010) (quoting *Rebozo v. Wilen,* 41 A.D.3d 457, 458, 838 N.Y.S.2d 121 (2007)). "Where the parties offer conflicting expert opinions, issues of credibility arise requiring jury resolution." *Id.; see also, Milano,* 64 F.3d at 97 (summary judgment inappropriate when defendants' "doctors' contentions are again contradicted by the testimony of [plaintiff's] experts at trial"). As explained above as well, a plaintiff must prove that Defendants' conduct was the cause of his injury to prevail on a constitutional claim. Here, the Defendants argue that Bamenga's death resulted from natural causes, not any of their conduct.

In short, the issue here is whether Defendants' conduct was a proximate cause of Bamenga's death. Defendants assert that there is no evidence to support a finding of proximate cause on any of Plaintiff's claims. Defendants are mistaken. As a general matter, a jury could certainly use evidence that moving Defendants took action to prevent Bamenga from receiving medication after she first arrived at the Allegany County Jail, did not perform tests necessary to evaluate her condition, and then did nothing of substance to ensure that the dosages of medication she received were proper for her and conclude that Defendants contributed to a disruption in medication and failures in treatment that eventually caused Bamenga to die. If the jury came to that conclusion, they could conclude that Defendants' acts were in "clear sequence with the result and if it could have been reasonably

anticipated that the consequences complained fo would result from the act[s]." *Ouimet,* 55 A.D.2d at 856.

**\*34** Moreover, Plaintiff has provided the expert evidence necessary both for a jury to come to this conclusion generally and within the context of a medical malpractice claim. As explained above, Plaintiff has submitted the expert report of Randy Werthheimer, M.D., which alleges that the medical professionals who treated Decedent after she entered both jails deviated from the standard of care. Dr. DeNofrio's report likewise concludes that Irene Bamenga died from "decompensated cardiac failure that may also have included a cardiac arrhythmia." DeNofrio at 3. Both the County of Allegany and the County of Albany, DeNofrio finds, "[failed] to provide appropriate care and treatment" to Bamenga while she was in their custody. *Id.* Bamenga's death "was directly a result of the lack of appropriate care and treatment she received at both facilities." *Id.* DeNofrio's opinion is based on his examination of "all records from both correctional facilities, prior medical records" pertaining to Bamenga, "autopsy reports and toxicology reports[,]" the ICE Mortality Review and physician review" as well as other medical records and the depositions of Bamenga's health-care providers. *Id.* DeNofio points specifically to Bamenga's failure to receive any medication during the first days of her custody in the Allegany County Jail and concludes that "this directly contributed to a decompensation of her underlying congestive heart failure." *Id.* at 6. He explains how the failure to provide specific medications at the appropriate times and doses caused these problems. *Id.* at 6–8. Incorrect doses of Lasix, for instance, "further contributed to undermining and destabilizing [Bamenga's] congestive heart failure." *Id.* at 7. The Allegany County jail ordered this dosage. *Id.* In addition, DeNofrio finds, failure to properly monitor kidney function by the medical staff at both Allegany and Albany County left them "without information that was absolutely critical to making reasoned decisions about [Decedent's] care." *Id.* at 8.

Defendants' experts dispute these findings, and Defendants insist that no evidence indicates that Bamenga was in any distress when she left the Allegany County Jail. This evidence, moving Defendants argue, indicates that no evidence supports a jury finding of proximate cause with respect to their alleged breach of the standard of care. The Court disagrees. While the jury will face the difficult task of determining whether Defendants' conduct was a

proximate cause of Bamenga's death, Plaintiff has met his burden of providing evidence that would permit a jury to make that conclusion. The motion will be denied in this respect as well.

### e. Conscious Pain and Suffering

Defendants next argue that no evidence indicates that Decedent faced any conscious pain and suffering while incarcerated in the Allegany County Jail, and they therefore cannot be liable for any damages based on such suffering. They point to two recorded phone calls from the Jail, where Bamenga told her husband (the plaintiff), that " 'it is well with me' " and that she was " 'doing fine' " in making this argument.

**\*35** An "award of damages for pain and suffering compensates the victim for physical discomfort and anguish[.]" *McDougald v. Garber,* 135 A.D.2d 80, 91, 524 N.Y.S.2d 192, 198 (1st Dept.1988). Proof of conscious pain and suffering requires a showing of "cognitive awareness" of the injuries. *Id.* at 94, 524 N.Y.S.2d 192. A plaintiff must provide "proof that the injured party experienced some level of cognitive awareness following the injury." *Williams v. City of New York,* 71 A.D.3d 1135, 1137, 898 N.Y.S.2d 208, 210 (2d Dept.2010). Still, "the factfinder is not required to sort out varying degrees of cognition, and the degree of pain is only a factor to be considered in determining the amount of damages, not whether damages should be awarded at all." *Id.* at 1138, 898 N.Y.S.2d 208 (internal citations omitted). As a general matter, "an award of damages is limited to the injuries and pain and suffering caused by the defendant's negligence[.]" *Melito v. Genesee Hosp.,* 167 A.D.2d 842, 842, 561 N.Y.S.2d 951, 952 (4th Dept.1990).

To support this position, Defendants point to *Naughton v. Arden Hill Hosp.,* 215 A.D.2d 810, 625 N.Y.S.2d 746 (3d Dept.1995). The case in *Naughton* concerned allegations that doctors failed to diagnose "an acute myocardial infraction" and plaintiff sought damages for conscious pain and suffering. *Id.* at 811, 625 N.Y.S.2d 746. The trial court granted judgment as a matter of law at trial. *Id.* at 812, 625 N.Y.S.2d 746. The plaintiff had claimed malpractice because doctors failed to diagnose an acute myocardial infraction. *Id.* at 811, 625 N.Y.S.2d 746. Because "there [was] no proof that had [decedent] been hospitalized" when he first saw a doctor "a heart attack would have been prevented or the risk of such an attack lessened," no proximate cause existed for the malpractice

claim. *Id.* at 812, 625 N.Y.S.2d 746. In addition, the court granted judgment on plaintiff's claim for conscious pain and suffering because "there [was] no indication in the record that [decedent] was in pain from the time he was seen by" his personal physician "until the time of his death." *Id.* at 813, 625 N.Y.S.2d 746. Moreover, the medications decedent received at the hospital had "alleviated his pain and there is no proof that he was in pain thereafter." *Id.*

The Court will deny the motion in this respect as well. Defendants' position is that Decedent did not exhibit any pain and suffering during the time she was in the Allegany County Jail, and therefore the County cannot be liable for any pain or suffering she experienced later while in the custody of the Albany County Jail. As explained above, however, Plaintiff has presented evidence indicating that Bamenga was harmed by the conduct of the Allegany County Defendants, who failed to provide her with proper medication, failed to properly prescribe medication, and failed to perform necessary medical tests. Plaintiff's expert contends that Bamenga's death was a result of these improper medical decisions. A jury could certainly conclude that moving Defendants' conduct set in motion a process that led to conscious pain and suffering for Decedent before she passed away, and that this pain and suffering was "caused by the defendants' negligence." *Melito,* 167 A.D.2d at 842, 561 N.Y.S.2d 951. *Naughton* is unavailing under these circumstances, since there is evidence that Bamenga complained of shortness of breath, chest pain, and other painful conditions before her death, and that such conscious pain and suffering occurred after the allegedly negligent conduct of the moving Defendants.

### f. Breach of Contract

**\*36** Defendants next argue that Plaintiff's breach-of-contract claims should be dismissed. Defendants insist that Plaintiff cannot exercise any rights as a third-party beneficiary of the contract between the Allegany County and Immigration and Customs Enforcement ("ICE"). Plaintiff contends that three contracts are at issue in the litigation. First, a contract between ICE and the County of Allegany to house immigration detainees. Second, a contract between the United States Marshal's Service and Albany County to house federal prisoners, including immigration detainees. Third, a contract between Albany County and Corizon, Inc., f/k/a Correctional Medical Services to provide medical care for prisoners and detainees at Albany. Decedent was

an intended beneficiary of all three contracts, Plaintiff insists, and can therefore bring a contract claim against the County of Allegany for a breach.

In New York, "[p]arties asserting third-party beneficiary rights under a contract must establish: '(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for [their] benefit and (3) that the benefit to [them] is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate [them] if the benefit is lost.' " *Mendel v. Henry Phipps Plaza W., Inc.,* 6 N.Y.3d 783, 786, 811 N.Y.S.2d 294, 844 N.E.2d 748, 751 (2006) (quoting *Burns Jackson Miller Summit & Spitzer v. Lindner,* 59 N.Y.2d 314, 316, 464 N.Y.S.2d 712, 451 N.E.2d 459 (1983)). In determining whether a third party was an intended beneficiary of the contract, "[t]he focus is on the intent of the promisee, inasmuch as 'the promisee procured the promise by furnishing the consideration therefore[.]' " *Logan–Baldwin v. L.S.M. Gen. Contrs., Inc.,* 94 A.D.3d 1466, 1468, 942 N.Y.S.2d 718, 720 (4th Dept.2012) (quoting *Drake v. Drake,* 89 A.D.2d 207, 209, 455 N.Y.S.2d 420 (1982)). As such, " '[a] beneficiary will be considered an intended beneficiary, rather than merely an incidental beneficiary, when the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." *Id.* (quoting *DeLine v. CitiCapital Commercial Corp.,* 24 A.D.2d 1309, 1311, 807 N.Y.S.2d 247 (2005)). When " 'performance is rendered *directly to the third party,* it is presumed that the contract was for his [or her] benefit.' " *Id.* (quoting *Drake,* 89 A.D.2d at 209, 455 N.Y.S.2d 420) (emphasis in original).

Defendants' argument is premised on the notion that Plaintiff's decedent was not an intended third-party beneficiary of the contract and therefore Plaintiff cannot sue to enforce the contract's terms on her behalf. Defendants cite to *Abu Dhabi Commer. Bank v. Morgan Stanley & Co.,* 651 F.Supp.2d 155 (S.D.N.Y.2009), for the proposition that Plaintiff must "put forward ... contractual provisions that 'clearly evidence an intent to permit enforcement' of that contract by Bamenga" to survive judgment on this claim. (Defendants' Brief, dkt. # 311–2). That court went on to find, however, that " '[w]hile the third-party beneficiary does not have to establish that it is explicitly mentioned in the contract, New York law requires that the parties' intent to benefit a third-party be shown on the face of the contract.' " *Id.* (quoting *Synovus*

*Bank of Tampa Bay v. Valley Nat'l Bank,* 487 F.Supp.2d 360, 368 (S.D.N.Y.2007)). Indeed, the court earlier cited to New York law to establish that "a third-party is an intended beneficiary only if 'no one other than the third-party can recover if the promisor breaches the contract' or the contract language would otherwise clearly evidence 'an intent to permit enforcement by the third party.' " *Id.* at 175 (quoting *Debary v. Harrah's Operating Co., Inc.,* 465 F.Supp.2d 250, 263–64 (S.D.N.Y.2006)).

**\*37** The contract in question consists of an "Intergovernmental Service Agreement" between the United States Department of Homeland Security U.S. Immigration and Customs Enforcement Office of Detention and Removal and Defendant Allegany County. *See* Exh. A to Affidavit of Christopher Ivers, dkt. # 313–1. The agreement states its "purpose" is "to establish an Agreement between ICE and the Service Provider for the detention and care of persons detained under the authority of the Immigration and Nationality Act, as amended." *Id.* at Art. I ¶ A. Among the services that the Defendant agreed to provide "detainees" like the Decedent were such "basic needs" as "safekeeping, housing, subsistence, medical and other services in accordance with this Agreement." *Id.* at Art. III ¶ B. "The types and levels of services shall be consistent with those the Service Provider routinely affords other inmates." *Id.* The agreement addresses "medical services" directly, mandating that "[t]he Service Provider shall provide ICE detainees with on-site health care services under the control of a local government designated Health Authority." *Id.* at Art. VI, ¶ A. "The Service Provider" is also required to "ensure that ICE detainees receive no lower level of on-site medical care and services than those it provides to local inmates." *Id.* at Art. VI, ¶ D. The Provider must provide an initial screening within twenty-four hours of a detainnees arrival, "sick call coverage, provision of over-the counter medications ... [and] treatment of special needs and mental health assessments." *Id.* A detainee suffering from a chronic condition "shall receive prescribed treatment and follow-up care." *Id.*

Decedent was clearly an intended beneficiary of this contract, which requires the provision of medical care to detainees. Decedent was a detainee suffering from a chronic condition, and the terms of the contract explicitly require the Defendant County to provide her with medical services to treat and care for her condition. Since the contract's " 'performance is rendered *directly to the*

[decedent], it is presumed that the contract was for his [or her] benefit.' " *Logan–, 942 N.Y.S.2d 718Baldwin,* 94 A.D.3d at1468, 720 (quoting *Drake,* 89 A.D.2d at 209, 455 N.Y.S.2d 420) (emphasis in original). The motion must be denied in this respect.

**g Punitive Damages**
Defendants next assert that they cannot be liable for punitive damages. First, they point out that municipalities are immune from punitive damages under Section 1983 and as such any claims against the municipality and the individual Defendants in their official capacities must be dismissed. Moreover, none of the individual Defendants engaged in the type of extreme and outrageous conduct for which punitive damages are available against them under Section 1983. State law, they argue, likewise does not permit damages against these Defendants.

Plaintiff agrees with the Defendants that punitive damages are not available against the County under Section 1983. They are correct. *See Newport v. Fact Concerts,* 453 U.S. 247, 271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) ("[A] municipality is immunity from punitive damages under 42 U.S.C. § 1983."). As the Court has already dismissed claims against the individual defendants in their official capacities, claims for punitive damages against them in their official capacities are likewise dismissed. In terms of punitive damages against the individual defendants, the Court finds that a jury could use the evidence related above to conclude that Defendants' conduct was outrageous. The motion for summary judgment on punitive damages will therefore be denied with respect to the individual defendants. [9]

**h. Conclusion as to Allegany County Defendants**
**\*38** For the reasons stated above, the motion of the Allegany County Defendants, dkt. # 211, will be granted in part and denied in part, as follows:

1. The motion is granted with respect to Plaintiff's claims against Defendant Sheriff Rick L. Whitney in his individual capacity;

2. The motion is granted with respect to Plaintiff's claims against all individual Defendants in their official capacities;

3. The motion is granted with respect to Plaintiff's claims for punitive damages against Defendant County of Allegany pursuant to 42 U.S.C. § 1983; and

4. The motion is denied in all other respects.

## C. Motion of Defendants Sheriff Craig Apple and County of Albany

Defendants Sheriff Craig Apple and the County of Albany also filed a motion for summary judgment. The Court will address the facts related to that motion and the grounds raised by Defendants for granting the motion in turn.

### 1. Facts Relevant to the Motion [10]

Decedent was transferred to the Albany County Correctional Facility ("ACCF") by ICE on July 21, 2011. (Albany Defendants' Statement of Material Facts, dkt. # 307–2, ("Albany Defendants' Statement") at ¶ 16). ACCF had a contract with ICE to house federal detainees. (Id.). She arrived with medications prescribed to her at the Allegany County Jail, including: ASA 81 mg (daily); Spironolactone 25 mg (twice daily); Lasix 20 mg (daily); Digoxin .25 mg (daily); and Lisinopril 20 mg (daily). (Id.). The parties dispute whether the daily dose of Cavedilol prescribed for Decedent contained 20 or 25 mg. (Id.; Plaintiff's Response to Albany Defendants' Statement, dkt. # 338, ("Plaintiff's Response to Albany Defendants"), at ¶ 16). Officer Michael Beliveau booked Decedent into the ACCF at 5:58 p.m. and her information entered into the Offenders Management System. (Albany Defendants' Statement at ¶ 16). Decedent was then referred to the medical department for an initial medical screening. (Id.).

Debra Vogel, R.N., performed an initial medical screening at 6:30 p.m. on July 21, 2011. (Id. at ¶ 17). Defendant Corizon, Inc ., [11] had a policy for Receiving Screening. (Id.). The parties dispute whether Vogel followed this policy, and Plaintiff argues that Defendants' description of the policy is incomplete. (Id.; Plaintiff's Response to Albany Defendants at ¶ 17). Plaintiff contends that the policy provides that a detainee should receive "a prompt screening of an inmate who arrives at the facility for the purpose of 'providing continuity of care, to meet the urgent and emergent health needs, and to identify inmates who pose a threat to their own or others' health or safety and may require immediate attention.' " (Albany Defendants' Statement at ¶ 17). In addition,

the Defendants assert that the policy provides for screening of suicide risks, mental illnesses, chronic medical conditions, acute medical conditions, potential withdrawl, communicable diseases, and tuberculosis. (Id.). Plaintiff contends that Vogel's screening failed to include such required elements as "recommendations for healthcare issues to follow up on routine, urgent and emergent needs"; failed to place Bamenga on a list for follow-up with a doctor or other provider, despite Bamenga's chronic condition; failed to verify that the medication and doses prescribed to Decedent were proper; failed to refer Bamenga for a chest x-ray; and failed to document her current medications. (Plaintiff's Response to Albany Defendants at ¶ 17). Plaintiff also contends that Vogel failed to follow the demands of Corizon's Management of Chronic Disease Policy by neglecting to schedule an appointment with a doctor for Plaintiff. (Id.).

**\*39** Vogel recorded that Decedent had a history of congestive heart failure, hypertension and anemia. (Albany Defendants' Statement at ¶ 18). She weighed 194 pounds and had a blood pressure of 140/88. (Id.). Plaintiff disputes that Decedent made no complaints about her health condition during this screening, pointing out that Bamenga reported that she had "health problems" the Jail should know about, "major medical concerns" about her heart, and that she was "not happy" with her incarceration. (Plaintiff's Response to Albany Defendants at ¶ 18). Vogel also contacted Defendant Dr. Syed Azaz Haider–Shah [12] to obtain telephone orders for Decedent's prescriptions. (Albany Defendants' Statement at ¶ 18). Dr. Haider–Shah ordered that the prescription regime from Allegany County be continued, except that he ordered Coreg 25 mg instead of Carvedilol 20 mg. (Id.). Plaintiff points out that Dr. Haider–Shah made these orders by telephone from vacation. (Plaintiff's Response to Albany Defendants at ¶ 18).

Defendants assert that after her initial assessment Bamenga was assigned to the general population in housing unit 8 West, Left Block, cell 6, bed 2. (Albany Defendants' Statement at ¶ 18). Plaintiff insists that Bamenga was assigned to a "classification unit," where she was confined to her cell for 23 out of every 24 hours from July 21, 2011 until sometime in the afternoon of July 26, 2011. (Plaintiff's Response to Albany Defendants at ¶ 18). The parties agree that by July 26, 2011 Decedent had obtained medical clearance and been assigned to housing unit 6 West. (Albany Defendants' Statement at ¶

18; Plaintiff's Response to Albany Defendants' Statement at ¶ 18).

The parties dispute which medications Decedent received on July 21, 2011. Defendants contend that she received "all of her medications" on that day. (Albany Defendants' Statement at ¶ 19). Plaintiff disputes this claim, pointing out that Defendants' reference is unclear; "[i]s this a reference to the medications prescribed by [Defendant] Ralyea, those prescribed by Dr. Haider–Shah or ... those prescribed by her community physicians?" (Plaintiff's Response to Albany Defendants' Statement at ¶ 19). Plaintiff contends that the evidence shows that Decedent did not receive any medications on the morning of July 21, 2011, and that she received an evening dose of Spironolactone on that day. (Id.). According to Plaintiff, this means that she failed to receive her regularly scheduled doses of carvedilol, lisinopril, furosemide, digoxin and aspirin on the 21st. (Id.). On July 22, 2011, Bamenga received all of her morning doses of medication, but was recorded as a "no show" for her evening doses. (Albany Defendants' Statement at ¶ 19). She therefore did not receive her evening dose of Spironolactone and was not prescribed a second dose of Coreg. (Id.). Plaintiff disputes that Decedent was at fault for not receiving this medication; Plaintiff insists that Defendants had a duty to investigate and determine why Decedent failed to show up for her medication call. (Plaintiff's Response to Albany Defendants at ¶ 19).

**\*40** The parties agree that Decedent received the medications prescribed for her by Dr. Haider–Shah on July 23, 2011, though they dispute whether the medications were appropriate or in line with the treatment regime prescribed for her by her own doctors. (Albany Defendants' Statement at ¶ 19; Plaintiff's Response to Albany Defendants' Statement at ¶ 19). Plaintiff also points out that Decedent did not receive an evening dose of carvedilol on any day during which she was confined in the ACCF. (Plaintiff's Response to Albany Defendants at ¶ 19). Plaintiff alleges that Dr. Haider–Shah incorrectly prescribed that medication, ignoring instructions on the packaging directing twice-daily doses. (Id.).

Plaintiff received all of the required doses of her medications as prescribed on the mornings of July 24 and July 25, 2011. (Albany Defendants' Statement at ¶ 19). She did not receive her evening medication on those dates. (Id.). Defendant contends that she was a "no show." (Id.).

Plaintiff agrees that Bamenga did not receive doses in the evening, but points out again that the Carvedilol was improperly prescribed, and that Defendants did not follow proper procedure when Decedent did not show up for her medication. (Plaintiff's Response to Albany Defendants at ¶ 19).

Defendants point out that Corrections Officers, per policy, do not administer medications at the ACCF. (Albany Defendants' Statement at ¶ 19). Instead, medical staff are to perform this task pursuant to Corizon, Inc.'s policy for monitoring medication compliance. (Id.). Moreover, inmates have a right to refuse medication. (Id.). Plaintiff responds by pointing out that the Medication Administration Policy ("MAR") in place at the ACCF set out procedures for recording the administration of medications at the Jail. (Plaintiff's Response to Albany Defendants' Statement at ¶ 19). That procedure set out rules for signing the MAR and the codes to be recorded on the form when an inmate did not receive prescribed medication. (Id.). Codes existed to state the reason for the failure to receive medication, but staff at the jail failed to follow this policy when Bamenga did not show up to receive her medications. (Id.). Plaintiff also points out that there is no documentation showing that Decedent ever explicitly refused any medication while at the ACCF. (Id.). No such refusals are recorded in the MAR. (Id.).

On July 25, 2011, a change was made to Decedent's MAR which ordered that an apical pulse be taken prior to the administration of Digoxin. (Albany Defendants' Statement at ¶ 20). The MAR directed that Digoxin should not be given with a pulse less than 60, and that if the pulse were less than 60 a physician should be notified. (Id.). On July 25, Bamenga's apical pulse was 88 and she received a dose of Digoxin. (Id.). Plaintiff points out that no record was made of the provider who ordered this change, and that failure to record such information in the MAR violated Corizon's policy. (Plaintiff's Response to Albany Defendants at ¶ 20). Plaintiff also contends that security footage indicates that Bamenga went to the medical unit on the morning of July 25, 2011, but that medical staff failed to document this interaction. (Id.). Later that day, prison officials recorded a conversation between Decedent and her husband. (Id.). The transcript of that recording, Plaintiff claims, indicates that Decedent complained to her husband that medical staff would not address her medical complaints unless she first returned

to her cell and completed a request for a medical services form that could be processed. (*Id.*).

**\*41** The parties agree that Bamenga completed two Correctional Medical Services Health Service Request Form on July 25, 2011. (Albany Defendants' Statement at ¶ 21; Plaintiff's Response to Albany Defendants at ¶ 21). The parties call these forms "sick call slips." (*Id.*). The first slip indicates that Decedent was not provided with the complete dosages of her medications. (Albany Defendants' Statement at ¶ 21). The second slip stated that she was experiencing shortness of breath, palpitations when lying down, and dizziness when standing. (*Id.*). The parties agree that no evidence indicates how the sick call slips made their way to the bin in the nurses' station on that date. (*Id.* at ¶ 22). The slips coud be given to the evening medication nurse on rounds, to a corrections officer, or to anyone working on the tier where the inmate was housed. (*Id.* at ¶ 22). The slips are brought to a designated "bin" in the nurses' station and the nurse on duty is tasked with triaging them. (*Id.*) That nurse also logs the slips into a sick call tracking log. (*Id.*). Once the slips are triaged, the inmate's chart is pulled and the inmate place on a list to be seen by the nurse practitioner or a physician that day or the next. (*Id.*). Robert LaVenutre, R.N., triaged the slip that indicated that Decedent was not receiving her medications. (*Id.* at ¶ 23). He did not, however, triage the slip that indicated Decedent's shortness of breath and other symptoms. (*Id.*). Instead, he found that second slip after Bamenga died. (*Id.*).

At approximately 9:40 a.m. on July 26, 2011, Nurse Practitioner Anna Paulino performed a physical assessment of the decedent. (*Id* . at ¶ 24). At the time, Paulino was an employee of Defendant Corizon, Inc., working pursuant to a collaboration agreement with Defendant Dr. Haider–Shah. (*Id.*). Paulino performed this assessment within five days of Decedent's arrival at the ACCF, which complies with Correctional Medical Service's ("CMS") policies regarding initial health assessments. (*Id.*). [13] Plaintiff disputes that the exam Paulino gave actually complied with the policy. (Plaintiff's Response to Albany Defendants, at ¶ 24). Plaintiff alleges that, contrary to the policy: the examination did not include certain laboratory and diagnostic tests; the results of the exam were not reviewed with a physician; no treatment plan was developed or implemented; Decedent was not referred to a physician for evaluation of her chronic condition; no detailed medication history was

elicited; no physician ordered a chest x-ray and none was obtained; and, though clinically indicated, no EKG was done. (*Id.*). Plaintiff further argues that the examination Paulino performed was "perfunctory at best," and failed to comply with ICE standards, particularly in failing to develop any written treatment plan for Bamenga. (*Id.*).

Paulino testified that she reviewed Decedent intake screening form, which contained a medical and surgical history, along with other notes and documents, during that assessment. (Albany Defendants' Statement at ¶ 25). Paulino recorded that Bamenga suffered from CHF and hypertension. (*Id.*). The parties dispute whether Paulino documented that Decedent had failed to receive full doses of two of her medications. (*Compare* Albany Defendants' Statement at ¶ 25 and Plaintiff's Response to Albany Defendants at ¶ 25). Paulino also documented that she examined Bamenga's eyes and ears, listened to her heart and lungs, and took her body temperature, blood pressure and pulse rate. (Albany Defendants' Statement at ¶ 25). Paulino concluded that Decedent's measurements were within normal limits. (*Id.*). Paulino also claimed that she was unaware of Bamenga's second sick call request, and that Decedent did not complain of any shortness of breath or chest pain during the examination or have any signs of swelling or difficulty walking a the time. (*Id.*). Plaintiff disputes this claim, pointing out that he had visited he Decedent at the ACCF prior to this examination, and she complained of swelling in her feet and legs. (Plaintiffs' Response to Albany Defendants at ¶ 25). Plaintiff also complains that Paulino missed a "classic sign of decompensating heart failure": the fact that Decedent had gained six pounds in five days. (*Id.*). Paulino assigned no clinical significance to that fact. (*Id.*). Moreover, Plaintiff insists, Paulino failed to perform several important tests that would have signaled Decedent's distress and which were recommended both by medical standards and CMS policies. (*Id.*). Paulino concluded the exam by increasing Plaintiff's dose of Coreg to twice per day and ordering Decedent to return to the Chronic Disease Clinic within 90 days. (Albany Defendants' Statement at ¶ 25). Plaintiff points out that this dose amounted to twice the dosage of carvedilol that Bamenga had been prescribed prior to her incarceration. (Plaintiff's Response to Albany Defendants at ¶ 25).

**\*42** On July 26, 2011, Decedent received morning doses of all her medications. (Albany Defendants' Statement at ¶ 26). Plaintiff disputes whether these doses

were appropriate for a person in Decedent's condition. (Plaintiff's Response to Albany Defendants at ¶ 26). Her apial pulse was recorded as 82 at that time. (Albany Defendants' Statement at ¶ 26). Nurses recorded Plaintiff as a no show for her evening doses of Spironolactone and Coreg on that day. (*Id.*).

At approximately 12:15 a.m. on July 27, 2011, Corrections Officer Thomas Alund was informed by inmates in 6 West Left Bay 3 at ACCF that Decedent was ill. (*Id.* at ¶ 27). Alund called for a relief officer, which would allow him to take Bamenga for medical assistance. (*Id.*). At 12:19 a.m., Alund notified his unit supervisor that Decedent was non-responsive. (*Id.*). He entered the Bay in an attempt to rouse Bamenga, but she did not respond. (*Id.*). Alund then called medical staff via radio and left the Bay to activate the units alarm system. (*Id.*). A nurse and a licensed practical nurse responded to the call. (*Id.*).

These nurses entered the bay at approximately 12:24 a.m. (*Id.* at ¶ 28). They placed the Decedent on the floor and began CPR. (*Id.*). The nurses used a defibrillator to no effect and then again attempted CPR. (*Id.*). At about 12:35 a.m., Colonie Emergency Medical Services ("EMS") arrived and took over attempts to revive Bamenga. (*Id.*). At 12:53 a.m., EMS transported her to Albany Memorial Hospital, where she was pronounced dead at 1:15 a.m. (*Id.*). Plaintiff adds that when staff first examined Decedent in the Bay they found no signs of life, no pulse, no respiration and that her pupils were fixed and dilated. (Plaintiff's Response to Albany Defendants at ¶ 27). They also found that her eyes were dry, her extremities cold and stiff, her skin cyanotic and that her temperature was 91.2 degrees. (*Id.*). Plaintiff asserts that this evidence indicates that Bamenga had died several hours before ACCF staff noticed her condition, and that this notice came only because other prisoners altered them. (*Id.*).

Dr. Jeffrey D. Hubbard performed an autopsy at the Albany Medical Center Mortuary on July 27, 2011. (Albany Defendants' Statement at ¶ 29). The parties dispute the findings of this autopsy and their significance. (*Compare* Albany Defendants' Statement at ¶ 29 with Plaintiff's Response to Albany Defendants at ¶ 29). Defendants contend that the autopsy did not reveal any effusions, pulmonary edema, peripheral edema or dependent edema, all of which would suggest uncontrolled CHF. (Albany Defendants' Statement at ¶ 29). They note that Dr. Hubbard found the cause of death as

cardiomyopathy, and that he discovered no evidence of decompensation or Digoxin toxicity. (*Id.*). Plaintiff contends that Dr. Hubbard testified that Decedent likely died as a result of arrhythmia, which cannot be observed at autopsy and can be caused by digoxin. (Plaintiff's Response to Albany Defendants at ¶ 29). The death certificate, Plaintiff points out, was completed before Hubbard received the results of any toxicity screening for digoxin. (*Id.*). The results of such testing, Plaintiff contends, did contain higher-than-normal concentrations of digoxin. (*Id.*).

**\*43** Defendant County of Albany is a New York municipal corporation. (Albany Defendants' Statement at ¶ 30). The County receives per diem compensation for any immigration detainees housed in the ACCF. (*Id.*). Defendant Sheriff Craig Apple was appointing Acting Sheriff of the County in June 2011 and held that position through December of that year. (*Id.* at ¶ 31). He was elected Sheriff in January 2012 and currently holds that position. (*Id.*). Defendant Apple spent about 20–25% of each eight hour day on operating the ACCF and was involved in issuing policies for the jail. (*Id.* at ¶ 32). These policies were shaped by the minimum standards set by the New York State Commission of Corrections. (*Id.*). Plaintiff points out that Sheriff Apple testified at his deposition that "policymaking at the jail 'completely falls underneath the Sheriff.' " (Plaintiff's Response to Albany Defendants at ¶ 32).

Defendant Apple testified that he learned of Bamenga's death at around 5 or 6 a.m. on July 27, 2011 when he received a phone call from Christian Clark, the Assistant Superintendent. (Albany Defendants' Statement at ¶ 33). Apple then notified the Criminal Investigations Unit, which is the standard response to such events. (*Id.*). According to Apple, assistants kept him informed of the situation, and he was ultimately advised that Decedent had a heart problem and died of natural causes. (*Id.*).

Thomas Wigger served as superintendent of the ACCF at the time of Bamenga's death. (*Id.* at ¶ 34). Wigger was charged with operating the facility, overseeing those operations, developing policies and procedures, and ensuring that the medical provider performed its duties. (*Id.*). He reported to the Sheriff. (*Id.*). Corrections Officers are required only to have training in First Aid and CPR. (*Id.*). Plaintiff points out that the medical care Wigger supervised included more than the First Aid

and CPR that Corrections Officers practiced. (Plaintiff's Response to Albany Defendants at ¶ 34). From 2007 to 2011, Superintendent W igger had daily contact with the medical unit at the ACCF. (*Id.* at ¶ 35). Wigger testified that he had daily contact with that unit, and the unit participated in daily department head meetings where operations were discussed. (*Id.*). Gloria Cooper, the Health Services Administrator, and Jill Harrington, the Director of Nursing, participated in these meetings. (*Id.*). Dr. Syed Azaz Haider–Shah, the Medical Director, attended occasionally. (*Id.*). Wigger also toured the medical unit frequently and spoke with staff about operations. (*Id.*).

Defendants allege that after Decedent's death, ACCF followed the jail "protocol." (*Id.* at ¶ 36). Each department brought its records, property and personal belongs to the jail administration. (*Id.*). ACCF did not collect any medications, however. (*Id.*). The ACCF jail administration conducted an investigation and produced an Investigative Report, Facility Incident Report and a Facility Supplemental/Continuation Report. (*Id.*). Charles Higgins conducted an investigation on behalf of the Sheriff's office and found that Bamenga died of natural causes. (*Id.*). Plaintiff disputes that proper procedures were followed and disputes that the investigations were thorough, alleging that no witnesses were interviewed, no evidence gathered, and evidence of toxicology ignored. (Plaintiff's Response to Albany Defendants at ¶ 36).

**\*44** The parties dispute the adequacy of correctional and medical staffing at the ACCF, citing to New York requirements. (*See* Albany Defendants' Statement at ¶¶ 3738, Plaintiff's Response to Albany Defendants at ¶¶ 37–38). During the period in question, Albany County contracted with CMS to provide medical care at the jail. (Albany Defendants' Statement at ¶ 39). Pursuant to the agreement between CMS and the County, CMS was charged with "developing staffing plans for the medical unit." (*Id.*). CMS could decrease the medical staff if the inmate population experienced "a sustained decrease ... for thirty days or longer ." (*Id.*). Plaintiff points out that the CMS is the former name of Defendant Corizon, Inc. (Plaintiff's Response to Albany Defendants at ¶ 39). Plaintiff disputes that Albany County had no role in determining staffing levels for medical services, pointing out that the County agreed to the staffing levels proposed by CMS and that the staffing level helped determine the

contract price for medical services, which was of great interest to the County. (*Id.*).

Defendants point out that the average daily population of the ACCF declined over the course of the contract with CMS and Corizon. (Albany Defendants' Statement at ¶ 40). The County estimated an inmate population of 850–950 at the time it solicited proposals. (*Id.*). By 2010, the inmate population had decreased to an average of 726.31 and was 646.87 in July 2011. (*Id.*). Defendants contend that staffing levels decreased in 2011 to reflect this decreased inmate population. (*Id.*). Plaintiff points to evidence he claims indicates that physician staffing levels were decreased by 25%, which was greater than the decrease in inmate population. (Plaintiff's Response to Albany Defendants at ¶ 40). This evidence indicates that the County "prioritized" cost reduction over medical care from physicians. (*Id.*). Plaintiff points to evidence that "the medical unit was 'overwhelmed'," which made it impossible for physicians to provide proper care. (*Id.*).

The County of Albany retained CMS to provide medical treatment to inmates and to train, supervise and staff the ACCF between 2007–2011. (Albany Defendants' Statement at ¶ 41). Wigger was in daily contact with the medical unit during this period and supervised daily meetings with medical staff. (*Id.*). Wigger also toured the medical facilities frequently. (*Id.*). Plaintiff notes that the agreement between CMS and the County provided that CMS was to provide "a program for the provision of comprehensive health care services for Albany County." (Plaintiff's Response to Albany Defendants at ¶ 41). The program was required by that agreement to meet "constitutional, correctional and community standards" and comply with applicable law. (*Id.*).

Defendants contend that their safety and security policies in the ACCF required that guards perform safety checks every half hour. (Albany Defendants' Statement at ¶ 42). Logs indicate that guards performed the safety checks every half hour on the evening of July 26, 2011 and the early morning of July 27, 2011. (*Id.*). Decedent was not classified as a special needs inmate requiring greater supervision. (*Id.* at ¶ 43). Plaintiff points out that Bamenga apparently became more sick during the evening of July 26, 2011 and received no aid until it was too late. (Plaintiff's Response to Albany Defendants at ¶ 42). Plaintiff points to evidence that indicates that at 9 p.m.

on July 26, 2011, a corrections officer came to Decedent's bed, yelled at her to get up and, upon receiving no response from Bamenga, asked other inmates if she had died. (*Id.*). The officer left. (*Id.*). Later, when inmates realized that Bamenga was unresponsive, they yelled for a guard to come and examine her. (*Id.*). The officer on duty came near the cell and told the women to "shut up." (*Id.*). Ten minutes later, when the inmates continued to yell for help, the officer finally examined Decedent and realized that she was non-responsive. (*Id.*). Only then did the emergency response begin. (*Id.*). Plaintiff also argues that Decedent was improperly classified given her condition, and a question of fact exists for the jury to determine whether Defendants provided proper monitoring for her. (*Id.* at ¶ 43).

**\*45** The ACCF had a classification procedure during the relevant time. (Albany Defendants' Statement at ¶ 44). According to the procedure, inmates were screened by building and medical staff and by mental health, if necessary. (*Id.*). An inmate was then placed in a housing unit and confined for 23 hours a day. (*Id.*). Such inmates were supposed to have access to medication rounds; the medication nurse distributes medication on the housing unit and the inmate is let out of her cell to take medication in the nurse's presence. (*Id.*). Within five days of booking, the inmate was to meet with the Intake Services Unit for an interview and the file sent to classification once a medical clearance form is received. (*Id.*). The classification officer used a computer to process information from the inmate's file and determines the proper classification. (*Id.* at ¶ 45). The supervisor could override this determination, as could the medical and mental health departments. (*Id.*). The system had four levels of classification: Level 1 was a sentenced inmate classified as a "worker"; Level 2 was a non-violent offender with no disciplinary history in the ACCF; Level 3 was a medium-security inmate; and Level 4 was a high-security inmate. (*Id.*). Two other levels existed: Medical Level 5, which was determined by medical staff and Level 6, an "old designation" reserved for inmates in an intensive drug program. (*Id.*). Immigration detainees did not have a default classification. (*Id.* at ¶46). Inmates were to be classified within five days of their booking. (*Id.*). Plaintiff disputes whether these policies were followed in Decedent's case, pointing out that Bamenga had reported a previous positive test for tuberculosis and did not receive a chest x-ray to rule out that condition, but was still assigned to a dormitory-style housing unit. (Plaintiff's

Response to Albany Defendants at ¶ 44). Still, Plaintiff agrees that Decedent went through the general screening process. (Albany Defendants' Statement at ¶ 47; Plaintiff's Response to Albany Defendants at ¶ 47).

During the time period at issue, ACCF assigned an Assistant Superintendent to monitor the medical unit. (Albany Defendants' Statement at ¶ 48). This Assistant Superintendent, along with Richard Peters, the contract monitor, were charged with ensuring that Corizon, Inc., fulfilled its contractual obligations. (*Id.*). Peters reviewed approximately 1 per cent of patients' charts to check that tuberculosis tests and physical assessments were timely performed and providers worked their assigned hours. (*Id.*). Defendants insist that such monitoring was not designed to check the quality of care or adequacy of staffing. (*Id.*). Peters also attended CMS/Corizon Inc.'s quality assurance meetings, but was likewise not required to assess medical staff's compliance with procedures. (*Id.* at ¶ 49). Plaintiff agrees that the testimony indicated that the monitoring was not aimed at the quality of care, arguing that "oversight was limited to those items that had a financial consequence to the County[.]" (Plaintiff's Response to Albany Defendants at ¶ 48). Plaintiff contends that the contract with CMS/Corizon required the provision of quality care, and failing to check on the care's quality represented a failure of a County's duties. (*Id.*). Plaintiff likewise argues that Peters' attendance at quality assurance meetings served only to monitor Corizon's performance "in financial terms." (*Id.* at ¶ 49).

**\*46** Defendants describe means by which inmates could complain about medical care, either through the ACCF grievance process or complaints to outside figures like family, legal counsel or the County Legislature. (Albany Defendants' Statement at ¶¶ 50–52). Decedent did not file a grievance or other complaint regarding her care, other than filing sick slips. (*Id.* at ¶ 53). No evidence indicates that the Albany Defendants saw these slips before Bamenga's death. (*Id.*). Plaintiff points out that ACCF officials had recorded and monitored Decedent's telephone conversations, where Plaintiff alleges she expressed concern about her health condition. (Plaintiff's Response to Albany Defendants at ¶ 53).

## 2. Albany Defendants' Argument

The Albany Defendants seek summary judgment on several grounds, which the Court will address in turn.

#### a. Constitutional Claims

Defendants insist that no evidence supports Plaintiff's Fourteenth Amendment claims against the them. They address their argument to the two-part deliberate indifference standard related above.

#### i. Serious Medical Need

Defendants first contend that Plaintiff cannot prove that their conduct caused Decedent any harm in the objective sense and thus Plaintiff cannot prove that Decedent had a serious medical need. The Defendants, describing this element as the "objective prong" of a deliberate indifference claim, contend that Decedent suffered two separate objective failures in treatment during her incarceration. First, though Decedent received the same medications for her CHF and other conditions at the ACCF as she had been prescribed before her incarceration, Defendants admit that the doses she received of Lasix, Lisinopril and Coreg differed from those prescribed by her physician. Defendants also admit that Plaintiff did not receive any evening doses of Coreg on July 22nd, 24th and 25th. Pointing to medical screenings given at the ACCF and to their expert reports, however, Defendants contend that no evidence exists to support a claim that the failure to give the previously prescribed dosages and the denial of medication on three occasions caused Decedent to expire. This argument is unavailing. Whatever Defendants' experts may argue, Plaintiff has produced admissible expert reports which indicate that the failure to provide Bamenga with proper doses of medication and the failure to provide her with medication on several occasions while in the ACCF caused her death. *See, e.g.,* Expert Report of David DeNofrio, M.D., Exh. A to dkt. # 346, at 4; Expert Report of Monika Pilichowska, M.D., Ph.D, Exh. A to dkt. # 368 at 3–4. Taking all inferences in the non-moving party's favor, the Court finds that exists by which a reasonable juror could conclude that Defendant's conduct meets this element of the analysis. [14]

#### ii. Deliberate Indifference

Defendants also insist that no evidence supports a claim that they acted with deliberate indifference to a serious medical need. They insist that, because the medical care received by Decedent was provided by Defendant Corizon, Inc., by virtue of a contract, Albany County and Sheriff Apple cannot be liable for the medical defendants' conduct on a theory of *respondeat superior,* but must be

shown to be liable under the *Monell* theory of municipal liability recited above. Defendants' argument here is a bit mis-jointed: Defendants offer case law concerning the deliberate indifference standard, and then point out that they cannot be liable on a *respondeat superior* theory of liability. Next, Defendants offer a multi-part argument explaining a number of reasons why municipal liability pursuant to *Monell* cannot apply. [15] The Court will rely on the case law set forth above concerning municipal liability, supplementing that case law where appropriate. The Court notes, however, that Courts have concluded that a municipality can be liable for violating a plaintiff's constitutional rights in a number of ways, including: "(1) that the [municipality's] failure to train its employees amounted to deliberate indifference to constitutional rights; ... (2) that there was a persistent and widespread unconstitutional governmental policy or custom; ... or (3) that a [municipal] policymaker approved any constitutional violation." *Carter v. Inc. Vil. of Ocean Beach,* 759 F.3d 159, (2d Cir.2014) (citing *City of Canton v. Harris,* 489 U.S. 378, 392, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Monell,* 436 U.S. at 691; and *Roe v. City of Waterbury,* 542 F.3d 31, 37 (2d Cir.2008)).

**\*47** Defendants argue that Plaintiff cannot provide any evidence to support a claim that Defendants had a policy and/or practice of limiting the medical care available to ACCF detainees in a way that violated Decedent's constitutional rights. Defendants argue that the County's medical policies were adequate and in fact exceeded minimum standards promulgated by the State of New York and the National Commission on Correctional Health Care ("NCCHC"). Since the County's policies met New York standards and the evidence indicates that the medical staff at the ACCF followed them, Defendants claim that no evidence exists by which a jury could find that Decedent's constitutional rights were violated by an Albany County policy or practice. [16] Defendants also insist that no evidence exists to support Plaintiff's claim that Defendants deprived Plaintiff of necessary and adequate medical care, or that Defendants did not provide emergency medical care. Defendants point to evidence and policies which they contend demonstrate that Defendants supplied Decedent with the care necessary.

The Court will deny the motion on this basis. Plaintiff's expert reports, particularly the report of Dr. Robert Cohen, M.D., provide evidence a jury could use to conclude that Decedent's constitutional rights were

violated by policies and/or customs put in place by the Defendants. (*See* Cohen Report). Dr. Cohen, who has an extensive background in correctional medical care, lays out a basic set of standards for intake and screening of new inmates, and described how such policies should be crafted and implemented. (*Id* . at ¶¶ 8–15). After summarizing Bamenga's condition upon arrival at the ACCF as that of "a very complex patient" with a "very serious medical condition [who was] receiving multiple complex medications with high toxicity and a great risk for dangerous, life-threatening drug interactions," Dr. Cohen points to several failings in the policies and procedures created and followed by the ACCF and Corizon, Inc., blaming those failings for Bamenga's ultimate demise. (*Id.* at ¶¶ 66a–66j). Among these policy mistakes were a failure to see a physician within 24 hours and the lack of "an intake system that identified that a patient with multiple medical problems needed to be seen urgently." (*Id.* at ¶¶ 66a–66c). Cohen further notes that Albany and Corizon policy permitted a 14–day delay in examining patients with a chronic illness, a thirty-day delay in obtaining a chemistry panel from such patients, and a 90–day delay in obtaining an EKG." (*Id.* at 66c). While such delays in obtaining a chemistry panel and scheduling an EKG "places the patient at clinical risk," such delays "[decrease] the financial risk [to] Corizon and ACCF." (*Id.*). Dr. Cohen opines that "[t]he failure of Corizon nursing and medical staff to identify that [decedent] required urgent medical attention represents a terrible failure of their intake screening system." (*Id.* at ¶ 66b). A delay of 90 days between intake and examination by a physician is mandated by the ACCF/ Corizon contract, but "inconsistent with the needs of many patients with chronic medical problems, including Irene Bamenga." (*Id.* at ¶ 75).

**\*48** Moreover, the expert report concludes that policies were often ignored in practice. Dr. Cohen finds that, even though the Defendants had a policy for managing chronic diseases, "it was routinely not followed." (*Id.* at ¶ 68). Corizon did not provide protocols for managing cardiac illnesses that the Company recognized were necessary, and "no materials related to the appropriate evaluation and management of cardiac disease [were] present in the ACCF manuals" that Cohen reviewed. (*Id.* at ¶ 69). Cohen points out that Nurse Paulino failed to assess severity of Decedent's condition or order any diagnostic testing, which contradicted the alleged policy. (*Id.*). Moreover, though a chronic care system existed at the Jail, the

system was "dysfunctional" (*Id.* at ¶ 74). Despite stated policy, few patients were actually seen and few of the required laboratory studies were completed. (*Id.*). In the end, Dr. Cohen concludes that Decedent's death was a result of both "the conscious disregard of her medical needs by the physicians and nurses charged to care for her and blatant deficiencies in the system established by Allegany County, Corizon and County of Albany to provide medical care to prisoners at the ACCF." (*Id.* at ¶ 82). Plaintiff has therefore produced evidence that would allow a jury to conclude that Defendants violated Decedent's constitutional rights pursuant to an official policy and/or custom. (*Id.*).

Other evidence in the case, summarized *infra,* could also be used by a reasonable juror to conclude that Defendants did not have in place proper procedures to ensure that inmates who needed medication received that medication in proper doses. Jurors could also find that the procedures in place for medical illnesses and emergencies were inadequate to a level that gives rise to a constitutional claim. As Dr. Cohen states it, Irene Bamenga had "multiple serious medical problems" when she was taken into custody. (*Id.*). Bamenga was "aware of her problems, she had medications with her, she was cooperative, and sought desperately to receive necessary medical care." (*Id.*). Despite the need for "careful and urgent monitoring" of her condition, "her life threatening medical problems were ignored." (*Id.*). Defendants "denied medications, denied basic necessary diagnostic testing, and, when she complained of life threatening symptoms and shortness of breath, she was ignored." (*Id.*). As explained above, despite Defendants' knowledge of Decedent's chronic condition and her need for medication, the evidence could be read to conclude that a policy or practice existed of ignoring or delaying a response to medical complaints, even by an inmate in Decedent's condition. Similarly, a jury could conclude, given the amount of time between reports of Decedent's condition on the night of her death and an actual medical response, that Defendants had a policy and/or practice in place that led guards and other staff to ignore medical emergencies. The motion for summary judgment will be denied on this basis as well.

**\*49** Defendants also argue that Plaintiff has not produced evidence to support claims that Defendants failed to properly staff, supervise and train the medical staff at ACCF. Defendants point out that the staffing

levels at the ACCF complied with New York law and staffing analyses that directed a particular level of staffing. In addition, medical staffing at the Facility was ceded in part to Corizon by the terms of the contract between the County and the company. Any decrease in staff came because of a decrease in inmate population.

In responding, Plaintiff points to policies adopted by County in 2010 that reduced the hours of the Medical Director by 25%, and which Plaintiff contends led to an inability on the part of Dr. Haider–Shah to properly monitor patients. Additionally, Albany County's contract with Corizon, Inc., made Corizon responsible for the cost of patient care and created an incentive to cut that care. These reductions, Plaintiff insists, were designed as a money-saving measure, and were not justified by any decrease in services used. Plaintiff's brief does not address the issue of inadequate training for prison staff.

Dr. Cohen points out that in 2010 the hours for Dr. Haider–Shah, the ACCF Medical Director, were reduced from 40–30 per week. (Cohen Report at ¶ 72). During 2011, Dr. Haider–Shah averaged more than 100 visits to inmates per week, while also being required to review records and laboratory studies, counter-sign verbal orders, review policies, participate and oversee quality assurance activities, and supervise Paulio, the Nurse Practitioner. (*Id.*). The limited time that Dr. Haider–Shah had to see patients was inadequate to provide them with proper care: "Dr. Haider–Shah did not have the time requried to review, in a timely manner, the charts of complex patients whose admissions he had 'approved' over the weekend when he was on call." (*Id.*). The Court finds that the evidence recited above and in this sections provides evidence a jury could use to conclude that Albany County's policy of reducing physician staffing at the prison caused a violation of Decedent's constitutional rights. If a jury were to believe the Plaintiff's evidence, the cut-back in Dr. Haider–Shah's hours was motivated by the County's desire to save money, not by actual staffing needs. Reducing those hours, moreover, led to a lack of adequate care of patients. [17] Defendant's motion will be denied on this basis. [18] The Defendants' motion with respect to Plaintiff's constitutional claim of deliberate indifference to a serious medical need will therefore be denied. [19]

### iii. Qualified Immunity for Sheriff Apple

Defendants argue that Sheriff Apple is entitled to qualified immunity because he had no knowledge or notice of any constitutional violations. Defendants' argument does not address the actual issue of qualified immunity, since Defendant argues that Sheriff Apple did not violate Decedent's constitutional rights, not that he is entitled to immunity for violating those rights because a reasonable person in his position would not clearly know that his conduct violated rights. As stated previously, "qualified immunity is an affirmative defense that shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stephenson,* 332 F.3d at 76. Qualified immunity also applies when " 'it was 'objectively reasonable' for [the officer] to believe that [his or her] actions were lawful at the time of the challenged act.'" *Betts,* 751 F.3d at 83. A right is clearly established when " 'the contours of the right [were] sufficiently clear in the context of the alleged violation such that a reasonable official would understand that what he [was] doing violate[d] that right.' " *Iqbal v. Hasty,* 490 F.3d 143, 152 (2d Cir.2007) (quoting *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250–51 (2d Cir.2001)). At the same time, "for a right to be clearly established for the purposes of a qualified immunity defense, the precise conduct at issue need not previously have been ruled unlawful." *Zahrey v. Coffey,* 221 F.3d 342, 357 (2d Cir.2000).

**\*50** Defendants do not even argue that the right to medical care for a detainee was not clearly established, or that a reasonable person in Sheriff Apple's position would not know that failing to craft and implement policies and practices to treat and protect an inmate with a chronic medical condition would amount to deliberate indifference to a serious medical need. The Court finds that, since this right was clearly established and the Defendants do not argue otherwise and the conduct of the Defendant Apple in failing to craft and implement such policies was not objectively reasonable, the qualified immunity defense is unavailable to Sheriff Apple. The motion will be denied on this basis as well.

### c. Contract Claim

Defendant argues that Plaintiff cannot prevail on his claim that Decedent was a third party beneficiary of a contract to provide medical care to detainees at the ACCF, and that Defendants breached that contract.

Defendant's argument is that the County did not have a contract with Immigrations and Customs Enforcement, but instead contracted with the United States Marshals Service to house ICE detainees. Moreover, even if the Court were to permit the contract claim to go forward based on the existence of a contract to deliver medical services to ICE detainees between the County and the Marshals Service, no evidence supports that claim because the ACCF delivered the level of care required by the Contract. Plaintiff contends that the Bamenga was an intended beneficiary of the contract, and that Defendants breached that contract by failing to provide appropriate medical care, causing her death.

For substantially the reasons stated with respect to the Allegany County Defendants, the Court will deny the Albany Defendants' motion in this respect as well. Bamenga was clearly an intended beneficiary of a contract to which the Defendant County was a party, wherein the parties agreed that Albany County would provide detainees with "a full range" of medical care. A jury could certainly find evidence to support a claim that Defendants did not provide medical care. Plaintiff has produced evidence from a jury could conclude that the medical care provided was grossly inadequate, and that the Albany Defendants were deliberately indifferent to the needs of a detainee like Bamenga.

#### d. Wrongful Death Claim

Defendants also seek summary judgment on Plaintiff's wrongful death claim against the County. Defendants apparently concede that the County could be vicariously liable for the conduct of Dr. Haider–Shah, Nurse Vogel and/or Nurse Practitioner Paulino, but they contend that the no evidence exists to support a claim that those Defendants breached the standard of care or that their actions caused Bamenga's death. Rather than offer their own arguments, the Albany Defendants adopt the arguments of those Defendants and seek judgment on those bases. Since-as will be explained below-the Court finds that evidence exists to support Plaintiff's wrongful death claim against those Defendants, the Court will deny the Albany Defendants' motion for the same reasons.

#### e. Conscious Pain and Suffering

**\*51** Finally, Defendants argue that Plaintiff cannot produce any evidence to support a claim for conscious pain and suffering. The Court has already found that evidence exists to support such a claim. For the same reasons as stated above, the Court will deny that portion of the motion as well.

#### 3. Conclusion as to the Albany Defendants

For the reasons stated above, the Albany Defendants motion for summary judgment, dkt. # 307, will be denied.

### D. Motion of Corizon, Inc., Syed Azaz Haider–Shah, M.D., Anna J. Paulino and Debra C. Vogel

Defendants Corizon, Inc., Syed Azaz Haider–Shah, M.D., Anna J. Paulino and Debra C. Vogel ("Corizon Defendants") have also filed a summary judgment motion, which the Plaintiff opposes.

#### 1. Facts Relevant to the Motion [20]

At the times relevant to this dispute, Defendant Corizon, Inc., provided healthcare services to the ACCF pursuant to a contractual agreement. (Corizon Defendants' Statement of Material Facts, dkt. # 308–3, ("Corizon Defendants' Statement) at ¶ 2). Defendants Syed Azaz Haider–Shah, M.D., Anna J. Paulino, and Debra C. Vogel were at all relevant times employees of Defendant Corizon, Inc. (*Id.* at ¶¶ 3–5).

As described more fully above, Defendant Debra Vogel, a registered nurse, completed the medical screening of Decedent on July 21, 2011. (*Id.* at ¶ 67). Plaintiff contends that Vogel's screening did not comply with ACCF policies for screening and management of chronic diseases. (Plaintiff's Response to the Corizon Defendants' Statement of Material Facts, dkt. # 339, ("Plaintiff's Response to Corizon") at ¶ 67). Defendants contend that Bamenga did not voice any concerns about her health condition to Vogel. (Corizon Defendants' Statement at ¶ 68). Plaintiff disputes this claim, pointing out that "[i]mmediately prior to her encounter with Ms. Vogel," Bamenga went through a booking screening. (Plaintiff's Response to Corizon at ¶ 68). In that encounter, Decedent expressed that she was "very worried" about her medical condition. (*Id.*). Plaintiff contends that this earlier statement supports an inference that Decedent informed Vogel of her concerns and Vogel failed to record them. (*Id.*). Plaintiff points to alleged failings by Vogel to record Plaintiff's diagnoses of hypertension and anemia in her chart as evidence of her failure to record all relevant information. (*Id.*). Plaintiff also alleges that

Vogel violated ACCF policy by checking a box for "no referrals," even though ACCF policies required a doctor's appointment for any new inmate with a chronic condition. (*Id.*). According to Plaintiff, Vogel also ignored certain medication requirements, meaning that Decedent was not administered her digoxin correctly and did not have her apical pulse checked at appropriate times. (*Id.*). The parties also dispute whether Vogel ordered a screening x-ray for tuberculosis. (Corzion Defendants' Statement at ¶ 69; Plaintiff's Response to Corizon at ¶ 69).

**\*52** When Decedent arrived at the ACCF she had medications contained in blister packs. (Corzion Defendants' Statement at ¶ 70). Those medications included: ASA 81 mg daily; Spironalactone 25 mg twice daily; Lasix 20 mg daily; Digoxin 0.25 mg daily; Lisinopril 20 mg daily; and Carvedilol 25 mg daily. (*Id.*).

Defendant Dr. Haider–Shah served as medical director of the ACCF in July 2011. (*Id.* at ¶ 71). Haider–Shah was on vacation on July 21, 2011. (*Id.*). Dr. Elizabeth Kulesza was covering for him, though Dr. Haider–Smith remained on call. (*Id.*). Vogel contacted Haider–Shah concerning Decedent. (*Id.*). She informed Defendant Haider–Shah of Bamenga's diagnoses and read him the medications and dosages printed on the blister packs Decedent brought to the jail. (*Id.*). Dr. Haider–Shah ordered that these medications be continued. (*Id.*). Thus, the medications Decedent had received in Allegany County were continued at the ACCF, dispensed from the same packs as used in Allegany County. (*Id.* at ¶ 72).

The parties dispute whether Decedent received all of her prescribed medication on July 21, 2011. (Corzion Defendants' Statement at ¶ 73; Plaintiff's Response to Corizon Defendants at ¶ 73). The Corizon Defendants note that Bamenga's records indicate that she received all of those medications at the ACCF on July 21, 2011, even though she was not present at the ACCF in the morning on that date, when the medication record states she took those drugs. (Corizon Defendants' Statement at ¶ 73). Without pointing to any evidence to support these claims, the Defendants speculate that either Bamenga reported to Vogel that she had taken the medication or that Vogel administered the medication later in the day. (*Id.* at ¶ 74). [21]

After her initial screening, Bamenga was held in a cell twenty-three hours a day awaiting classification. (*Id.* at ¶¶

76–77). In the ACCF, medications were administered four times per day in a procedure known as the "pill pass." (*Id.* at ¶ 80). Two pill passes occurred in the morning, at 8 or 9 a.m. and 1 p.m., and two in the evening, at 5 p.m. and 8 or 9 p.m. (*Id.*). As a general matter, medications were placed on a medication cart and transported around the facility. (*Id.* at ¶ 81). When the cart reached a tier, a corrections officer would announce that it was time for medication rounds. (*Id.*). Inmates lined up to receive their medications, which would be administered by a medication administration nurse. (*Id.*). The medication nurse would make a record for the medications taken on each inmate's individual record. (*Id.*). Plaintiff points to testimony from corrections officers and other medical staff that indicates that this procedure was not uniformly followed. (Plaintiff's Response to Corizon Defendants at ¶ 81). These witnesses indicated that procedures varied for dealing with inmates who did not respond to the pill pass, and that staff often failed to take steps to investigate why an inmate did not appear for medication distribution. (*Id.*). Some witnesses claimed that no policy existed requiring staff to insure that individuals took their medication. (*Id.*). Likewise, Plaintiff disputes Defendants' claim that the floor where Decedent was initially housed was inaccessible to the medication cart, requiring that guards check to see that all inmates were able to exit their cells to obtain medication. (Corizon Defendants' Statement at ¶ 82; Plaintiff's Response to Corizon Defendants at ¶ 82). Plaintiff points to the testimony of the Chief of Corrections that the cells were accessible to the cart and argues that no consistent policy of opening cells to allow access to medications existed. (Plaintiffs' Response to Corizon Defendants at ¶ 82).

**\*53** Decedent received all of her morning medication doses on July 22, 2011. (Corizon Defendants' Statement at ¶ 83). She did not receive her evening dose of Spironolactone. (*Id.*). Stephen Wallace, a nurse, marked Bamenga as a "no-show" on that date. (Plaintiff's Response to Corizon Defendants at ¶ 83). Plaintiff contends that recording Plaintiff as a "no show" violated the policies of the ACCF and Corizon (*Id.*). Plaintiff received medication in the morning of July 23, 2011 from Nurse Genovese. (Corizon Defendants' Statement at ¶ 84). The parties dispute Bamenga's demeanor when she received that medication. (*Id.;* Plaintiff's Response to Corizon Defendants at ¶ 84). Defendants contend Decedent was happy and responsive on that date, but Plaintiff contends that Decedent's demeanor was due not

to good health but to a pending visit from her husband, and not because of good health. (*Id.*).

Bamenga received all of her morning medication on July 24, 2011. (Corizon Defendants' Statement at ¶ 85). She was listed as a "no show" for evening medication. (*Id.*). Defendants contend that Decedent received all of her medication in the morning and evening on July 25, 2011. (*Id.*). According to Defendants, Nurse Debra Vogel administered the evening dose. (*Id.*). Pointing to an ICE investigation, Plaintiff claims that no one administered the evening medication to Decedent. (Plaintiff's Response to Corizon Defendants at ¶ 85). Plaintiff contends that the ICE report finds that nurses did nothing to seek out Decedent and administer medication on those days when she did not appear. (*Id.*). The parties dispute whether the doses Bamenga missed mandated that she be counseled under Corizon's written policies, and they dispute whether Corizon actually followed those policies. (Corizon Defendants' Statement at ¶ 86; Plaintiff's Response to Corizon Defendants at ¶ 86). They parties also dispute whether Defendants properly monitored Bamenga's apical pulse and digoxin levels. (Corizon Defendants' Statement at ¶ 87; Plaintiff's Response to Corizon Defendants at ¶ 87). Plaintiff cites to his expert reports to allege that Defendants' monitoring in this level fell below the standard of care. (Plaintiff's Resposne to Corizon Defendants at ¶ 87).

Decedent reported to her husband in a telephone conversation on July 25, 2011 that she was having trouble breathing when lying down. (Corzion Defendants' Statement at ¶ 88). Plaintiff contends that in this conversation Bamenga also informed her husband she was worried she would die in prison and complained that she was not receiving her medication as prescribed.[22] (Plaintiff's Response to Corizon Defendants at ¶ 88). Decedent complained that jail staff did not listen to her complaints about difficulty breathing and did not meet her requests to take additional medication. (*Id.*). The parties agree that Bamenga filled out two "sick call slips," and that only one of the slips was actually processed by a nurse before she died. (Corizon Defendants' Statement at ¶¶ 89–93; Plaintiff's Response to Corizon Defendants at ¶¶ 89–93). Plaintiff contends that the failure to process the second slip represented a failure to follow Corizon's procedures and health-care standards, as well as a failure to respond to Bamenga's repeated complaints about

her health condition. (Plaintiff's Response to Corizon Defendants at ¶¶ 91–93).

**\*54** Nurse Practitioner Anna Paulino examined Bamenga on the morning of July 26, 2011. (Corizon Defendants' Statement at ¶ 94). Defendants contend that this examination, undertaken five days after Bamenga entered the ACCF, complied with jail standards and ICE requirements. (*Id.* at ¶ 95). Paulino reviewed Decedent's intake screening form, medical history, surgical history and medications. (*Id.* at ¶ 96). She listened to Bamenga's heart and lungs, examined her eyes and ears, and then took her body temperature, blood pressure and pulse rate. (*Id.*). Decedent reported she suffered from CHF and hypertension. (*Id.*). All of these tests were within normal limits. (*Id.*). Paulino did not report that Decedent complained of shortness of breath or chest pain during the examination and did not record that she had swelling or difficulty walking. (*Id.*). Paulino likewise reported that Bamenga understood her medication requirements. (*Id.* at ¶ 98). Bamenga complained that she had not received two types of medication. (*Id.*). Paulino testified that she increased Decedent's dosage of Carvedilol to twice per day. (*Id.*). Paulino also reported that she observed that Bamenga had missed two doses of Spironalactone and told Decedent not to miss any more doses. (*Id.*). According to the Defendants, "Nurse Paulino prescribed Carvedilol for twice per day as Ms. Bamenga reported that this was the proper administration." (*Id.* at ¶ 99). Moreover, Defendants insist, "[t]here is no evidence that Bamenga requested that her doses be altered, or that she informed Nurse Paulino that any of the dosages of her medications were not correct." (*Id.*).

Plaintiff disputes many of the facts of this examination. First, Plaintiff contends that the evidence demonstrates that Paulino saw Bamenga because she had complained about the dosing of her medications, and not because of any scheduled initial assessment. (Plaintiff's Response to Corizon Defendants at ¶ 94). Plaintiff points out that the evidence is unclear as to why Paulino saw the decedent, and that the eight-minute duration of the examination indicates that the appointment did not serve as a formal examination. (*Id.*). Nor did such a brief examination constitute enough time to perform all of the tests Paulino recorded. (*Id.* at ¶ 97). In any case, Plaintiff contends that the examination Paulino recorded was insufficient to assess a person with a major health condition, like Decedent's CHF. (*Id.* at ¶ 95). Plaintiff also points out that

Paulino testified she had not read Decedent's medical file before the exam; failed to assign any medical significance to a rapid weight gain, despite clinical guidelines; failed to assess whether Bamenga had (i) an enlarged heart, (ii) reduced ventricular ejection fraction, (iii) a laterally displaced apical pulse, (iv) a positive hepatojugular reflex, or increased venous jugular pressure. (*Id.*). All of those examinations were recommended by Corizon's policies for dealing with patients who suffered CHF. (*Id.*). Paulino did not consider performing any additional tests, and did nothing to assess the severity of Decedent's heart condition. (*Id.*). She did not address any of the symptoms Decedent had complained of in her sick call slip of the previous day, and did not notice the edema that Plaintiff saw on his visit to Decedent on July 23. (*Id.*). Plaintiff also disputes Defendants' claims about the Decedent's complaints concerning and knowledge of her medications. (*Id.* at ¶¶ 98–99). The parties dispute whether Decedent complained of shortness of breath, palpitations or dizziness during Paulino's assessment, as well as the significance of any statements about medication during that encounter. (Corizon Defendants' Statement at ¶ 100; Plaintiff's Response to Corizon Defendants at ¶ 100). Paulino ordered that Bamenga return to the chronic disease clinic in 90 days. (Corizon Defendants' Statement at ¶ 101). Plaintiff contends that this schedule violated the standard of care and ignored the need to monitor changes in Decedent's medications. (Plaintiff's Response to Corizon Defendants at ¶ 101).

**\*55** Decedent received her morning medications on July 26, 2011. (Corizon Defendants' Statement at ¶ 102). She was classified that day by Corrections Officer Nancy LaFontaine. (*Id.* at ¶ 105). Officers assigned Bamenga to Section 6W, Block L3, Cell 09, Bed 1. (*Id.*). Decedent was classified as Level III, a "medium" security level. (*Id.*). Plaintiff disputes that this classification was proper, given Decedent's health condition and her expressed concerns about that condition. (Plaintiff's Response to Corizon Defendants at ¶ 105). Following this classification, Decedent was transferred to 6W. (Corizon Defendants' Statement at ¶ 106). The parties dispute the meaning of film of Bamenga taken that day in the unit: Defendants contend that they show her moving normally; Plaintiff contends that the videos supplied by Defendants distort Bamenga's actually condition, particularly because as submitted they play at a faster rate than when they were recorded and are of too low a resolution to accurately

reflect her situation. (Corizon Defendants' Statement at ¶ 108; Plaintiff's response to Corizon Defendants at ¶ 108).

The parties also dispute Bamenga's condition during the afternoon and early evening of July 26, 2011 in the 6W unit and conversations she had about it with others. Defendants claim that Plaintiff spoke with her husband around 4:07 p.m. and told him she was "fine." (Corizon Defendants' Statement at ¶ 110). They also contend that another inmate in 6W, Karrie Stefanik, testified that she witnessed two medication rounds that occurred on July 26, 2011. (*Id.* at ¶ 109). At some point, probably between 4:30 and 5:00, Stefanik testifed that she overheard a conversation between Bamenga and a nurse about medication. (*Id.*). Bamenga asked about her medications, and the nurse told her that she had none for her. (*Id.*). According to the Plaintiff, Defendants' statement misstates these two conversations. First, though Plaintiff does not dispute that Bamenga told plaintiff she was fine at 4:07 p.m. that day, Plaintiff points out that a conversation recorded at 12:18 p.m. on July 26 reveals that Bamenga complained at length to her husband about her difficulty breathing and difficulty in obtaining her medications, as well as receiving improper doses. (Plaintiff's Response to Corizon Defendants at ¶ 110). Second, Plaintiff points out that Stefanik also testified that Bamenga, who was wrapped in a blanket, complained to Nurse Vogel that she was not feeling well, and that her chest was hurting. (*Id.* at ¶ 109). After informing Decedent that she had nothing for her, Vogel " 'told her to drink eight to ten ounces of water and lay down [because] she's probably dehydrated.' " (*Id.*).

The parties offer different explanations of Bamenga's behavior after this meeting with the nurse. According to Plaintiff, Stefanik testified that Decedent went to bed shortly after dinner. (Corizon Defendants' Statement at ¶ 111). Plaintiff points out that Stefanik testified that, shortly after speaking with Nurse Vogel, Decedent went to lie down on her top bunk. (Plaintiff's Response to Corizon Defendants at ¶ 111). Decedent did not eat any dinner, but instead gave her food away. (*Id.*). Stefanik testified that, at dinner time, Bamenga "was walking around warpped up in the wool blanket they give you. She was really cold. And, pretty much, from when we got our food, we all sat down to eat, she hopped up in bed and went to sleep." (*Id.*). Later, around 8:30 p.m., when a guard came to make a live inspection, Decedent did not get out of bed, though instructed to do so by the guard. (*Id.*). Despite

yelling from the guard, Stefanik testified that Plaintiff " 'didn't even flinch.' " (*Id.*). Lights started to go down at 10:00 p.m.; Stefanik noted that between 5:00 p.m. and 10:00 p.m., Bamenga " 'hadn't moved a beat. She hadn't gotten up to go to the bathroom. She [was] in the same position. Her arm was in the same position. Like she was literally in the same position.' " (*Id.*). The pod lights were finally turned off at 11:00 p.m. (*Id.*). Plaintiff was listed as a no-show for her evening medications on that day. (Corizon Defendants' Statement at ¶ 112).

**\*56** Thereafter, as related above, Decedent was discovered unresponsive in her bed and taken to the Albany Memorial Hospital, where she was pronounced dead. [23]

### B. Argument of Corizon Defendants
The Corizon Defendants seek summary judgement on various grounds, which the Court will address in turn.

### 1. Constitutional Claims
Defendants first argue that no evidence exists to support Plaintiff's claims that Defendants violated Irene Bamenga's constitutional rights by acting with deliberate indifference to a serious medical need. The legal standard related earlier applies to this portion of Defendants' argument.

### a. Serious Medical Need
Defendants first argue that the interruptions in Decedent's prescription medication schedule pointed to by Plaintiff would not have had a substantial effect on Decedent's CHF. Defendants point to the testimony of their experts, who contend that no evidence supports a finding that missed medication dosages caused Bamenga's death. As explained above, however, there is evidence by which a jury could find that the Decedent suffered from a serious medical need. For the reasons explained previously by the Court, the motion will be denied on this basis.

### b. Deliberate Indifference
Defendants next contend that, even if Decedent's condition did represent a serious medical need, no facts exist to support a finding of deliberate indifference to that serious medical need. Moreover, none of the named Defendants acted with any deliberate indifference.

Defendants offer a variety of arguments, contending both that the general care provided by the Corizon Defendants did not amount to deliberate indifference, and that for a variety of reasons the individual Corizon Defendants cannot be liable. The Court will first address the Defendants' general arguments on this element of Plaintiff's claim, and then address the arguments related to each of the individual Corizon Defendants.

### i. General Medical Care
Defendants first argue that a failure to provide medication in itself does not constitute deliberate indifference, and that no evidence supports a claim that Nurse Practitioner Paulino or Dr. Haider–Shah refused to provide Decedent with medication. Nurse Vogel, who was simply assigned to administer medications on one occasion, likewise did nothing to prevent Decedent from receiving that medication. Defendants also argue that Plaintiff's allegations against the Corizon Defendants are simply complaints about a failure to employ particular treatments or perform specific tests and do not arise to the level of constitutional violations, even if true. Defendants' expert testimony, Defendants argue, demonstrates that no evidence supports a claim that discrepancies in Decedent's medications were not the result of any error by the moving Defendants, much less deliberate indifference. Defendants additionally argue that they cannot be seen as deliberately indifferent for relying on the dosages assigned to Decedent at the Allegany County Jail. They were entitled to rely on those prescriptions.

**\*57** Applying the same reasoning and case law as the Court applied with reference to the Allegany Defendants, the Court finds that evidence exists to support the Plaintiff's claims against the Corizon Defendants in this instance. Plaintiff does not simply quarrel with the treatments that the Defendants provided to the Decedent or insist that she should have received different doses of medication. Instead, Plaintiffs' experts argue that the Defendant health-care professionals failed to follow basic medical procedures necessary to protect the health of a severely ill inmate. [24] In failing to do so, the experts contend, the medical professionals who treated the Decedent were indifferent to the risks their treatment provided, and that the Defendants made no legitimate effort to determine whether the medication provided to the Decedent was appropriate for her medical needs. Dr. Cohen's report, for instance, notes that,

despite the fact that Dr. Haider–Shah and other medical professionals were aware of the need to perform various laboratory studies to evaluate Decedent's condition and determine whether her medications were properly dosed, Dr. Haider–Shah "consciously chose not to order these critically necessary tests." (Cohen Report at ¶ 49). Dr. Cohen also alleges that Decedent's condition required several specific tests, evaluations, and examinations, and that failure to order these procedures was not simply a different medical approach, but failing to undertake these required procedures meant that the Defendants "ignored" Decedent's needs. (*Id.* at ¶ 66, 82; *see also,* Wertheimer Report at 13–14 (Dr. Haider–Sha's failure to order tests came despite his knowledge of Decedent's condition and the deadly potential consequences of failing to order the tests and procedures). Similarly, Nurse Practitioner Alexandra Schneider's Report concludes that the nursing professionals in this case, including the Corizon Defendants, "engaged in patterns of conduct that no reasonable nurse could engage in without the expectation that injury to the patient was highly likely to result." (Exh. A to dkt. # 348 ("Schneider Report") at 23). The report details the specific Defendants' failings in this respect. Such conduct, as explained above, can amount to deliberate indifference to a serious medical need. The motion will be denied on this basis.

### iii. Individual Defendants
The Defendants also contend that the individual Defendants did not commit any constitutional torts.

#### a. Debra Vogel
Nurse Vogel argues that, as a nurse she cannot be liable for administering medications prescribed by a doctor or for failing to order particular tests and thus cannot be liable under the circumstances.

The Court will deny the motion on this basis. Plaintiff's expert report from Alexandra Scheider does not simply allege that Vogel failed to deliver the proper doses of medication or failed to order particular tests. (*See* Schneider report at 22–23). Schneider contends that Vogel failed to take a detailed history from Decedent in her initial intake interview. (*Id.* at 22). Vogel therefore did not obtain any information concerning Decedent's prescription regimen or whether she had missed any medications. (*Id.*). Vogel, who had information indicating that Plaintiff suffered from CHF, also failed to elicit any

information on her past disease history. (*Id.*). Vogel failed to obtain this information, even though the Defendant acknowledged that she was a aware that a person in Decedent's condition suffered from a serious medical condition. (*Id.* at 23). According to Schneider, "Nurse Vogel's failure to seek additional history and diagnostic testing results, to contact community prescribers or pharmacy, or to put Ms. Bamenga on the list to be seen by the physician covering Dr. Haider–Shah while he was on vacation ... demonstrate Nurse Vogel's indifference to her patient's well-being and continued safety and survival." (*Id* . at 20). In other words, "[f]aced with a patient she knew was being treated with multiple medications for a very serious illness, Ms. Vogel made no effort to obtain the information necessary to care for her patient." (*Id.*). Such indifference, Schenider contends, is also demonstrated by Vogel's failure "to make any effort" to get Bamenga her evening medication dose and failure to record an explanation for that failing, in violation of written policies on the issue. (*Id.* at 21). If a jury adopts these conclusions, Plaintiff could prevail against Nurse Vogel, and the motion must be denied in this respect.

#### b. Nurse Practitioner Anna Paulino
**\*58** Defendants contend that Plaintiff cannot make out a deliberate indifference claim by pointing to disagreements about proper dosages of medications or a failure to prescribe the appropriate dosage. Indeed, when Decedent complained to Nurse Practitioner Paulino about receiving improper doses of the medication, NP Paulino changed the dosage. Defendants likewise argue that Plaintiff's complaint about failure to perform specific tests and provide specific treatments does not support a claim of deliberate indifference.

Plaintiff uses Schenider's expert opinion to support his claim that Nurse Paulino's treatment of Decedent amounted to deliberate indifference to a serious medical need. (*See* Exh. A to dkt. # 348 ("Schneider Report")). Scheider finds that Paulino's conduct in changing the dosages of Decedent's medication represented the sort of conduct that constitutes abandonment of a patient. (*Id.* at 11). Paulino did not perform any diagnostic tests, and did not consider performing any. (*Id.*). Instead, "new orders for carvedilol ... doubling the dose were, according to Nurse Paulino's testimony, made as an accommodation to Ms. Bamenga's insistence that she receive a carvedilol dose twice daily." (*Id.*). Paulino did not change the dosage because of "a determination that

the change was medically indicated," but simply because of the Decedent's complaints and then scheduled her for a 90–day follow-up appointment. (*Id.*). Schneider finds this "inexplicable," especially given the length of time between changing the medication and ordering new testing. (*Id.*). The expert concludes that, "Nurse Paulino had to have been aware that, having ordered no diagnostic testing, she could not make a reliable assessment" about the stability of Decedent's condition. (*Id.*). In effect, Schneider finds, "Nurse Paulino abandoned Irene Bamenga, leaving her survival to blind luck." (*Id.*). These failings led to Bamenga's death. (*Id.*).

The Court finds that, for reasons substantially similar to those stated in reference to the other health professionals, Nurse Practitioner Paulino's conduct could be viewed by a reasonable juror as deliberate indifference. The motion will be denied in this respect as well.

### c. Dr. Haider–Shah

Defendants contend that Dr. Haider–Shah cannot be liable simply because he held a position of authority. Vicarious liability is not available under Section 1983. Defendants assert that no evidence indicates that Dr. Haider–Shah was aware that a substantial risk of serious harm existed, or that he was directly involved in any of the alleged constitutional violations. He did not create any policies that caused constitutional violations, nor was he aware of any such violation. Dr. Haider–Shah simply engaged in a telephone consultation with Nurse Vogel and ordered the continuation of medications from the Allegany County Jail.

Again, Plaintiff's expert reports paint a different picture, which if believed by the jury could lead to verdict against the Defendant. Dr. Wertheimer finds that Dr. Haider–Shah acted in a manner "[indifferent] to the safety and well-being of Ms. Bamenga" during her confinement at the ACCF. (Wertheimer Report at 13). Her report argues that Dr. Haider–Shah failed to "order an appropriate initial work-up, appropriate history, physical examination, laboratory testing and confirmation of cardiac pharmacologic regime," even though he knew that failing to order any of these procedures could lead to Bamenga's death. (*Id.* at 13–14). According to Wertheimer, "Dr. Haider–Shah knew Ms. Bamenga had a potentially life-threatening diagnosis; and knew that she was on a regime of medications that he himself described as 'dangerous.' " (*Id.* at 14). Despite this awareness,

Haider–Shaw, in Wertheimer's telling, deliberately failed to order appropriate tests. (*Id.*). This evidence indicates more than a simple disagreement about procedures, but conduct that a jury could conclude represented an indifference to the consequences of determining proper treatment for a seriously ill patient. Dr. Cohen's report likewise faults Dr. Haider–Shah for failing to act in light of Decedent's serious needs. (*See* Cohen Report at 14–15). Despite being aware of Decedent's condition and the need for such tests to guide her treatment, "he consciously chose not to order these critically necessary tests." (*Id.* at 15). A jury could therefore find that Dr. Haider–Shah was deliberately indifferent to a serious medical need based on this evidence. [25]

### d. Corizon, Inc.

**\*59** Defendants note that Defendant Corizon, Inc., cannot be vicariously liable on a constitutional claim, and argue that none of Corizon's policies and/or practices caused a violation of Decedent's constitutional rights. Defendants admit that Corizon could be liable if the Defendant had a policy or custom which caused a constitutional violation, but insist that their policies were adequate in a constitutional sense. They likewise contend that no evidence supports a claim of that the ACCF had insufficient staffing levels.

Defendants correctly point out that "[p]rivate employers are not liable under § 1983 for the constitutional torts of their employees unless the plaintiff proves that 'action pursuant to official ... *policy* of some nature caused a constitutional tort.' " *Rojas v. Alexander's Dep't Store,* 924 F.2d 406, 408 (2d Cir.1990) (quoting *Monell,* 436 U.S. at 691) (internal citations omitted) (emphasis in original). Plaintiff has introduced evidence, however, that a jury could use to determine that Decedent's constitutional rights were violated by a Corizon policy or practice.

The expert report of Dr. Cohen identifies numerous policies and practices instituted by Defendant Corizon, Inc., which he claims caused Decedent's injuries. Corizon's policies that encouraged a lengthy delay before a physician or nurse practitioner saw an inmate who arrived suffering form a chronic disease and performed appropriate tests. (Dkt. 367 at ¶ 65(c)). The policies for dealing with hypertension were severely lacking, and numerous basic tests were never performed. (*Id.* at ¶¶ 65(e-h). Moreover, practice did not meet the basic policies in place. The

Corizon, Inc ., policy required that inmates with chronic diseases have a care plan, but only 56% of inmates with chronic diseases had one. (*Id.* at ¶ 68). Likewise, Corizon had a stated policy requiring protocols for management of cardiac illness, but those policies were never implemented. (*Id.* at ¶ 69). As explained previously, the cardiac care system at the ACCF fell far short of these standards, with the Cardiac Care Clinic consistently failing to provide assessments and laboratory tests as required by the policy. (*Id.* at ¶ 74). In the end, Dr. Cohen blames the death of Irene Bamenga, in part, on the "blatant deficiencies" in the health care system created and operated by Corizon, Inc. (*Id.* at ¶ 82). Thus, Plaintiff has provided sufficient evidence-through Dr. Cohen's report, as well as other testimony of health-care providers at the ACCF-to establish that the constitutional tort that caused Decedent's injuries was the result of an official policy of custom established by Corizon, Inc. The motion will also be denied in this respect.

#### c. Wrongful Death Claims

The Corizon Defendants also seek summary judgment on Plaitniff's wrongful death claims against them. The Defendants contend that no evidence supports any claim of negligence against them. They assert that Plaintiff has no evidence that they deviated from the standard of care or that such deviations injured the Decedent. Even if such evidence existed, Defendants insist that no evidence exists to prove that Plaintiff suffered any pecuniary loss. Moreover, Defendants argue that no evidence exists to support liability against the individual Defendants. The Court will address each Defendant's position in turn, as appropriate.

#### i. Legal Standard for Wrongful Death

**\*60** "To succeed on a cause of action to recover damages for wrongful death" in New York, "the decedent's personal representative must establish, inter alia, that the defendant's wrongful act, neglect, or default caused the decedent's death." *Eberts v. Makarczuk,* 52 A.D.3d 772, 772–73, 861 N.Y.S.2d 731, 732 (2d Dept.2008). The elements of such a claim are: "(1) the death of a human being, (2) the wrongful act, neglect or default of the defendant by which the decedent's death was caused, (3) the survival of distributees who suffered pecuniary loss by reason of the death of decedent, and (4) the appointment of a personal representative of the decedent." *Chong v. New York City Transit Authority,* 83 A.D.2d 546, 547,

441 N.Y.S.2d 24, 25–26 (2d Dept.1981). Defendants here argue that the Plaintiff cannot satisfy the second and fourth elements of such a claim.

The parties agree that the wrongful acts, neglect or default alleged by the Plaintiff against the moving Defendants are claims of negligence and medical malpractice. The parties agree here that to prove his claims in this respect, the Plaintiff must demonstrate "(1) the existence of a duty on defendant's part to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result[.]" *Akins v. Glens Falls City School Dist.,* 53 N.Y.S.2d 325, 333, 424 N.E.2d 531, 535 (1981). A m edical malpractice claim requires a showing of "(1) a deviation or departure from accepted practice, and (2) evidence that such departure was a proximate cause of plaintiff's injury." *Frye v. Montefiore Med. Ctr.,* 70 A.D.3d 15, 24, 888 N.Y.S.2d 479, 486 (1st Dept.2009). When a defendant physician moves for summary judgment in such cases, the physician "must make a prima facie showing of entitlement to judgment as a matter of law by establishing the absence of a triable issue of fact as to his alleged departure from accepted standards of medical practice." *Id.* The plaintiff must then "produce expert testimony regarding specific acts of malpractice, and not just testimony that alleges " '[g]eneral allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of malpractice.' " *Id* . (quoting *Alverez v. Prospect Hosp.,* 68 N.Y.S.2d 320, 325, 508 N.Y.S.2d 923, 501 N.E.2d 572 (1986)). "In most instances, the opinion of a qualified expert that the plaintiff's injuries resulted from a deviation from relevant industry or medical standards is sufficient to preclude a grant of summary judgment in defendant's favor." *Id.* If, however, the expert's opinion is " 'speculative or unsupported by an evidentiary foundation,' " the opinion " 'is insufficient to withstand summary judgment.' " *Id.* (quoting *Diaz v. New York Downtown Hosp.,* 99 N.Y.S.2d 542, 544, 748 N.E.2d 68 (2002)).

#### ii. Conduct of the Various Corizon Defendants

The Court has already explained how the evidence supports a finding that Defendants acted in ways that were deliberately indifferent to a serious medical need of the Decedent. In some sense, that finding, which employs a more stringent standard than medical malpractice, should lead the Court to find that Plaintiff has evidence of medical malpractice against all of the Defendants. In any case, all of the Plaintiff's expert reports conclude that

Defendants Haider–Shah, Vogel and Paulino violated the standard of care and injured the Decedent. Schneider details the care provided by both Vogel and Paulino and concludes that they "repeatedly and consistently deviated in significant ways from accepted standards for providing reasonable and prudent nursing care." (Schneider Report at 26). Such failings helped cause Bamenga's demise. (*Id.*). Likewise, Dr. Werthheimer relates the nature of Dr. Haider–Shah's care and finds that it "fell below the minimal standard of care at all points [.]" (Wertheimer Report at 13). Such failings included failure to order specific tests, prescription of inappropriate dosages of medication, and a failure to investigate past medical history. (*Id.* at 16–17, 888 N.Y.S.2d 479). This conduct, Wertheimer concludes, caused Bamenga's death. (*Id.* at 18, 888 N.Y.S.2d 479). Indeed, with reference to Defendants Haider–Shah and Paulino, Defendants simply cite to their own expert reports and argue that the Court should accept those findings. As the Defendants brought the instant motion for summary judgment, the motion must be denied in this respect. The Court cannot grant the motion for summary judgment based solely on the evidence supplied by the moving party if evidence exists to support the position of the non-movant. Since such evidence exists, the Court must permit the jury to decide the wrongful-death claims with respect to these two Defendants. The motion is denied with respect to both Defendant Haider–Shah and Defendant Paulino.

**\*61** Defendants' argument with respect to Defendant Vogel is slightly different, but no more persuasive. Defendants argue that summary judgment should be granted to her because Vogel had no responsibility to verify that the medications ordered at the ACJ were accurate. The Plaintiff's expert report, however, finds failings by Vogel far beyond her provision of medication, and that report helps create questions of fact on this issue. The report alleges that her basic examination failed to ask necessary questions and did not elicit important information, and in that way violated the standard of care. (Schneider report at 19–20). The report thus offers a basis for liability beyond ordering tests and correcting doses, and the motion is denied in that respect. Defendants also contend, however, that their expert and Nurse Vogel's own testimony establish that she did not violate the standard of care in her treatment of the Decedent. Whatever this testimony states, of course, that testimony-contradicted, as here, by other admissible testimony, provides no basis for summary judgment. Defendant's further contend that

Vogel cannot be liable because under New York law she is permitted to order medications, testing or consultations. Liability against Vogel here is premised not on her failure to order particular tests, but her failure to ask certain questions and perform certain basic examinations indicated for a person in Bamenga's condition. (*See* Schneider Report at 20). Plaintiff also points to liability based on Vogel's alleged failure to ensure that Bamenga received an evening dose of her medication on July 25, 2011 and to Vogel's conduct the following evening, when she allegedly did nothing to act on Decedent's health concerns. (*Id.* at 21, 888 N.Y.S.2d 479). The motion will be denied in this respect as well.

### iii. Proximate Cause

Moving Defendants' argument that their conduct was not a proximate cause of Decedent's injuries is unpersuasive for the same reasons state above in reference to the other Defendants. Plaintiff has submitted evidence a jury could use to conclude that Defendants' conduct caused Bamenga's injuries. The motion must therefore be denied on this basis.

### iii. Pecuniary Loss

Defendants next argue that no evidence exists to support a claim for lost wages on the part of the decedent, or that the Plaintiff suffered any pecuniary loss as distributee of the Decedent's estate. Defendants claim Plaintiff has not produced any record of wages earned by the Decedent in the United States, but offered only his own testimony concerning Decedent's work under an assumed name at a Whole Foods Market. Moreover, because Decedent was working without legal authorization, Defendants insist that Plaintiff cannot raise a claim for potential future earnings.

In New York,"[d]amages in an actions for wrongful death are the fair and just compensation for the pecuniary injuries resulting from the decedent's death to the persons for whose benefit the action is brought." *Brooks v. Siegel,* 52 A.D.2d 1003, 383 N.Y.S.2d 439, 440 (3d Dept.1976) (citing N.Y. EPTL § 5–4.3). "The standard by which to measure the value of past and future lost earnings is the decedent's gross income at the time of death." *Plotkin v. New York City Health & Hosps. Corp.,* 221 A.D.2d 425, 426, 633 N.Y.S.2d 585,. 586 (2d Dept.1995). "Pecuniary loss includes medical and funeral expenses of the decedent paid by the distribute ." *Gabriel v. County of Herkimer,*

889 F.Supp.2d 374, 406 (N.D.N.Y.2012) (quoting N.Y. Est. Powers & Trust § 5–4.1).

**\*62** Plaintiff Yodi Zikianda testified that he paid a portion of the funeral expenses of the decedent. (*See* dkt. # 309–14 at 108). Because pecuniary loss includes funeral expenses paid by the distributee of the estate, the Plaintiff has produced evidence to satisfy this element of the wrongful death claim as well. The motion must be denied in that respect.

As to whether Plaintiff may recover for lost wages, the Court finds that the question of whether such damages are available is a factual one to be resolved by the jury. The parties agree that Decedent did not have legal authorization to work in the United States, and had previously worked in this country using another person's social security number. The Plaintiff insists, however, that Decedent may have gained authorization to work in the United States at some future point.

The New York law cited by the Defendant does not automatically preclude a Plaintiff from recovering for lost wages potentially earned by a person not legally permitted to work in the United States. In the case cited by the Defendants, *Collins v. New York,* 201 A.D.2d 447, 607 N.Y.S.2d 387 (2d Dept.1994), the Defendant had "moved for partial summary judgment to preclude the plaintiff from seeking to recover any lost earnings of the decedent based on his employment in the United States or upon United States wage rates, and to preclude plaintiff from offering evidence of the decedent's employment qualifications." *Id.* at 447, 607 N.Y.S.2d 387. The decedent was an "illegal alien from India." *Id.* The lower court granted the motion in part, "limiting any evidence of lost earnings to the amount which the decedent lawfully could have earned in India." *Id.* The Appellate Department reversed, finding a question of fact "with regard to the decedent's lost earnings" because "the record fails to establish as a matter of law that any wages which the decedent might have earned would have been the product of illegal activity." *Id.* at 448, 607 N.Y.S.2d 387. Instead, "this question, as well as the length of time during which the decedent might have continued earning wages in the United States, and the likelihood of potential deportation, are factual issues for resolution by the jury under all of the circumstances of the case as developed by a full trial." *Id.* at 448, 607 N.Y.S.2d 387. The Court reads this law to establish that a recovery of lost wages

requires proof of some sort that a decedent who at time of death was not authorized to work in the United States could earn money, whether in the United States or in some other country.

In their statement of facts, Defendants contend that the only employment documents produced by the Plaintiff were from Whole Foods Market, where Decedent began working in 2007. (Corizon Defendants' Statement at ¶ 22). To obtain this job, Bamenga used the working papers of Plaintiff's aunt, who was reportedly living in England at the time. (*Id.*). Decedent received W–2 forms each year for that aunt. (*Id.*). In discovery, Plaintiff produced these documents for the years 2009 through 2011, and all were addressed to the aunt, not the decedent. (*Id.* at ¶ 23, 607 N.Y.S.2d 387). Def endants do not deny, however, that Decedent actually performed the work under the name of Plaintiff's aunt. Defendants also admit that, though Bamenga had overstayed her tourist visa, which expired in October 2005, her husband had acquired a Green Card and sought "legal citizenship" for "Bamenga "as the spouse of a resident alien at some point in 2009 or 2010." (*Id.* at ¶21, 607 N.Y.S.2d 387). Plaintiffs also admit that "[t]his request was approved some time in 2010." (*Id.*).

**\*63** The Court further finds that a question of fact exists as to Decedent's lost wages. The Defendants admit that Bamenga may have been a legal resident at the time of her death. At the very least, then, a question of fact exists as to her capacity to work in the United States. Moreover, Defendants do not even argue that Bamenga lacked the capacity to work if she were deported. To the extent that Plaintiff can provide evidence which convinces the jury that Bamenga's legal status was about to be resolved, or that she had good prospects for employment even if deported, Plaintiff could prove a pecuniary loss. Summary judgment is unwarranted on the issue.

**v. Corizon, Inc.**
Defendants' only argument with respect to Corizon, Inc., is that only vicarious liability can apply and thus "[t]o the extent that the Court grants summary judgment with respect to any of the above defendants, summary judgment must also be granted with respect to defendant Corizon, Inc." (Corizon Defendants' Brief, dkt. # 308–2 at 29). As the Court has found that evidence supports wrongful death claims against all of the individual Defendants, the Court also finds that a jury could conclude that Corizon, Inc., was vicariously liable for

Decedent's injuries. The motion will be denied in this respect as well.

#### d. Contract Claims

Defendants next contend that no evidence exists to support Plaintiff's breach-of-contract claims against Corizon, Inc. Defendants do not dispute that Decedent was an intended third-party beneficiary of the contract between Corizon, Inc., and its predecessors and the County of Albany. Instead, Defendants argue that "the level of care provided to Decedent at the ACCF was within the applicable standard of care" and the policies in place at the facility met applicable guidelines and the standard of care in that respect. Thus, Defendants contend, no evidence exists that Corizon, Inc., breached the contract and injured the Decedent.

The Court notes that a large portion of Defendants' argument here is based on the notion that Corizon, Inc., and Corizon's employees delivered the level of care promised in the contract with Albany County because no evidence supports a claim that Corizon breached a standard of care. As explained above, there is evidence to support such a claim, both in terms of the care provided by Corizon employees and in terms of policies developed by Corizon. As such, the motion must be denied on these grounds as well.

#### e. Conscious Pain and Suffering

Defendants also seek judgment on any claim by Plaintiff for conscious pain and suffering. For the reasons stated above in reference to the other Defendants, that portion of the motion will also be denied.

#### f. Cross Claims

Defendants finally argue that the cross claims of Defendants Allegany County, Sheriff Rick Whitney, Cheryl Ralyea, Debra Harrington and Christopher Depner should be dismissed against them if the Court grants the Corizon Defendants' motion for summary judgment. As the Court has denied the Corizon Defendants' motion, there is no basis for granting the motion on the cross claims. That motion will be denied as well. [26]

#### g. Conclusion as to Corizon Defendants

**\*64** For the reasons stated above, the Corizon Defendants' motion for summary judgment, dkt. # 308, will be denied.

### IV. CONCLUSION

For the reasons stated above, the Defendants' motions for summary judgment will be **GRANTED** in part and **DENIED** in part, as follows:

1. The motion for summary judgment of Defendant Christopher Depner, M.D., dkt. # 304, is hereby **DENIED;**

2. The motion for summary judgment of Defendants Craig Apple and County of Albany, dkt. # 307, is hereby **DENIED;**

3. The motion for summary judgment of Defendants Corizon, Inc., Syed Azaz Haider–Shah, M.D., Anna J. Paulino, and Debra C. Vogel, dkt. # 308, is hereby **DENIED;** and

4. The motion for summary judgment of Defendants County of Allegany, Sheriff Rick L. Whitney, Cheryl Ralyea, and Debra Harrington, dkt. # 311, is GRANTED in part and DENIED in part, as follows:

a. The motion is granted with respect to Plaintiff's claims against all individual Defendants in their official capacities and Defendant Rick L. Whitney is dismissed from the case;

b. The motion is granted with respect to Plaintiff's claims for punitive damages against Defendant County of Allegany pursuant to 42 U.S.C. § 1983; and

C. The motion is denied in all other respects.

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 5510956

Footnotes

1    The Court offers a general outline of the facts here, but will address the facts relevant to the parties' motion in more detail when addressing them.

2    The Court notes that the litigation in this matter has been spirited, as evidenced by the more than 400 docket entries as of the date of this writing, as well as the frequent-and sometimes personal-disputes between counsel revealed in the thousands of pages of deposition transcripts submitted by the parties surrounding the summary judgment motions. The Court is certain the parties and their counsel will treat each other with dignity and respect and that counsel will conduct themselves with the decorum expected of legal professionals as the case proceeds.

3    Plaintiff objects to the term "temporary," contending that he "does not know what constitutes a 'temporary' basis[.]" (Plaintiff's Response at ¶ 9).

4    In reply, Defendant criticizes the conclusions of the expert report with respect to Dr. Depner's role in setting medical policies at the jail. Defendant's criticism of the report's conclusions is an issue for the jury.

5    Plaintiff contends that a recent Supreme Court holding requires the Court to apply a standard other than deliberate indifference here; Defendants disagree. *Kingsley v. Hendrickson,* decided this year, concerned the standard for determining whether officers used excessive force, violating the constitutional rights of a pre-trial detainee. *See Kingsley v. Hendrickson,* ––– U.S. ––––, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015). The Court concluded that-unlike a prisoner after conviction, who must show that an officer subjectively knew that the force used was excessive to obtain Eighth-Amendment relief-"a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable" to prevail under the due process clause. *Id.* at 426. The crucial distinction for the Court was the nature of the detainee's claims: they were Fourteenth Amendment Due Process claims, as opposed to the Eighth Amendment cruel and unusual punishment claims convicted prisoners bring in the excessive force context. *Id.* at 428–429. The Court did not need to determine under the circumstances whether a "punishment [was] unconstitutional," and thus an objective standard could apply. *Id.* at 429. Plaintiff asserts that a similar, less demanding, standard should apply to medical treatment claims. He points to no case law that establishes this standard, but instead contends that the Supreme Court's determination that a clear distinction exists between Eighth Amendment and Fourteenth Amendment Due Process claims mandates that a new standard be applied because prisoners are subject to punishment and detainees are not. A case cited by the Plaintiff, *Turkmen v. Hasty,* No. 13–1002, 2015 U.S.App. LEXIS 10160 at *77 n. 34, 2015 WL 3756331 (2d Cir. June 17, 2015), noted that the "deliberate indifference" applied to both prisoners and pre-trial detainees, but declined to address whether "civil immigration detainees should be governed by an even more protective standard than pretrial criminal detainees." *Turkmen* was decided a year before *Kingsley*. The Court is unconvinced that *Kingsley* mandates a different standard for immigration detainees than for pre-trial detainees. *Kingsley* did not address that question, and could not have, since the detainee alleging excessive force in that case was "detained in jail prior to trial [.]" *Kingsley,* 192 L.Ed.2d at 423. Thus, the question for the Court in *Kinglsey* was how (and whether) to distinguish between excessive-force claims brought under the Eighth and Fourteenth Amendments, not the general standard to be applied to constitutional claims brought by immigration detainees. As explained above, the Second Circuit has already answered the question of whether the deliberate indifference standard applies to pre-trial detainees asserting medical claims and concluded that it does. Nothing in *Kingsley* undermines that holding. Moreover, the Second Circuit in *Turkmen* did not decide that civil immigration status disrupted the deliberate indifference standard, and the Court sees no reason to abandon a standard that Courts have determined applies to persons in detention, whether convicted of a crime and thus subject to punishment or held prior to trial, and thus eligible for more extensive protection. The deliberate indifference standard recognizes the unique demands for health care in jails, and the same logic that would apply that standard to pre-trial detainees counsels that the standard apply to civil immigration detainees like the Decedent. In any case, the Court concludes that Plaintiff may prevail under the deliberate indifference standard. The Court will of course permit the parties to argue about the proper standard before trial-any changes in the controlling law should be argued by the parties in proposing jury instructions.

6    The parties have not adequately briefed the issue of whether qualified immunity applies to Dr. Depner, a private physician working under a contract that made him prison medical director, at least at some points in his service. A question therefore might exist as to whether qualified immunity is even a possibility in this context. Courts are clear that "private actors are not *automatically* immune (*i.e.,* § 1983 immunity does not automatically follow § 1983 liaiblity) [.]" *Richardson v. McKnight,* 521 U.S. 399, 412, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997). Courts have found that immunity may be available for a private actor subject to liability under Section 1983 when granting immunity comports with "general principles of tort immunities and defenses applicable at common law, and the reasons [the Supreme Court has] afforded protection from suit under § 1983." *Filarsky v. Delia,* ––– U.S. ––––, ––––, 132 S.Ct. 1657, 1662, 182 L.Ed.2d 662 (2012). In determining whether immunity is available to private persons fulfilling a governmental role, then, the Court is "to look both to history

and to the purposes that underlie government employee immunity in order to find the answer." *Richardson,* 521 U.S. at 404. As the Sixth Circuit has described this test, the Court must "determine whether: (1) there was a firmly rooted history of immunity for similarly situated parties at common law; and (2) whether granting immunity would be consistent with the history and purpose of § 1983." *McCullum v. Tepe,* 693 F.3d 696, 700 (6th Cir.2012). Applying that standard, the Sixth Circuit determined that a prison psychologist employed by a private company could not claim qualified immunity in a case where he failed to provide any treatment to a patient who committed suicide. *Id.* at 704. The court found that "there does not appear to be any history of immunity for a private doctor working for the government, and the policies that animate our qualified-immunity cases do not justify our creating an immunity unknown to the common law." *Id.; see also, Tewksbury v. Dowling,* 169 F.Supp.2d 103, 114–15 (E.D.N.Y.2001) (defendants, private physicians who ordered plaintiff's civil confinement, were not entitled to qualified immunity). The Court finds that, to the extent that Dr. Depner operated as a private physician working for the prison, he could not claim qualified immunity. The authority cited by the Court in *McCullum* in holding that private physicians working for the government did not traditionally enjoy any immunity from suit is persuasive. Moreover, the policy elements to be examined by the Court-whether immunity would serve the goals of " '(1) protecting the public from unwarranted timidity on the part of public officials'; (2) 'ensur[ing] that talented candidates were not deterred by the threat of damages suits from entering public service'; and (3) guarding against the distraction from job duties that lawsuits inevitably create-weighs against finding immunity applies. *McCullum,* 693 F.3d at 704 (quoting *Richardson,* 521 U.S. at 408, 411). As with other private prison employees, Dr. Depner's position as a private provider mitigates concerns about potential liability in ways not present for other public employees. *See Richardson,* 521 U.S. at 410. The parties did not fully develop this argument, and Defendant appears to offer no reply on the qualified immunity issue. In any case, as explained above, even when considered, qualified immunity is unavailable.

7    The facts are taken from the statement of material facts filed by the moving Defendants. The Court will cite to that statement for facts that are undisputed. The Court will reference the Plaintiff's response to address facts which are disputed.

8    Plaintiff's Response to Defendants' Statement of Material Facts contains numerous additional facts, supported with citations to the record. The Court has considered those portions of the record cited by the Plaintiff and will relate those facts as appropriate in rendering a decision on Defendants' motion.

9    Defendants' citation to *Mayo v. County of Albany,* 357 Fed. Appx. 339 (2d Cir.2009) is instructive. Defendants claim that in that case the court dismissed "plaintiff's breach of contract claim alleging that defendants failed to provide appropriate medical care in jail." The Second Circuit surely came to the conclusion that the plaintiff could not bring a breach-of-contract claim and that plaintiff could not prevail on his claims of deliberate indifference pursuant to 42 U.S.C. § 1983 and negligence under state law. *Id.* at 340–343. With regard to the plaintiff's contract claim, the court found that "[s]ince the Court has already determined that defendants were neither deliberately indifferent nor negligent in the standard of care provided to [plaintiff], we accordingly cannot find that there was a breach of contract due to defendants' alleged failure to provide appropriate care for the reasons stated above." *Id.* at 343. In other words, the Court of Appeals, contrary to Defendants' implication, did not find that the plaintiff had no right to enforce the contract as a third-party beneficiary. Instead, the court found that the plaintiff had no evidence to prove that the defendant breached the contract. Indeed, the court ruled explicitly that "[I]t is not disputed that a contract existed between the County of Albany and CMS for the latter to provide medical services to prisons and pretrial detainees. Nor is it disputed that [plaintiff] was the intended beneficiary of the contract." *Id.*

10   The Court will state the facts relevant to the motion as raised in the parties' statements of material facts, filed as required by the local rules. The Court will cite to the Defendants' statement for facts which are uncontested, and will note those facts which are contested by the Plaintiff. The Court will endeavor to avoid repeating facts already related above and will instead focus on those specifically relevant to the instant motion.

11   Corizon has filed its own motion for summary judgment.

12   Dr. Haider–Shah has filed his own motion for summary judgment.

13   CMS contracted with the County to provide medical care at the ACCF in December 2006. (Albany Defendants' Statement at ¶ 54). The parties later extended this contract to run from January 1, 2009 to December 31, 2009, and then again from January 1, 2010 to December 31, 2010 and January 1, 2011 to December 31, 2011. (*Id.* at ¶ 56). On June 3, 2011, CMS and Prison Health Services merged to form Defendant Corizon, Inc. (*Id.* at ¶ 58). "As such, Corizon was the vendor performing health services at ACCF in July 2011[.]" (*Id.*).

14   The Court notes that Defendants' argument here is similar to that raised by Defendants Ralyea and Harrington, discussed above. The argument here fails for the same reasons as those explained above, in addition to the reasons stated here.

**15** For reasons that will become clear, the Court will not address separately each element of the Defendants' motion. The Court finds that Plaintiff has produced evidence sufficient to support a claim that Defendants' conduct amounted to deliberate indifference to a serious medical need, which is sufficient to support a 14th Amendment cause of action. The Court's opinion in this respect will largely address that evidence. Most of Defendants' argument address specific evidentiary matters-such as whether Defendants' prison policies complied with New York regulations and statutory law-that are not conclusive as to deliberate indifference.

**16** Defendants' argument appears to some extent to be that, because Defendants' policies complied with state law and a national standard, they cannot have violated Decedent's constitutional rights. Defendants cite to only one case to support this proposition: *Mayo v. County of Albany,* 367 Fed. Appx. 339 (2d Cir.2009), quoting a portion of the opinion that concludes that the National Commission on Correctional Health Care's standards " 'which,' " according to the Defendants, are " 'understood to represent the applicable standard of care for inmates.' " *Id.* at 343 n. 3. That portion of the opinion, however, does not address any constitutional standard, but instead evaluates the issue of whether the defendants in *Mayo* could be found negligent for failing to prevent a suicide attempt. *Id.* at 342–43. The Circuit Court found that "we cannot find that [the inmate's] suicide attempt was a reasonably foreseeable consequence of defendants' actions, and we accordingly cannot find that defendants were negligent." *Id.* at 342. The citation provided by the Defendants here is a footnote (which Defendants do not acknowledge) to the Court's finding that "none of the tools employed indicated that [the inmate] posed a suicide risk;" which itself was one of five pieces of evidence that showed a lack of foreseeability. *Id.* Defendants here ask the Court to conclude that a footnote to a case not published in the official reporter addressing proof of negligence mandates a finding of no deliberate indifference if any evidence shows Defendants followed NCCHC standards. That is not the holding of *Mayo,* and, as explained *infra,* is not the standard to be applied in this case. The question here is whether Plaintiff has evidence a jury could use to find Defendants liable, not whether any evidence exists to support a defense to negligence claims.

**17** Defendants offer a good deal of argument concerning staffing levels, citing to New York law to argue that the medical staff at the ACCF was adequate. Plaintiff's claims about staffing, however, appear to be confined to the cut-back in Dr. Haider–Shah's hours, and Plaintiff does not point to any other incidents of inadequate staffing in their argument. Likewise, Plaintiff points to inadequacies in policies guiding the examination and treatment of chronically ill inmates, but does not specifically argue that training was inadequate. These claims are more specifically related to policies and procedures than training, and Plaintiff has not pointed to any evidence of inadequate training per se. The relevance of any evidence on these issues is one for trial, not this motion.

**18** Defendants additionally contend that Sheriff Apple cannot be liable, using arguments similar to those offered by the Allegany County Defendants concerning Sheriff Witney. The same rules apply here. Unlike the Allegany Defendants, the Defendants here have not argued that Sheriff Apple had no role in designing and implementing policies with respect to medical care at the jail, and thus have not argued that he could not be liable based on that role. The jury will have to decide that issue. Defendants do argue that Sheriff Apple cannot be liable for any unconstitutional acts by the Corizon Defendants because Sheriff Apple had "no actual or constructive notice of any unconstitutional acts on the part of the medical staff and deliberately failed to take corrective action." (Defendants' Brief, dkt. # 307–1, at 21). The Court agrees that no evidence indicates that Sheriff Apple played any role in directly supervising the medical staff and he could not be liable on that basis. Liability for Sheriff Apple will be dependent on the Plaintiff convincing the jury that Sheriff Apple was responsible for "creation of a policy or custom fostering the unlawful conduct[.]" *Hayut,* 352 F.3d at 753. Defendants also argue that Superintendent Wigger likewise played no role in any violation of Decedent's rights. As Wigger is not a Defendant, this is of no matter.

**19** Defendants' brief also contains sections that address alleged negligence clams against the County of Albany and violations of New York Corrections Law § 500. *See* dkt. # 307–1 at 28–29. Both these sections are addressed to the question of violations of Decedent's constitutional rights, however. As the Court has determined that evidence supports Plaintiff's claims that Decedent's rights were violated, the Court will not address these arguments, which simply point to other ways of proving those violations. The Court takes no position on whether Defendants could raise those arguments at trial.

**20** To avoid repetition, the Court will recite only the facts directly and uniquely relevant to deciding the Corizon Defendants' motion.

**21** Corizon points to the Medication Administration Record ("MAR") completed at the ACCF concerning Bamenga. *See* Dkt. # 309–32 at 3–5. That MAR states that Bamenga received her morning medications on July 21, and a health-care provider initialed the record to show that she received them. The record does not explain, however, when these medications were administered, and, given that the medications were ordered for the morning, when Bamenga had not yet arrived at the

ACCF, a jury could conclude Defendants' claims that she did take the medications in the morning are mere speculation unsupported by any actual evidence.

22 The parties in this case dispute the accuracy and admissibility of translations. Those translations are not dispositive to the instant motions. The parties may choose to raise such issue at an appropriate point later in the proceedings.

23 Defendants supply numerous additional material facts related to the individual Defendants and their training and experience, as well as their roles in the treatment of the Decedent. The Court will relate these facts as necessary in deciding the motion as it relates to those Defendants.

24 The Corizon Defendants have objected to the Court's consideration of two of the Plaintiff's expert reports, those of Robert Cohen, M.D., and Monika Pilichowska, M.D. *See* dkt. # 352. Plaintiff wrote the Court on January 3, 2015, after filing responses to the motions for summary judgment, to request permission to file two affidavits related to those reports. *See* dkt. # 351. Plaintiff contended that the affidavits were not substantive and pertained to copies of reports put into the record as part of the Defendants' summary judgment motions. *Id.* The Corizon Defendants objected to the Court's accepting such affidavits, arguing that Federal Rule of Civil Procedure 56(c)(4) makes inadmissible an unsworn expert report. *See* FED. R. CIV. P. 56(c) (4) (stating that "An affidavit or declared used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). The Court will consider the reports. While the Plaintiff agreed that the expert reports had to be sworn to be considered, Plaintiff provided affidavits to comply with that requirement. Moreover, the reports were already part of the record. Defendants' objection is simply that counsel had "already begun preparing my reply affidavit under the assumption that affidavits by Dr. Cohen and Dr. Pilchoswka would not be submitted in support of plaintiff's opposition. The Court notes that this objection does not assert that Counsel was unaware of the reports. Indeed, Defendants' moving papers include as exhibits the expert reports of Dr. Cohen and Dr. Pilichowska and the transcripts of their depositions.. *See* Declaration of Molly C. Casey, dkt. # 308–1. Moreover, the affidavits submitted do not alter the reports in any way, but simply affirm that the reports were prepared by the experts and represent their opinions. *See* dkt. s 367, 368. Defendants' arguments that they were somehow prejudiced by the late filing of affidavits is wholly unconvincing. The Court finds that the Defendants suffered no prejudice from the Plaintiff's late filing of affidavits related to the Cohen and Pilichowska reports. Defendants also argue that all of Plaintiff's expert reports are inadmissible because the experts' deposition testimony was inconsistent with their reports. They claim that the expert reports amount to evidence which his inadmissible under the "sham affidavit" doctrine, "which prohibits a party from defeating summary judgment simply by submitting an affidavit that contracts the party's previous sworn testimony." *Secrest v. Merck, Sharp & Dohme Corp.,* 707 F.3d 189, 193 (2d Cir.2013). The experts' depositions occurred after they authored reports and it is unclear that the doctrine would apply under those circumstances. The affidavits in question provide only a certification that the experts authored the attached reports. In any case, "a sham issue of fact exists only when the contradictions in the expert witness's testimony are inescapable and unequivocal[.]" *Id.* at 194. Defendants state that "[d]ue to space constraints, defendants are unable to provide a comprehensive list of contradictory testimony[,] however, specific examples are contained throughout this Reply." Dkt. # 398 at 3. The Court has examined both the expert reports and the experts' deposition testimony. The Court finds that any contradictions between the report and testimony are not so inescapable and unequivocal that the reports must be rejected altogether. Defendants will certainly have an opportunity to expose any flaws in the experts' reports or in their testimony at trial. The jury will ultimately decide which evidence is believable and persuasive.

25 Defendants also argue that Dr. Haider–Shah could not be liable for any constitutional violation in his capacity as a supervisory official at the jail. Defendants are correct that "a defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority." *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Instead, a plaintiff must demonstrate "personal involvement" in the violation, which can "mean direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates." *Id.* Liability can also occur when a supervisory official has " 'exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.' " *Vincent v. Yelic,* 718 F.3d 157, 173 (2d Cir.2013) (quoting *Colon v. Coughlin,* 58 F.3d 865, 873 (2d cir.1995)). The Court has already found that evidence supports a conclusion that Dr. Haider–Shah was personally involved in the constitutional violation, as he acted in a fashion deliberately indifferent to a serious medical need, and that summary judgment in his favor is unwarranted. *See Provost v. City of Newburgh,* 262 F.3d 146, 155 (2d Cir.2001) (defining " 'direct participation [as] personal participation by one who has knowledge."). Plaintiff has therefore produced evidence to avoid summary judgment on this claim. Addressing Defendants' additional arguments is unnecessary at this point.

26    Defendants also argue that no Corizon Defendant can be held liable for violating any statute. They contend that none of the statutes mentioned in the Plaintiff's Complaint apply to them. Even if they did, the Defendants contend that no evidence would support any claims against them under those statutes. The question here is whether Defendants violated Decedent's constitutional rights or committed medical malpractice. Whether Defendants violated any laws or regulations does not answer that question.

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Breland v. Goord, Not Reported in F.Supp. (1997)

1997 WL 139533

1997 WL 139533
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Vincent BRELAND, Plaintiff,

v.

Glenn J. GOORD, Deputy Commissioner of the
New York State Department of Correctional
Services; Lt. Allen Cave, Officer Michael Ryals
and Officer Jose Cruz, all in their official
and individual capacities; and the New York
Department of Correctional Services, Defendants.

No. 94 CIV. 3696(HB).
|
March 27, 1997.

*OPINION AND ORDER*

BAER, District Judge.

**\*1** Plaintiff Vincent Breland, an inmate in the custody
of defendant New York State Department of Correctional
Services ("DOCS"), brings this action seeking declaratory
and injunctive relief and money damages, alleging that
defendants violated his constitutional rights to freedom
of speech, freedom of association and free exercise of
religion and his rights under the Religious Freedom
Restoration Act ("RFRA") when his Five Percenter
Nation of Islam literature was confiscated and destroyed.
Defendants have moved for summary judgment and
plaintiff has cross-moved for summary judgment on his
RFRA claim. For the reasons stated below, defendants'
motion is GRANTED as to the qualified immunity of
defendants, and DENIED as it relates to plaintiff's claims
for declaratory and injunctive relief. Plaintiff's cross-
motion for summary judgment is DENIED.

I. Factual Background

A. The Confiscation
Plaintiff was incarcerated at the Fishkill Correctional
Facility ("Fishkill") in January, 1994 when the events
complained of occurred. On or about January 22, 1994,
plaintiff was moved from one unit to another. During
the move, defendant Michael Ryals conducted a search
of plaintiff's property and discovered certain literature

regarding the Five Percenter Nation of Islam ("Five
Percenter"). As discussed below, there is some dispute
among the parties as to the contents of the confiscated
literature. Defendant Ryals determined that the Five
Percenter material was contraband pursuant to a directive
issued by defendant Glenn Goord, then the Deputy
Commissioner of DOCS. See Memorandum from Glenn
S. Goord, Deputy Commissioner, to All Superintendents,
March 31, 1993, attached as Exh. 7 to affidavit of Allen
Cave in support of defendants' motion for summary
judgment (the "Goord Directive").

The Goord Directive states that "[i]t is ... imperative
that we do not allow unrecognized inmate groups or
organizations to flourish in our facilities." *Id.* at 2, and
provides:

> Symbols, flags, emblems, and any
> other items denoting groups or
> organizations (with the exception
> of *approved* religious articles), can
> and should, in most cases, be
> considered contraband pursuant to
> Rule # 113.23 in the Standards
> of Inmate Behavior. Written
> materials regarding unrecognized
> inmate groups or organizations
> within the system can and should
> be treated in the same fashion.
> These items should be confiscated
> pursuant to established procedures
> and appropriate action taken on
> a case by case basis through the
> disciplinary system.

*Id.* (emphasis added).

After he confiscated plaintiff's literature, defendant Ryals
issued an Inmate Misbehavior Report and charged
plaintiff with possession of contraband. Defendant Jose
Cruz signed the report as a witness. Subsequently, a
disciplinary hearing was held before defendant Allen
Cave, at which plaintiff was found guilty of possession of
contraband. Plaintiff was sentenced to 30 days "keeplock"
and 30 days loss of package, commissary and telephone,
but the sentence was suspended. Plaintiff requested that
the confiscated material be sent home to his mother.
This request was denied. The material was to have been
destroyed, but defendants have provided the Court with
27 pages of material they claim was contained in the

Breland v. Goord, Not Reported in F.Supp. (1997)

1997 WL 139533

69 pages of confiscated literature. See Reply affidavit of Michael Ryals in further support of defendants' motion for summary judgment ("Ryals Reply Aff. ") at ¶ 2.

**B. The Confiscated Literature**
**\*2** The content of the literature is disputed. Plaintiff alleges that the confiscated material consisted of the *Book of Lessons,* a book setting forth the principles and laws of the Five Percenters. *See* Affidavit of Vincent Breland in opposition to defendants' motion for summary judgment ("Breland Aff.") at ¶ 1.d. Defendants disagree. Defendant Ryals, who confiscated the material, asserts that the *Book of Lessons* was not among the materials confiscated. *See* Ryals Reply Aff. at ¶ 3. Furthermore, he contends that 27 pages of newly-found material titled *Allah's News,* found "in a cabinet in the Captain's office containing gang-related material" and not destroyed, was part of the 69 pages of confiscated literature. *Id.* at ¶ 2.

Both sides misrepresent the content of the material in their submissions.[1] Defendant Ryals states that "he skimmed through plaintiff's Five Percenters material and saw that it contained language such as 'kill the White devils and their families.' " Affidavit of Michael Ryals in support of defendants' motion for summary judgment ("Ryals Aff.") at ¶ 2. Clearly, no such language is contained in the 27 pages of material that was allegedly later "found" in the captain's cabinet. *See Allah's News,* attached as Exh. 1 to Ryals Reply Aff. (*"Allah's News"* ). Furthermore, plaintiff denies that the material contained any such language. *See* Breland Aff. at ¶ 1.p.

There is no dispute that the material does make reference to "devils." Defendants, as noted above, state that the literature incites violence against white persons who are depicted as devils. Plaintiff, by contrast, states that any reference to "devils" in the *Book of Lessons,* a copy of which was submitted along with plaintiff's papers, refers to the "vices of hate, lust, greed and envy." Breland Aff. at ¶ 1.q. As usual, the truth lies somewhere in the middle. Nowhere does any of the material submitted state that white devils should be killed. The material does, however, refer to caucasians as devils. *See Book of Lessons* at 3, 7 ("The colored man or caucasian is the devil."). It also speaks of the day when "the Gods take the devil into the hell" and "the day, when Allah ... takes the devil off our planet." *Id.* at 18.

Defendants also note the 27 pages of *Allah's News* include the language: "we've experienced the trials and tribulations of his prison houses and we must now struggle to get out of his prison houses ...," and contend that such language is an incitement to escape. Defendants' reply memorandum of law in further support of their motion for summary judgment at 10. Defendants, however, omit the text that immediately follows the above-quoted language: "and remove the veil he has placed over our people's minds. This can only be done through education, i.e., proper education." *Allah's News* at 9. When read in context, the focus is on education, not incitement to escape.

**II. Discussion**
**\*3** Plaintiff alleges that defendants' actions violated his First Amendment rights to freedom of association, freedom of speech and free exercise of religion and also violated his free exercise rights under RFRA. Defendants have moved for summary judgment on all of plaintiff's claims and plaintiff has cross-moved for summary judgment on the RFRA claim.

**A. Constitutional Claims**

**1. Applicable Standard**
The courts have long recognized that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). At the same time, prisoners are subject to restrictions. A prison regulation that infringes upon an inmate's constitutional rights is valid if the regulation is reasonably related to legitimate penological objectives. *Id.* at 87 (freedom of speech); *see also O'Lone v. Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (applying reasonably related test to free exercise claims).

To determine whether a particular regulation is rationally related to a legitimate penological objective, courts apply a three-prong test. First, there must be a rational connection between the regulation and the legitimate interest put forward. "A regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational" and the government objective being advanced must be "legitimate and neutral ... without regard to content of expression." *Turner,* 482 U.S. at 89.

Breland v. Goord, Not Reported in F.Supp. (1997)

1997 WL 139533

Second, courts consider whether alternative means exist of exercising the right in question. *Id.* at 90. In making this determination, courts view the right in question "sensibly and expansively." *Thornburgh v. Abbott,* 490 U.S. 401, 417, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); *Giano v. Senkowski,* 54 F.3d 1050, 1055 (2d Cir.1995). Third, courts must consider the impact that accommodation of the inmate's rights will have on guards, other inmates and prison resources. *Turner,* 482 U.S. at 90. In addition, the existence of ready alternatives to the regulation at issue is evidence of reasonableness, while the lack of such ready alternatives is evidence of an exaggerated response by prison officials. *Id.* at 90. The burden is on the plaintiff to demonstrate the unreasonableness of the regulation at issue. *Giano,* 54 F.3d at 1054.

In making the determination as to whether a particular regulation is rationally related to a legitimate penological interest, courts must "accord substantial deference to the informed judgment of prison officials on matters of prison administration." *Id.* at 1055. "However, defendants cannot merely brandish the words 'security' and 'safety' and expect that their actions will automatically be deemed constitutionally permissible conduct." *Campos v. Coughlin,* 854 F.Supp. 194, 207 (S.D.N.Y.1994). There must be some showing by defendants that the regulation does promote the claimed penological objective.

2. Constitutionality of the Goord Directive

**\*4** Defendants assert that the Goord Directive and the confiscation of plaintiff's materials are rationally related to the objective of prison safety and security. There is no question that prison safety and security are legitimate penological objectives. *Giano,* 54 F.3d at 1054. The issue is whether the Goord Directive, as applied to plaintiff's allegedly religious literature, is rationally related to safety and security.

Before reaching the *Turner* test outlined above, the Court must address defendants' contention that Five Percenters are not a religion and that plaintiff therefore is not entitled to any free exercise protections. Defendants make much of the fact that Five Percenters are different from traditional religions in that they allegedly do not believe in an afterlife, do not seek the betterment of society and do not have an organized church hierarchy as do "traditional" religions. Defendants' memorandum of law in further support of their motion for summary judgment at 3–4 n. 2. Such facts are irrelevant to the determination of whether Five

Percenters are a religion for constitutional purposes. The First Amendment's free exercise clause was meant to protect all religious beliefs—both traditional and non-traditional—and to inhibit our government from coming to the judgment urged by defendants. Because of the inappropriateness of government—or the courts—passing on the wisdom or legitimacy of particular religious beliefs, "the judiciary has but a limited function ... in determining whether beliefs are to be accorded free exercise protection. Our scrutiny extends only to whether a claimant sincerely holds a belief and whether the belief is religious in nature." *Jolly v. Coughlin,* 76 F.3d 468, 476 (2d Cir.1996); see also *International Society for Krishna Consciousness, Inc. v. Barber,* 650 F.2d 430, 439–40 (2d Cir.1981) (determination of whether belief is religious in nature focuses on sincerity of belief and role it plays in plaintiff's life).

The question of what constitutes a religion is thus particularly ill-suited to determination on summary judgment. *Patrick v. Lefevre,* 745 F.2d 153, 158 (2d Cir.1984). In *Patrick,* the district court had granted summary judgment to defendants on the basis that Five Percenters did not constitute a religion. The Second Circuit reversed, noting that the First Amendment encompasses an "expansive conception of religious belief" and that the subjective nature of the "religion" determination precludes summary judgment. *Id.* at 158–59; *see also Ramirez v. Coughlin,* 919 F.Supp. 617, 621 (N.D.N.Y.1996) (denying defendants' request for summary judgment on grounds that Satanism is not a religion). Here, plaintiff has asserted that according to his beliefs, he is required to study the *Book of Lessons* on a daily basis. Breland Aff. at ¶ 1.g. Accordingly, defendants' contention that Five Percenters are not a religion must be rejected. *Cf. Allah v. Beyer,* Civ. No. 92–0651, 1994 WL 549614 (D.N.J. March 29, 1994) (treating Five Percenters as a religion without addressing the issue).

**\*5** Turning to an application of the *Turner* standards, the Court finds that summary judgment is inappropriate on plaintiff's constitutional claims [2] Defendants have put forth much evidence regarding the alleged relationship between Five Percenters and prison violence. This evidence consists of affidavits from prison administrators, copies of protective custody incident reports involving inmates identified as Five Percenters, and copies of voluntary inmate requests for protective custody based on fear of retaliation by Five Percenters. These submissions certainly create the impression that inmates associated

Breland v. Goord, Not Reported in F.Supp. (1997)

1997 WL 139533

with Five Percenters have been involved in violent disturbances and that some inmates are afraid of other inmates identified as Five Percenters. They also establish that prison administrators believe that unauthorized inmate groups that advocate violence pose a threat to prison safety and security.

What defendants' evidence fails to establish, however, is any link between the materials at issue in this case and the violent incidents described in the incident reports. The mere fact that inmates identified as Five Percenters have been involved in altercations with other inmates and guards does not establish that the literature at issue here caused these disturbances. Defendants have submitted affidavits alleging that literature from unauthorized inmate groups such as the Five Percenters "oftentimes advocate[s] subversive and/or hate-mongering philosophies" and that "the literature is often reproduced and disseminated to other inmates who may be persuaded to adhere to the violent philosophies in such literature," affidavit of George Bartlett in further support of defendants' motion for summary judgment ("Bartlett Aff.") at ¶ 3. The facts as presented here, however, fail in any way, shape or form to tie the literature in the motion papers to such allegations.

Other courts have held that broad bans on publications such as the Goord directive—which operates to prohibit all Five Percenter literature regardless of whether it incites violence—are unconstitutional. Thus, for example, in upholding a Bureau of Prison regulation authorizing wardens to reject publications found to be detrimental to prison security, the Supreme Court noted that its decision was based in part on the fact that the federal regulation provided for review of each publication at issue. *Thornburgh v. Abbott,* 490 U.S. 401, 416, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) ("We are comforted by the individualized nature of the determinations required by the regulation."); *see also Murphy v. Missouri Dep't of Corrections,* 814 F.2d 1252, 1256 (8th Cir.1987) ("a total ban is too restrictive a mail censorship policy"); *Wiggins v. Sargent,* 753 F.2d 663, 668 (8th Cir.1985) ("Clearly, a total ban on all literature concerning the churches would be overbroad. On the other hand, materials which advocate violence may properly be excluded.").

As for the second *Turner* factor, whether alternative means exist for exercising the right in question, the Court finds that this too is a question of fact that must

be resolved at trial. *Cromwell v. Coughlin,* 773 F.Supp. 606, 611–12 (S.D.N.Y.1991). Defendants' contend that plaintiff has alternative means of exercising his rights by reading the materials of other, recognized, inmate groups. In support of this contention, defendants cite *Nogueras v. Coughlin,* No. 94 civ. 4094(JSM), 1996 WL 487951 at *3 (S.D.N.Y. Aug.27, 1996), in which the court upheld the Goord directive as applied to literature of the Latin King gang. Defendants' reliance on *Nogueras* reflects their misconception of the Five Percenters and their attempt to portray the Five Percenters as a gang. Because the Latin Kings, unlike Five Percenters, are not a religion, *Nogueras* did not involve allegations of free exercise of religion. Although the right in question is to be viewed flexibly when considering possible alternative means of exercising it, defendants' argument stretches this concept too far. The Supreme Court has recognized that in free exercise cases the proper test to be applied is whether the plaintiff has opportunities to participate in other activities and practices of *his* religion. *See Thornburgh,* 490 U.S. at 418; *O'Lone,* 482 U.S. at 352. In light of the dearth of any evidence regarding alternative means for plaintiff to practice the Five Percenter religion, summary judgment must be denied on this score as well.

**\*6** The Court also finds that questions of fact exist as to the final *Turner* prong—what effect accommodation of plaintiff would have on the prison—and the related inquiry as to whether easy alternatives exist to a total ban of the literature. Defendants have submitted affidavits indicating that allowing plaintiff to keep the material would lead to its broad dissemination and concomitant violence, and that the alternatives proposed by plaintiff —limiting the material in question to inmates' cells or a special room—would be prohibitively expensive and ineffective. This determination too turns on issues of fact which must be resolved at trial.

Finally, the Court notes its concern with defendants' arguments. As noted above, defendants have unfairly characterized the material at issue and unfortunately focused on the non-traditional nature of plaintiff's religion:

> The inclination to silence expression in the context of prisons is an enduring tendency which history and experience teaches is pervasive and recurrent.... Case history is replete with

Breland v. Goord, Not Reported in F.Supp. (1997)

1997 WL 139533

examples of correctional officials banning publications which do not advocate criminal behavior or prison disruption, are not obscene, and do not instruct bomb-building, liquor-brewing, lock-picking, escape-planning, or other clandestine activities which would be injurious to a prison's security and safety. Instead, the censored materials have expressed points of view of religious minorities, people of color and political third parties....

*Nichols v. Nix,* 810 F.Supp. 1448, 1461–62 (S.D.Iowa 1993) (footnote omitted), *aff'd,* 16 F.3d 1228 (8th Cir.1994).

B. The Religious Freedom Restoration Act
Plaintiff has cross-moved for summary judgment on his free exercise claim under RFRA, 42 U.S.C. §§ 2000bb *et seq.* RFRA provides that if a government regulation substantially burdens the exercise of religion, the regulation must further a compelling government interest and be the least restrictive means of furthering that interest. 42 U.S.C. § 2000bb–1(b); *Jolly,* 76 F.3d at 475. There is no question that RFRA applies in the prison context. *Id.*

In order to trigger RFRA, plaintiff must show that the regulation at issue substantially burdens the exercise of his religion. "To impose a substantial burden, government interference must be more than an inconvenience. The interference must burden a belief central to plaintiff's religious doctrine." *Alameen v. Coughlin,* 892 F.Supp. 440, 448 (E.D.N.Y.1995). Plaintiff has asserted that he is a member of the Five Percenters and that the teachings of the Five Percenters require daily study of various texts, including the *Book of Lessons.* Breland Aff. at ¶¶ 1.e & 1.g. Although these contention have not been challenged by the defendants,[3] the Court cannot on this record—without additional information—determine that confiscation of plaintiff's literature constitutes a significant burden on the exercise of his religion.

*7 Furthermore, as discussed above, defendants have submitted considerable evidence raising an issue of fact as to whether the confiscation of plaintiff's literature furthered the government's compelling interest in security

and whether it is the least restrictive means available to achieve this goal. Accordingly, summary judgment on plaintiff's RFRA claim is denied.

C. Qualified Immunity
Defendants also move for summary judgment on the ground that they are entitled to qualified immunity. Government officials "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "To determine whether a particular right was clearly established at the time the defendants acted, a court should consider: (1) whether the right in question was defamed with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993). In this Circuit, qualified immunity applies either if "it was not clear ... that the interest asserted by the plaintiff was protected by a federal statute or the Constitution; *or* ... it was objectively reasonable for [the official] to believe that his acts did not violate those rights." *Gittens v. LeFevre,* 891 F.2d 38, 42 (2d Cir.1989) (emphasis added).

The determination of whether the conduct of defendants violated a clearly established right turns on how broadly or narrowly the right in question is defined. Thus, if the right is defined broadly as plaintiff's first amendment right to possess reading material of a religious nature, defendants' motion must be denied. On the other hand, if the right is defined more narrowly as the right to possess Five Percenter literature or the specific Five Percenter literature at issue here, defendants' motion must be granted.

In articulating the standard to be applied in determining the definition or scope of the right in question, the Second Circuit has held that "[t]he very action in question need not previously have been held unlawful, but the unlawfulness must be apparent in light of preexisting law." *Gittens,* 891 F.2d at 42. More recently, in *Soares v. State of Connecticut,* 8 F.3d 917 (2d Cir.1993), the court was faced with a lawsuit alleging a violation of plaintiff's constitutional rights because plaintiff had

Breland v. Goord, Not Reported in F.Supp. (1997)

1997 WL 139533

been handcuffed during his arrest. The court noted that "[w]hile the right to be free from excessive force is clearly established, the inquiry cannot stop at such a generalized level of fact." *Id.* at 922. The court went on to define the right narrowly: "In the present case, the right in question is the right not to be handcuffed in the situation presented to the arresting officers." *Id.* Similarly, in *Gittens, supra,* the court held that a regulation allowing prison authorities to hold an inmate in keeplock for seven days before a hearing was unconstitutional. Although it was "clearly established" that an inmate's due process rights are implicated by detention in keeplock without a hearing, the *Gittens* court held that the defendants were entitled to qualified immunity because no case had previously held that seven days was an unreasonable period of time to be held without a hearing. *Id.* at 42; *see also Green v. Bauvi,* 46 F.3d 189, 195 (2d Cir.1995) (although right to hearing within reasonable time was clearly established, qualified immunity granted because no caselaw had articulated maximum amount of time before hearing). In all of these cases, the Circuit defined the right in question narrowly. "[T]he inquiry is not whether plaintiff has alleged a violation of an abstract legal standard, but whether *under the particular circumstances alleged,* defendants could have reasonably believed that they did not violate plaintiff's constitutional rights." *Gittens,* 891 F.2d at 42 (emphasis added).

**\*8** Clearly plaintiff's right to possess religious material not incompatible with prison security was established at the time of defendants' actions. Further, as early as 1967 defendants knew or should have known that punishment could not be imposed for its possession. *Mukmuk v. Commissioner of Dep't of Correctional Servs.,* 529 F.2d 272, 275 (2d. Cir.1976) [4]. Equally clearly, the right to possess this particular material, i.e. Five Percenter material, has never been the subject of any Court decision. Neither the Supreme Court nor the Second Circuit, to my knowledge, has held that Five Percenters constitute a religion and no court has spoken to the constitutional protections to be afforded Five Percenter literature. Furthermore, no court, to my knowledge, has addressed the validity of defendants' assertions regarding the nexus between Five Percenter literature and prison security. While the claims here come perilously close to the line, the narrow and fact-specific manner in which this Circuit defines qualified immunity leads to the conclusion that defendants here did not violate a clearly established right of plaintiff's and they are entitled to qualified immunity.

This holding is supported further by the fact that defendants Cruz, Ryals and Cave were acting pursuant to the Goord Directive. While the history of this century has proven that obedience to duly promulgated orders and directives should not necessarily absolve individuals of responsibility for their actions, [5] the existence of the directive here adds fuel to the argument that it was reasonable for the defendants to believe that their actions were constitutionally permissible. The Second Circuit has noted that "even if compliance with the state's own regulations is insufficient to meet the requirements of [the First Amendment] adherence to such regulations may be pertinent in considering whether a reasonable official would have known his actions violated the Constitution." *Green,* 46 F.3d at 195. [6] Accordingly, the Court holds that "defendants could have reasonably believed that they did not violate plaintiff's constitutional rights," *Gittens,* 891 F.2d at 42, and that qualified immunity is appropriate.

Though neither party emphasizes the point, it is important to note that qualified immunity applies only to claims seeking money damages. *Ramirez,* 919 F.Supp. at 622; *cf. Gittens v. LeFevre,* 891 F.2d 38 (granting summary judgment to defendants on qualified immunity grounds and granting plaintiff injunctive relief); *Harlow,* 457 U.S. at 818 (government officials "shielded from liability for *civil damages* ") (emphasis added). [7] Accordingly, plaintiff's claims for equitable relief survive defendants' summary judgment motion.

### III. Conclusion

For the reasons stated above, defendants' motion for summary judgment is GRANTED as it relates to plaintiff's claims for money damages and DENIED as it relates to plaintiff's claims for equitable relief. Plaintiff's motion for summary judgment is DENIED. The case is set for trial beginning Friday, April 18, 1997. The Attorney General will promptly arrange for the plaintiff's writ and the writs for any appropriate witnesses. Since there was no demand for a jury trial and since equitable relief is the subject matter of the remaining prayers for relief the case will proceed without a jury.

**\*9** SO ORDERED.

**Breland v. Goord, Not Reported in F.Supp. (1997)**

1997 WL 139533

**All Citations**

Not Reported in F.Supp., 1997 WL 139533

---

Footnotes

1    Because the confiscated material was (at least partially) destroyed, it is impossible to know what it said. Accordingly, the Court is limited at this juncture to a review of the materials submitted by the parties. Furthermore, as to plaintiff's request for injunctive relief, it appears that plaintiff seeks only to be allowed to possess the *Book of Lessons.* That text then will be my focus in deciding whether to grant injunctive relief. Any incitement to violence contained in the other materials is only relevant to plaintiff's claims for money damages, which, as discussed below, are dismissed.

2    Because, as discussed below, the government must meet an even higher standard under RFRA, the denial of summary judgment with regard to plaintiff's constitutional claims means that summary judgment for defendants is *a fortiori* inappropriate with regard to plaintiff's RFRA claim.

3    Defendants have, as noted, disputed whether Five Percenters constitute a religion.

4    The *Mukmuk* court denied defendants' motion for summary judgment on the ground that the religious nature of the materials at issue was a question of fact. In light of more recent Second Circuit cases cited above, however, the Court is convinced that summary judgment is appropriate here.

5    Indeed, the law in some countries specifically provides that persons are not allowed to obey blatantly illegal orders. See Israel Criminal Law 1977 § 24(a) (obeying an order is defense to criminal charges except when order is blatantly illegal); *Offer v. Attorney General of Israeli Defense Forces,* App. No. 279–283/58, 44 P.S.M. 362, 410 (1958) (order to shoot innocent civilians is no defense to criminal charges because such an order is obviously and plainly illegal); *Eichman v. State of Israel,* Cr.App. No. 336/61, 16 P.D.2033 (1961).

6    This reasoning does not, of course, apply to defendant Goord, who promulgated the regulation at issue. An argument can be made that Goord, by promulgating the facially broad directive, did violate plaintiff's clearly established right. *See* discussion *supra* regarding the necessity for individualized review of materials. Nevertheless, in light of the Second Circuit's narrow definition of the right in question, qualified immunity is appropriate as to Goord as well.

7    Any claim for money damages from defendant DOCS is barred by the Eleventh Amendment. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 99–103, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Edelman v. Jordan,* 415 U.S. 651, 677, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (in "a § 1983 action [against a State or State agency] ... a federal court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief").

---

2014 WL 6982470
Only the Westlaw citation is currently available.
United States District Court, E.D. Virginia,
Norfolk Division.

PRISON LEGAL NEWS, a project of the
Human Rights Defense Center, Plaintiff,

v.

Ken STOLLE, Sheriff for Virginia
Beach, Virginia, et. al, Defendants.

Civil No. 2:13cv424.
|
Signed Dec. 8, 2014.

**Attorneys and Law Firms**

Jeffrey E. Fogel, Steven David Rosenfield, Charlottesville,
VA, Lance Theodore Weber, Lake Worth, FL, for
Plaintiff.

Jeff Wayne Rosen, Pender & Coward PC, Virginia Beach,
VA, for Defendants.

### OPINION AND ORDER

MARK S. DAVIS, District Judge.

**\*1** This matter is before the Court on a motion for
partial summary judgment filed by Prison Legal News, a
project of the Human Rights Defense Center, ("Plaintiff,"
or "PLN"), and a cross-motion for summary judgment
filed collectively by Ken Stolle, Sheriff for Virginia
Beach, Virginia ("Sheriff Stolle," or "the Sheriff"), and
the eight named defendant employees of the Virginia
Beach Sheriff's Office (collectively with the Sheriff,
"Defendants"). For the reasons set forth below, the
Court **TAKES UNDER ADVISEMENT** the parties' cross
motions for summary judgment as to the constitutionality
of Defendants' "sexually explicit materials" policy in
order to permit additional briefing on such subject.
As to the cross motions for summary judgment on
Defendants' "ordering form policy," Defendants' motion
is **GRANTED** and Plaintiff's motion is **DENIED.**
Additionally, the Court **GRANTS** Defendants' motion to
the extent Defendants invoke the doctrine of qualified
immunity. All other arguments in support of summary
judgment contained in the cross motions are **DENIED.**

### I. Factual and Procedural Background

PLN is the publisher of a monthly magazine titled "*Prison
Legal News,*" which includes articles and news about
various legal issues, access to courts, prison conditions,
mail censorship, prisoner litigation, visitation rights,
religious freedom, and prison rape, among other things.
ECF No. 36, at 1. Contained in the monthly *Prison Legal
News* magazine are advertisements from various vendors
selling adult oriented photographs, which are frequently
offered in two versions: "Nude" and "Non–Nude: Bureau
of Prisons Friendly." Some advertisements are text only,
some include various sized pictures of women in tight
clothing and/or miniskirts, and some include thumbnail
images of women or men wearing skimpy bathing suits
or lingerie or otherwise in a state of undress. None of
the images in *Prison Legal News* display nudity, but some
images do include women or men posed in overtly sexual
positions with a star shaped censor (hereinafter, "censor
star") strategically placed to avoid any technical nudity.
Although the censor star images avoid any technical
"nudity," the use of the star is plainly designed to be
suggestive by giving the impression that the woman or
man in the photograph is revealing their genital area, or
alternatively, that the woman is revealing her breasts.

In addition to the monthly *Prison Legal News* publication,
PLN also publishes and distributes books and periodicals
on issues related to the criminal justice and corrections
systems. *Id.* From 2012 through the present, PLN
advertised for many of these additional publications in
each monthly issue of *Prison Legal News* . Additionally,
PLN produces a stand-alone "informational packet"
designed to familiarize prisoners with various PLN
publications. It is undisputed that, during the time
period relevant to the instant litigation, all informational
packets, and all monthly issues of *Prison Legal News,*
that were sent to inmates at Virginia Beach Correctional
Center ("VBCC") included "ordering forms" with prices
advertising PLN's various written publications.

**\*2** Since April of 2012, neither the monthly *Prison
Legal News* magazine nor PLN's informational packet
have been permitted inside VBCC, which is operated
by Sheriff Stolle and the Virginia Beach Sheriff's Office
("VBSO"). According to Defendants, they have censored
issues of *Prison Legal News* "pursuant to VBSO policies

as PLN's magazines have contained sexually explicit pictures, which may be intended to arouse sexual desire, may be deemed offensive, and/or include scantily clothed persons." ECF No. 48, at 2–3. Defendants assert that a policy preventing sexually explicit materials from entering VBCC is necessary to advance jail security and protect the safety of both jail personnel and VBCC inmates.

Separately, Defendants assert that *Prison Legal News* is not permitted at VBCC because it contains "ordering forms," which are not permitted at VBCC. PLN's informational packets have likewise been excluded from VBCC because they contain ordering forms. Defendants assert in their summary judgment filings that the prohibition on ordering forms "protects the public and businesses from fraud" because "VBCC inmates do not have cash, credit cards, or funds available to order or purchase from outside vendors." *Id.* at 7.

On July 30, 2013, PLN filed the instant civil action in this Court challenging the "censorship of its monthly publication, books and other correspondence," and further asserting a violation of due process based on Defendants' alleged failure to both timely notify PLN of such censorship and to provide PLN a meaningful opportunity to challenge such censorship. ECF No. 1, ¶ 1. On March 26, 2014, PLN filed an amended complaint, which continues to assert unlawful censorship and due process violations. ECF No. 17. Defendants, who are all represented by the same counsel, oppose the relief sought in the amended complaint, and deny that they committed any constitutional violations. ECF Nos. 23, 28, 32.

In May of this year the parties attended a settlement conference conducted by a United States Magistrate Judge, but attempts at settlement were unsuccessful. PLN thereafter filed its motion for *partial* summary judgment. Defendants oppose Plaintiff's motion, and separately filed a cross motion seeking summary judgment as to all of Plaintiff's claims. Alternatively, Defendants seek a ruling that they are shielded by qualified immunity as to claims seeking monetary relief. The cross-motions for summary judgment are now fully briefed and ripe for review. [1]

## II. Standard of Review

The Federal Rules of Civil Procedure provide that a district court shall grant summary judgment in favor of a movant if such party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(a)*. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 247–48 (1986). A fact is "material" if it "might affect the outcome of the suit," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

**\*3** If a movant has properly advanced evidence supporting entry of summary judgment, the non-moving party may not rest upon the mere allegations of the pleadings, but instead must set forth specific facts in the form of exhibits, sworn statements, or other materials that illustrate a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24 (1986); *Fed.R.Civ.P. 56(c)*. At that point, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249. In doing so, the judge must construe the facts and all "justifiable inferences" in the light most favorable to the non-moving party, and the judge may not make credibility determinations. *Id.* at 255; *T–Mobile Northeast LLC v. City Council of City of Newport News, Va.,* 674 F.3d 380, 385 (4th Cir.2012).

When confronted with cross-motions for summary judgment, "the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir.2003) (internal quotation marks and citation omitted). As to each separate motion, the Court must separately resolve factual disputes and competing rational inferences in favor of the non-movant. *Id.*

## III. Discussion

### A. Legal Standard Governing Restrictions on Incoming Mail/Publications at a Prison/Jail

It is well-established that "the First Amendment plays an important, albeit somewhat limited, role in the prison context." *Montcalm Publ'g Corp. v. Beck,* 80 F.3d

105, 107 (4th Cir.1996). As described in detail in the Fourth Circuit's *Montcalm* opinion, the contours of the legal standard governing a jail's censorship of incoming and outgoing mail has changed over time. *Montcalm Publ'g,* 80 F.3d at 107–08. The standard now applicable to regulations that censor incoming publications was established by the United States Supreme Court in *Turner v. Safley,* 482 U.S. 78 (1987), and later expressly extended to incoming publications in *Thornburgh v. Abbott,* 490 U.S. 401, 413 (1989).

As explained by the Supreme Court in *Turner,* "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution"; however, the complexities of incarceration are such that "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner,* 482 U.S. 84–85. Accordingly, the *Turner* opinion "specifically rejected the application of [a] strict scrutiny" standard applicable to prison regulations that impinge on constitutional rights, adopting instead a four-part test "to guide the review process" that gives "deference to the judgments of prison administrators faced with difficult problems." *Montcalm Publ'g,* 80 F.3d at 108. Such test requires the Court to consider:

> **\*4** (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right ... remain open to prison inmates" ...; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns."

*Lovelace v. Lee,* 472 F.3d 174, 200 (4th Cir.2006) (quoting *Turner,* 482 U.S. 89–92) (first omission in original).

Further articulating the deference owed to prison administrators, the Fourth Circuit has repeated the Supreme Court's warning that " 'courts are ill equipped to deal with the increasingly urgent problems of prison administration.' " *Id.* at 199 (quoting *Procunier*

*v. Martinez,* 416 U.S. 396, 405 (1974), *overruled by Thornburgh,* 490 U.S. at 413–14). Accordingly, "courts must accord deference to the officials who run a prison, overseeing and coordinating its many aspects, including security, discipline, and general administration." *Id.; see In re Long Term Administrative Segregation of Inmates Designated as Five Percenters,* 174 F.3d 464, 469 (4th Cir.1999) (noting that "the evaluation of penological objectives is committed to the considered judgment of prison administrators, who are actually charged with and trained in the running of the particular institution under examination," and that "[w]hen a state correctional institution is involved, the deference of a federal court is even more appropriate") (internal quotation marks and citations omitted). Such deference is, in part, built into the *Turner* test as such test "is less restrictive than the test ordinarily applied to alleged infringements of fundamental constitutional rights." *Lovelace,* 472 F.3d at 200; *see United States v. Stotts,* 925 F.2d 83, 86 (4th Cir.1991) (describing the role of courts in this context as "one of caution").

In applying the *Turner* test, it is the party challenging the prison regulation that "bears the burden of showing that the [challenged] regulations ... are not reasonably related to legitimate penological objectives, or that they are an 'exaggerated response' to such concerns." *Prison Legal News v. Livingston,* 683 F.3d 201, 215 (5th Cir.2012) (citing *Overton v. Bazzetta,* 539 U.S. 126, 132 (2003); *Turner,* 482 U.S. at 87). Although such burden falls squarely on PLN in the instant case, Defendants are nevertheless required to articulate a rationale in support of the disputed polices such that the Court can perform a meaningful review of the policy under *Turner. Beard v. Banks,* 548 U.S. 521, 535 (2006) (plurality opinion); *see Van den Bosch v. Raemisch,* 658 F.3d 778, 786 (7th Cir.2011) ("While the burden of persuasion is on the [plaintiff] to disprove the validity of a [prison] regulation, defendants must still articulate their legitimate governmental interest in the regulation.") (citations omitted); *Livingston,* 683 F.3d at 215 (noting that in order for prison administrators to be "entitled to summary judgment, ... the record must be 'sufficient to demonstrate that the Policy is a reasonable one' " (quoting *Beard,* 548 U.S. at 533)).

### B. Parties' Summary Judgment Claims

**\*5** PLN's motion for partial summary judgment and supporting memoranda challenge Defendants' polices banning from VBCC "sexually explicit" photos or publications, which at VBCC extends not only to what is traditionally considered "pornography," but also to "any writings [or] pictures. which may be deemed offensive" as well as to "material dealing with or displaying ... scantily clothed persons." ECF No. 48–4. Separately, PLN challenges the VBSO policy banning incoming mail containing "ordering forms with prices ." *Id.* Although PLN's amended complaint also alleges due process violations based on Defendants' handling of censored PLN publications, PLN does not pursue such issue on summary judgment. ECF No. 36, at 11 n. 8.

Defendants' summary judgment motion and supporting memoranda oppose Plaintiff's constitutional challenge to the two jail policies at issue, and assert that Defendants are entitled to summary judgment on such issues because the sexually explicit material and order form restrictions are constitutionally proper under *Turner.* Defendants also assert that they are entitled to summary judgment on Plaintiff's due process claim, arguing that PLN was afforded sufficient notice, and an opportunity to challenge, the rejection of its publications. Additionally, to the extent PLN's amended complaint seeks money damages, as contrasted with declaratory or injunctive relief, Defendants seek summary judgment on such monetary claims based on their qualified immunity. The Sheriff also asserts that summary judgment should be entered in his favor because Plaintiff's claims against him are improperly based on Respondeat Superior liability.

### C. Analysis

#### 1. Challenge to Ordering Form Ban

Considering first the VBSO ban on incoming publications containing "ordering forms," Defendants' policy states: "Newspaper clippings, lyrics, poems, calendars, *ordering forms with prices,* catalogs, brochures, any information printed from the internet, checks or cash will not be accepted." ECF No. 48–4, ¶ 6 (emphasis added); ECF No. 48–13 (banning "Mail containing" the above listed items). Defendants assert in their summary judgment filings that because inmates at VBCC have no access to money, the order form ban is designed to protect the public from fraud, further stating that there have in the past

been investigations into VBCC inmates fraudulently using credit cards to purchase goods from outside vendors, as well as problems with inmates using stamps as currency to purchase items from outside vendors. ECF No. 48–3, ¶¶ 12, 16–17. PLN responds by arguing that the Sheriff failed to articulate "fraud" as a justification for such policy during his deposition, and separately arguing that the disputed policy is not a rational means of achieving such goal. Having considered each motion for summary judgment, resolving factual disputes and competing rational inferences in favor of the non-movant, *Rossignol,* 316 F.3d at 523, the Court **GRANTS** summary judgment in favor of Defendants on this issue.

#### a. Fraud as the asserted Penological Goal

**\*6** As noted above, Defendants' position is that the ban on incoming mail containing "ordering forms" is in place at VBCC to prevent inmates from committing fraud on the public, and PLN concedes that the prevention of fraud is in fact a valid penological goal. ECF No. 52, at 8. Notwithstanding its concession, PLN highlights in its summary judgment filings that: (1) the Sheriff did not articulate the prevention of fraud as a basis for the ban on catalogs and ordering forms with prices during his January 2014 deposition; and (2) the Sheriff further stated during such deposition that he was "not sure" that there would be a benefit to denying inmates access to certain types of catalogs if such catalogs were intended to be used by the inmate to identify to loved ones which permissible items the inmate would like as a gift. ECF No. 36–3, at 16–18. Although the Sheriff did not mention "fraud" in the deposition excerpts that were provided to the Court, he did say that the reason the VBSO censors "ordering forms with prices, catalogs, brochures" is that inmates "have no way to pay" for such items and are not permitted to "purchase anything outside of the [VBCC] canteen." *Id.* Moreover, "fraud" was identified as the Defendants' penological motivation for the ban on ordering forms in discovery responses provided to Plaintiff *two months prior to* the Sheriff's deposition. ECF No. 48–6, at 8. Additionally, the Sheriff subsequently provided an affidavit more fully explaining his view on the risk of VBCC inmates committing fraud on the public if they have access to ordering forms. ECF No. 48–3. Accordingly, based on the current record, the Court finds both that "fraud" is a valid penological goal and that it is the penological goal articulated by Defendants that must

be analyzed by this Court in its analysis of the *Turner* factors. [2]

### b. Ordering Form Ban satisfies *Turner* test

This Court begins its analysis under *Turner* by reiterating the clear and controlling rule of law mandating that this Court afford deference to prison administrators in the difficult arena of managing a prison. *Lovelace,* 472 F.3d at 199; *see Stotts,* 925 F.2d at 86 (explaining that heightened scrutiny would result in unworkable intertwinement of the courts in difficult institutional judgments, and therefore, the proper approach for a reviewing court is "one of caution"). Separately, the Court reiterates that the burden is "not on [Defendants] to prove the validity of prison regulations but on the [Plaintiff] to disprove it." *Overton,* 539 U.S. at 132.

### i. Rational Connection

The first step of the *Turner* analysis requires the Court to consider whether, based on the record before it, there is a "valid, rational connection" between the ordering form ban and the prevention of fraud on the public, or whether such penological goal is "so remote as to render the policy arbitrary or irrational." *Lovelace,* 472 F.3d at 200. Because the current record suggests two different interpretations of the disputed ordering from ban, the Court first articulates the difference in interpretations and then analyzes each alternative.

**\*7** Although the disputed policy states, on its face, that it bans "ordering forms with prices," there is conflicting evidence in the record as to whether such policy, was/is applied at VBCC to exclude: (1) any incoming publication that includes an actual "order form" that can be filled out and returned to a vendor; or (2) any incoming publication that does not include a "per se order form," but does include a product advertisement with a price, as well as sufficient additional information to permit an individual to order such product from the advertising vendor. *Compare* ECF No. 36–5, at 6–8 (deposition testimony from VBSO employee Captain Lori Harris indicating that written publications are permitted at VBCC if they include advertisements with prices as long as there is not a per se "order form" that can be mailed back to the vendor), *with* ECF No. 48–3, ¶ 10 (affidavit from the Sheriff stating that

the policy "encompasses all solicitations, ordering forms, catalogs, brochures, whether print or from the internet, which offer inmates the opportunity to make purchases from outside vendors," and that "[o]ffers without ordering forms per se, but which contain information required to make such purchases, are included in this policy"). Although the precise contours of the disputed policy are unclear from the current record, as evidenced by the analysis that follows, such lack of clarity does not constitute a "genuine dispute as to a material fact" because the penological objective advanced by Defendants would be adequately served by *either version of the policy,* one version of the policy would simply appear to be more effective than the other at achieving such goal. [3]

### *Per Se Ordering Forms*

First, assuming the policy to only "per se" order forms that can be filled out and returned to a vendor, PLN does not dispute the fact that the banned issues of *Prison Legal News* and the banned PLN informational packets all included such "per se" order forms. ECF No. 38, ¶¶ 6, 8, 25. The question for the Court is therefore limited to whether the ban on "per se" ordering forms has a valid and rational connection to reducing fraud. A review of relevant case law reveals few instructive cases on prison policies aimed at combating fraud on the public, *see, e.g., Woods v. Commissioner of the Ind. Dept. of Corrections,* 652 F.3d 745 (7th Cir.2011), and an apparent dearth of case law involving regulations designed to prevent prisoners from accessing vendor information in an effort to combat fraud. [4] However, regardless of whether there exist any factually similar policies at other jails or prisons aimed at similar penological concerns, the law is clear that PLN "bears the burden of showing that the [challenged] regulations ... are not reasonably related to legitimate penological objectives." *Livingston,* 683 F.3d at 215.

PLN argues that excluding publications containing ordering forms from VBCC is not an effective means to achieve the goal of reducing fraud on the public. Specifically, PLN argues that VBCC inmates cannot commit mail order fraud because they do not have money (or stamps as a substitute to money), VBCC rules prohibit them from purchasing mail order items, and all incoming mail at VBCC is screened for contraband (presumably suggesting that most mail order items would never be delivered to VBCC if ordered). ECF No. 52, at 8. Such

argument, however, "seems to be that the regulation in question is *unnecessary* " in PLN's opinion, rather than remote or arbitrary. *Woods,* 652 F.3d at 749. Although Defendants' ban on "ordering forms" might constitute only one of several policies aimed at deterring additional crimes and/or reducing fraud on the public, there is no constitutional or prudential requirement that a jail policy alone root out all evil for it be "reasonable" in its pursuit of a valid penological objective. To the contrary, controlling law clearly provides that a jail "does not need actually to demonstrate that its regulations" succeed in achieving the penological goals at which they are aimed; the regulations must instead merely have a rational relationship to the stated goals. *Stotts,* 925 F.2d at 87 (citations omitted); *see Amatel v. Reno,* 156 F.3d 192, 202–03 (D.C.Cir.1998) (indicating that the question of whether a federal statute regulating incoming publications at a prison is constitutional under *Turner* does not require the court to ask if such rule "*will* advance the prisons' rehabilitative project, but whether Congress could reasonably have believed that it would do so"). Accordingly, PLN's suggestion that the disputed policy is not rational or necessary because it arguably overlaps other VBSO rules carries little weight.

**\*8** Although Plaintiff seeks to cast the VBSO policy as ineffective and suggests that the risk of fraud is very low, it offers no evidence to such points, and instead advances several arguments that seemingly attempt to shift the burden to Defendants. For example, Plaintiff argues that Defendants have not demonstrated an evidentiary link between past instances of inmate fraud and such inmates' access to order forms. Such arguments, however, miss the mark because Defendants have no obligation to prove that their policy is responsive to past misuse of order forms. It is well-documented in the law that a jail must adopt regulations *in anticipation of* future events, and the *Turner* "reasonableness" standard is designed to: (1) "ensure[ ] the ability of corrections officials to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration"; and (2) "avoid [ ] unnecessary intrusion of the judiciary into problems particularly ill suited to resolution by decree." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349–50 (1987) (internal quotation marks and citations omitted). Moreover, although it is arguably unclear what degree of evidentiary proof a defendant must advance in defense of a jail regulation, here, Defendants have advanced evidence demonstrating that fraud is a real, and

not artificial, concern at VBCC through the introduction of an affidavit stating that there have been "multiple investigations of [VBCC] inmates involving the fraudulent use of credit cards to purchase goods from outside vendors or to generate profits from the use of credit/ debit cards, and possible bank fraud and check writing schemes," with one such investigation leading to criminal convictions for credit card fraud. ECF No. 48–3, ¶ 16. Defendants have also presented evidence demonstrating that VBCC inmates have previously purchased items from vendors outside the approved channels by using stamps as currency. [5] *Id.* ¶ 17. Considering these facts together, Defendants have advanced a reasonable relationship between the "ordering form" ban and the goal of combatting fraud.

Associated with the above arguments, PLN asserts that the "ordering form" ban is arbitrary because inmates have access to television and newspapers. First, as to television, the fact that prisoners may have fleeting access to a certain television advertisement for a product does not undercut the rationality of the VBSO ban on print materials containing ordering forms. Unlike television, print materials can more readily be previewed by authorities in order to exclude materials that pose a risk. Moreover, unlike television, print ads are static and present a more long-term opportunity to facilitate fraud. As to PLN's suggestion that other print materials, such as newspapers, that contain "per se" order forms were admitted into VBCC during the relevant time period, such contention is speculative and not supported by the record as Plaintiff has not introduced a single newspaper edition or magazine issue that was admitted into VBCC during the relevant period that contained ordering forms. [6]

**\*9** Accordingly, the Court finds that Defendants have articulated a valid rational connection between the ban on per se ordering forms and the penological goal of combating fraud and PLN has failed to undercut such connection. Notably, "[a] prohibition on [ordering forms] relates fairly directly to the goal of preventing fraud since it cuts off the inmates' access to potential victims." *Woods,* 652 F.3d at 749.

**\*Ordering Information\***

Assuming, arguendo, that the policy at issue bans not only advertisements with "per se" ordering forms, but also

those ads which contain sufficient information required to purchase the advertised product, PLN likewise fails to demonstrate that such policy lacks a "valid rational connection" to reducing fraud. To the contrary, such a policy would likely be more effective at combatting fraud because it would restrict more incoming publications from VBCC, and thus would reduce the likelihood of fraud being committed by a more resourceful inmate who, in the absence of an "ordering form," is willing to draft a letter or use other means to perpetrate a fraudulent transaction. [7] Accordingly, the conflict in the record as to precisely how the VBSO's policy is applied is not material to the determination of whether the policy at issue is rationally connected to reducing fraud—it is so connected under either interpretation of the ordering form policy.

The Court therefore reincorporates the above analysis and alternatively finds that, on the current record, Defendants have articulated a valid rational connection between a ban on "ordering information" and the penological goal of combating fraud. [8]

### ii. Alternative Means

The second *Turner* factor requires the Court to consider whether there are alternative methods for PLN, and VBCC inmates, to exercise their constitutional rights. *Lovelace,* 472 F.3d at 200. The constitutional right at issue in this case, defined expansively, [9] appears to include PLN's ability as a publisher to communicate with inmates at VBCC, and the inmates' intertwined right to receive written materials from PLN and other publishers. The current record presents little question that this factor cuts in Defendants' favor because VBCC inmates may permissibly receive written materials mailed directly from PLN, and other publishers, to include any books or other written publications that do not include order forms and do not otherwise violate VBCC policy. Specifically, the record reveals that at least one book published by PLN is permitted at VBCC, and PLN is not precluded by VBSO policy from otherwise communicating with inmates. Inmates likewise have access to a lending library and may receive newspapers and magazines from PLN and other publishers that comply with VBSO policies. Accordingly, the limits on PLN's ability to mail publications to VBCC inmates that include "ordering information" advertising

for other mail order products does not eliminate PLN's ability to communicate with VBCC inmates. [10]

### iii. Impact of the desired accommodation

**\*10** The third *Turner* factor requires the Court to consider the likely impact on VBSO staff, inmates, and prison resources if the challenged regulation is struck down. Most relevant to such inquiry in this case "is whether lifting the ban would re-open a channel of communication" that would create the reasonable potential for future frauds to occur. *Woods,* 652 F.3d at 750. Consistent with the prior discussion herein, this Court believes that striking down the ban on ordering forms would create such risk. As in *Woods,* here, there is record evidence that the Sheriff has utilized investigative resources to root out prior frauds at least similar to those targeted by the policy in dispute, and dedicating resources to investigate past crimes "is not the type of activity prison officials should regularly have to conduct"; rather, they should endeavor to implement policies to curtail such illegal behavior before it occurs. *Id.* Accordingly, because Defendants in this case were "rational in their belief that, if left unchecked, an activity will lead to fraud," restricting that activity "does not violate inmates' First Amendment rights." *Id*.

### iv. Obvious Alternatives

The fourth *Turner* factor requires the Court to consider whether there are "any obvious, easy alternatives to the challenged regulation or action, which may suggest that it is not reasonable, but is [instead] an exaggerated response to prison concerns." *Lovelace,* 472 F.3d at 200. Stated differently, the Court considers whether an alternative regulation, or no regulation at all, "would fully accommodate the [Plaintiff's] First Amendment rights at a de minimus cost to legitimate penological interests." *Woods,* 652 F.3d at 750. PLN does not present any evidence that an alternative regulation would sufficiently achieve the same penological goals, but does argue that the regulation is unnecessary because other VBSO polices prevent fraud through limiting inmates abilities to purchase outside items. Even assuming that such other rules or practices help reduce the potential for fraud, they "can hardly be said to eradicate it." *Id.* PLN does not appear to consider the possibility that inmates could

commit fraud through using false credit card information or forged checks. Similarly, PLN does not appear to consider the possibility that products not permitted at VBCC could be purchased through a mail order fraud scheme launched from within the jail walls with the products arranged to be shipped to a friend or family member outside the walls of VBCC. Accordingly, because "no single regulation can serve as a catchall for eliminating the potential for fraud," based on the current record, the appropriate course is to "defer to the judgment of the prison administrators when it comes to deciding whether a ban on [ordering forms] is also necessary." *Id.*

Having considered all of the *Turner* factors, the Court finds that Defendants' ordering form policy survives scrutiny under such test, noting again that the burden was on PLN to demonstrate the unconstitutionality of the disputed policy, and on the current record, no reasonable factfinder could conclude that PLN carried such burden. The fact that PLN is purportedly widely permitted in jails and prisons across the country is not itself a reason to declare the more restrictive VBSO policies unconstitutional. Evidence advanced by a plaintiff is necessary to prove such fact, and such evidence is not currently before this Court. Defendants' summary judgment motion is therefore **GRANTED** on this issue.

### 2. Challenge to Sexually Explicit Materials Ban

**\*11** Plaintiff's amended complaint seeks monetary damages, equitable relief, and declaratory judgment, associated with VBSO's rule prohibiting publications containing "sexually explicit material." PLN contends that such rule is vague and overbroad, and that it was unconstitutionally applied to PLN. ECF No. 17, at 9. The parties have filed cross motions for summary judgment on this issue; however, in light of the above ruling on the ordering form ban, the Court takes this matter **UNDER ADVISEMENT** pending additional briefing.

It appears undisputed that every issue of *Prison Legal News* and every PLN "informational packet" that was excluded from VBCC during the relevant time period contained per se "ordering forms," and thus, PLN cannot establish that the exclusion of such publications from VBCC violated the Constitution. Because all excluded PLN materials were permissibly excluded for containing ordering forms, it appears that a question exists as to

whether one or more of PLN's challenges to the VBSO's "sexually explicit" materials policy have been rendered moot. The parties should therefore provide supplemental briefing addressing the following two matters: (1) which of Plaintiff's claims, if any, remain a live controversy; and (2) to the extent any of PLN's claims survive or potentially survive the instant ruling, the parties should separately address the law governing each type of claim (facial challenge vs. as applied challenge), and should provide individualized supplemental arguments as to how the Court should rule on each type of surviving or potentially surviving claim.

### 3. Alleged Due Process Violations

In addition to the above issues on which *cross-motions* for summary judgment were filed, Defendants move for summary judgment as to Plaintiff's claim that PLN was unconstitutionally denied due process when it was not timely notified of Defendants' rejection of PLN publications, or the actual reasons for such rejections, and was also not provided a meaningful opportunity to challenge such censorship decisions. For the reasons discussed below, Defendants' summary judgment motion is denied on this issue.

In *Montcalm Publ'g,* the Fourth Circuit expressly held that a magazine publisher "has a constitutional interest in communicating with its inmate-subscribers" and is therefore entitled to some degree of process when a publication is censored. *Montcalm Publ'g,* 80 F.3d at 109; *see also Jacklovich v. Simmons,* 392 F.3d 420, 433 (10th Cir.2004) (agreeing with the holding in *Montcalm Publ'g* ). Although the Fourth Circuit did not expressly define the precise contours of the process necessary to satisfy the Constitution, it "h[e]ld that publishers are entitled to notice and an opportunity to be heard when their publications are disapproved for receipt by inmate subscribers," and appeared to discuss with favor a procedure that would provide publishers a written rejection notice and an opportunity to respond in writing. *Id.* at 106, 109.

**\*12** Here, it appears undisputed that Defendants first notified PLN of a rejection of an issue of *Prison Legal News* in April of 2012, and did not thereafter notify PLN of subsequent rejections of any PLN publications until late 2013, after the instant lawsuit was filed. [11]

Moreover, the record demonstrates that during a period of time in late 2013 when PLN was receiving notice from Defendants of censorship decisions and seeking a review of such decisions, the "review procedure" merely involved a VBSO employee reviewing whether the rejection form was properly filled out; it did not involve a review of the rejected publication to determine whether it actually violated VBSO rules. ECF No. 52– 2, at 2–5; *see Jordan v. Sosa,* 577 F.Supp.2d 1162, 1172–73 (D.Colo.2008) (concluding that a BOP program statement was unconstitutional "to the extent it permits the institution to return the [rejected] publication ... to the publisher *prior to completion of the administrative review* ") (emphasis added).

During the time period relevant to this case, the VBSO has twice amended its policy associated with providing notice and an opportunity to be heard, the first amendment appearing to ensure that "notice" is properly provided, and the second appearing to ensure that a publisher be given the opportunity to be heard as part of a meaningful review procedure. [12] Although it appears from the current record that the VBSO's procedures currently in force provide constitutionally adequate notice and a sufficient opportunity to participate in a meaningful review of a censorship decision, such recent changes in policy do not undercut PLN's ability to obtain injunctive relief as to the prior practices applied during the period relevant to this litigation and challenged in PLN's amended complaint. [13] *See Wall v. Wade,* 741 F.3d 492, 497 (4th Cir.2014) (noting that the "heavy burden" of demonstrating that "the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness," and that the Fourth Circuit has "previously held that when a defendant retains the authority and capacity to repeat an alleged harm, a plaintiff's claims should not be dismissed as moot") (internal citations omitted). This is particularly the case because Defendants do not in any way acknowledge that their prior practices were unconstitutional, and instead portray their recent policy revisions as "clarifications." To the extent that Defendants maintain that their prior procedures were lawful, PLN's injunctive claim is not moot, as claimed by Defendants, because there is no impediment to Defendants returning to their past practices.

Accordingly, because the current record, when viewed in PLN's favor, could plainly support a finding that Defendants failed to provide PLN with constitutionally

adequate notice, a constitutionally adequate opportunity to be heard, or both, Defendants' summary judgment motion is **DENIED** as to this issue.

## IV. Immunity

**\*13** Defendants move for summary judgment on Plaintiff's claims seeking money damages as to both the "ordering forms" policy and the "sexually explicit materials" policy on the basis of both Eleventh Amendment immunity and qualified immunity. For the reasons discussed below, Defendants' summary judgment motion is **GRANTED** as to their assertion of qualified immunity.

### A. Eleventh Amendment Immunity

The Eleventh Amendment to the Constitution of the United States immunizes the individual states against suits seeking money damages. U.S. Const. amend. XI; *see Vollette v. Watson,* 937 F.Supp.2d 706, 713–16 (E.D.Va.2013) (discussing the fact that Virginia Sheriffs are state constitutional officers and are therefore immune from suit under the Eleventh Amendment for "official capacity" claims *seeking money damages,* but are not immune from suit for claims *seeking injunctive relief* ). However, here, in light of the parties' positions on summary judgment, there is no dispute that Eleventh Amendment immunity is not applicable to the claims pending in this case. Notably, while Defendants effectively argue that they are shielded from liability by the Eleventh Amendment for claims seeking money damages against them in their "official capacity," ECF No. 48 at 29– 30, PLN concedes in its responsive brief that Plaintiff's "official capacity" claims are limited to seeking injunctive relief, ECF No. 52, at 18–19. Accordingly, as PLN makes clear that it does not advance any "official capacity" money damages claims in this case, and the law clearly provides that Eleventh Amendment immunity does not extend to claims seeking injunctive relief, no further ruling is required by the Court on this issue. *Bland v. Roberts,* 730 F.3d 368, 390–91 (4th Cir.2013). [14]

### B. Qualified Immunity

Defendants separately assert that the claims seeking money damages against Defendants in their "individual capacities" based on the "ordering form" ban and the "sexually explicit materials" ban are barred based on the doctrine of qualified immunity. As recently explained by the Fourth Circuit:

A government official who is sued in his individual capacity may invoke qualified immunity. *See Ridpath* [*v. Board of Governors Marshall Univ.*], 447 F.3d [292,] 306 [ (4th Cir.2006) ]. "Qualified immunity protects government officials from civil damages in a § 1983 action insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Edwards v. City of Goldsboro,* 178 F.3d 231, 250 (4th Cir.1999) (internal quotation marks omitted). In determining whether a defendant is entitled to qualified immunity, a court must decide (1) whether the defendant has violated a constitutional right of the plaintiff and (2) whether that right was clearly established at the time of the alleged misconduct. *See Walker v. Prince George's Cnty.,* 575 F.3d 426, 429 (4th Cir.2009). However, "judges of the district courts and the courts of appeals [are] permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan,* 555 U.S. 223, 236 (2009).

**\*14** In analyzing whether the defendant has violated a constitutional right of the plaintiff, the court should identify the right "at a high level of particularity." *Edwards,* 178 F.3d at 251. For a plaintiff to defeat a claim of qualified immunity, the contours of the constitutional right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer,* 536 U.S. 730, 739 (2002) (internal quotation marks omitted).

*Bland,* 730 F.3d at 391. In determining whether a defendant is entitled to summary judgment on the basis of qualified immunity, the Court must consider the facts " 'in the light most favorable to the party asserting the injury.' " *Tolan v. Cotton,* 134 S.Ct. 1861, 1865 (2014) (quoting *Saucier v. Katz,* 533 U.S. 194, 201 (2001)).

Because qualified immunity is an affirmative defense, " '[t]he burden of proof and persuasion with respect to a defense of qualified immunity rests on the official asserting that defense.' " *Durham v. Jones,* 737 F.3d 291, 299 (4th Cir.2013) (quoting *Meyers v. Baltimore Cnty., Md.,* 713 F.3d 723, 731 (4th Cir.2013)). Accordingly, here, in order to prevail on summary judgment, Defendants must " 'show either that there was no constitutional violation or that the right violated was not clearly established.' " *Id.* (quoting *Gregg v. Ham,* 678 F.3d 333, 341 n. 7 (4th Cir.2012)).

### 1. "Order Forms"

As discussed in detail above, this Court finds that PLN fails to demonstrate that a constitutional violation occurred through the VBSO's maintenance of an ordering form ban and/or its application of such ban to PLN's publications. Accordingly, as no constitutional violation occurred, Defendants have demonstrated that they are shielded by the doctrine of qualified immunity as to this issue. *Durham,* 737 F.3d at 299.

Alternatively, even if this Court had denied summary judgment on the merits of the "ordering form" dispute, it would have granted the Defendants qualified immunity on the basis that the right at issue is not "clearly established." *Id.* The Court agrees with Defendants that the current state of the law would not put them on notice that it was unconstitutional to ban ordering forms in an effort to reduce fraud. Although a lack of "on point" case law does not automatically support a finding of qualified immunity, such lack of "on point" law, considered in conjunction with cases approving catalog bans or other policies implemented in an effort to prevent fraud on the public clearly support a finding that Defendants are immune from damages on this issue. *See, e.g., Woods,* 652 F.3d at 749 (upholding policy banning inmate pen-pal solicitations in an effort to reduce fraud); *Klein v. Skolnik,* No. 3:08cv177, 2010 WL 745418, \*3–4 (D.Nev. Jan. 22, 2010) (upholding the constitutionality of a prison's policy of removing magazine subscription renewal "order form" inserts to combat fraud); *Dixon v. Kirby,* 210 F.Supp.2d 792, 795, 800–01 (S.D.W.Va.2002) (upholding as constitutional a policy that banned all "mail order catalogs" but appeared to permit magazines even if they included "advertisements").

### 2. "Sexually Explicit Materials"

**\*15** A survey of case law clearly demonstrates the unremarkable fact that prisons and jails can constitutionally restrict "pornography" and "sexually explicit" writings and photographs in the name of promoting institutional order and security, which are indisputably valid penological goals. *See, e.g., Jordan v. Sosa,* 654 F.3d 1012, 1016–17 (10th Cir.2011) (explaining that federal prison facilities ban publications that include "a pictorial depiction of actual or simulated sexual acts including sexual intercourse," and those that "feature" nudity, which is defined by regulation as "a pictorial depiction where genitalia or female breasts are exposed"); *Bahrampour v. Lampert,* 356 F.3d 969, 976 (9th Cir.2004) (upholding as constitutional a regulation that prohibited inmates from receiving publications that contained images portraying actual or simulated sexual acts or sexual contact, but that permitted some nude images). Here, this Court in no way questions the Sheriff's "common sense" explanation of the risks associated with allowing "sexually explicit" materials into VBCC; however, questions remain as to whether the VBSO's conception of "sexually explicit" materials is constitutionally permissible.

Although this Court takes the parties' cross-motions for summary judgment on the VBSO's sexually explicit material policy under advisement to permit additional briefing, even considering all disputed facts and reasonable inferences in favor of PLN, the Court finds that Defendants have demonstrated that they are entitled to qualified immunity on this issue. Notably, even if this Court assumes that Defendants committed a constitutional violation through censoring monthly issues of *Prison Legal News* based on the application of the VBSO "sexually explicit materials" policy, the "contours of the constitutional right ... [were not] 'sufficiently clear [such] that a reasonable official would understand that what he [was] doing violates that right.' " *Bland,* 730 F.3d at 391 (quoting *Hope v. Pelzer,* 536 U.S. 730, 739 (2002)).

Although the VBSO policy appears to restrict a broader range of materials than policies at issue in similar cases, such fact does not alone support a finding that such policy is unconstitutional, let alone support a finding that such policy violates a "clearly established" constitutional right. Notably, issues of *Prison Legal News* that were barred from VBCC during 2012 and the first half of 2013 included photographs of women and men in lingerie, skimpy swimsuits, or other revealing clothing with the subjects posed in a manner overtly designed to connote

that, absent a strategically placed "censor star," the subject was revealing his or her genitals and/or her breasts. Even if this Court assumes that Defendants lacked a valid penological justification for censoring such materials, Defendants have carried their burden to prove the absence of law that would have put Defendants on notice that their conduct was unconstitutional. *See Durham v. Horner,* 690 F.3d 183, 190 (4th Cir.2012) (explaining that the "qualified immunity standard gives ample room for mistaken judgments" and is designed to "protect[ ] public officials from bad guesses in gray areas") (internal quotation marks and citations omitted). Notably, not only is there a lack of controlling precedent demonstrating that censoring *Prison Legal News* based on such images violated the Constitution, but there is at least some non-binding case law holding that arguably similar acts of censorship were constitutional. *See Elfand v. County of Sonoma,* No. C–11–0863, 2013 WL 1007292, at *4 (N.D.Cal. Mar. 13, 2013) (upholding the constitutionality of a jail's censorship of issues of *Maxim Magazine* and *GQ Magazine* that displayed pictures of woman and men in "underwear, bikinis, and tight and scant clothing revealing breasts and buttocks" to include an image of a woman in a "see-through bra and 'thong' underwear with her buttocks raised").

**\*16** Because the state of the relevant law, both in 2012, 2013, and today, does not indicate that a jail is prohibited from excluding all incoming publications containing revealing images of individuals in sexual poses overtly intended to sexually arouse the viewer, Defendants' summary judgment motion is **GRANTED** to the extent that Defendants invoke the doctrine of qualified immunity to shield them from money damages associated with the exclusion of the April 2012 through June 2013 issues of *Prison Legal News. See Woods v. Director's Review Committee,* No. H–11–1131, 2012 WL 1098365, at *1, (S.D.Tex. Mar. 30, 2012) (concluding that the defendants were entitled to qualified immunity in a case challenging a Texas prison's censorship of nude photos that had been "blurred in such a way as to disguise or cover up any exposed nudity," noting that there was "no clear statement" in the law that would put an official on notice that it was unlawful to ban such images).

Although a closer question, the Court also finds that Defendants have satisfied their burden to demonstrate that they are protected by qualified immunity as to PLN's challenge to the issues of *Prison Legal News* that no

longer included advertisements with "censor star" images (July 2013 through April 2014). After the removal of such images, every monthly issue of *Prison Legal News* issued between July 2013 and April of 2014 continued to include images of women in tight fitting clothing, including short skirts and short shorts, tight pants, and clothing that at least appears to be "lingerie." Additionally, some issues contained an image of a woman wearing an erotic top that appears to expose her breasts; however, she is holding up the book promoted for sale in a manner that obscures the majority of her breasts. Although most of these images are quite small, it is apparent that at least some of the images are designed to either draw attention to the amount of skin being displayed, or to emphasize the subject's buttocks. Additionally, the fact that such images are often included in ads promoting "(non-nude) sexy photos," to include "various backshots & positions" increases the sexual connotation of the images. These images, therefore, could reasonably be viewed as "sexually suggestive," and there is an absence of case law establishing clear lines between sexually oriented materials that can be constitutionally restricted from a jail or prison and those that cannot. *See Tolan,* 134 S.Ct. at 1866 (" '[T]he salient question ... is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.' " (quoting *Hope,* 536 U .S. at 739) (omission and alteration in original)); *see also North v. Clarke,* No. 3:11cv211, 2012 WL 405162, at *9–10 (E.D.Va. Feb. 7, 2012) (concluding that the defendants were entitled to qualified immunity in a case where the court granted summary judgment *in favor of the plaintiff* based on the unconstitutionality of the challenged prison regulation).

**\*17** Defendants have therefore carried their burden to demonstrate that they lacked "fair warning" that their decision to adopt and apply a broad policy aimed in part at sexually "suggestive" materials was unconstitutional. *Tolan,* 134 S.Ct. at 1866; *see Hunter v. Bryant,* 502 U.S. 224, 229 (1991) (noting that "[t]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law' " (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 343 (1986))); *Ashcroft v. al-Kidd,* 131 S.Ct. 2074, 2083 (2011) (explaining that "[a] Government official's conduct violates clearly established law" when existing precedent "placed the statutory or constitutional question beyond debate"). Defendants'

summary judgment motion is **GRANTED** to the extent that Defendants invoke the doctrine of qualified immunity to shield them from money damages associated with the exclusion of the April 2012 through June 2013 issues of *Prison Legal News* based on the pictures contained therein.

### 3. Due Process

As previously noted, Plaintiff does not seek summary judgment on its due process claim. Defendants seek summary judgment on such constitutional claim *on the merits,* but did not advance an argument contending that Defendants are shielded from damages based on qualified immunity, apparently on the belief that PLN was not pursuing money damages on such claim. ECF No. 48, at 24. PLN thereafter indicated in its filings that while it was not pursing compensatory damages on this claim, it is pursuing nominal damages and/or punitive damages. ECF No. 52, at 18. Defendants' subsequent responsive brief does not address such statement in the context of qualified immunity, but instead continues to challenge the merits of Plaintiff's due process claim.

Based on the foregoing, it does not appear that Defendants move for summary judgment on the basis of qualified immunity as to Plaintiff's due process claim, and no ruling is therefore necessary at this time. Alternatively, to the extent that Defendants' filings can be interpreted to seek qualified immunity on this issue, the Court finds that Defendants fail to carry their burden, and summary judgment is therefore **DENIED** as to such matter. Notably, the governing law appears to be clearly established on this issue, *Montcalm Publ'g,* 80 F.3d 105, [15] and the questions of fact will dictate whether the policy previously in place at VBCC, either with respect to the alleged failure to provide notice in 2012 and 2013, or alleged failure to conduct a meaningful review of censorship decisions in late 2013, violated such clearly established law.

### V. Respondeat Superior

The Sheriff briefly argues in his summary judgment filings that he is shielded from liability to the extent that he is being sued for damages in his individual capacity only on the theory of respondeat superior. *See Harris v.*

*City of Virginia Beach, VA,* 11 F. App'x 212, 215 (4th Cir.2001) ("[A] plaintiff's § 1983 action against a particular defendant must be dismissed if the plaintiff's reason for naming the defendant is based solely upon the theory of respondeat superior" (citing *Vinnedge v. Gibbs,* 550 F.2d 926, 928 (4th Cir.1977)). However, for the reasons set forth in PLN's responsive brief, ECF No. 52, at 22, the Court finds that there is sufficient record evidence indicating that the Sheriff was directly involved in relevant events such that the remaining damages claim against him (the due process claim) is not based solely on the theory of respondeat superior. Notably, when viewed in Plaintiff's favor, the record reveals that the Sheriff, at least for a time, participated in the appeal process and acted as the final decision maker as to whether a publication would be barred from VBCC. ECF No. 36–3, at 11–13. Defendants' motion for summary judgment is therefore **DENIED** as to such claim.

### VI. Additional Settlement Discussions

**\*18** The Court's award of partial summary judgment on the "ordering form" ban and its finding in Defendants' favor as to qualified immunity on both the "ordering form" ban and the "sexually explicit materials" ban resolve a large portion of this case in favor of Defendants. That said, although not resolved in the instant motion, and not prejudged in any way, the current record suggests that PLN has a strong position on its due process claim.[16] *Jordan,* 577 F.Supp.2d at 1172–73. Moreover, if not moot, Plaintiff has a potentially meritorious argument on its facial challenge to Defendants' "sexually explicit materials" policy to the extent such policy broadly bans "any writings [or] pictures ... which may be deemed offensive."[17] ECF No. 48–4. *Arguably,* even under the deferential *Turner* standard, it is unconstitutional for a jail to exclude publications based on a broad undefined standard whose text does not tie it to any penological concerns, thus leaving it open to being invoked merely because a prison official is personally displeased with the content of "any writing or picture." *Cf. Abbott,* 490 U.S. at 404–05, 419 (upholding the facial validity of the federal Bureau of Prisons' restrictions against publications deemed "detrimental to the security, good order, or discipline of the institution," expressly noting that such restrictions *prohibit the rejection* of a publication "solely because its content ... is unpopular *or repugnant*") (emphasis added). A similar argument can be made

to the extent that the VBSO policy broadly bans any "material *dealing with* or displaying ... scantily clothed persons," because on its face such policy: (1) can be (and arguably has been) applied to ban written text discussing or in any way "dealing with," in less than graphic detail, a person wearing underwear or a bathing suit; and (2) can be (and arguably has been) applied to ban any image of a person in a bathing suit regardless of the sexual connotation of such image and regardless of the image's likely impact on penological concerns. *Cf. Couch v. Jabe,* 737 F.Supp.2d 561, 567–71 (W.D.Va.2010) (indicating that the "expansive reach" of a Virginia Department of Corrections prohibition on all explicit descriptions of sexual acts, to include "[a]ny sexual acts in violation of state or federal law" is overbroad even under the undemanding *Turner* reasonableness standard because it reaches a wealth of written material, including great literary works of art, that could not "have *any* effect on the security, discipline, and good order of the prison"); *Aiello v. Litscher,* 104 F.Supp.2d 1068, 1079–82 (W.D.Wis.2000) (denying the defendants' summary judgment motion, recognizing that although there is surely a rational connection between a prison ban on explicit pornography and advancing legitimate penological goals, the defendants had not demonstrated a valid rational connection between such goals and the broadly sweeping regulation at issue, specifically noting that the record "reveals no debate among scholars or experts on the effect on rehabilitation of great works of art and literature, [such as nude images from the Sistine Chapel] ... *and common sense suggests none*") (emphasis added).

**\*19** In light of the fact that Defendants have prevailed on a substantial portion of this case, yet Plaintiff remains in a position where it could prevail on one or more outstanding issues, counsel for both parties are **INSTRUCTED** to meet and confer to discuss whether a resumption of the previously conducted settlement conference may prove fruitful. As in all civil disputes, this Court encourages the parties to seriously consider the benefits of a negotiated settlement, noting that in this case in particular the current record suggests a potential benefit to both parties in reaching such a stipulated resolution, as the record at least suggests that both parties may have an interest in the VBSO improving its sexually explicit materials policy (as it twice revised and improved its due process policy associated with rejected publications) in order to more closely tie the text of the policy to the goal of excluding

materials that might affect internal safety and associated penological concerns.

## VII. Conclusion

For the reasons set forth in detail above, the Court **TAKES UNDER ADVISEMENT** the parties' cross motions for summary judgment as to the constitutionality of Defendants' "sexually explicit materials" policy in order to permit additional briefing on such subject. As to the cross motions for summary judgment on Defendants' "ordering form policy," Defendants' motion is **GRANTED** and Plaintiff's motion is **DENIED.** Additionally, the Court **GRANTS** Defendants' motion for summary judgment to the extent Defendants invoke the doctrine of qualified immunity as to both the ordering form ban and sexually explicit materials ban. All other arguments in support of summary judgment contained in the cross motions are **DENIED.**

Counsel for both parties are **INSTRUCTED** to *meet* and confer *in person* within 21 days of the issuance of this Opinion and Order to discuss whether the resumption of the settlement conference previously conducted in this case would prove fruitful. The parties shall file with the Court, jointly or separately, a "status update" no later than Wednesday, January 7, 2015, indicating their position on whether a briefing schedule should be set by the Court for supplemental summary judgment briefs or whether the parties would prefer to resume settlement discussions with a Magistrate Judge prior to being ordered to submit further briefing on the issue of summary judgment.

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

### All Citations

Not Reported in F.Supp.3d, 2014 WL 6982470

---

Footnotes

1    The trial of this case has been continued at the request of the parties.

2    Although prison authorities must articulate the goal or goals that a policy is aimed at achieving in order for a Court to apply the test articulated in *Turner,* the subjective viewpoint of any one administrator is not controlling because the better interpretation of *Turner* is that it is an *objective test* that turns on the reasonableness of the policy itself, not the personal viewpoint of any one actor. *See Hammer v. Ashcroft,* 570 F.3d 798, 803 (7th Cir.2009) (indicating that the *Turner* test involves "an objective inquiry"); *Lovelace,* 472 F.3d at 200 (rejecting an approach that focused "entirely on the defendants' state of mind" because such inquiry did not resolve the question of whether the prison's policy, "by its own terms" violates the Constitution). Arguably, any other approach would be unworkable because even if a policy was struck down by a Court due to evidence of improper subjective motivation, it could be readopted by the jail the very next day on the proffered objectively valid ground that would have otherwise satisfied the *Turner* test. Alternatively, consistent with the conclusion reached earlier this year by the United States Court of Appeals for the District of Columbia Circuit, even if this Court assumes that "motive" plays some part in the *Turner* inquiry and that "some quantum of evidence of an unlawful motive can invalidate a policy that would otherwise survive the *Turner* test," this Court finds that the record developed by PLN in this case "is too insubstantial to do so ." *Hatim v. Obama,* 760 F.3d 54, 61 (D.C.Cir.2014).

3    Although not squarely addressed in the briefs before the Court, to the extent the VBSO banned only "per se" ordering forms, logic would suggest that jail authorities could reasonably determine that VBSO resources would be unduly taxed by scouring the fine print in all incoming publications to determine if "ordering information" was included, as contrasted with conducting a more limited search for easily identifiable "order forms."

4    This Court is unaware of any federal case addressing a ban on "ordering forms" contained within other publications adopted for the purpose of combatting fraud, with the exception being a case barring magazine inserts that permit a prisoner to renew a magazine subscription *on the promise* of future payment. *See Klein v. Skolnik,* No. 3:08cv177, 2010 WL 745418, *3–4 (discussing the prison's policy of removing magazine renewal inserts prior to delivering magazines to inmates). Other courts have acknowledged the appropriateness of bans on catalogs and other unsolicited "junk mail" designed to alleviate the heavy burden on prison mail rooms. *See, e.g., Morrison v. Hall,* 261 F.3d 896, 905 (9th Cir.2001).

5    Many of the "ordering forms" contained in issues of *Prison Legal News* expressly invite readers to pay for advertised products through postage stamps.

6   There appears to be some legal support for the proposition that inconsistent application of a prison policy may serve to undercut the claimed link between the policy and the asserted penological goal. *See Couch v. Jabe,* 737 F.Supp.2d 561, 569 (W.D.Va.2010) (noting that when a publication that plainly violates a prison regulation is nevertheless permitted, "the argument by [the defendants] that there is a logical connection between the broad scope of the regulation and their legitimate goals is fundamentally weakened"). However, PLN did not introduce as an exhibit any newspapers or other publications allegedly permitted into VBCC during the relevant period in an effort to demonstrate that Defendants were not applying the policy in a neutral fashion. Plaintiff did ask questions of one deposition witness about the "Virginia[n] Pilot" newspaper generally, and also asked questions about a specific issue of a sports magazine that appears to have belonged to a lawyer involved in this case, but PLN did not ultimately introduce those materials in support of, or opposition to, one of the pending summary judgment motions. ECF Nos. 36–5, 52–1. PLN has therefore failed to demonstrate that the manner in which the policy was applied could serve to undercut the logical connection between such policy and the stated goal of combatting fraud.

7   To the extent that the record suggests that newspapers are allowed at VBCC, and common familiarity with newspapers reveals that they often contain ads selling products, if the VBSO's ban extends to all "ordering information," PLN might be in a better position to demonstrate, as PLN at least suggests through its current filings, that PLN's publications were subject to unequal treatment at VBCC. However, as stated in the preceding footnote, PLN has not introduced any newspapers or other magazines as exhibits in an effort to support its "suggestion" of differential treatment, and it is therefore impossible to determine without resorting to speculation whether PLN's publications were treated differently.

8   Although the lack of clarity in the record is immaterial to ruling on this issue, it appears that Defendants have an obligation to provide inmates, the public, and VBSO staff with sufficient information such that the controlling policy is understood by all. The Court would hope that, to the extent Defendants intend on applying their policy to ban all "ordering information," regardless of whether there is an "ordering form with prices," they make the effort to modify their written policy. Additionally, whatever version of the policy is applied going forward, Defendants should anticipate the fact that they may find themselves back in this very Court if such policy is not applied consistently across different publications.

9   The Supreme Court has cautioned against a narrow interpretation of "the right" in question, finding that it must be "viewed sensibly and expansively." *Thornburgh,* 490 U.S. at 417. Accordingly, prison mail restrictions that limit certain publications from entering the prison, yet still "permit a broad range of publications to be sent, received, and read" favor the constitutionality of the challenged restriction. *Id.* at 418.

10  Although VBSO rules prohibit inmates from receiving ordering forms with prices, as suggested by the Sheriff's deposition testimony, it appears that PLN, as a publisher, may be permitted to mail a publication to VBCC inmates that does not include pricing or other "ordering information" but does include enough details about PLN's educational publications such that the inmate could ask a friend or family member to seek out PLN *to discover the necessary ordering information.* Moreover, to the extent PLN wants to provide inmates access to the articles in the monthly issues of *Prison Legal News,* PLN appears to retain the ability to either publish and provide a free version of *Prison Legal News* that does not include the banned advertisements, or to publish a separate paid version of its monthly publication (the subscription to be paid for by friends or family of a VBCC inmate) that excludes the banned advertisements. Although such alternatives may not be desirable to PLN or its business model, the fact that such alternatives appear to exist, further support a finding in favor of Defendants on the second *Turner* factor.

11  Defendants' assertion that PLN received *sufficient notice* of the VBSO's ongoing censorship of each *Prison Legal News* monthly publication during 2012 and early 2013 because VBCC inmates made complaints to PLN does not appear to be supported by the law of this Circuit. *See Montcalm Publ'g,* 80 F.3d at 109 (noting that "while the inmate is free to notify the publisher and ask for help in challenging the prison authorities' decision, the publisher's First Amendment right must not depend on that"). Moreover, Defendants acknowledge that some issues of *Prison Legal News* were being delivered by a certain VBSO employee during the relevant time frame, further suggesting that PLN may not have known when issues were delivered, and when they were censored.

12  Among the recent revisions in procedure, Defendants now retain a copy of the excluded publication until the review process is complete.

13  It appears from the record that PLN also seeks nominal damages and punitive damages for the alleged past violations.

14  Defendants' summary judgment motion would be granted on this issue to the extent that PLN did assert claims seeking money damages against Defendants in their "official capacities." *Bland,* 730 F.3d at 390–91.

15  Although the Fourth Circuit's opinion in *Montcalm Publ'g* declined to expressly define the procedure necessary in order to ensure that a sufficient degree of "process" is provided, the Court made the following clear statements:

(1) "We hold that publishers are entitled to notice and an opportunity to be heard when their publications are disapproved for receipt by inmate subscribers"; and

(2) "An inmate who cannot even see the publication can hardly mount an effective challenge to the decision to withhold that publication, and while the inmate is free to notify the publisher and ask for help in challenging the prison authorities' decision, the publisher's First Amendment right must not depend on that."

*Montcalm Publ'g,* 80 F.3d at 106, 109.

16  PLN has not moved for summary judgment on its due process claim, but because the parties' request to postpone trial has left sufficient time for additional motions practice, if there is an alleged absence of disputed material facts relevant to this issue, the Court would entertain a request by PLN to file a second summary judgment motion on its due process claim.

17  From the current record, it is unclear what the broad and undefined term "offensive" means, although there is at least some record evidence indicating that "offensive" means "sexually offensive." ECF No. 36–5, at 3.

---

**End of Document**
© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1007292
Only the Westlaw citation is currently available.
United States District Court,
N.D. California.

Jonathan Craig ELFAND, Plaintiff,

v.

COUNTY OF SONOMA; Sheriff–
Coroner Steve Freitas, Defendants.

No. C 11–0863 WHA (PR).
|
Docket No. 22.
|
March 13, 2013.

**Attorneys and Law Firms**

Jonathan Craig Elfand, East Brunswick, NJ, pro se.

Anne L. Keck, County Counsel's Office, Santa Rosa, CA,
for Defendants.

### ORDER GRANTING MOTION
### FOR SUMMARY JUDGMENT

WILLIAM ALSUP, District Judge.

### INTRODUCTION

**\*1** Plaintiff was an inmate in Sonoma County Jail when
he filed this pro se civil rights action under 42 U.S.C.1983
claiming that his First Amendment right to receive
magazines were violated when he was incarcerated there.
He has since been released from the jail and now resides
in New Jersey. Defendants' motion to dismiss was granted
in part. Following that order, the remaining defendants
are the County of Sonoma and the Sonoma County
SheriffCoroner Steve Frietas in his official capacity. These
defendants have filed a motion for summary judgment.
Plaintiff has filed a brief opposition, and defendants have
filed a reply. For the reasons discussed below, the motion
for summary judgment is **GRANTED.**

### ANALYSIS

### A. *SUMMARY JUDGMENT STANDARD*

Summary judgment is proper where the pleadings,
discovery and affidavits show that there is "no genuine
issue as to any material fact and that the moving party
is entitled to judgment as a matter of law." Fed.R.Civ.P.
56(c). Material facts are those which may affect the
outcome of the case. *Anderson v. Liberty Lobby, Inc .,*
477 U.S. 242,248 (1986). A dispute as to a material fact is
genuine if there is sufficient evidence for a reasonable jury
to return a verdict for the nonmoving party.

The moving party for summary judgment bears the initial
burden of identifying those portions of the pleadings,
discovery and affidavits which demonstrate the absence of
a genuine issue of material fact. *Celotex Corp.v. Cattrett,*
477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265
(1986). When the moving party has met this burden of
production, the nonmoving party must go beyond the
pleadings and, by its own affidavits or discovery, set forth
specific facts showing that there is a genuine issue for trial.
If the nonmoving party fails to produce enough evidence
to show a genuine issue of material fact, the moving party
wins. *Ibid.*

### B. *PLAINTIFF'S CLAIM*

Plaintiff claims that defendants violated his First
Amendment rights by denying magazines he subscribed
to on the grounds that they violated the jail's policy
against sexuallyoriented material (Compl.3). Following
defendants' motion to dismiss for lack of exhaustion,
the portion of plaintiff's claim that remains concerns the
denial of three issues of *Maxim* magazine and one issue
of *GQ* magazine in February 2010 (*ibid.;* Toby Decl. ¶ 7,
Exh. B).

As an initial matter, it is noted that the only relief available
to plaintiff is for nominal damages. He seeks injunctive
relief directing the jail to return the confiscated magazines
to him and to change its policies against sexually-oriented
material (Compl.3–4). This request is moot because
defendants have returned the magazines to plaintiff now
that he is no longer in jail (Toby Decl. Exh. D), and his
release from the jail deprives him of standing to obtain
an injunction changing the jail's practice and procedures.
Plaintiff also seeks $5000 in damages "for denying his
First Amendment rights" (Compl.4). Plaintiff cannot
recover compensatory damages because the magazines
were returned to him, and damages for emotional or
mental injury are barred because there is no physical
injury, *see* 42 U.S.C.1997e(e). Punitive damages also

cannot be recovered against defendants because they are a municipality and a county official sued in his official capacity only. *See City of Newport v. Fact Concepts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) (prohibiting punitive damage recovery against municipality); *see also McMillan v. Monroe County,* 520 U.S. 781, 785 n. 2, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997) (county official sued in official capacity is same as suit against county). Thus, plaintiff's remaining claim is for nominal damages based on the denial of four magazines while he was in defendants' custody.

**\*2** Defendants argue that the jail policy prohibiting sexually-oriented materials and the denial of the four magazines pursuant to that policy was constitutional. The policy is described in detail in the order of dismissal. In addition to banning depictions of sexual acts and unclothed genitalia and female areolae, the policy bans pictures that have "the purpose of arousing sexual stimulation in its intended audience" if "there is a reasonable belief that the material will jeopardize safety, security, rehabilitation or other legitimate Facility interests, or create a hostile work environment of other violation of [federal laws against workplace discrimination]" (Toby Decl. Exh. A at 3, 5–6).

Imprisonment does not automatically deprive an inmate of certain important constitutional protections, including those of the First Amendment. *Beard v. Banks,* 548 U.S. 521, 527, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006). However, the Constitution does permit greater restriction of such rights in a prison than it would allow elsewhere. *Id.* at 527–30. Regulations limiting prisoners' access to publications or other information are valid only if they are reasonably related to legitimate penological interests. *Thornburgh v. Abbott,* 490 U.S. 401, 413, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); *see Mauro v. Arpaio,* 188 F.3d 1054, 1058–59 (9th Cir.1999) (en banc). This determination entails consideration of the four-factor test set forth in *Turner v. Safley,* 482 U.S. 78, 89–90, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987):(1) whether there is a rational relationship between the regulation and the proffered legitimate government interest; (2) whether inmates have alternative means of exercising their asserted rights; (3) how accommodation of the claimed constitutional right will affect guards, a prisoner's fellow inmates, and the allocation of prison resources; and (4) whether there are easy or obvious alternatives to the policy such that the policy is an "exaggerated response" to the prison's

concerns. *Ibid.* Courts owe "substantial deference to the professional judgment of prison administrators," and plaintiff bears the burden of proving that the regulations are not valid under the *Turner* factors. *Overton v. Bazzetta,* 539 U.S. 126, 132, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003).

Defendants have presented evidence, undisputed by plaintiff, of legitimate government interests rationally served by their policy against sexually-oriented materials in jail. This evidence indicates that sexually-oriented materials exacerbate sexual harassment of jail staff, especially female staff, which undermines important government interests in two ways: first, it creates a hostile work environment for the staff, in violation of federal employment laws, and second such harassment diminishes respect for and the authority of jail officers, which in turn increases inmate rule-breaking (Toby Decl. ¶ 8). In addition, defendants' evidence indicates that sexually stimulating materials can increase sexual aggression and non-consensual sex between inmates, and allows inmates to depersonalize past and potential future victims insofar as it depicts women or men as sex objects (*ibid.*).

**\*3** Federal courts have recognized these government interests as legitimate and rationally related to bans on sexually-oriented materials in prisons and jails. *See Bahrampour v. Lampert,* 356 F.3d 969, 976 (9th Cir.2004) (rational connection between sexually oriented materials and harmful inmate behavior such as sexual predation); *Mauro,* 188 F.3d at 1059 (reducing sexual harassment of guards and protecting their safety is legitimate and rationally related to ban on sexually oriented materials); *Dawson v. Scurr,* 986 F.2d 257 (8th Cir.1993) (rational relation between ban on pornography and curtailing sexual aggression by inmates). The courts have upheld bans that extend not only to overt depictions of sexual acts and unclothed genitalia, but also to sexually-oriented or stimulating materials similar to those denied in this case. *See Bahrampour,* 356 F.3d at 976 (upholding denial of issues of *Muscle Elegance* magazine); *Zarate v. Tilton,* 2009 U.S. Dist. LEXIS 14345, 2009 WL 311401 (N.D.Cal.2009) (Illston, J.) (upholding denial of issues of Maxim and Maxim Espanol magazine); *Ashker v. Schwarzenegger,* 2009 U.S. Dist. LEXIS 25092, 2009 WL 801557 (N.D.Cal.2009) (Wilken, J.) (upholding denial of art magazine *Juxtapoz* ); *Self v. Horel,* 2008 U.S. Dist. LEXIS 95623, 2008 WL 1925211 (N.D.Cal.2008) (upholding denial of "The Practical Guide to Drawing").

Under *Turner*'s second factor, defendants have presented unrefuted evidence that under their policy, inmates are allowed to exercise their rights under alternative means because they are allowed a broad range of magazines, articles and other publications, including ones about sex, as long as their purpose is not to sexually stimulate the recipient (Toby Decl. ¶ 4, Exh. A). *See Thornburgh,* 490 U.S. at 418 (when jail mail regulations restricting sexually-oriented otherwise materials permit a broad range of publications, the second *Turner* factor is satisfied). The third *Turner* factor is also satisfied because sexually-oriented material can easily be circulated among inmates, increase sexual harassment of guards and diminish their authority, and exacerbate the problem of sexual aggression and non-consensual sex among inmates. *See ibid.* (circulation of sexually-oriented materials produces precisely the kind of "ripple effect" that *Turner*'s third factor is designed to address).

Under *Turner*'s fourth factor, there is no evidence of easy or obvious alternatives to banning such publications. Defendants have presented evidence that redacting or cutting out all of the offending words and pictures in every magazine or publication received in the jail would be cost-prohibitive, and that under their current practice the magazines are returned unaltered to the inmates upon their release from jail (Toby Decl. ¶ 9). Plaintiff has presented no evidence to the contrary. As defendants' evidence tilts all of the *Turner* factors in favor of finding the jail's policy constitutional, and plaintiff presents no evidence to the contrary, there is no genuine issue of material fact as to whether the policy is constitutional.

**\*4** There is also no genuine issue of material fact as to whether the issues of *Maxim* and *GQ* denied in this case fall within the scope of defendants' policy. These magazines were not denied for explicitly depicting sexual acts or unclothed genitalia or the female areola, but rather on the grounds that they have "the purpose of arousing sexual stimulation in its intended audience" and jail officials had the "reasonable belief" that they would "jeopardize safety, security, rehabilitation or other legitimate Facility interests, or create a hostile work environment of other violation of [federal laws against workplace discrimination]" (Toby Decl. Exh. A at 3, 5–6; Exh. B).

The content of the magazines is not in dispute. They all contain pictures of women and some men in underwear,

bikinis, and tight and scant clothing revealing breasts and buttocks, as well as articles about sex, including:

• a picture of a woman on her hands and knees bending forward with her buttocks spread,

• pictures of a woman wearing only thigh-high stockings and underwear with an article about her "first stripper fight," "first girl-on-girl kiss," "first S & M scene," and "first phone sex attempt,"

• a picture of a woman in lace-up and see-through bra and "thong" underwear with her buttocks raised,

• a picture of a woman without a top or bra pulling down her underwear,

• a picture of a woman lying in a tub with her legs spread open wearing see-through lingerie;

• advertisements for "Girls Gone Wild!" videos,

• a feature called "Sex" advising men on how to be sexually unfaithful to their partners;

• pictures of a woman kneeling on the floor and draped over a chair with her bottom out wearing only lace underwear and exposing parts of her breasts;

• pictures of a man wearing only underwear, with his legs spread and his crotch in the foreground, and another man holding the inner thigh of a model in short shorts with her shirt off of her shoulder, and

• pictures of a topless woman draped over and preparing to kiss a man in a suit (Toby Decl. Exh. B). The foregoing material has the purpose of "arousing sexual stimulation" and, for the reasons discussed under the *Turner* factors, can "reasonably" be found to jeopardize the safety of the jail and/or create a hostile work environment (*id.* Exh. A). No reasonable factfinder can dispute that the *Maxim* and *GQ* magazines denied to plaintiff were prohibited under the terms of the jail policy.

Plaintiff's only argument in opposition is that the jail may not ban materials that do not depict sexual intercourse or unclothed genitalia unless the materials have "no literary content and is only specifically meant to arouse" (Opp.1–2). He gives as examples an underwear and lingerie

catalogue from *Victoria's Secret* and the *Sports Illustrated* swimsuit issue, and he argues that because some people might not be sexually stimulated by them, they may not be prohibited under the First Amendment (*ibid.*) Plaintiff does not cite to any authority for this proposition, nor is there any. *Thornburgh, Mauro,* and *Bahrampour* and their progeny do not hold that a prison may only ban materials that are universally perceived as sexually stimulating. Under the case law cited above, materials whose purpose is to sexually stimulate the intended recipients may be banned from a jail without offending the First Amendment, regardless of whether there are some individuals who may not be stimulated by them.

**\*5** There is no genuine dispute of material fact as to whether the four magazines were denied pursuant to the jail policy, and there is no genuine issue of material fact as to whether the policy was constitutional under the four factors outlined in *Turner.* Consequently, defendants are entitled to summary judgment on plaintiff's claim.

## CONCLUSION

Defendants' motion for summary judgment (docket number 22) is **GRANTED.** The Clerk shall enter judgment and close the file.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1007292

---

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 1098365
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas,
Houston Division.

William Denton WOODS, Plaintiff,
v.
DIRECTOR'S REVIEW
COMMITTEE, et al., Defendants.

Civil Action No. H–11–1131.
|
March 30, 2012.

**Attorneys and Law Firms**

William Denton Woods, Huntsville, TX, pro se.

Patrick Brezik, Office of the Attorney General, Austin, TX, for Defendants.

### *MEMORANDUM AND ORDER*

NANCY F. ATLAS, District Judge.

**\*1** The plaintiff, William Denton Woods (TDCJ # 654317), is an inmate incarcerated in the Texas Department of Criminal Justice—Correctional Institutions Division (collectively, "TDCJ"). Woods has filed a civil rights complaint under 42 U.S.C. § 1983, alleging that he was wrongfully denied correspondence that contained "sexually provocative" photographs. The defendants (TDCJ Director Brad Livingston and Prison Mailroom Supervisor Nancy Alger) have filed a motion for summary judgment [Doc. # 20]. Woods has filed a response [Doc. # 22]. After considering all of the pleadings, the evidence, and the applicable law, the Court grants the defendants' motion and dismisses this case for the reasons that follow.

### I. *BACKGROUND*

Woods, who is incarcerated at the Wynne Unit in Huntsville, Texas, complains that the Unit Mailroom Supervisor (Officer Alger) refused to allow him to receive correspondence which, according to Woods, contained twenty "photographs of scantily clad females in sexually provocative poses" [Doc. # 8, at 1]. Woods explains that he purchased the photographs from a "pen pal" business called "South Beach Singles," in Miami, Florida. Woods attached to his more definite statement two brochures that contain miniature versions of the selection of photographs that he ordered [Doc. # 8–4—sealed]. The Clerk's Office has restricted public access to the brochures because of their explicit sexual content.

Woods claims that Officer Alger "unfairly denied" him the photographs because they were "altered" and therefore violated the TDCJ Correspondence Rules. Woods appealed Officer Alger's decision to the "Director's Review Committee," which was established to hear prisoner grievances about the TDCJ Correspondence Rules. The Director's Review Committee upheld Officer Alger's decision, but for a different reason. The Director's Review Committee found that Woods was not entitled to the photographs under a provision found in the Correspondence Rules that prohibits inmates from receiving "sexually explicit" images in the mail.

Although Woods acknowledges that the TDCJ Correspondence Rules prohibit "sexually explicit images" that feature "frontal nudity," including "exposed female breasts," or genitalia of either gender, he asserts that the correspondence was wrongfully denied because the photographs that he ordered were "photo-shopped" or blurred in such a way as to disguise or "cover up any exposed nudity." Accordingly, Woods maintains that the digitally altered photographs were not so sexually explicit that they violated the TDCJ Correspondence Rules. As relief in this case, Woods requests the pictures that he ordered and the costs of this suit.

The court ordered the defendants to answer the complaint, and the defendants moved to dismiss on the grounds that Woods had failed to exhaust available administrative remedies as required by 42 U.S.C. § 1997e(a), with respect to his claims. The court denied the motion, without prejudice, and granted the defendants sixty days in which to file either an amended motion to dismiss or a motion for summary judgment [Doc. # 19]. The defendants have filed a motion for summary judgment [Doc. # 20] in which they argue: (1) Livingston had no personal involvement in the alleged constitutional violation; (2) both Livingston and Alger are entitled to qualified immunity;(3) the blurred pornography was properly withheld from Woods; and (4) the defendants are entitled to immunity under the Eleventh Amendment.

## II. *STANDARD OF REVIEW*

**\*2** The defendants' motion is governed by Rule 56 of the Federal Rules of Civil Procedure, which mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc); *see also Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir.2002). In that respect, a reviewing court must determine whether the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2); *Celotex Corp.,* 477 U.S. at 322–23; *Weaver v. CCA Indus., Inc.,* 529 F.3d 335, 339 (5th Cir.2008).

For summary judgment, the initial burden falls on the movant to identify areas essential to the nonmovant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna,* 401 F.3d 347, 349 (5th Cir.2005). The moving party, however, need not negate the elements of the non-movant's case. *Boudreaux v. Swift Transp. Co.,* 402 F.3d 536, 540 (5th Cir.2005). The moving party may meet its burden by pointing out " 'the absence of evidence supporting the nonmoving party's case.' " *Duffy v. Leading Edge Products, Inc.,* 44 F.3d 308, 312 (5th Cir.1995) (quoting *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 913 (5th Cir.1992)).

If the moving party meets its initial burden, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Littlefield v. Forney Indep. Sch. Dist.,* 268 F.3d 275, 282 (5th Cir.2001) (internal citation omitted). The nonmovant must do more than simply show that there is some "metaphysical doubt" as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" *DIRECTV Inc. v. Robson,* 420 F.3d 532, 536 (5th Cir.2006)

(internal citations omitted). In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party. *Matsushita Elec. Co.,* 478 U.S. at 587–88; *see also Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.,* 336 F.3d 410, 412 (5th Cir.2003). However, factual controversies are resolved in favor of the non-movant "only 'when both parties have submitted evidence of contradictory facts.' " *Alexander v. Eeds,* 392 F.3d 138, 142 (5th Cir.2004) (quoting *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir.1999)).

**\*3** The plaintiff proceeds *pro se* in this case. Courts construe pleadings filed by *pro se* litigants under a less stringent standard than those drafted by attorneys. *See Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *Bledsue v. Johnson,* 188 F.3d 250, 255 (5th Cir.1999). Pleadings filed by a *pro se* litigant are entitled to a liberal construction that affords all reasonable inferences which can be drawn from them. *See Haines,* 404 U.S. at 521; *see also United States v. Pena,* 122 F.3d 3, 4 (5th Cir.1997) (citing *Nerren v. Livingston Police Dept.,* 84 F.3d 469, 473 & n. 16 (5th Cir.1996)). Nevertheless, "the notice afforded by the Rules of Civil Procedure and the local rules" is considered "sufficient" to advise a *pro se* party of his burden in opposing a summary-judgment motion. *See Martin v. Harrison County Jail,* 975 F.2d 192, 193 (5th Cir.1992).

## III. *DISCUSSION*

**A. No Showing of Personal Involvement—Brad Livingston**
Woods names TDCJ Director Brad Livingston as a defendant; however, he does not present any facts which indicate how or if Livingston was personally involved in the alleged denial of blurry pornography. To assert a claim under section 1983, a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law. *Moore v. Willis Independent School Dist.,* 233 F.3d 871, 874 (5th Cir.2000), *citing Lefall v. Dallas Independent School District,* 28 F.3d 521, 525 (5th Cir.1994). To state a claim against a defendant in his individual capacity, there must be a showing of personal involvement. *Anderson v. Pasadena Independent School Dist.,* 184 F.3d 439, 443 (5th Cir.1999). Naming a person who had no direct contact with the plaintiff will not

suffice even if that person is alleged to have supervisory authority over other officials who may have had some interaction with the plaintiff. *Id.* Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.* *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009) Woods fails to assert a claim against Livingston because he has not identified any overt act by Livingston or policy implemented by Livingston which resulted in a constitutional deprivation. *Porter v. Epps,* 659 F.3d 440, 446 (5th Cir.2011). Therefore, Livingston shall be dismissed from this proceeding because there are no allegations or facts showing that he was involved in any violation of Woods's constitutional rights. *Rios v. City of Del Rio, Tex.,* 444 F.3d 417, 425 (5th Cir.2006).

**B. Qualified Immunity**

Both Alger and Livingston have asserted the affirmative defense of qualified immunity in their motion for summary judgment which alters the burden of proof in a summary judgment proceeding. *See Brown v. Callahan,* 623 F.3d 249, 253 (5th Cir.2010). Woods now must negate the qualified immunity defense. *Id.* "The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." *Morgan v. Swanson,* 659 F.3d 359, 370 (5th Cir.2011). It protects "all but the plainly incompetent or those who knowingly violate the law." *Id., quoting Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). Accordingly, the court will determine: (1) whether Woods has presented or alleged facts which establish a violation of a constitutional right, and (2) whether that right was "clearly established" at the time of the alleged misconduct. *Ontiveros v. City of Rosenberg, Tex.,* 564 F.3d 379, 382 (5th Cir.2009). *See also Manis v. Lawson,* 585 F.3d 839, 843 (5th Cir.2009); *Simmons v. City of Paris, Tex.,* 378 F.3d 476, 479 (5th Cir.2004), *citing Glenn v. City of Tyler,* 242 F.3d 307, 312 (5th Cir.2001). The defendants are entitled to qualified immunity unless their conduct violated a clearly established constitutional right. *Id. See also Morgan,* 659 F.3d at 371–372. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

**\*4** Woods contends that the defendants have denied him the right to possess and view photographs that

were made and sold for their sexual content. The TDCJ Board has promulgated a policy regarding prisoner correspondence, BP–03.91 [Doc. # 20–1 at pages 3–15]. The policy contains language addressing the receipt of sexually explicit materials. *Id.* at 11, 13. The policy unequivocally states that all incoming correspondence, including photographs, shall be disapproved for receipt if it contains a "sexually explicit image". *Id.* at 11. It also states that a publication may be rejected because "it contains sexually explicit images." *Id.* at 13. The TDCJ Correspondence Rules evolved after a lengthy class action lawsuit regarding restrictions on inmate mail. *See Guajardo v. Estelle,* 432 F.Supp. 1373 (S.D.Tex.1977). The district court's decision was affirmed in part and reversed in part by the Fifth Circuit which held that prison administrators may ban sexually explicit publications including materials which were not judicially declared to be obscene. *Guajardo v. Estelle,* 580 F.2d 748, 761–62 (5th Cir.1978). The Correspondence Rules were established under a settlement agreement that was approved in this district. *See Guajardo v. Estelle,* 568 F.Supp. 1354, 1364 (S.D.Tex.1983). TDCJ's policy of screening and governing sexually oriented materials had been upheld by the United States Court of Appeals for the Fifth Circuit. *Thompson v. Patterson,* 985 F.2d 202, 206 (5th Cir.1993), *citing Guarjardo v. Estelle,* 540 F.2d 748 (5th Cir.1978). Specifically, the Fifth Circuit found that TDCJ could withhold sexually oriented materials from inmates on the basis that the materials were detrimental to the inmates' rehabilitation as well as the order and stability of the prisons. *Id.*

Woods contends that he should be allowed to have the pictures because certain parts have been photo-shopped; however, he does not deny their sexual content. He does not cite any cases in which prison officials were held to have violated a prisoner's rights by withholding blurred images. To defeat the defendants' defense of qualified immunity, Woods must show that the complained of behavior was so clearly proscribed that any official would have known it was a violation of the law. *Morgan,* 659 F.3d at 371–372. Under *Thompson* and *Guajardo,* a prison official could have determined that withholding the images was permissible. Having found no clear statement which specifically prohibits the confiscation of blurred pornography, the Court concludes that the defendants are entitled to qualified immunity. *Id.*

**C. Denial of Pornography—Nancy Alger**

Alger contends that the withholding of the photographs was proper and was not a constitutional violation. Although prisoners do have First Amendment rights to receive publications, their rights are limited by the legitimate objectives and needs of the prison systems in which they are incarcerated. *Shaw v. Murphy,* 532 U.S. 223, 229, 121 S.Ct. 1475, 1479, 149 L.Ed.2d 420 (2001), *citing Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). As noted in the previous section, prison officials are authorized to screen incoming mail and remove items which contain explicit sexual content. *Thompson,* 985 F.2d at 207. Moreover, the officials are accorded some discretion in determining which materials are acceptable. *Beard v. Banks,* 548 U.S. 521, 528, 126 S.Ct. 2572, 2577–2578, 165 L.Ed.2d 697 (2006) To do otherwise would possibly result in more rigid restrictions against incoming materials. *Thornborough v. Abbott,* 490 U.S. 401, 417, 109 S.Ct. 1874, 104 L.Ed.2d 459 n .15, 490 U.S. 401, 109 S.Ct. 1874, 1883 n. 15, 104 L.Ed.2d 459 (1989).

**\*5** As Woods concedes, Board Policy 03.91 of the TDCJ Correspondence Rules prohibits receipt of sexually explicit publications or images. *See Moore v. Dretke,* Civil No. H–05–0213, 2006 WL 1663758, \*4 (S.D.Tex. June 14, 2006) (explaining that, as of June 1, 2004, offenders are no longer permitted to receive sexually explicit photographs, among other things, in the mail). The intent of Board Provision 03.91 "is to encourage a rehabilitative environment for offenders and to discourage sexual harassment of staff." *Id.; see also Mauro v. Arpaio,* 188 F.3d 1054, 1059 (9th Cir.1999) (recognizing that, in addition to the legitimate interests in rehabilitation and security, the prohibition of sexually explicit materials also protects the safety of correctional officers in general and reduces sexual harassment of female officers employed at the prison).

Woods admits that he was aware of the policy against sexually oriented materials, but he contends that the images he bought should not have been banned because they were photo-shopped. To avoid becoming hopelessly entangled in the day-to-day affairs of the prisons, the courts generally defer to the prison administrators' judgment in determining whether a publication or picture is suitable for inmate correspondence. *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2262, 96 L.Ed.2d 64 (1987). With this in mind, the court has examined the brochures submitted by Woods [Doc. # 8–4—sealed].

Without going into a detailed description of the images in the brochures, the court notes that most of the photographs depict female nudes or partial nudes whose poses feature their genitalia. In short, the pictures are a clear appeal to the prurient interest in sex despite Woods's insistence that the sexual organs are supposed to be covered. There is no disagreement that Woods purchased the images for their erotic content, and it is equally clear that some individuals might consider them to be sexually obscene. *See Miller v. California,* 413 U.S. 15, 24, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973); *Ginzburg v. United States,* 383 U.S. 463, 471, 86 S.Ct. 942, 947–48, 16 L.Ed.2d 31 (1966). There is also no question that Alger, or any other official involved in the censorship process, was authorized to withhold the photographs and that the denial of the photographs was not a constitutional violation. *Thompson,* 985 F.2d at 206. Therefore, Alger is entitled to be dismissed from this action because there is no evidence showing that she violated Woods's constitutional rights.

### D. Eleventh Amendment

The defendants have asserted immunity under the Eleventh Amendment against claims made against them in their official capacities. Such claims are actually suits against the governmental entities who employ the defendants. *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). The defendants have correctly stated that the Eleventh Amendment bars any monetary claims brought against them in their official capacities. *Cozzo v. Tangipahoa Parish Council—President Government,* 279 F.3d 273, 280–81 (5th Cir.2002); *Oliver v. Scott* 276 F.3d 736, 742 (5th Cir.2002). However, the Eleventh Amendment does not bar suits for injunctive relief. *Meza v. Livingston,* 607 F.3d 392, 412 (5th Cir.2010). *See also Union Pacific R. Co. v. Louisiana Public Service Com'n,* 662 F.3d 336, 340 n. 5 (5th Cir.2011). To prevail in an official capacity suit, Woods must show that the government entity is the moving force behind the violation. 473 U.S. 159, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 To do so, Woods must identify: (1) a policy (2) of the policy maker (3) that caused the plaintiff (4) to be subjected to a deprivation of his constitutional rights. *Grandstaff v. City of Borger,* 767 F.2d 161, 169 (5th Cir.1985). At the least, the plaintiff must present specific facts showing a pattern of violations in order to prevail on a claim against a defendant in his official capacity. *Spiller v. City of Texas City,* 130 F.3d 162, 167 (5th Cir.1997); *Frare v. City of Arlington,* 957 F.2d 1268, 1278 (5th

Cir.1992). First, Woods has only identified an isolated incident. Such facts do not support an official capacity claim under § 1983. *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985); *Bigford v. Taylor,* 834 F.2d 1213, 1220 (5th Cir.1988). Of greater significance is the fact that the policy behind the withholding of the photographs has been upheld by the courts. Therefore, any official capacity claims are subject to dismissal because Woods has failed to present any evidence of a policy which denied him his constitutional rights.

**\*6** The defendants presented evidence clearly demonstrating that there is no genuine issue of dispute regarding the withholding of the photographs that Woods purchased. No constitutional violation occurred. The motion for summary judgment [Doc. # 20] shall be granted, and this action shall be dismissed under FED. R. CIV. P. 56.

## IV. CONCLUSION AND ORDER

Based on the foregoing, the Court **ORDERS** as follows:

1. The defendants' motion for summary judgment [Doc. # 20] is **GRANTED.**

2. The prisoner civil rights complaint is **DISMISSED** with prejudice.

The Clerk shall provide a copy of this order to the parties.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 1098365

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.